# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL DIGITAL INCLUSION ALLIANCE,
3000 E Main Street #50
Columbus, OH 43209

Plaintiff,

v.

PRESIDENT DONALD J. TRUMP,  The White House, 1600 Pennsylvania Avenue, NW, Washington, DC 20500,  U.S. DEPARTMENT OF COMMERCE, HOWARD LUTNICK, *in his official capacity as Secretary Of Commerce*, U.S. Department of Commerce, 1401 Constitution Ave., NW, Washington, DC 20230,  NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION, ARIELLE ROTH, *in her official capacity as Assistant Secretary Of Commerce For Communications And Information*, U.S. Department of Commerce, 1401 Constitution Avenue, NW, Washington, DC 20530, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, CRAIG BURKHARDT, *in his official capacity as Acting Director of National Institute Of Standards And Technology*, 100 Bureau Dr., Stop 1070, Gaithersburg, MD 20899-1070, OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT, *in his official capacity as Director of Office Of Management And Budget*, 725 17th Street NW, Washington, DC 20503,

Defendants.

Case No.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**JURY TRIAL REQUESTED**

## INTRODUCTION

1.      Plaintiff, the National Digital Inclusion Alliance ("NDIA"), brings this lawsuit to challenge the unilateral repeal by the Executive Branch of the Digital Equity Competitive Grant Program, which Congress required under the Digital Equity Act of 2021 (the "Act").  Pub. L. No. 117-58, div. F, tit. III, §§ 60301-60307, 135 Stat. 1210-31 (Nov. 15, 2021) (codified at 47 U.S.C. §§ 1721-1726).  Congress duly enacted the Act under its powers under the Constitution's Article I, Section I.

2.      Congress enacted the Digital Equity Act to close the "digital divide" between those who have affordable access, skills, and support to effectively engage online and those who do not.  And still, nearly one-third of Americans lack a reliable fixed home connection.[1]

3.      As then-Chairman of the Federal Communications Commission ("FCC") Ajit Pai told an audience at the Ronald Reagan Presidential Library in 2017, "[i]n urban areas, only 2% of residents lack access to high-speed fixed [internet] service.  In rural areas, over one-quarter don't have it.  93% of Americans earning more than $75,000 have home broadband service.  Barely half of those making less than $30,000 do."[2]

4.      Then-Chairman Pai recognized that "[e]ach percentage point on the wrong side of the [digital] divide represents hundreds of thousands of personal stories" of the millions of Americans who cannot participate fully and equally in fundamental aspects of society or access crucial goods, services, and opportunities.  Closing this "digital divide" has been a key, bipartisan priority for decades, furthered through action by Congress and statutory programs and

---

[1] *See, e.g.*, U.S. Gov't Accountability Off., *Closing the Digital divide for Millions of Americans without Broadband* (Feb, 1, 2023) https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband.

[2] Chairman Ajit Pai, Fed. Commc'ns Comm'n, *Morning in Digital America,* Remarks at the Ronald Reagan Presidential Library, Simi Valley, Cal. (Oct. 10, 2017) https://docs.fcc.gov/public/attachments/DOC-347182A1.pdf.

appropriations to create infrastructure, subsidize affordable access, and provide digital literacy training.

5.      Those on the "have not" side of the digital divide cannot use modern telemedicine services, educational resources, or even apply for the 90% of jobs found only online.  These Americans are cut off from avenues for personal expression, economic advancement, and social interaction.  Further, as more critical resources are exclusively offered online—including local news, election guidance, public services, and even public safety alerts—these Americans are at risk of being literally and figuratively left behind.

6.      Congress recognized the severe consequences of the digital divide when it passed the Digital Equity Act, appropriating $2.75 billion dollars to be distributed through grant programs to close the digital divide specifically for "communities that have not yet secured the skills, technologies, and support needed to take advantage of broadband connection."[3]  In doing so, Congress specifically required the Department of Commerce to establish and implement the Competitive Grant Program "to award grants to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations." 47 U.S.C. § 1724(a).

7.      "Equity" as intended by the Digital Equity Act was not intended to, nor does it favor a race or a gender; its goal is to provide critical broadband internet access to Americans— all of them.  Similarly, the "digital divide" Congress sought to address in the Act is not an issue of race or gender; it references the fact that millions of Americans—of all races and genders—do not have access to the internet and other digital services.

---

[3] 167 Cong. Rec. S5684 (Aug. 3, 2021) https://www.congress.gov/117/crec/2021/08/03/167/138/CREC-2021-08-03-pt1-PgS5683-9.pdf (statement of Sen. Collins).

8.    Congress ensured Digital Equity Act Competitive Grant resources would also serve eight "covered populations" that include groups with lower rates of broadband internet adoption than the national average.  In most states, the largest shares of "covered populations" are residents of rural areas, and low-income Americans.

9.    These categories are broad—over 80 percent of Americans fall within at least one of the "covered populations"—to capture the wide array of circumstances that contribute to the digital divide, including age, geography, household income, disability, veteran status, language barriers, and ethnicity or race.

10.    Congress also expressly prohibited discrimination under the Digital Equity Act, and the "digital equity" or "digital inclusion" activities it authorizes.  *See id*. at § 1726(a)(1): ("No individual in the United States may, on the basis of actual or perceived race, color, religion, national origin, sex, gender identify, sexual orientation, age, or disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any Digital Equity Act program).

11.    Plaintiff NDIA, a leading voice in the fight for digital equity, was awarded a $25.7 million grant under the Competitive Grant Program in January 2025.  The grant would have funded provision of low or no-cost devices and a cohort of "digital navigators" to assist individuals with accessing low-cost reliable broadband, identifying local online resources, and using digital tools to fulfill basic needs.

12.    Then came the sea of change: on January 20 and 21, 2025, President Trump signed Executive Orders 14151 ("EO 14151") and 14173 ("EO 14173").  Both EO 14151 and EO 14173 generally direct all executive departments and agencies to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance,

regulations, enforcement actions, consent orders, and requirements."  EO 14151 and EO 14173

characterize "diversity, equity and inclusion" and "diversity, equity, inclusion, and accessibility"

programs inaccurately as "discriminatory" and "illegal."

13.     Enforcement of the new anti-equity policy quickly followed.  On April 9, 2025, an

NTIA Federal Program Officer emailed NDIA a message with the subject line "Digital Equity

Act of 2021 Grant Programs: Alignment with Executive Order 14151 for Conferences, Trainings,

and other Activities," which NDIA understood included its national conference, "Net Inclusion,"

proposed as part of NDIA's grant performance under the Competitive Grant Program.[4]  The April

9 Email stated that "any costs associated with diversity, equity, and inclusion conferences,

trainings, and/or professional development are not allowable."  This email aligning

reimbursement for federal funds with the Executive Branch's new anti-equity policy made no

reference to the constitutionality of the Competitive Grant Program.

14.     One month later, on May 8, 2025, the President posted to the social media

platform Truth Social claiming that the Digital Equity Act is an "UNCONSTITUTIONAL"

"woke handout[] based on race" and "a RACIST and ILLEGAL $2.5 BILLION DOLLAR

GIVEAWAY."[5]

15.     The day after the President's post declaring the Digital Equity Act

unconstitutional, NDIA received a notice that its award and the Competitive Grant Program had

---

[4] Email from NTIA to NDIA re: *Digital Equity Act of 2021 Grant Programs: Alignment with Exec. Order No. 14151 for Conferences, Trainings, and other Activities* (Apr. 9, 2025) (on file with counsel) (hereinafter, the "April 9 Email").

[5] President Donald J. Trump (@realdonaldtrump), Truth Social (May 8, 2025 at 04:38 pm ET) https://truthsocial.com/@realDonaldTrump/posts/114474136573150113 (archived from the original at https://web.archive.org/web/20250000000000*/https://truthsocial.com/@realDonaldTrump/posts/114474136573150113).

been terminated in its entirety, adopting the President's wholescale misunderstanding of the Act.[6]

The May 9 Letter espouses a final, unappealable determination, without any supporting facts, reasoning, or analysis, that all Competitive Grant Program awards "were created with, and administered using, impermissible and unconstitutional racial preferences."[7]

16.    But just as diversity, equity, and inclusion are not illegal, the Digital Equity Act is not racist, illegal, or unconstitutional.

17.    Defendants' defiance of Congress's clear will by eliminating an entire statutory scheme based on a policy set forth in EO 14151 and EO 14173 violates the separation of powers, infringes Congress's spending power under Article I, usurps the power delegated to the Courts under Article III, and far exceeds the constitutional authority of the Executive Branch.

18.    NDIA brings this lawsuit to stop these flagrant constitutional violations, that severely undermine Congress's efforts and intent to close the digital divide in an age where internet access is a critical necessity.

19.    Primary among the relief sought by Plaintiff is a declaratory judgment that the Digital Equity Act's Competitive Grant Program is a constitutional and lawful act of Congress, and therefore, that the Executive Branch's elimination of that congressionally authorized Program is unconstitutional and unlawful.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under federal laws and the U.S. Constitution.  Jurisdiction is also proper under the

---

[6] Letter from NIST to NDIA re: *NTIA Award Number 39-32-DC150: Digital Equity Competitive Grant* (May 9, 2025) (on file with counsel) (hereinafter, the "May 9 Letter").

[7] *Id.*

judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, 706, and through the equitable powers of this Court.

21.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1), because defendants are agencies or officers of the United States sued in their official capacity and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Columbia.

## PARTIES

22.     Plaintiff **National Digital Inclusion Alliance ("NDIA")** is a not-for-profit 501(c)(3) organization based in Columbus, Ohio.  NDIA's mission is to "advance digital equity by supporting community programs and equipping policymakers to act."  As a part of this mission, NDIA planned to use federal grants to address digital inequities experienced by communities across the country.  NDIA provides training for individuals to become digital navigators—community-embedded digital case workers.  NDIA also ran its own National Digital Navigator Corps program, which has helped approximately 6,506 people across fifteen (15) states and seven (7) Tribal territories by teaching digital skills, aiding individuals in identifying and accessing affordable internet services, and distributing free or low-cost computing devices. NDIA received an award under the Competitive Grant Program, and otherwise intends to apply for and receive such Digital Equity Act grant funding in the future, should the Program be restored.

23.     Defendant **President Donald J. Trump** is the President of the United States.  He is sued in his official capacity.

24.     Defendant **U.S. Department of Commerce ("Commerce" or the "Agency")** is an executive department of the United States Government.  It houses and oversees Defendants National Institute of Standards and Technology and National Telecommunications and

Information Administration.  Commerce oversees the deployment of broadband infrastructure across the United States under the Digital Equity Act.

25.     Defendant **Howard Lutnick** is the Secretary of Commerce.  He is sued in his official capacity.  As Secretary, he is responsible for all aspects and operation and management of Commerce, including implementing Commerce's duties under federal law.

26.     Defendant **National Telecommunications and Information Administration ("NTIA")** is an agency with the Department of Commerce.  NTIA advises the President on telecommunications and information policy issues, and supports a mission that ensures that affordable, reliable high-speed internet service is available to everyone in America.  NTIA is responsible for administering the Digital Equity Competitive Grant Program and released the notice of funding opportunity ("NOFO") thereunder.

27.     Defendant **Arielle Roth** is the Assistant Secretary of Commerce for Communications and Information.  She is responsible for implementing the Digital Equity Act provisions, including the Competitive Grant Program, and is statutorily required to do so.

28.     Defendant **National Institute of Standards and Technology ("NIST")** is a component of the Department of Commerce.  NIST assists NTIA with grants management under the Competitive Grant Program.

29.     Defendant **Craig Burkhardt** is the Acting NIST Director.  He is sued in his official capacity.  As the Acting NIST Director, he is responsible for the NIST's overall strategy and operations.

30.     Defendant **Office of Management and Budget ("OMB")** is directed to implement executive orders in various ways, which OMB has proceeded to do.

31.     Defendant **Russell Vought** is the Director of the Office of Management and Budget.  He is sued in his official capacity.  Director Vought and OMB are responsible for implementing EO 14151 and EO 14173.

32.     Commerce, NIST, NTIA, OMB, Secretary Lutnick, Assistant Secretary Roth, Acting NIST Director Burkhardt, and Director Vought, are collectively the "Agency Defendants."

## FACTUAL ALLEGATIONS

### Congress' Commitment to Addressing the Digital Divide

33.     The "digital divide" is the gap between those who have affordable access, skills, and support to effectively engage online and those who do not.  As employment, education, healthcare, and commerce move increasingly into digital spaces, the digital divide prevents excluded individuals from equal participation and opportunity in all parts of life.

34.     Today, having access to the internet and other digital services provide avenues to "communicate with family and friends, perform daily chores, conduct business, and learn about and comment on current events," as the Supreme Court observed in *Moody v. NetChoice, LLC,* 603 U.S. 707, 767 (2024).  Reflective of that, most job openings are posted exclusively online, and over 92 percent of job openings require digital skills.[8]  Most home sales and rental listings are also found online, and over 50 percent of homebuyers find their homes online.  Online access is also necessary for a significant amount of school coursework and academic enrichment activities, as well as electronic medical care.

---

[8] Elizabeth Bogue, Baseline for Work: 92 Percent of Jobs Require Digital Skills, Fed. Reserve Bank of Atlantic: Partners Update (Aug. 10, 2023) https://www.atlantafed.org/community-development/publications/partners-update/2023/08/10/baseline-for-work-92-percent-of-jobs-require-digital-skills.

35.    However, millions of Americans lack reliable broadband access and the essential services it provides, including telehealth, academic resources, job training, news services, and community engagement.[9]

36.    Congress has a long-standing history of recognizing the digital divide and the importance of **every American** having access to technology and telecommunications services. Nearly a century ago, for example, Congress charged the Federal Communications Commission with making communications services available, at affordable prices, to all Americans.

37.    Congress has re-emphasized this commitment over the ensuing decades, most recently with the passage of the Digital Equity Act, which created grant programs to "help communities that have not yet secured the skills, technologies, and support needed to take advantage of broadband connection."[10]   These programs were critical because, as Congress found, "[a]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States[,]" 47 U.S.C. § 1701(1) (2021), and a lack of access to the internet "is a barrier to the economic competitiveness of the United States."  *Id.* at § 1701(2).

**The Digital Equity Act and the Digital Equity Competitive Grant Program**

38.    This dispute concerns the Digital Equity Act of 2021 (the "Act").  Pub. L. No. 117-58, div. F, tit. III, §§ 60301-60307, 135 Stat. 1210-31 (Nov. 15, 2021), codified at 47 U.S.C. §§ 1721-26; *see also* Pub. L. No. 117-58, div. J, tit. II, 135 Stat. 1354 (appropriating funds to carry out the Act).  Congress duly enacted the Act under its powers under the Article I, Section I of the U.S. Constitution.

---

[9] U.S. Gov't Accountability Off., *Closing the Digital divide for Millions of Americans without Broadband* (Feb, 1, 2023) https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband.

[10] 167 Cong. Rec. S5684 (Aug. 3, 2021) https://www.congress.gov/117/crec/2021/08/03/167/138/CREC-2021-08-03-pt1-PgS5683-9.pdf (statement of Sen. Collins).

39.    Congress passed the Act in response to its belief that "achieving digital equity is a matter of social and economic justice" worth pursuing because digital services enable Americans to "participate in the society, economy, and civic institutions" of the U.S.; "access health care and essential services, obtain education, and build careers;" and address "wealth and income gaps" faced by groups without internet access.  47 U.S.C. § 1722(1), (2), (5).

40.    Congress expressly found that "a broadband connection and digital literacy are increasingly critical to how individuals […] participate in the society, economy, and civic institutions of the United States; and […] access health care and essential services, obtain education, and build careers[.]"  *Id.* at § 1722(1).  The Act defines the term "digital literacy" as "the skills associated with using technology to enable users to find, evaluate, organize, create, and communicate information."  *Id.* at § 1721(12).

41.    The Act defines digital equity as "the condition in which individuals and communities have the information technology capacity that is needed for full participation in the society and economy of the United States."  *Id.* at § 1721(10).  And the Act defines "digital inclusion" as "the activities that are necessary to ensure that all individuals in the United States have access to, and the use of, affordable information and communication technologies, such as […] reliable fixed and wireless broadband internet service; [and] internet-enabled devices that meet the needs of the user[.]"  *Id.* at § 1721(11).  It includes, among other things, "obtaining access to digital literacy training" and "quality technical support."  *Id*.

42.    The Act requires Commerce to create the Digital Equity Competitive Grant Program (the "Competitive Grant Program").  *Id*. at § 1724 ("the Assistant Secretary ***shall*** establish in the Department of Commerce the Digital Equity Competitive Grant Program") (emphasis added).  Through the Competitive Grant Program, Commerce must "award grants to

support efforts to achieve digital equity, promote digital inclusion activities, and spur greater

adoption of broadband among covered populations." *Id.* at § 1724(a)(1).

43.   "Covered populations," according to the Act, are persons who are aging,

incarcerated in non-federal facilities, veterans, low-income, disabled, facing a language barrier

(i.e., English learners or people with a low level of literacy), members of any racial or ethnic

minority group, and residents of rural areas. *Id.* at § 1721(7)-(8).

44.   The Act required Commerce to award grants under the Competitive Grant

Program for at least one of the following needs:

> (i) To develop and implement digital inclusion activities that benefit covered populations.
>
> (ii) To facilitate the adoption of broadband by covered populations in order to provide educational and employment opportunities to those populations.
>
> (iii) To implement, consistent with the purposes of this subchapter-
>
>> (I) training programs for covered populations that cover basic, advanced, and applied skills; or
>>
>> (II) other workforce development programs.
>
> (iv) To make available equipment, instrumentation, networking capability, hardware and software, or digital network technology for broadband services to covered populations at low or no cost.
>
> (v) To construct, upgrade, expend, or operate new or existing public access computing centers for covered populations through community anchor institutions.
>
> (vi) To undertake any other project and activity that the Assistant Secretary finds to be consistent with the purposes for which the Program is established.

*Id.* at § 1724(d)(2)(A).

45.   The Digital Equity Act, and the Competitive Grant Program, are constitutional.

The Act does not preclude the use of Competitive Grant Program funds on persons who are not

part of a "covered population," meaning that the Program is open to everyone regardless of whether they are a member of one of the many groups that fall under the definition of a "covered population." *See id.* at § 1724(d), (f).

46.    Further, the Act strictly forbids discrimination in any "digital equity" or "digital inclusion" activity. *See id*. at § 1726(a)(1) ("No individual in the United States may, on the basis of actual or perceived race, color, religion, national origin, sex, gender identity, sexual orientation, age, or disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any Digital Equity Act program).

47.    Moreover, the statute does not favor one group over another under the Competitive Grant Program. Any eligible entity can apply for funding under the Program and propose to increase access among any covered population. *Id.* at § 1724(b). The Competitive Grant Program's selection criteria do not consider applicants' identities, or favor applicants belonging to certain groups. *See id.* at § 1724(c), (d)(1). Nor does the Competitive Program require that proposals serve any specific covered population. *Id.* at § 1724(d)(1). The Act does not require that Competitive Grant Program recipients prefer certain groups themselves, nor does it require Competitive Grant Program recipients to only serve covered populations or to serve covered populations at the expense of other groups. *Id.* at § 1724(d)(1)-(2).

48.    To carry out the Digital Equity Act, Congress authorized and appropriated $2,750,000,000 for fiscal years 2022 through 2026. *See id*. at § 1724(l). Of that amount, Congress appropriated $1,250,000,000 ($250,000,000 per fiscal year for five years) specifically for the Competitive Grant Program under § 60305. *See* Pub. L. No. 117-58, div. J, tit. II ("shall be made available").

49.     The end result is the Act's authorization of the Competitive Grant Program that, among other things, "distributes laptops in Iowa[;]" "help[s] people get back online after Hurricane Helene washed away computers and phones in western North Carolina[;]" and teaches seniors in rural Alabama "including some who have never used a computer—how to use the internet."[11]

### The Digital Equity Act's Grant Termination Process

50.     The Act permits Commerce to "deobligate or terminate" a grant awarded under the Act only "after notice to the entity and opportunity for a hearing," 47 U.S.C. § 1724(g)(1), and when it:

> (A) presents to the entity a rationale and supporting information that clearly demonstrates that—
>
> (i) the grant funds are not being used in a manner that is consistent with the application with respect to the grant submitted by the entity . . . ; and
>
> (ii) the entity is not upholding assurances made by the entity to the Assistant Secretary under subsection (f) [i.e., assurances of compliance with laws and grant administration requirements]; and
>
> (B) [the Assistant Secretary] determines that the grant is no longer necessary to achieve the original purpose for which [the] Assistant Secretary awarded the grant . . . .

47 U.S.C. § 1724(g)(1).

51.     Commerce's adoption of 2 C.F.R. Part 200 and 2 C.F.R. § 1327.101, confirms that the Agency must "maintain written procedures for processing objections, hearings, and appeals,"

---

[11] *A Review of the President's Fiscal Year 2026 Budget Request for the Department of Commerce: Hearing before the S. Comm. on Appropriations, Subcomm. on Commerce, Justice Science and Related Agencies*, 119th Cong. -- (June 4, 2025) https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2026-budget-request-for-the-department-of-commerce (questioning by Vice Chairwoman Sen. Patty Murray).

and "provide [grant] recipient[s] with an opportunity to object and provide information

challenging the action."  2 C.F.R. § 200.342 (2024).

### NIST's Award to NDIA

52.    NDIA advances digital equity by supporting community programs and equipping

policymakers to act, so that everyone has the opportunity to use technology to live, learn, work,

and thrive.

53.    NDIA advocates for home broadband access, public broadband access, personal

devices and local technology training and support programs.  It advises on digital inclusion

design, impact measurement, outcome evaluation, and program refinement.  NDIA supports

programs to provide home broadband access, public broadband access and personal devices.

NDIA also provides local technology training through its digital navigator programs.  NDIA

works collaboratively with over 2,000 affiliates in all 50 states, five US territories, and 47 Tribal

Entities, to identify and disseminate resources for community-based digital inclusion programs to

increase their impact while serving as a bridge to policymakers and the public.

54.    Defendants published NTIA NOFO No. NTIA-DECGP-2024, soliciting

applications for the Competitive Grant Program to "support efforts to achieve digital equity,

promote digital inclusion activities, and spur greater adoption and meaningful use of broadband

among the Covered Populations."[12]

55.    NDIA submitted a timely proposal, outlining its multi-faceted Digital Navigator

Plus Program (the "DN+ Program").  Digital Navigators ("DNs") are professionally trained

technology educators who provide technology resources, and teach effective use of the internet

---

[12] NTIA NOFO No. NTIA-DECGP-2024 at 2 (2024) https://www.ntia.gov/sites/default/files/2024-07/de-competitive-nofo-fy24.pdf

for education, work, healthcare, civic and social engagement.  NDIA proposed to equip thirteen (13) local DN programs in eleven (11) states to scale their existing DN programs to better support clients and communities.  NDIA designed the DN+ Program to serve over 30,000 people in "covered populations" in urban, rural, suburban, and Tribal communities across the U.S. Through private matching funds, NDIA also would have distributed and managed 6,500 wireless internet accounts and devices—an in-kind donation worth upwards of $11 million.

56.    NDIA also proposed to use its annual conference, "Net Inclusion," as part of its grant performance.  The Net Inclusion conference typically features over fifty discussions among hundreds of practitioners, advocates, academics, internet services providers, and policymakers, exploring the following topics: (1) local, state, Tribal, and federal policies impacting digital equity; (2) sources of financial and programmatic digital inclusion support; and (3) digital inclusion best practices from across the country.

57.    NDIA most recently held Net Inclusion from May 20 through May 22, 2025, and plans to hold its next Net Inclusion from February 3 through February 5, 2026, and thereon after on an annual basis.

58.    On January 6, 2025, NTIA announced twenty-four (24) awards under the Competitive Grant Program, including an award to NDIA.

59.    NTIA informed grant recipients that NIST would administer the Competitive Grant Program grants.

60.    On January 21, 2025, a NIST Grants Officer emailed NDIA an executed Award No. 39-32-DC150 (the "Award") for $25,755,652.64 over a five-year period from March 1, 2025 through February 30, 2030, and incorporating 2 C.F.R. Part 200.  The executed Award stated that the Award "constitutes an obligation of Federal funding[.]"

### Executive Orders and Executive Agency Actions Regarding
### Diversity, Equity, and Inclusion

61.    On January 20, 2025, President Trump signed EO 14151, 90 Fed. Reg. 8339 (Jan.

20, 2025).  EO 14151 directs the OMB Director to terminate "all 'equity action plans,' 'equity'

actions, initiatives or programs, 'equity-related' grants or contracts," stating, counterfactually,

that they were "discriminatory programs."

62.    Relatedly, on January 21, 2025, President Trump signed EO 14173, 90 Fed. Reg.

8633 (Jan. 21, 2025).  The EO directs all executive departments and agencies "to terminate all

discriminatory and illegal preferences, mandates, policies, programs, activities, guidance,

regulations, enforcement actions, consent orders, and requirements."  The EO also inaccurately

characterizes DEI and DEIA programs as "discriminatory" and "illegal."

63.    Defendants did not explain "equity-related" activities in the context of the EOs for

several months.  *See, e.g.*, *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, No. CV 25-10787-

WGY, 2025 WL 1822487, at *17 (D. Mass. July 2, 2025) ("The Court need not delve deeply into

the rudderless EOs [14151 and 14173] concerning DEI: they do not even attempt to define DEI,

but instead set it up as some sort of boogeyman."); *Chicago Women in Trades v. Trump*, 778 F.

Supp. 3d 959, 984 (N.D. Ill. 2025) (EOs 14151 and 14173 do "not define the term 'DEI' itself,"

nor do they "not refer to any other source indicating what the term means as used in the Order—

let alone what might make any given 'DEI' program violate Federal anti-discrimination laws.").

64.    In Spring 2025, NTIA nevertheless communicated with NDIA (and, on

information and belief, other recipients in the Competitive Grant Program) about what EO 14151

and EO 14173 meant for the Award.

65.    On April 9, 2025, an NTIA Federal Program Officer emailed NDIA a message

with the subject line "Digital Equity Act of 2021 Grant Programs: Alignment with Exec. Order

No. 14151 for Conferences, Trainings, and other Activities."  The April 9 Email asserted:

> To ensure alignment with the Trump-Vance Administration,
> Executive Order 14151, 'Ending Radical and Wasteful Government
> DEI Programs and Preferencing' this email is to inform you that any
> costs associated with diversity, equity, and inclusion conferences,
> trainings, and/or professional development are not allowable. This
> includes any federal award funds used for recipients, sub-grantees,
> contractors and/or vendors in the participation, attendance, or travel
> costs associated for[sic] conferences, trainings, and professional
> development that are not in alignment with the Executive Order.
> NITA [sic] and NIST will not approve this as an allowable cost.[13]

### The President's Social Media Post and Termination Actions

66.    One month after the NTIA email about "Alignment with Executive Order 14151,"

on May 8, 2025, President Trump declared on Truth Social that the Digital Equity Act is

unconstitutional, stating:

> I have spoken with my wonderful Secretary of Commerce, Howard
> Lutnick, and we agree that the Biden/Harris so-called "Digital
> Equity Act" is totally UNCONSTITUTIONAL.  No more woke
> handouts based on race!  The Digital Equity Program is a RACIST
> and ILLEGAL $2.5 BILLION DOLLAR giveaway.  I am ending
> this IMMEDIATELY, and saving Taxpayers BILLIONS OF
> DOLLARS![14]

67.    The next day, on May 9, 2025, NIST terminated the Competitive Grant Program

and with it, NDIA's Award, via letter echoing the President's claim that the Competitive Grant

Program is unconstitutional, stating:

---

[13] Email from NTIA to NDIA re: *Digital Equity Act of 2021 Grant Programs: Alignment with Exec. Order No. 14151 for Conferences, Trainings, and other Activities* (Apr. 9, 2025) (on file with counsel).

[14] President Donald J. Trump (@realdonaldtrump), Truth Social (May 8, 2025 at 04:38 pm ET) https://truthsocial.com/@realDonaldTrump/posts/114474136573150113 (archived from the original at https://web.archive.org/web/20250000000000*/https://truthsocial.com/@realDonaldTrump/posts/114474136573150 113).

As the President determined and as Secretary Lutnick agreed, the Digital Equity Competitive Grant Program, 47 U.S.C. § 1723, is unconstitutional and grants issued pursuant to it were created with, and administered using, impermissible and unconstitutional racial preferences.     Furthermore, Section 200.340 of the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (2 C.F.R. Part 200), which provides that '[t]he Federal award may be terminated . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or priorities.'[15]

68.     The May 9 Letter also claimed that "[t]his decision is final and there is no right of administrative appeal."[16]  Upon information and belief, all terminations notices issued for the Competitive Grant Program were identical and devoid of supporting evidence or analysis.

69.     On June 6, 2025, NDIA appealed the termination in accordance with 47 U.S.C. § 1724(g)(1) and 2 C.F.R. § 200.342.

70.     On June 10, 2025, NTIA denied NDIA's appeal via email, reiterating that termination was "final" and that "there is no right of administrative appeal."[17]

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Separation of Powers
### (Against All Defendants)

71.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

---

[15] Letter from NIST to NDIA re: *NTIA Award Number 39-32-DC150: Digital Equity Competitive Grant* (May 9, 2025) (on file with counsel).

[16] *Id.*

[17] Email from NTIA to NDIA (June 10, 2025) (denying appeal) (on file with counsel).

72.     The Constitution vests exclusive power over federal spending and lawmaking with Congress.  *See* U.S. Const. art. I, § 1; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1.  The Constitution likewise requires the Executive Branch to faithfully execute the law.  *See* U.S. Const. art. II, § 3.  The Constitution also provides the judiciary sole power over all cases "arising under this Constitution[.]"  U.S. Const. art. III, § 2, cl. 1.

73.     Neither the President nor the Executive Branch has any constitutional power to unilaterally repeal duly enacted statutes.  Even when courts determine that a statute is unconstitutional, courts generally do not strike the entire statute—they narrowly tailor the remedy to the unconstitutional portion of the statute.

74.     Congress has exercised its Article I legislative power to require Commerce to establish and carry out the Competitive Grant Program under the Digital Equity Act.  Congress's exercise of authority in that respect was constitutional, as is the Digital Equity Act.

75.     The Defendants' termination of the Competitive Grant Program exceeded their authority under Article II of the Constitution and unlawfully usurped Congress' exclusive power to legislate under Article I.

76.     NDIA is therefore entitled to an order and judgment, and a permanent injunction, holding unlawful and setting aside the termination of the Competitive Grant Program.

## COUNT II
### Violation of the Spending Clause
### (Against All Defendants)

77.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

78.     Congress possesses exclusive power to legislate.  Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."

79.     And the Spending Clause of the U.S. Constitution, art. I, §8, cl. 1 (Spending Clause), provides that Congress—not the Executive Branch—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States."

80.     The Executive Branch has no power to amend or rescind appropriations that conflict with its priorities.

81.     In enacting the Digital Equity Act and its appropriations, Congress lawfully imposed spending mandates on the Department of Commerce.  Agency Defendants contravened and defied those mandates by imposing policy in contravention of those mandates and cancelling the Competitive Grant Program, in violation of U.S. Constitution, art. I, §8, cl. 1.

82.     NDIA is therefore entitled to an order and judgment, and a permanent injunction, holding unlawful and setting aside the termination of the Competitive Grant Program.

**COUNT III**
**Violation of the APA – Contrary to Constitutional Right, Power, Privilege, or Immunity**
**(Against All Defendants Except the President)**

83.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

84.     The Administrative Procedure Act ("APA") requires courts to "hold unlawful and set aside" any agency action that is taken "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

85.     For the reasons described in Count I (Separation of Powers) and Count II (Spending Clause), Defendants' termination of the Competitive Grant Program on the basis that the Digital Equity Act is unconstitutional is contrary to the powers that the Defendants may exercise under the Constitution.  The Court must therefore hold these actions unlawful and set them aside.

## COUNT IV
### Violation of the APA – Excess of Statutory Authority
### (Against All Defendants Except the President)

86.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

87.     A reviewing court must hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

88.     The Digital Equity Act required that Defendants "shall" establish the Competitive Grant Program and award grants that would meet at least one of the five needs specified in statute for the "covered populations" of people lacking meaningful access. 47 U.S.C. §§ 1724(a)(1), 1724(d)(2)(A).

89.     The Digital Equity Act also specifically limited Defendants' ability to terminate awards under the Competitive Grant Program to certain bases and required Defendants to follow defined procedures for notice and opportunity to respond. *Id.* at § 1724(g).

90.     Defendants' termination of the Competitive Grant Program ran afoul of those statutory mandates.

91.     Accordingly, Defendants acted "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The Court must therefore hold these actions unlawful and set them aside.

## COUNT V
### Violation of the APA – Contrary to Law
### (Against All Defendants Except the President)

92.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

93.     The APA instructs courts to hold unlawful and set aside agency actions that are

contrary to law, or that are "without observance of procedure required by law." *Id.* at §

706(2)(A), (D).

94.     Congress expressly appropriated $2,750,000,000 for the Competitive Grant

Program, directing equal apportionments "shall" be made available for fiscal years 2022-2026

and "to remain available until expended." 47 U.S.C. § 1724(a)(1); *Id.* at 1724(l); *see also* Pub.

L. No. 117-58, div. J, tit. II, 135 Stat. 1354 (appropriating funds to carry out the Act).

Defendants' refusal to administer the mandated programs and disburse the appropriated funding

is contrary to law.

95.     Defendants terminated the entire Competitive Grant Program, and therefore also

Plaintiff's award, in a manner contrary to the termination procedure in the Digital Equity Act.

96.     The Digital Equity Act only permits Commerce to "[d]eobligate or terminate a

grant . . . after notice to the entity and opportunity for a hearing" and when it:

> (A) presents to the entity a rationale and supporting information that
> clearly demonstrates that—
>
> (i) the grant funds are not being used in a manner that is consistent
> with the application with respect to the grant submitted by the entity
> [in its application]; and
>
> (ii) the entity is not upholding assurances made by the entity to the
> Assistant Secretary under subsection (f) [i.e., assurances of
> compliance with laws and grant administration requirements]; and
>
> (B) [the Assistant Secretary] determines that the grant is no longer
> necessary to achieve the original purpose for which [the] Assistant
> Secretary awarded the grant; . . .

*Id.* at § 1724(g)(1).

97.     The termination of the entire Competitive Grant Program, including the purported

recission of appeal rights, thus violates 47 U.S.C. § 1724(g)(1).

98.     The termination also failed to provide NDIA or any other recipient with "an opportunity to object and provide information challenging the action[,]" in violation of the regulations governing Commerce grant awards.  2 C.F.R. § 200.342; *see also* 2 C.F.R. § 1327.101 (adopting 2 C.F.R. Part 200 in its entirety).

99.     Because the termination of the Competitive Grant Program is contrary to law, 47 U.S.C. §§ 1724(a)(1), 1724(g)(1), P.L. 117-58, div. J, tit. II (Nov. 21, 2021) 135 Stat. 1354, and regulation, 2 C.F.R. § 200.342, Defendants violated the APA, 5 U.S.C. § 706(2)(A), (D).

**COUNT VI**
**Violation of the APA – Arbitrary and Capricious**
**(Against All Defendants Except the President)**

100.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

101.    The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

102.    The Court shall "hold unlawful and set aside agency action" that is "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).

103.    The policy articulated in the April 9 Email is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

104.    The policy terminating the Competitive Grant Program articulated in the May 9 Letter is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

105.    Agency Defendants' actions are arbitrary and capricious because they are neither "reasonable [nor] reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).  They are not the product of "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

106.    Agency Defendants' actions are arbitrary and capricious because Agency Defendants failed to "articulate a satisfactory explanation for [their] action[s]" and demonstrated no 'rational connection between the facts found and the choice made.' *State Farm*, 463 U.S. at 43 (citation omitted).

107.    Agency Defendants' actions are also arbitrary and capricious because they failed to consider reasonable, obvious alternatives to termination of an entire congressionally mandated grant program. *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

108.    Further defendants held no hearings, provided no reasoned analysis, and have identified no supporting evidence.  Defendants' termination of the grant program on this basis was an abuse of discretion.

109.    The policy articulated in the April 9 Email denying "any costs associated with diversity, equity, and inclusion conferences, trainings, and/or professional development" therefore is arbitrary and capricious.  It therefore must be declared in violation of the APA, 5 U.S.C. § 706(2)(A) and enjoined.

110.    The policy articulated in the May 9 Letter determining that the Competitive Grant Program is unconstitutional was unsupported by reasoned explanation and therefore is arbitrary and capricious.  It must be declared in violation of the APA, 5 U.S.C. § 706(2)(A) and enjoined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A.    Enter judgment declaring that the Competitive Grant Program is not unlawful or unconstitutional, and therefore the Defendants' termination of the Competitive Grant Program violates the Constitution;

B.    Vacate and set aside the termination of the Competitive Grant Program;

C.  Vacate and set aside all of Defendants' actions relating to the Competitive Grant Program that this Court determines were unconstitutional or otherwise illegal;

D.  Enjoin Defendants, and those in concert or participation with them, from imposing any negative consequences on Plaintiff for involvement in this litigation;

E.  Award Plaintiff's reasonable attorneys' fees and costs; and

F.  Grant any other or further relief the Court may deem just and proper.

Respectfully submitted,

Dated: 10/07/2025

By:  */s/* Edward G. Caspar
Edward G. Caspar, D.C. Bar No. 1644168
Leah Frazier, D.C. Bar No. 492540*
Gillian Cassell-Stiga, D.C. Bar No. 90032319*
Marc P. Epstein, D.C. Bar No. 90003967

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street N.W. Suite 900
Washington, D.C. 20005
Tel: 202-662-8300
ecaspar@lawyerscommittee.org
lfrazier@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org
mepstein@lawyerscommittee.org

*Pro Hac Vice* forthcoming

By: */s/ Keith Harrison*
Keith J. Harrison, D.C. Bar No. 416755
Christian N. Curran,* DC Bar No. 1004269
Alexandra Barbee-Garrett,* DC Bar No. 187886
Ahmad Al Dajani,* DC Bar No. 90001902

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Tel: (202) 624-2500
KHarrison@crowell.com
CCurran@crowell.com
ABarbee-Garrett@crowell.com
AAlDajani@crowell.com

*/s/ Warrington Parker*
Warrington Parker,* CA Bar No. 148003
CROWELL & MORING LLP
3 Embarcadero Center
26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800
WParker@crowell.com

Attorneys for National Digital Inclusion Alliance

*Pro Hac Vice* forthcoming