## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL DIGITAL INCLUSION ALLIANCE, | |
| Plaintiff, | |
| v. | No. 1:25-cv-3606-JDB |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND.................................................................................................................2

I.    Statutory Background ..............................................................................................2

    A.    The Digital Equity Act and Its Competitive Grant Program .........................2

    B.    The DEA's Drafting and Passage .................................................................4

II.    Factual Background .................................................................................................4

    A.    The Competitive Grant Program's Application and Selection Process....................4

    B.    Plaintiff's Grant Application and Grant Termination ................................6

III.    Procedural Background ...........................................................................................7

LEGAL STANDARD .........................................................................................................8

ARGUMENT .....................................................................................................................8

I.    The District Court Lacks Jurisdiction Over This Grant Dispute .................................8

    A.    Sovereign Immunity Immunizes the Government from Suit .........................10

    B.    The Tucker Act Channels Grant Termination Disputes to the CFC ..........11

        1.    Under *Megapulse*'s First Prong, The Source of Plaintiff's Rights Is the Grant Agreement ................................................................13

        2.    Under *Megapulse*'s Second Prong, Plaintiff May Not Circumvent the Tucker Act Through Artful Pleading ................................................15

    C.    Plaintiff Lacks Standing for the Competitive Grant Program's Termination ............18

II.    All of Plaintiff's Claims Fail Because the Competitive Grant Program Unconstitutionally Considers Race in Grantmaking....................................................20

    A.    The Digital Equity Act's Competitive Grant Program Racially Discriminates............21

        1.    The Classification Is Explicit and the Impact Is Direct...................................21

        2.    Plaintiff's Defenses of the DEA's Racial Classifications Are Meritless..........23

    B.    The Competitive Grant Program Fails Strict Scrutiny Because Congress Lacked a Compelling Interest for Its Racial Classification ..............................24

| | 1. | *Croson*, *Adarand*, *Shaw*, and *Wisconsin Legislature* Require Congress to Show Its Work | 24 |
| | 2. | There Were No Statutory Findings | 26 |
| | 3. | The Legislative History Says Little About Racial Discrimination | 29 |
| C. | | The Racial Classification Is Not Narrowly Tailored | 30 |
| III. | | The Constitutional Challenges Should Be Dismissed | 33 |
| A. | | Plaintiff's Constitutional Claims Fail Because All of Plaintiff's Challenges May Be Pleaded in the Proper Forum | 34 |
| | 1. | Plaintiff May Not Repackage *Ultra Vires* Claims as Constitutional | 34 |
| | 2. | The President Should Be Dismissed from the Suit | 35 |
| | 3. | The Allegations Do Not Meet *Ultra Vires* Standards | 35 |
| B. | | The Complaint Fails to Plead a Plausible Spending Clause Claim | 37 |
| IV. | | Plaintiff's APA Claims Fail as a Matter of Law for Other Independent Reasons | 38 |
| A. | | Counts IV and V Fail to State a Claim Because the Agency Followed Proper Procedures in Terminating Plaintiff's Award | 38 |
| | 1. | Plaintiff's Grant Termination Was Governed by 2 C.F.R. § 200.340(a)(4), Which Does Not Provide Appellate Rights | 39 |
| | 2. | Section 1724(g) Does Not Limit Terminations to Noncompliance | 41 |
| B. | | Count VI Does Not Plausibly Allege that NTIA's Termination of the Competitive Grant Program Was Arbitrary and Capricious | 42 |
| C. | | Count III Fails Because the Constitutional Claims Fail | 43 |
| D. | | Plaintiff's Attack on the April 9, 2025 Email Fails on Threshold Grounds | 43 |
| CONCLUSION | | | 45 |

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)............................................................................................ 21, 22, 25, 42

*Albrecht v. Committee on Emp. Benefits of the Federal Reserve Emp. Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004)............................................................................................10

*Am. Waterways Operators v. United States Coast Guard,*
    613 F. Supp. 3d 475 (D. Mass. 2020)............................................................................13

*American Foreign Serv. Ass'n v. Trump,*
    2025 WL 1742853 (D.C. Cir. June 20, 2025) ...............................................................35

*American Pub. Health Ass'n v. NIH,*
    145 F.4th 39 (1st Cir. 2025) ............................................................................................14

*Appalachian Voices v. U.S. Env't Prot. Agency,*
    No. CV 25-1982 (RJL), 2025 WL 2494905 (D.D.C. Aug. 29, 2025)...................... 13, 14, 17

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................................8

*Associated Gen. Contractors of Ohio, Inc. v. Drabik,*
    214 F.3d 730 (6th Cir. 2000).............................................................................................26

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)..............................................................................................................42

*Bd. of Educ. for the Silver Consol. Schs. v. McMahon,*
    2025 WL 2017177 (D.N.M. July 18, 2025)................................................................ 37, 38

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................................8

*California v. Azar,*
    950 F.3d 1067 (9th Cir. 2020) .........................................................................................43

*California v. U.S. Dep't of Educ.,*
    132 F.4th 92 (1st Cir. 2025)..............................................................................................12

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)..........................................................................................................45

* *City of Richmond v. J.A. Croson Co.,*
    488 U.S 469 (1989). .................................................................................................*passim*

*Columbus Reg'l Hosp. v. United States,*
  990 F.3d 1330 (Fed. Cir. 2021) ...................................................................................13

*Consolidated Edison Co. of N.Y. v. U.S. Dep't of Energy,*
  247 F.3d 1378 (Fed. Cir. 2001) ...................................................................................15

\* *Crowley Gov't Servs., Inc. v. GSA,*
  38 F.4th 1099 (D.C. Cir. 2022) ...........................................................................*passim*

\* *Dalton v. Specter,*
  511 U.S. 462 (1994)........................................................................................9, 33, 34

*Davis v. FEC,*
  554 U.S. 724 (2008)..................................................................................................18

\* *Department of Educ. v. California,*
  604 U.S. 650 (2025) ..........................................................................................12, 13

*Dillmon v. Nat'l Transp. Safety Bd.,*
  588 F.3d 1085 (D.C.Cir.2009)....................................................................................43

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)..................................................................................................42

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024)..................................................................................................19

*Fisher v. Univ. of Tex. at Austin,*
  570 U.S. 297 (2013)............................................................................................21, 30

*Food Mktg. Inst. v. Argus Leader Media,*
  588 U.S. 427 (2019)............................................................................................29, 30

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992)..................................................................................................35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000)..................................................................................................19

*Full Value Advisors, LLC v. SEC,*
  633 F.3d 1101 (D.C. Cir. 2011) ..................................................................................45

\* *Global Health Council v. Trump,*
  153 F.4th 1 (D.C. Cir. 2025) ................................................................... 33, 34, 35, 36

*Holistic Candlers & Consumers Ass'n v. FDA,*
  664 F.3d 940 (D.C. Cir. 2012) ...................................................................................44

*Holley v. United States,*
    124 F.3d 1462 (Fed. Cir. 1997)........................................................................................15

*Huss v. Gayden,*
    571 F.3d 442 (5th Cir. 2009)..........................................................................................25

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) .......................................................................................21

*\* Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985)............................................................... 11, 16, 17, 39

*International Eng'g Co., Div. of A-T-O v. Richardson,*
    512 F.2d 573 (D.C. Cir. 1975) ........................................................................................11

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005)......................................................................................................28

*Jafarzadeh v. Duke,*
    270 F. Supp. 3d 296 (D.D.C. 2017) ...............................................................................36

*Kareem v. Haspel,*
    986 F.3d 859 (D.C. Cir. 2021) .........................................................................................8

*Kidwell v. Dep't of Army, Bd. of Corr. of Mil. Recs.,*
    56 F.3d 279 (D.C. Cir. 1995)..........................................................................................11

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006)......................................................................................................20

*Lewis v. Casey,*
    518 U.S. 343 (1996).......................................................................................................18

*Lewis v. U.S. Parole Comm'n,*
    743 F. Supp. 3d 181 (D.D.C. 2024)...............................................................................36

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)....................................................................................................8, 18

*Masroor v. Noem,*
    2025 WL 2439176 (D.D.C. Aug. 25, 2025) ..................................................................36

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012).......................................................................................................10

*\* Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ............................................................... 11, 12, 15, 16

*Merck & Co. v. Reynolds,*
    559 U.S. 633 (2010)................................................................................27

*National Black Police Ass'n v. District of Columbia,*
    108 F.3d 346 (D.C. Cir. 1997) ..............................................................45

*National Bus. Aviation Ass'n, Inc. v. FAA,*
    496 F. Supp. 3d 102 (D.D.C. 2020)......................................................36

*Nat'l Educ. Ass'n v. U.S. Dep't. of Educ.,*
    779 F. Supp. 3d 149 (D.N.H. 2025)......................................................43

* *NIH v. American Pub. Health Ass'n,*
    145 S. Ct. 2658 (2025)....................................................................*passim*

*Nuclear Regulatory Comm'n v. Texas,*
    605 U.S. 665 (2025)..........................................................................9, 33

*O'Shea v. Littleton,*
    414 U.S. 488 (1974)..............................................................................45

*Parents Involved in Community Schools v. Seattle School Dist. No. 1,*
    551 U.S. 701 (2007)........................................................................20, 30

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.,*
    918 F.3d 151 (D.C. Cir. 2019) ..............................................................39

*Plunkett v. Castro,*
    67 F. Supp. 3d 1 (D.D.C. 2014) ...........................................................43

*POET Biorefining, LLC v. EPA,*
    970 F.3d 392 (D.C. Cir. 2020) ..............................................................18

*Pollack v. Hogan,*
    703 F.3d 117 (D.C. Cir. 2012) ..............................................................33

*Rothe Dev. Corp. v. Dep't of Def.,*
    413 F.3d 1327 (Fed. Cir. 2005)..............................................................26

* *Shaw v. Hunt,*
    517 U.S. 899 (1996)........................................................................26, 27

* *Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ........................................................13, 39

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)..............................................................................18

*Strickland v. U.S. Dep't of Agric.*,
736 F. Supp. 3d 469 (N.D. Tex. 2024)..................................................................31

\* *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*, ,
143 S. Ct. 2141 (2023) ............................................................................*passim*

\* *Sustainability Inst. v. Trump*,
No. 25-1575, __ F.4th __, 2026 WL 157120 (4th Cir. Jan. 21, 2025) ...........................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................. 5, 8

*Tesoro Refining & Mktg. Co. v. FERC*,
552 F.3d 868 (D.C. Cir. 2009) .........................................................................44

*Thakur v. Trump*,
No. 25-4240, __ F.4th __, 2025 WL 1760650 (9th Cir. Dec. 23, 2025)....................... 15, 17

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
770 F. Supp. 3d 155 (D.D.C. 2025)................................................................. 12, 16

*United States v. Johnson*,
529 U.S. 53 (2000).....................................................................................41

*United States v. L.A. Tucker Truck Lines, Inc.*,
34 U.S. 33 (1952).....................................................................................44

*United States v. Paradise*,
480 U.S. 149 (1987)....................................................................................30

*United States v. Tohono O'Odham Nation*,
563 U.S. 307 (2011)....................................................................................10

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
No. 25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025).......................... 17, 36

*Washington v. Davis*,
426 U.S. 229 (1976)....................................................................................27

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of* President,
784 F. Supp. 3d 127 (D.D.C. 2025*), amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the Presi*dent, No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025)... 37, 38

\* *Wisconsin Legis. v. Wisconsin Elec. Comm'n*,
595 U.S. 398 (2022)....................................................................................26

*Woodford v. Ngo*,
548 U.S. 81 (2006)....................................................................................44

*Zuber v. Allen*,
  396 U.S. 168 (1969)...........................................................................................29

**Constitutional Provision**

U.S. Constitution, art. I, §8, cl. 1 ..........................................................................37

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................................................44

28 U.S.C. § 1491(a)(1) .........................................................................................10

42 U.S.C. § 18116 ................................................................................................28

47 U.S.C. § 172...................................................................................................42

47 U.S.C. § 641(1) ................................................................................................2

47 U.S.C. § 1302(d)(1) ..........................................................................................2

* 47 U.S.C. § 1721–1726....................................................................................*passim*

Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117–58, 135 Stat. 429 (Nov. 15, 2021)...4, 28

**Legislative Materials**

167 Cong. Rec. S5239–40 (2021) ...........................................................................4

167 Cong. Rec. H4304........................................................................................29

H.R. 2, 116th Cong. (2020) ..................................................................................4

H.R. 1783, 117th Cong. (2021) .............................................................................4

H.R. 1841, 117th Cong. (2021) .............................................................................4

H.R. 1848, 117th Cong. (2021) .............................................................................4

H.R. 3684, 117th Cong. (2021) .............................................................................4

H.R. 4486, 116th Cong. (2019) .............................................................................4

H.R. 4875, 117th Cong. (2021) ...........................................................................29

H.R. Rep. No. 116-437 (2020)...........................................................................4, 29

H.R. Rep. No. 117-70 (2021)..............................................................................4, 29

S. 1167, 116th Cong. (2019)..................................................................................................... 4, 28

S. 2018, 117th Cong. (2021).......................................................................................................4

S. Amdt. 2137 ........................................................................................................................ 4, 28

S. Amdt. 2133, 2140, 2146, 2162, 2164, 2180, 2181, 2210, 2233, 2245, 2255, 2279, 2300, 2338, 2354, 2358, 2449, 2464, 2478, 2548, 2564, 2570 ................................................................................28

*Empowering and Connecting Communities Through Digital Equity and Internet Adoption: Hearing Before the H. Subcomm. on Comm. & Tech.*, 116th Cong. 81 (Jan.29, 2020)...........................................29-30

## Rules

Fed. R. Civ. P. 12....................................................................................................................... 8, 20

## Regulations

2 C.F.R. Part 200 ..................................................................................................................7, 38, 39

2 C.F.R. § 200.1..............................................................................................................................38

*2 C.F.R. § 200.340 ..................................................................................................................*passim*

2 C.F.R. § 200.341 ................................................................................................................... 40, 41

*2 C.F.R. § 200.342 ................................................................................................................... 40, 41

2 C.F.R. § 1327.101 .......................................................................................................................38

47 C.F.R. § 8.1(b) ............................................................................................................................2

79 Fed. Reg. 75871 ........................................................................................................................38

89 Fed. Reg. 30046 ........................................................................................................................40

## INTRODUCTION

This case is about whether a grant recipient may force the federal government to racially discriminate when paying out money under a broadband benefit program. Under the equal protection component of the Fifth Amendment's Due Process Clause, race-based classifications are presumptively unconstitutional. And under 2 C.F.R. § 200.340(a)(4), an agency may terminate an award if it "no longer effectuates the program goals or agency priorities." The Secretary of Commerce, after careful consideration and instruction from the President, decided that allocating grants to improve broadband adoption based on whether a grant, at least in part, would serve "members of a racial or ethnic minority group" was not just unconstitutional, but no longer a priority of the Department of Commerce under his leadership. That determination—a lawful exercise of his authority under the applicable regulations—resulted in terminating a $25.77 million award to Plaintiff National Digital Inclusion Alliance, who brings a litany of constitutional and Administrative Procedure Act claims resisting that outcome. But no matter how much Plaintiff says otherwise, the gravamen of its Complaint, and the only injury alleged in the Complaint that provides standing, is the termination of a single race-based grant awarded under the Digital Equity Act's Competitive Grant Program.

Plaintiff's claims fail for several reasons. *First*, these claims do not belong in federal district court in the first place. The Court of Federal Claims is the exclusive forum for remedying Plaintiff's financial injury, and in any event, Plaintiff lacks standing to challenge any underlying policy of terminating the Competitive Grant Program *writ large*. *Second*, even if such claims are properly brought here, the Competitive Grant Program's statutory requirement to consider race in federal grantmaking triggers strict scrutiny. Because the Digital Equity Act's racial classifications fail both prongs of strict scrutiny, all of Plaintiff's claims fail on the merits. *Third*, several claims suffer from fundamental legal defects that independently warrant dismissal.

# BACKGROUND

## I.    Statutory Background

### A.    The Digital Equity Act and Its Competitive Grant Program

The Digital Equity Act of 2021, 47 U.S.C. §§ 1721–26 (2023) (DEA), appropriated $2.75 billion to facilitate increased access to and adoption of broadband internet among certain populations. Broadband is the everyday term for commercial, mass-market, high-speed Internet service. *Cf.* 47 C.F.R. § 8.1(b); 47 U.S.C. § 641(1) (adopting this definition for 47 U.S.C. §§ 641–46). The DEA defines "adoption of broadband" as, in relevant part, "a speed, quality, and capacity [] that is necessary for the individual to accomplish common tasks," and that qualifies as a "high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology." *Id.* §§ 1721(1)(A), (2); 1302(d)(1).

The DEA created two grant programs to "support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations." 47 U.S.C. § 1724(a)(1); *see also id.* § 1723(a)(1)(A) (similar); *id.* § 1721(8) (defining "covered populations"). The first program is the Capacity Grant Program, which makes formula grants to states. *Id.* § 1723. And the second program is the Competitive Grant Program, which allocates grants to individual applicants, mostly localities and non-governmental entities. *Id.* § 1724.[1] To administer the Competitive Grant Program, the National Telecommunications and Information Administration (NTIA) reviews grant applications and ultimately recommends funding recipients to the National Institute of Standards and Technology (NIST)—the grants office for such programs at the Department. As the responsible office, NIST makes awards to funding recipients and oversees grantees' compliance with

---

[1] The Competitive Grant Program also requires NTIA to "reserve … 5 percent to award grants to, or enter into contracts or cooperative agreements with, Indian Tribes, Alaska Native entities, and Native Hawaiian organizations to allow those tribes, entities, and organizations to carry out the activities described in this section[.]" 47 U.S.C. § 1724(j)(2); *see also id.* § 1723(i)(2) (same for the Capacity Grant Program). NTIA has not terminated any awards issued to Native entities under the Program.

the terms of their grants from an operational perspective. *See* ECF 1 (Compl.) ¶¶ 54-59.

In authorizing awards under the Competitive Grant Program, the DEA repeatedly envisions considerations of race. The DEA, by its plain text, directs NTIA to "consider [] whether an application shall, if approved—[] increase internet access and the adoption of broadband among covered populations." *Id.* § 1724(d)(1)(A)(i). Consistent with that directive, the Competitive Grant Program statute requires applicants to "provide[] a detailed explanation of how [they] will use any grant amounts awarded under the Program to carry out the purposes of the program"—*i.e.* "achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations." *Id.* §§ 1724(a)(1), (c)(2)(A). It also mandates that recipients of Competitive Grant Program awards specifically use the grant amounts to serve "covered populations." *Id.* § 1724(d)(2)(A) (setting forth a list of pre-approved forms of assistance).[2]

Underlying all these requirements is the DEA's definition of "covered populations," which incorporates an express racial classification:

> The term "covered populations" means—
> (A) individuals who live in covered households [defined as "a household, the income of which for the most recently completed year is not more than 150 percent of an amount equal to the poverty level," 47 U.S.C. § 1721(7)];
> (B) aging individuals;
> (C) incarcerated individuals, other than individuals who are incarcerated in a Federal correctional facility;
> (D) veterans;
> (E) individuals with disabilities;
> (F) individuals with a language barrier, including individuals who—
>       (i) are English learners; and
>       (ii) have low levels of literacy;

---

[2] Plaintiff did not receive an award under the Capacity Grant Program and does not discuss it in its complaint. In any event, that program's enabling statute similarly uses the definition of "covered populations"—and its embedded racial preference—to target services and allocate monetary rewards. To qualify for formula grants, states must draft "State Digital Equity Plan[s]" that identify "barriers to digital equity faced by covered populations in the state." 47 U.S.C. § 1723(c)(1)(A). States must target every covered population—including minority groups—by setting "measurable objectives for documenting and promoting [program priorities], among **each group** [listed as a covered population] located in that State". *Id.* § 1723(c)(1)(B) (emphasis added). And 25% of the Capacity Program formula is set by a given state's relative share of covered populations. *Id.* § 1723(d)(3)(A)(i)(II).

*(G) individuals who are members of a racial or ethnic minority group*; and
(H) individuals who primarily reside in a rural area.

47 U.S.C. § 1721(8) (emphasis added).

### B.    The DEA's Drafting and Passage

From 2019 to 2021, legislators repeatedly introduced the DEA. It received neither a committee report nor floor vote. S. 1167, 116th Cong. (2019); H.R. 4486, 116th Cong. (2019); H.R. 2, 116th Cong. (2020) (DEA added after committee report, H.R. Rep. No. 116-437 (2020)); H.R. 1783, 117th Cong. (2021); H.R. 1841, 117th Cong. (2021); H.R. 1848, 117th Cong. (2021); S. 2018, 117th Cong. (2021). In 2021, Congress enacted the DEA after the Senate rolled it into a $1.2 trillion appropriations measure called the Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117–58, 135 Stat. 429–1467 (Nov. 15, 2021). The DEA was enacted as IIJA §§ 60301–07, 135 Stat. 1209–31.

The IIJA's enactment was itself an abbreviated process. The House passed a separate bill, H.R. 3684, and issued a committee report. H.R. Rep. No. 117-70 (2021). After cross-house negotiations, the Senate replaced the House bill with S. Amdt. 2137, which contained the DEA. 167 Cong. Rec. S5239–40, 5463–68 (2021). Each house took about a week to consider Amendment 2137. In the Senate, it was proposed on August 1 and passed on August 8. In the House, it began consideration on September 27 and was adopted without changes on November 5. The President signed it into law on November 15. There were no Senate floor votes on amendments to the DEA, no House floor votes on any amendments, and no committee report on Amendment 2137.

## II.    Factual Background

### A.    The Competitive Grant Program's Application and Selection Process

Although Congress passed the DEA in late 2021, the DEA required NTIA to start with the Capacity Grant Program first and then turn to the Competitive Grant Program. *See* 47 U.S.C. § 1724(a)(1). NTIA thus did not begin soliciting Competitive Grant Program applications until July

24, 2024, when it released a Notice of Funding Opportunity (NOFO) for the Program. Ex. B.[3] Applications under that NOFO were due in September 2024. *Id.* at 7.

The NOFO put the DEA's statutory mandates into practice, and confirmed that race would be a factor when both awarding and administering grants. For the application process, the NOFO recited the DEA's list of covered populations. *Id.* at 16. It required applicants to identify "the Covered Populations to be served including the *expected number of individuals* to be served within each Covered Population," and "[t]he amount of funding to be *devoted proportionally* to each Covered Population." *Id.* at 26 (emphasis added). For continuing oversight, the NOFO required recipients to collect information regarding "the Covered Populations being served," "the total number of individuals being served," and "the number of individuals that belong to each Covered Population." *Id.* at 20. The NOFO stated that "in assessing applications, the Assistant Secretary will consider, to the extent practicable, whether the proposed program will increase Internet access and the adoption of broadband among Covered Populations." *Id.* at 14. The "Covered Populations," of course, included "individuals who are members of a racial or ethnic minority group" at each step in this application process, as required by the DEA.

The NOFO further previewed NTIA's consideration of race in the selection process, under the DEA. For starters, it outlined the scoring system it would use for grant applications. *Id.* at 37–41. The system would "consider the number of different identifiable Covered Populations to be served as well as the total number of individuals within the Covered Populations to be served." *Id.* at 38. NTIA disclosed that it reserved the right to deviate from the usual process of prioritizing applications for awards "to ensure that all Covered Populations are being served or to balance the Covered populations being served." *Id.* at 39. Again, as mandated by the DEA, "Covered Populations"—and

---

[3] This filing attaches various documents "incorporated into the complaint by reference," including Plaintiff's grant award and Termination Letter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). An exhibit list and supporting declaration accompany this filing.

thus, those subject to the scoring and balancing in NTIA's selection process—included "individuals who are members of a racial or ethnic minority group."

### B.    Plaintiff's Grant Application and Grant Termination

Plaintiff National Digital Inclusion Alliance is a non-profit whose stated mission is to "advance digital equity by supporting community programs and equipping policymakers to act." Compl. ¶ 22. On September 21, 2024, it applied for $25.8 million in federal funding under the Competitive Grant Program for a total budget of $41.7 million; the remainder came from outside sources. Ex. C at 8. It proposed training "Digital Navigators" to spread awareness and provide technical advice; distributing free Internet data "hotspot" accounts (with outside funds); and supporting related projects. *Id.* at 6–7. It estimated that its proposal would serve "30,063 individuals" within the covered populations, including 19,886 members of a racial or ethnic minority group—the single largest covered population category in the estimate. *Id.* at 7. Following the NOFO's wording, Plaintiff agreed to "allocate the funding proportionally to each [covered population]." *Id.* To calculate proportional figures, Plaintiff multiplied its total budget by a particular covered population's share of the total number of individuals within covered populations. It arrived at a figure of "$27,579,031 to serve … member[s] of a racial or ethnic minority group." *Id.* Because racial and ethnic minorities were the single largest group in the sample, they were also the single largest target of grant funds. *Id.*

On January 6, 2025, NTIA announced its first tranche of Competitive Grant Program awards, including Plaintiff's. Compl. ¶ 58. On January 21, 2025, the agency sent Plaintiff a grant award. Ex. D. Plaintiff, however, never received any grant funds under the Competitive Grant Program.

On May 8, 2025, President Trump announced that, after speaking with Secretary of Commence Howard Lutnick, the two agreed that the DEA was unconstitutional due to its racial preferences. *Id.* ¶ 66. Implementing that constitutional determination and Presidential direction, NIST, as the grantmaking bureau for NTIA, terminated Plaintiff's grant on May 9, 2025. *Id.* ¶ 67.

Plaintiff received the explanation for that termination via letter:

> As the President determined and as Secretary Lutnick agreed, the Digital Equity Competitive Grant Program, 47 U.S.C. § 1723, is unconstitutional and grants issued pursuant to it were created with, and administered using, impermissible and unconstitutional racial preferences. Furthermore, Section 200.340 of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200), which [sic] provides that "[t]he Federal award may be terminated … [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or priorities." … This decision is final and there is no right of administrative appeal.

Ex. A. On June 6 or 7, 2025, Plaintiff filed an administrative appeal, which the agency summarily denied on June 10, 2025. Ex. F–G.

## III.    Procedural Background

Plaintiff filed this lawsuit on October 7, 2025, five months after its award was terminated. Compl. It sued four agency defendants (the Department of Commerce, NTIA, NIST, and the Office of Management and Budget (OMB)) and five official-capacity defendants (President Trump, Secretary Lutnick, NTIA Administrator and Assistant Secretary of Commerce for Communications and Information Arielle Roth, NIST Acting Director Craig Burkhardt, and OMB Director Russell Vought). *Id.* ¶¶ 23–31.

Plaintiff alleges that the Department unlawfully "terminated the Competitive Grant Program and with it, NDIA's Award." *See id.* ¶ 67. It alleges that, in doing so, Defendants violated the DEA's statutory process for grant terminations and a variety of constitutional provisions. *Id.* ¶¶ 95–98. As relief, Plaintiff seeks a declaratory judgment upholding the Competitive Grant Program and rejecting its termination; vacatur of the Competitive Grant Program's termination; and vacatur of any illegal "actions relating to the Competitive Grant Program." *Id.* Prayer §§ A–C.

Plaintiff pleads six counts. Counts I and II are framed as constitutional: they say Defendants violated the separation of powers (*id.* ¶¶ 71–76) and the Constitution's Spending Clause (*id.* ¶¶ 77–82). Counts III–VI are premised on the Administrative Procedure Act (APA): they say the non-

President Defendants acted contrary to the Constitution (*id.* ¶¶ 83–85), in excess of statutory authority (*id.* ¶¶ 86–91), contrary to law (*id.* ¶¶ 92–99), and arbitrary and capriciously (*id.* ¶¶ 100–110).

## LEGAL STANDARD

On a FED. R. CIV. P. 12(b)(1) challenge to subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A court "may consider material outside the pleadings," including judicially noticeable agency materials. *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021). On a FED. R. CIV. P. 12(b)(6) challenge for failure to state a claim, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[C]onclusory statements" and "legal conclusion[s] couched as … factual allegation[s]" are not presumed true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (simplified). When assessing the factual sufficiency of a pleading, a court considers "the complaint in its entirety, as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

## ARGUMENT

**I.    The District Court Lacks Jurisdiction Over This Grant Dispute**

This lawsuit involves two legally distinct challenges, neither of which this Court has jurisdiction to review (though for separate reasons). In *NIH v. American Public Health Association*, the controlling opinion articulated a "[t]wo-track litigation" process for challenges to grant terminations that were, at least in part, based on agency guidance or decisional documents. 145 S. Ct. 2658, 2662 (2025) (Barrett,. J., concurring). Accordingly, Plaintiff's assertion that the Department unlawfully "terminated the Competitive Grant Program and with it, NDIA's Award," Compl. ¶ 67, actually presents two discrete issues that should be analyzed separately.

*First*, the grant termination claim fails because the thrust of the Complaint is that the federal

government did not pay Plaintiff the money it was due under its grant agreement. Those grant payment claims, at their core, sound in contract. Because the Tucker Act represents a limited waiver of sovereign immunity and exclusively channels federal contract litigation to the Court of Federal Claims (CFC), Plaintiff's claims relating to the grant termination should be dismissed from this district court action on sovereign immunity grounds. *See infra* § I.B. To the extent the Tucker Act requires dismissal of the APA claims but not the constitutional claims, the constitutional claims independently fail anyway because under *Dalton v. Specter*, 511 U.S. 462, 474 (1994), they are actually statutory *ultra vires* claims, and statutory claims are subject to higher substantive standards, *see Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Here, the CFC is an available forum to consider Plaintiff's grant termination challenge. *See* 145 S. Ct. at 2662 n.1 (Barrett, J.). Therefore, *ultra vires* review is unavailable. *See infra* § III.A.

     *Second*, the allegations about the termination of the Competitive Grant Program fail for lack of standing. The fact that Plaintiff did not receive grant money is what provides it with standing to challenge termination of its *individual* grant award. In turn, Justice Barrett's controlling concurrence in *NIH* clarifies that Plaintiff was injured not by any underlying policy of terminating the Competitive Grant Program *writ large* but by the grant termination, and "vacating the [policy] does not necessarily void decisions made under it." 145 S. Ct. at 2661. On the one hand, standing is claim-specific and not dispensed in gross, so if Plaintiff is challenging the termination of the Competitive Grant Program separately from its grant termination, it would need to plead a non-speculative injury separate from the loss of its grant to have standing to bring that challenge. It has not done so. On the other hand, if Plaintiff is arguing that the termination of the Competitive Grant Program injured it *because* of the grant termination, that injury is likely not redressable in district court, since "vacating [a policy guidance] does not necessarily void decisions made under it." *Id.*

### A.    Sovereign Immunity Immunizes the Government from Suit

The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Most litigation against the government is governed by statutes where Congress consented to suit. But because sovereign immunity is the government's to waive, "relief [against the United States] is available by grace and not by right." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 317 (2011).

The APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking relief other than money damages. *Crowley*, 38 F.4th at 1105. But that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"—a safety valve that "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted).

The Tucker Act is one of the reasons why that safety valve exists. When a party seeks to require the government to continue to perform its obligations under a contract, the Tucker Act establishes a specific place to do that: the CFC. It provides that the CFC "shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In doing so, it "impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Federal Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67–68 (D.C. Cir. 2004) (quotation omitted). It is well-settled that the Tucker Act's grant of jurisdiction to the CFC supersedes the APA's limited waiver of sovereign immunity in district courts. *Crowley*, 38 F.4th at 1105–07. The combination of the Tucker Act and the APA's limited waiver create a "channeling" effect: the CFC is the exclusive forum for contract disputes and no other forum has jurisdiction over those disputes.

Many plaintiffs attempt to circumvent Tucker Act channeling by arguing that their claims are

10

not actually based on a specific contract (and here, Plaintiff ostensibly characterizes all six counts as policy challenges). But because Congress has limited the forum and the remedies for contract claims against the government, "a plaintiff whose claims against the United States are essentially contractual [is] not … allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *Sustainability Inst. v. Trump*, No. 25-1575, __ F.4th __, 2026 WL 157120, at *5 (4th Cir. Jan. 21, 2025).

But a court's jurisdictional analysis cannot hinge upon a plaintiff's preferred characterization of its claim, lest a court "upset the carefully modulated waiver of sovereign immunity and grant of remedies for breach of contract embodied in the Tucker Act." *International Eng'g Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975). Tucker Act channeling is not limited to cases where the plaintiff specifically pleaded a breach of contract claim. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985). Nor is it limited to cases where the plaintiff specifically requested money damages. On the contrary, the D.C. Circuit has warned plaintiffs against the "'creative drafting of complaints,' for example, by 'disguis[ing]' a claim for money damages as one for equitable relief," *Crowley*, 38 F.4th at 1107 (quoting *Kidwell v. Dep't of Army, Bd. of Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). As addressed in further detail below, to ascertain whether jurisdiction is proper, a district court must assess whether claims are essentially contractual. *Megapulse*, 672 F.2d at 967–68.

## B.     The Tucker Act Channels Grant Termination Disputes to the CFC

Through the Tucker Act, Congress has assigned the CFC exclusive jurisdiction to adjudicate the sorts of claims at issue in this case: that the government wrongfully terminated contracts. Plaintiff's allegation regarding the improper termination of its grant agreement and its request for an order compelling Defendants to resume payments that would otherwise be due under the agreements

fall squarely within that jurisdictional scheme. Indeed, since April 2025, the Supreme Court has twice stayed district-court orders that purported to set aside the termination of grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act channels those suits to the CFC. *See NIH*, 145 S. Ct. 2658; *Department of Educ. v. California*, 604 U.S. 650, 651 (2025).

Under the two-pronged *Megapulse* test for determining whether "a particular action" is "at its essence a contract action" subject to channeling or a challenge properly brought under the APA, courts look at both (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (quotation omitted). Defendants need to succeed on only one prong to establish CFC jurisdiction. *See, e.g.*, *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 162–63 (D.D.C. 2025) ("The latter factor is dispositive here.").

In applying *Megapulse*, "[t]he Supreme Court's recent decisions in [*California* and *NIH*] are instructive." *Sustainability Inst.*, 2026 WL 157120, at *5 (citations omitted). In *California*, a number of states challenged the Department of Education's termination of various education-related grants; the district court temporarily enjoined the terminations; and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 604 U.S. at 651 (quotation omitted). *NIH* reiterated *California*'s reasoning that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2659 (quotation omitted).

A straightforward application of each prong of the *Megapulse* test establishes, as in *California* and *NIH*, that Plaintiff's claims belong in the CFC—not this Court.

1.      **Under *Megapulse*'s First Prong, The Source of Plaintiff's Rights Is the Grant Agreement**

Plaintiff's claims sound in contract under the first prong of *Megapulse* because the source of Plaintiff's asserted rights is its grant agreement, which is essentially contractual. At bottom, Plaintiff alleges that Defendants violated "a contractual obligation to pay money" assertedly embodied in its grant agreement. *California*, 604 U.S. at 651 (quotation omitted); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–41 (Fed. Cir. 2021) ("treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"). To be sure, the Competitive Grant Program was created by statute, but that statute did not entitle *Plaintiff* (or any other *specific* grantee) to federal funding independent of an individual grant agreement. *See Appalachian Voices v. U.S. Env't Prot. Agency*, No. CV 25-1982 (RJL), 2025 WL 2494905, at *7 (D.D.C. Aug. 29, 2025). On the contrary, Plaintiff's asserted "substantive right" to monetary payments was "created in the first instance by the contract," not by the DEA. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). That is, in the absence of its grant agreement, Plaintiff had no entitlement to federal funds.

By a similar token, the APA "does 'not declare self-actualizing substantive rights, but rather, … merely provide[s] a vehicle for enforcing rights which are declared elsewhere.'" *Am. Waterways Operators v. United States Coast Guard*, 613 F. Supp. 3d 475, 486 (D. Mass. 2020) (citation omitted). Plaintiff's right to payment exists wholly within the four corners of the grant—not any federal statute or the Constitution. *See Sustainability Inst.*, 2026 WL 157120, at *5. That Plaintiff's claims could not "exist[] prior to and apart from rights created under the [agreement]" precludes district court jurisdiction over Plaintiff's APA causes of action. *Spectrum Leasing*, 764 F.2d at 894; *see Sustainability Inst.*, 2026 WL 157120, at *5. As such, Plaintiff's challenges to the grant termination sound in contract. Under the first prong of the *Megapulse* test, they belong in the CFC.

Plaintiff attempts to frame this case as a creature of statute or regulation (and not contract) by

alleging that Defendants violated statutory procedures, Compl. ¶¶ 73–74, 88–89, 95–96, and "the regulations governing Commerce grant awards," *id.* ¶¶ 51, 98, when terminating its grant. The text of the Complaint attempts to downplay Plaintiff's individual grant termination, focusing on the Secretary's termination of the entire Competitive Grant Program. *See* Compl. ¶¶ 76, 82, 85, 90–91, 95, 97, 104, 110. But Plaintiff is not the first grantee to frame its claim as a challenge to a policy or program termination in an effort to dodge the Tucker Act's jurisdictional requirements. The Supreme Court rejected a similar argument in *NIH*. As here, the plaintiffs challenged "directives" and "memoranda." *American Pub. Health Ass'n v. NIH*, 145 F.4th 39, 45–46 (1st Cir. 2025). As here, they pleaded APA claims, separation of powers claims, and Spending Clause claims. *NIH*, 145 S. Ct. at 2668 (Jackson, J., concurring and dissenting). Even so, the Supreme Court split the memoranda-based claims from the grant termination claims and channeled the latter to the CFC. *NIH*, 145 S. Ct. 2658 (per curiam). Likewise, in *California*, the plaintiffs had argued that that the terminations were "contrary to the Department's regulations and arbitrary and capricious when viewed in the light of the statutes authorizing those grants." *Sustainability Inst.*, 2026 WL 157120, at *6 (quoting *California* Plaintiffs' Opposition to Stay Application, 2025 WL 963588, at *22). Simply put, the fact that Plaintiff seeks to reverse the termination of the Competitive Grant Program writ large does not establish jurisdiction in this Court over Plaintiff's grant termination challenge.[4]

Following *California* and *NIH*, several Court of Appeals decisions have confirmed that attacking a policy of grant terminations is substantively identical to attacking a discrete grant termination. In *Sustainability Institute*, the Fourth Circuit held that an allegation that the government

---

[4] *See also Appalachian Voices*, 2025 WL 2494905, at *6 ("Plaintiffs, however, bundled together EPA's discrete actions (*i.e.*, the termination of individual grants), presented it as global events (*i.e.*, the termination of the Environmental and Climate Justice Block Grants programs)—and then crafted its claims as programmatic challenges instead of challenges to EPA's individual grant terminations. Plaintiffs cannot artfully plead around the Tucker Act by mounting a programmatic challenge to EPA's decision to cease a contractual relationship with them." (internal citation omitted)).

"froze or terminated grants *en masse*, allegedly without individualized analysis," did not transform the grant terminations into a challenge to a government policy subject to APA review. 2026 WL 157120, at *6. It concluded that "alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims." *Id.* The Ninth Circuit held likewise in *Thakur v. Trump*, where plaintiffs alleged a "mass termination of grants" by "form letter without any grant-specific explanation." No. 25-4240, __ F.4th __, 2025 WL 3760650, at *2 (9th Cir. Dec. 23, 2025).

Plaintiff alternatively frames its claims as partially constitutional, seemingly on the theory that such claims may always be brought in district court. But that is hard to square with the outcome of *NIH*, where the plaintiffs, as here, pleaded separation of powers claims and Spending Clause claims. *See* 145 S. Ct. at 2668 (Jackson, J.). The Federal Circuit has repeatedly emphasized that constitutional claims alleging that the government unconstitutionally violated a contract are still contract claims. *See Consolidated Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1384–85 (Fed. Cir. 2001) ("This case relates to a contract between the utilities and the Government," and the CFC "can supply an 'adequate remedy' to prevent the constitutional wrongs alleged by Con Ed."). The flip side is that Plaintiff is free to sue the government for contract-based disputes in whatever constitutional or statutory garb it desires, so long as it pleads those claims in the CFC. *See Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase [CFC] jurisdiction … or bar the [CFC] from considering the constitutional [due process] issue in the course of determining whether the discharge was wrongful."). In short, regardless of Plaintiff's attempts to recast its causes of action, the source of Plaintiff's asserted right to grant funding is essentially contractual under the first prong of the *Megapulse* test.

### 2.    Under *Megapulse*'s Second Prong, Plaintiff May Not Circumvent the Tucker Act Through Artful Pleading

Plaintiff's claims likewise sound in contract under the second prong of the *Megapulse* test— "the type of relief sought (or appropriate)," 672 F.2d at 968—because Plaintiff ultimately seeks the

money it was due under its individual grant. Specifically, the Complaint seeks, *inter alia*: (1) a declaratory judgment holding "that the Competitive Grant Program is not unlawful or unconstitutional, and therefore [that] the Defendants' termination of the Competitive Grant Program violates the Constitution"; (2) orders vacating and setting aside (a) "the termination of the Competitive Grant Program," and (b) all of Defendants' actions relating to the Competitive Grant Program" which are purportedly "unconstitutional or otherwise illegal"; and (3) an injunction prohibiting "Defendants … from imposing any negative consequences on Plaintiff for involvement in this litigation[.]" Compl. Prayer §§ A–D.

That Plaintiff nominally seeks forward-looking declaratory and injunctive relief, and orders vacating and setting aside the agency's grant terminations, "does not decide the issue" of whether an action, in essence, seeks contractual remedies. *Ingersoll-Rand*, 780 F.2d 79. The D.C. Circuit has stressed that a court must guard against "the creative drafting of complaints," lest litigants "'disguis[e]' … claim[s] for money damages as one[s] for equitable relief." *Crowley*, 38 F.4th at 1107 (first alteration in original) (citation omitted). Whether framed as "an order reinstating the original award of the contract," *Ingersoll-Rand*, 780 F.2d at 79–80; "[a]n order vacating the government's decision to terminate grants under the APA," *NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring and dissenting), or an order directing "the Government to stop withholding the money due under [certain agreements]," any request for "the Government to keep paying up" boils down to "the classic contractual remedy of specific performance," *Catholic Bishops*, 770 F. Supp. 3d at 163.

Plaintiff ultimately seeks to compel Defendants to *reinstate its award* under the Competitive Grant Program (in a matter that will entail reinstating all others) and to prevent future grant terminations. But as *Megapulse* recognized, the Tucker Act elevates substance over form: after all, any contractual claim can theoretically be reframed as an arbitrary-and-capricious claim, 672 F.2d at 967 & n.34, or any other cause of action. Plaintiff's carefully worded complaint downplays its quest for

monetary relief, claiming that Defendants have violated statutes and regulations. On the merits, its substantive and procedural challenges are both wrong. *See infra* §§ III-IV. But more importantly, these questions belong in the CFC. Plaintiff cannot evade the Tucker Act's limitations "merely by alleging violations of regulatory or statutory provisions rather than breach of contract." *Ingersoll-Rand*, 780 F.2d 77.

What's more, an injunction to vacate the termination of a grant is fundamentally indistinguishable from an injunction for specific performance—an inherently contractual remedy. By improperly framing this case as a general challenge to the termination of the Competitive Grant Program more broadly, NTIA invites the Court to enjoin the termination of that program. Compl. Prayer §§ A, B. Yet as *Sustainability Institute* recognized, "the relief [requested] by the [Complaint] here and the relief ordered by the district courts in *California* and [*NIH*] are substantially the same": reversal of the grant terminations and resumption of grant payments. 2026 WL 157120, at *7; *see also Thakur*, 2025 WL 1760650 (request for "vacatur of the termination notices and reinstatement of the terminated grants" was similar to *NIH*'s demand "'to enforce an[] obligation to pay money pursuant to [the] grants at issue'") (quoting *NIH*, 145 S. Ct. at 2658).

Finally, Plaintiff's requested relief—a "holding that the termination of the grant awards is unlawful" and unconstitutional, and orders setting aside the Department's termination of the entire Competitive Grant Program—simply "does not have 'considerable value' independent of the 'future potential for monetary relief.'" *Appalachian Voices*, 2025 WL 2494905, at *6 (citation and internal quotation marks omitted); *see id.* (noting that "'[s]uch 'non-monetary relief has little, if any, independent value from the future potential of monetary recovery.'" (quoting *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *13 (D.D.C. July 7, 2025)). Absent the "reinstatement of [Plaintiff's] grant[]," Plaintiff "will receive no monetary relief, which is what [it] ultimately hope[s] to attain." *Id.* In other words, Plaintiff's requested relief must track its asserted harm: here, both are

17

essentially monetary in nature.

Because Plaintiff's claims hinge on contractual disbursement of funding under a grant agreement, carefully pleading requests for equitable relief under the Constitution, a declaratory judgment, and vacatur under the APA cannot confer jurisdiction on this Court.

## C.    Plaintiff Lacks Standing for the Competitive Grant Program's Termination

To establish standing, a plaintiff must show an "injury in fact," a causal connection between the injury and Defendants' conduct, and a likelihood that "the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 560–61 (citation omitted). As the party invoking federal jurisdiction, Plaintiff "bears the burden of establishing these elements" and "must clearly … allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). And because "standing is not dispensed in gross," a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up). Plaintiff cannot make this showing for each of the claims it brings. Indeed, it purports to challenge the agency's termination of the Competitive Grant Program in its entirety. *See, e.g.*, Compl. ¶¶ 74, 82, 85, 90, 95, 97, 99, 104. Yet regardless of how it frames its Complaint, it lacks standing to mount a general challenge to grant terminations because a decision vacating that action would simply not remedy its individual grant termination injury (or any other cognizable injury).[5]

*First*, if Plaintiff is challenging the agency's general termination of the Competitive Grant Program separately from its discrete grant termination, it would still need to show a non-speculative

---

[5] Again, the Complaint appropriately discusses only one of the two DEA grant programs terminated by the Department: the Competitive Grant Program, under which Plaintiff received its grant. *Cf.* Compl. ¶¶ 42–49, 76, 82, 85, 90, 99, 110, Prayer §§ A–C. Plaintiff cannot (and indeed does not) challenge the agency's termination of the Capacity Grant Program. Because standing is not dispensed in gross, "a petitioner challenging distinct components of an agency's guidance must show that [the court has] jurisdiction to consider each claim." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (citing *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Here, Plaintiff is statutorily ineligible for Capacity Program grants, so it cannot have standing for a challenge thereunder. 47 U.S.C. § 1723(d)(1).

future injury to have standing to sue on any underlying policy, guidance, or memorandum. In *NIH*, the grant termination was the heart of the claim and the source of standing. As Justice Jackson put it, the "prospect [of reclaiming grant money] is also, one presumes, the only (or at least the primary) reason the grantee has Article III standing to sue at all." *Id.* at 2674 (Jackson, J., concurring and dissenting). In turn, because a plaintiff must maintain standing at every stage in the litigation, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), the fact that the Termination Letter might have conferred standing to challenge the termination of the Competitive Grant Program the day the Complaint was filed is no longer relevant once the Tucker Act kicks in. Plaintiff has not plausibly pleaded a non-speculative future injury that would confer standing for it to challenge any general termination of the Competitive Grant Program. Once the grant is excised, the Complaint pleads only the "asserted right to have the Government act in accordance with law"—the quintessential generalized grievance insufficient to create standing. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation omitted).

*Second*, if Plaintiff is alleging that the agency's general termination of the Program injured it *because* of its discrete grant termination, that injury is likely not redressable in district court. Even if the APA permits vacatur of agency actions, and "[e]ven if the [action] and grant terminations are linked, vacating [an agency's action] does not necessarily void decisions made under it." *NIH*, 145 S. Ct. at 2661 (Barrett, J.). To be more specific, Justice Barrett envisioned that "[i]f a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it *going forward*." *Id.* at 2662 n.1 (emphasis added).

Logically, *NIH*'s two-track procedure *presumes* that any APA relief in a successful general challenge to an agency's policy or guidance would be purely prospective. If Plaintiff could get all the relief it wanted in district court anyway, splitting the case in two—as *NIH* specifically dictates—would waste judicial resources. The two-track process deters litigants from pleading form over substance—

not generating additional form for its own sake. If it is impermissible to "end-run [the CFC's exclusive jurisdiction] simply by packaging [grant challenges] with a challenge to agency guidance," *id.* at 2662, it should be equally impermissible for Plaintiff to end-run that limit by pleading a challenge to the Program Termination and then carefully inserting a request for vacatur of "actions relating to" the termination at the very end, *see* Compl. Prayer § C.

Put plainly, Plaintiff lacks standing on each of its causes of action to bring a general challenge to the agency's termination of the Competitive Grant Program.

* * *

At bottom, the Court should dismiss the entire Complaint for lack of jurisdiction. Fed. R. Civ. P. 12(b)(1). (NTIA's April 9, 2025 email to Plaintiff is the subject of an ancillary allegation, which is also nonjusticiable. *See infra* § IV.D.) But in the alternative, the Court should dismiss the challenges to the Termination Letter and the general termination of the Competitive Grant Program for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

## II.    All of Plaintiff's Claims Fail Because the Competitive Grant Program Unconstitutionally Considers Race in Grantmaking

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 748 (2007). Or as the Supreme Court more recently put it, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*, 143 S. Ct. 2141, 2161 (2023). By contrast, the DEA's Competitive Grant Program expressly required the consideration of race in determining whether to award governmental broadband benefits. Such "divvying us up by race" required by the DEA—specifically, that grantees target "members of a racial or ethnic minority group" for program benefits and the government consider those racial classifications in awarding such grants, among others—"is a sordid business." *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring and dissenting). Perhaps unsurprisingly, the Secretary of

Commerce, in consultation with and as directed by the President, determined that such an express racial classification in federal grantmaking was unconstitutional. And "unless and until a final Court decision in a justiciable case says that a statutory mandate or prohibition on the Executive Branch is constitutional, the President (and subordinate executive agencies supervised and directed by the President) may decline to follow that statutory mandate or prohibition if the President concludes that it is unconstitutional." *In re Aiken County*, 725 F.3d 255, 261 (D.C. Cir. 2013); *see also id.* ("The President is of course not bound by Congress's assessment of the constitutionality of a statute.").

The Executive Branch was correct in that constitutional determination. To satisfy the Constitution, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. Under that test, Congress must show that the racial classifications "further compelling governmental interests." *SFFA*, 600 U.S. at 206–07 (simplified). And even if a compelling interest exists, any racial classification must still satisfy narrow tailoring—that is, a showing "that no workable race-neutral alternatives" would achieve that compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013). The Competitive Grant Program, as enacted by Congress, satisfies neither requirement and is unconstitutional discrimination. All of Plaintiff's claims therefore fail as a matter of law.

## A.    The Digital Equity Act's Competitive Grant Program Racially Discriminates

### 1.    The Classification Is Explicit and the Impact Is Direct

The Competitive Grant Program contains explicit and unconstitutional racial classifications. Recall that the DEA requires the issuing of awards to eligible entities "to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations." 47 U.S.C. § 1724(a)(1). As explained, the DEA defines "covered populations" to include, among others, "individuals who are members of a *racial or ethnic minority group*," *id.* § 1721(8)(G) (emphasis added). And by statute, the Competitive Grant Program mandates

21

applicants target their offerings at "covered populations"—including "members of a racial or ethnic minority group"—and mandates consideration of service to such covered populations—again, including "members of a racial or ethnic minority group"—as a factor when the government allocates those grants. *Id.* § 1724(d)(1)(A)(i), (d)(2)(A)(ii). Those grants are statutorily required to be used for one or more activities benefiting those "covered populations," such as "members of a racial or ethnic minority group," as a result. *Id.* § 1724(d)(2)(A)(i)–(vi). By its plain text, the DEA uses racial classifications to filter Program applicants and allocate Program awards. Such a racial grantmaking program is presumptively unconstitutional. *See Adarand*, 515 U.S. 200 at 235.

Although the statute is itself facially unconstitutional, the manner in which NTIA implemented it—that is, the Competitive Grant Program NOFO and Plaintiff's own grant apliccation under it—confirms the statute's unconstitutionality. Consistent with the DEA's statutory mandates, the NOFO required funding applicants to identify "the Covered Populations to be served including the expected number of individuals to be served within each Covered Population" and "the amount of funding to be devoted proportionally to each Covered Population." Ex. B at 26. The NOFO likewise effectuated the DEA's statutory mandate by requiring recipients to collect information regarding "the Covered Populations being served," "the total number of individuals being served," and "the number of individuals that belong to each Covered Population." *Id.* at 20. And "in assessing applications," the NOFO further explained, "the Assistant Secretary will consider, to the extent practicable, whether the proposed program will increase Internet access and the adoption of broadband among Covered Populations," *id.* at 14. The NOFO declared NTIA's intent to "ensure that all Covered Populations are being served" and "to balance the Covered Populations being served." *Id.* at 39.

For its part, Plaintiff's own grant application is proof positive of the DEA's statutory discrimination: it estimated that its project would serve "30,063 individuals" within the covered

populations, including 19,886 members of a racial or ethnic minority group—the single largest covered population category in the estimate, whether in raw numbers or proportionally. Ex. C at 7. Under the DEA's mandates, racial and ethnic minorities thus formed the *single largest target of grant funds* in Plaintiff's grant application. *Id.*

### 2.    Plaintiff's Defenses of the DEA's Racial Classifications Are Meritless

From its allegations, Plaintiff appears to recognize the DEA's constitutional infirmities and makes two arguments to head off strict scrutiny. But *SFFA* precludes both of them.

*First*, Plaintiff presses the theory that the DEA does not *require* NTIA to allocate grants to applicants who promise to benefit minorities. Compl. ¶ 47; 47 U.S.C. § 1724(c), (d)(1). This may be factually correct, but it is legally insufficient. The DEA allows NTIA to allocate Competitive Grant Program awards to an applicant that plans to work with (say) only veterans and prisoners. (Whether it did so is another question.) But it also requires NTIA to *consider* projected benefits to covered populations, including minorities, when picking winners and losers. *Id.* § 1724(d)(1)(A)(i). And when an agency allocates a limited resource—and here, Congress appropriated a sum certain—its selections are zero-sum. Therefore, it is not correct to say that "race is never a negative factor," as a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218–19. The DEA's use of race as a selection factor—even if it is one of several factors and is outcome-determinative in only "some" cases—is subject to strict scrutiny. *Id.* at 219 & n.6 (applying strict scrutiny because "race explains 1.2% of in state and 5.1% of out of state [college] admissions decisions").

*Second*, Plaintiff asserts that the DEA does not discriminate against individuals who do not fall within a covered population because grantees may not reserve their benefits exclusively for covered populations. Compl. ¶ 46. Once NTIA picks a winner based on the DEA's racial criteria, so Plaintiff's thinking goes, the grantee may not exclude people from federally funded grant projects on account of

protected characteristics like race, religion, or national origin. Yet this argument ignores the DEA's plain meaning. The DEA was designed to benefit covered populations, including "members of a racial or ethnic minority group." Nothing in the DEA is to the contrary. Indeed, it is precisely this sort of racial classification—which the DEA translates into express statutory requirements for the government to consider such a classification in grantmaking—that is offensive to equal protection under the Constitution. That Plaintiff and other grantees may not discriminate once they receive an award is obvious (hopefully). But it does nothing to cure the discrimination required by the statute in *making* that award.

### B. The Competitive Grant Program Fails Strict Scrutiny Because Congress Lacked a Compelling Interest for Its Racial Classification

#### 1. *Croson, Adarand, Shaw*, and *Wisconsin Legislature* Require Congress to Show Its Work

The Supreme Court has "identified only two compelling interests that permit resort to race-based government action": (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute"; and (2) "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207 (citations omitted). Only the former is potentially relevant here, and even then, the express racial preferences in the DEA's competitive grant program cannot qualify as remedial under governing precedent. For such a racial classification to constitute permissible legislation, Congress needs to make specific findings that support a compelling interest in racial remediation. Here, it is beyond dispute that Congress failed to make any such finding when it passed the Digital Equity Act in 2021. The caselaw has been clear for decades: statutory boilerplate and conclusory assertions are not enough. Rather, there must be a "strong basis in evidence for [Congress'] conclusion that remedial action was necessary." *Croson*, 488 U.S. at 500 (citation omitted). Congress "cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists." *Id.* at 501.

To the contrary, congressional findings should be *precise*: to impose a racial preference in a

given industry and jurisdiction, Congress must identify racial discrimination in that industry and jurisdiction. *See id.* at 500 (to earmark construction funding for minority-owned businesses, the City of Richmond needed to identify discrimination within the Richmond construction industry). Such findings should be *causal*: Congress may not prove discrimination by collecting bare statistical disparities between questionably related populations, which is tantamount to racial balancing. *Id.* at 501–03 (to prove discrimination, the City of Richmond could not simply assert that the percentage of city construction payments going to minority-owned businesses was lower than the percentage of minorities in the city).[6] They should be temporally *proximate*: Congress may not rely on generalized assertions of past "societal discrimination," such as "the history of discrimination in society at large," as those arguments have no judicially manageable end point beyond pure racial balancing. *Id.* at 496–97 (explaining that these arguments are "amorphous" and potentially "ageless"). They should be *robust*: even relevant statistical differences should be large enough and stable enough (through a sufficient sample size) to reflect a "strong basis in evidence." *Id.* at 503 (the statistical disparity must be "great enough [that] an inference of discriminatory exclusion could arise"). Finally, they should be *fresh*: because racial preferences are so dangerous, even a valid racial preference must be "a temporary matter … taken in the service of the goal of equality itself." *Id.* at 510; *SFFA*, 600 U.S. at 225 ("[R]ace-based admissions programs eventually had to end—despite whatever periodic review universities concluded.").

Congress—not an agency, and not a court—must make the requisite findings. "*Unless Congress clearly articulates the need and basis* for a racial classification, *and also tailors the classification to its justification*, the Court should not uphold this kind of statute." *Adarand*, 515 U.S. at 229 (citation omitted, emphasis in original). And Congress must make these findings *at the time it passes a race-conscious law*. It "must have

---

[6] In plainer terms, "[a]ny scientist or statistician must acknowledge … that correlation is not causation." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009).

had a 'strong basis in evidence' to conclude that remedial action was *necessary*, '*before* it embarks on an affirmative-action program.'" *Wisconsin Legis. v. Wisconsin Elec. Comm'n*, 595 U.S. 398, 404 (2022) (quoting *Shaw v. Hunt*, 517 U.S. 899, 910 (1996)) (emphasis added in *Wisconsin Legislature*). And it must make these findings "at the time of imposition." *Id.*

Finally, because Congress must make its own findings, a reviewing court can only infer Congress' basis for making a finding based on the evidence that Congress demonstrably had in front of it when it enacted the law. As the Supreme Court explained in *Shaw v. Hunt*, a governmental body might try to defend a racial classification by commissioning litigation expert reports, but those reports would be doubly superfluous. *See* 517 U.S. at 910. If they "were not before the [legislature] when it enacted [the challenged statute]," a court could not consider them in the present; and to the extent these reports summarized pre-enactment "historical events or social-science data," a court could not infer that any legislators actually "considered" those events or data from the existence of the litigation reports themselves. *Id.* Put simply, Congress may not backfill constitutionally insufficient findings with evidence gathered post-enactment—and particularly not when that evidence is assembled in the heat of litigation. *See Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1338 (Fed. Cir. 2005) ("[T]o be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification."). "[T]rial … is not the time for the state to undertake factfinding." *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 738 (6th Cir. 2000).

### 2.    There Were No Statutory Findings

The DEA is unsupported by *any* Congressional findings of racial discrimination in the broadband industry. Rather, the DEA simply found that the United States needed "additional and sustained investment and research efforts" to achieve "digital equity," defined as "the information technology capacity that is needed for full participation in the society and economy of the United States." 47 U.S.C. §§ 1721(10), 1722(3). It sought to "achieve digital equity" and "spur greater adoption

of broadband among covered populations." *Id.* § 1724(a)(1). It identified a statistical disparity and sought to narrow it. *Id.* § 1722(2). But it did not say what evidence reflected a disparity, how large it was, or which racial or ethnic minorities (presumably not all?) suffered from it. It did not trace the disparity to racial discrimination in the broadband industry. And it did not find any such discrimination. This is plainly insufficient.

What's more, to the extent Congress specified a cause for the disparities in broadband adoption, it identified economic conditions, *not intentional discrimination*. The DEA's preamble notes that covered populations face "wealth and income gaps." 47 U.S.C. § 1722(2)(C). In addition, the Competitive Grant Program's list of goals suggests that deterrents to broadband adoption may include insufficient infrastructure and training, and the high price of broadband subscriptions. *Id.* § 1724(d)(2)(A). These economic difficulties are not traceable to racial discrimination except in the most generalized "societal discrimination" sense of the term. But the Supreme Court has "repeatedly held that ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action." *SFFA*, 600 U.S. at 226; *see also Shaw*, 517 U.S. at 909–10 (noting that "an effort to alleviate the effects of societal discrimination is not a compelling interest"). "[T]he history of discrimination in society at large" is too "amorphous" a theory of injury to justify remedial racial classifications in the present. *Croson*, 488 U.S. at 496–97 (simplified).

Plaintiff does not—and indeed cannot—stretch Congress' (generalized and indistinct) finding of a statistical disparity into a backdoor finding of intentional discrimination. Congress, as the Supreme Court has explained, legislates with an understanding of black-letter law. *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010). And it is black-letter law that disparate impacts driven by causes beyond intentional discrimination are not constitutional violations. *Washington v. Davis*, 426 U.S. 229, 239–41 (1976). It is equally settled that racial balancing for balancing's sake is "patently unconstitutional," *SFFA*, 600 U.S. at 223 (citation omitted), as it opens the door to "racial politics,"

*Croson*, 488 U.S. at 511. Without specific findings of discrimination, the bare desire to narrow a statistical disparity is just that. Without "measur[ing] the recovery by the wrong … our history will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate 'a piece of the action' for its members." *Id.* (citation omitted). In short, a bare finding of a statistical disparity cannot displace the ordinary rule that "[t]he normal definition of discrimination is differential treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (simplified).

The DEA's drafting history is silent on the issue. The only two changes between its first introduction in April 2019 and its passage in November 2021 neither added nor subtracted legislative purposes or findings.[7] When Congress voted on the IIJA, no amendments specific to the DEA received a floor vote—either for or against.[8] And other provisions of the IIJA confirm that Congress did not make any findings of racial discrimination in the broadband industry. The IIJA separately directed the FCC to "prevent[] digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." 47 U.S.C. § 1754(b)(1). But that statute is facially race-neutral. It was drafted separately from the DEA, so the fact that it was enacted in the same 1,039-page appropriations bill as the DEA tells us little about the DEA's meaning. And on its own terms, it does not reflect a "strong basis in evidence" that racial discrimination has occurred—it is, at most, a bare suspicion that racial discrimination *might* occur. Congress frequently attaches prophylactic anti-discrimination rules to federal expenditures. *See, e.g.*, 42 U.S.C. § 18116 (Affordable Care Act). In fact, the DEA

---

[7] The IIJA made two substantive changes to the original 2019 bill. First, it raised the grant fund from $1.31 billion to $2.75 billion. *Compare* S. 1167 §§ 4(k), 5(*l*) *with* 47 U.S.C. §§ 1723(k), 1724(*l*). Second, it removed the requirement for NTIA to consider whether a grant application included a "socially and economically disadvantaged small business concern" as defined by Section 8(a)(4) of the Small Business Act. *Compare* S. 1167 §§ 2(21), 5(d)(1)(A)(ii) *with* 47 U.S.C. §§ 1721, 1724(d)(1).

[8] The House did not vote on any amendments to S. Amdt. 2137's version of the IIJA. The Senate took 23 votes on changes to S. Amdt. 2137. *See* S. Amdt. 2131, 2133, 2140, 2146, 2162, 2164, 2180, 2181, 2210, 2233, 2245, 2255, 2279, 2300, 2338, 2354, 2358, 2449, 2464, 2478, 2548, 2564, 2570.

preemptively imposed an anti-discrimination rule on future grantees before anyone received a dime of federal funds. *See* 47 U.S.C. § 1726.

Congress knows perfectly well that factfinding is the price of a racial classification. *See* IIJA § 11101(e)(1), 135 Stat. 448–49 (in the same enactment, refreshing statutory findings when reauthorizing the longstanding surface transportation disadvantaged business enterprise program). The DEA, however, contains no legislative findings of discrimination in the broadband industry necessary for the statute to constitute permissible, remedial legislation under the Fifth Amendment. That reality alone means the DEA's racial award criteria do not serve a compelling interest and thereby fail strict scrutiny.

### 3.    The Legislative History Says Little About Racial Discrimination

Legislative history is inherently a tricky tool. Some forms of it are more probative than others. Committee reports may be helpful, *Zuber v. Allen*, 396 U.S. 168, 186 (1969), but here, there weren't any. Although the DEA was enacted on the eighth try, only two of its vehicles received a report—in both cases *before* the DEA was rolled into them. *See* H.R. Rep. No. 116-437; H.R. Rep. No. 117-70.

Furthest down the totem pole lie "excerpts from committee hearings." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (citation omitted). Committee hearings on broadband sometimes mentioned bare racial disparities. But racial discrimination was not a common refrain.

Confirming this understanding, Rep. Clarke introduced an "Anti Digital Redlining Act" two days before S. Amdt. 2137 was introduced. *See* 167 Cong. Rec. H4304; H.R. 4875, 117th Cong. (2021). That bill did not pass, but even it did not attribute racial disparities in broadband adoption to intentional discrimination in the broadband industry, or even mortgage redlining.[9] Rep. Clarke instead

---

[9] One outside witness briefly said at a committee hearing that "racial minorities are already way behind in broadband adoption … because of structural discrimination, because of discriminatory lending practices and housing practices." She did not elaborate. *Empowering and Connecting Communities Through Digital Equity and Internet Adoption: Hearing Before the H. Subcomm. on Comm. & Tech.*, 116th Cong. 81 (Jan.

argued that disparities were caused by collusion between landlords and internet service providers to thwart free-market competition. *See id.* § 2(a)(9)–(12).

### C.     The Racial Classification Is Not Narrowly Tailored

Congress's lack of a compelling interest for the DEA's racial classification is dispositive of the Competitive Grant Program's unconstitutionality. Yet even if the statute's racial classification were supported by a compelling interest, that classification independently fails strict scrutiny because it is not narrowly tailored. Narrow tailoring requires the government to show "that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher*, 570 U.S. at 312. In assessing whether a racial classification is narrowly tailored, courts consider a variety of factors, including whether the policy at-issue is over- or under-inclusive, the duration of the discriminatory program, and whether the program has a coherent goal. *See SFFA*, 600 U.S. at 214–217; *United States v. Paradise*, 480 U.S. 149, 171 (1987). The Competitive Grant Program's use of racial classifications fails under any of these factors.

*First*, the DEA's racial classification is far from "necessary" to achieve its stated objective. *See SFFA*, 600 U.S. at 206–07. It is black-letter law that Congress is required to consider race-neutral alternatives before enacting racial classifications. *Croson*, 488 U.S. at 507–08. The IIJA contains *many* race-neutral proposals in addition to the DEA's racial classification, such as infrastructure funding and targeted access to low-income households, rural residents, and other covered populations.

---

29, 2020) (statement of G. Sohn). This claim does not come close to supporting a racial classification. *First*, even if a Member of Congress had said it, it would have been the sort of *ipse dixit* "pronouncement[] of necessity [that] has no place in equal protection analysis." *Croson*, 488 U.S. at 501. *Second*, there is no evidence that Congress even paid attention to this theory. *Food Mktg. Inst.*, 588 U.S. at 437 (court should not "rel[y] heavily on statements from witnesses in congressional hearings years earlier on a different bill that was never enacted into law"). *Third*, even if Congress took this statement at face value (and it did not), the Supreme Court has repeatedly rejected theories of present injury based on past housing discrimination. *Compare Croson*, 488 U.S. at 505 (plurality) *with id.* at 544 & 545 n.8 (Marshall, J., dissenting); *Parents Involved*, 551 U.S. at 731–32 (characterizing school district's desire to "address the consequences of racially identifiable housing patterns" as a standard "societal discrimination" argument).

But Congress did not wait to see whether these race-neutral measures could narrow the "digital divide" on their own. In particular, Congress should not have enacted a racial classification without first checking for a statistical disparity among individuals who were not already part of the other seven covered populations.

*Second*, the DEA's use of racial or ethnic classifications "lack[s] a 'logical end point.'" *SFFA*, 600 U.S. at 221 (citation omitted). Rather, the discrimination will persist as long as Congress continues the fund the program, ensuring "'that race will always be relevant ... and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* at 221 (quoting *Croson*, 488 U.S. at 495). Congress initially appropriated five years of funding for the Competitive Grant Program, 47 U.S.C. § 1724(*l*)(1), but the Program itself will exist until a court or Congress gets rid of it, *cf. id.* § 1724(*l*)(2) ("There are authorized to be appropriated ... such sums as may be necessary ... after the end of the 5-fiscal year period described in paragraph (1).").

*Third*, "[t]he gross overinclusiveness of [the DEA's] racial preference strongly impugns [Congress'] claim of remedial motivation." *Croson*, 488 U.S. at 506. Although "covered populations" is defined to include "individuals who are members of a racial or ethnic minority group," 47 U.S.C. § 1721(8), "minority group" is undefined in the statute. The Competitive Grant Program's consideration of race is thus inherently overinclusive, as it encompasses any individuals who fall within (undefined) racial or ethnic minority groups, absent any determination that those groups have faced discrimination in access to broadband. *See Strickland v. U.S. Dep't of Agric.*, 736 F. Supp. 3d 469, 483 (N.D. Tex. 2024) (finding the racial classification system employed in a USDA emergency relief program, which allocated more relief funds to farmers of certain races, is "over-inclusive because ... USDA provides additional relief to farmers of its preferred races absent any showing that they needed additional relief"). As the *Croson* Court noted, the "random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in [the

31

relevant location]," implies that a racial classification's remedial rationale (if any) may be a pretext. *Id.*; *see also SFFA*, 600 U.S. at 215–16 (the use of overbroad and/or amorphous racial categories like "Asian" and "Hispanic" fails to "articulate a meaningful connection between the means [the colleges] employ and the goals they pursue"). So too here.

*Fourth*, and finally, absent from the DEA is any measurable basis for determining when the Competitive Grant Program has achieved the amorphous goal of "support[ing] efforts to achieve digital equity, promot[ing] digital inclusion activities, and spur[ring] greater adoption of broadband among covered populations." 47 U.S.C. § 1724(a)(1). *See SFFA*, 600 U.S. at 214–15. This too establishes a lack of narrow tailoring.

\* \* \*

In sum, the DEA's racial classification neither serves a compelling governmental interest nor is narrowly tailored to achieve that interest. A failure to make either showing is constitutionally dispositive; here, the DEA lacks both. Because the DEA discriminates on the basis of race in violation of the equal protection component of the Fifth Amendment, the Executive Branch was correct that the Competitive Grant Program is unconstitutional. The Executive is permitted—in fact, obligated— to decline to enforce unconstitutional laws. Defendants' decision to terminate Plaintiff's award flows from this constitutional mandate and does not offend the separation of powers. *Contra* Compl. ¶¶ 71– 76. And because the Department properly and reasonably terminated the grant, it neither contravened the Constitution nor acted in excess (or violation) of its statutory authority.

As a result, all of Plaintiff's claims premised on the constitutional determination fail as a matter of law and must be dismissed for failure to state a claim.

### III.    The Constitutional Challenges Should Be Dismissed

Courts have sometimes characterized constitutional claims as a non-statutory exception to sovereign immunity that permit injunctive relief against an official-capacity defendant acting "beyond [his] statutory or constitutional authority." *Pollack v. Hogan*, 703 F.3d 117, 119–20 (D.C. Cir. 2012) (citations omitted).[10]

The threshold question is whether the claim is actually constitutional. Courts distinguish between claims that a federal actor violated a statute (better known as *ultra vires* claims) and claims that they violated the Constitution. *Sustainability Inst.*, 2026 WL 157120, at *8. The elements of an *ultra vires* claim are exceptionally high. *See Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). *Ultra vires* review "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Reg. Comm'n*, 605 U.S. at 681–82 (citation omitted).

Grant programs being creatures of statute, grant termination plaintiffs seeking to evade the Tucker Act are frequently tempted to repackage *ultra vires* claims as constitutional ones. *See Global Health Council*, 153 F.4th at 13–17; *Sustainability Inst.*, 2026 WL 157120, at *8–10. When evaluating those labels, courts place substance over form. *Dalton v. Specter*, 511 U.S. 462, 472–74 (1994). As an initial matter, claims alleging that government unconstitutionally violated a contract are still contract claims, and are subject to Tucker Act channeling. *See infra* section I.B.1. Even if they are not, constitutional claims alleging that the government violated a statute are just statutory *ultra vires* claims, and *ultra vires* review is unavailable when an APA claim exists or when the President is the defendant. Plaintiff's Spending Clause claim independently fails on the merits.

---

[10] Because these principles apply only to official-capacity defendants, Counts I and II—which the Complaint pleads against all defendants—should independently be dismissed against all the agency defendants (OMB, Commerce, NTIA, and NIST).

A. **Plaintiff's Constitutional Claims Fail Because All of Plaintiff's Challenges May Be Pleaded in the Proper Forum**

1. **Plaintiff May Not Repackage *Ultra Vires* Claims as Constitutional**

Constitutional claims alleging that the government violated a statute are just statutory *ultra vires* claims. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472. When this happens, courts simply evaluate the "constitutional" claim under *ultra vires* standards. *Id.* at 474. "If every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception … would be broadened beyond recognition." *Id.*; *Global Health Council*, 153 F.4th at 14. This case exemplifies what *Dalton* feared: Plaintiff doesn't plead an *ultra vires* claim at all.

- Count I (Separation of Powers) pleads that "Congress has exercised its Article I legislative power to require [the Department of] Commerce to establish and carry out the Competitive Grant Program under the Digital Equity Act" and that "Defendants' termination of the Competitive Grant Program exceeded their authority under Article II of the Constitution." Compl. ¶¶ 74–75.

- Count II (Violation of the Spending Clause) pleads that Article I's Spending Clause vests Congress with exclusive authority to "impose[] spending mandates on the Department of Commerce", and that "[t]he Executive Branch has no power to amend or rescind appropriations that conflict with its priorities." *Id.* ¶¶ 79–81.

These arguments are precisely the sleight of hand rejected in *Dalton*, and the D.C. Circuit's recent application of *Dalton* to materially similar claims "controls this case." *Global Health Council*, 153 F.4th at 17. An allegation that the Executive Branch terminated a grant program created by statute is, at bottom, an allegation that the Executive Branch violated a statute. The Fourth Circuit's *Sustainability Institute* decision explains it well: an allegation that the government violated "Congress's directive[] in the … IIJA … to carry out and fund the statutory [grant] programs at issue in this case" is an *ultra*

*vires* claim, not a statutory claim. 2026 WL 157120, at *10 (emphasis in original). The first paragraph of the complaint bears out that this is a statutory argument through and through: "Plaintiff … brings this lawsuit to challenge the unilateral repeal by the Executive Branch of the Digital Equity Competitive Grant Program, which Congress required under the Digital Equity Act of 2021[]." Compl. ¶ 1. Plaintiff repeats this refrain throughout its Complaint.[11] Because "Congress gave the Executive authority to issue grants under the various statutes at issue here," and "without the appropriations statutes there could be no improper withholding of funds," the claims are statutory. *Sustainability Inst.*, 2026 WL 157120, at *10.

### 2.    The President Should Be Dismissed from the Suit

"[I]t is unclear whether *ultra vires* review is available at all" against the President. *American Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("an *ultra vires* action is a suit in equity, … and courts generally lack authority to enjoin the President") (citation omitted). Plaintiffs rightly do not plead APA claims against the President, who is "not an agency within the meaning of the Act." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). It follows that the Court should independently dismiss the President from the suit.

### 3.    The Allegations Do Not Meet *Ultra Vires* Standards

"To prevail on an ultra vires claim, the plaintiff must establish that (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim[,] and (3) the challenged action is plainly in excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Global Health Council*, 153 F.4th at 20 (simplified).

*Ultra vires* review is unavailable because in their respective spheres, the CFC and the District

---

[11] "The Act requires Commerce to create the Digital Equity Competitive Grant Program"; "The Act required Commerce to award grants under the Competitive Grant Program"; "Neither the President nor the Executive Branch has any constitutional power to unilaterally repeal duly enacted statutes"; "The Digital Equity Act [] specifically … required Defendants to follow defined procedures for notice and opportunity to respond"; and so forth. Compl. ¶¶ 42, 44, 73, 89.

Court are open for business. *See Vera Inst.*, 2025 WL 1865160, at *17 ("[T]he *ultra vires* claim is simply a variant of their other claims, for which there are adequate forms of judicial review both in this court and the Court of Federal Claims."); *National Bus. Aviation Ass'n, Inc. v. FAA*, 496 F. Supp. 3d 102, 111 (D.D.C. 2020) (when plaintiffs could have moved to intervene in district court in California, *ultra vires* review in D.D.C. was unavailable). Under *NIH*'s two-track process, "[e]ach forum has the authority to fully adjudicate the claims over which it has jurisdiction." 145 S. Ct. at 2662 n.1 (Barrett, J.). "If the CFC concludes that the Government breached a grant agreement, it may award relief to the grantee. If a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward." *Id.*

 *Ultra vires* review is particularly inappropriate for any challenges to the program termination because if an APA claim is available, an *ultra vires* claim is not. *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199–201 (D.D.C. 2024). Since *NIH*'s controlling concurrence leaves the Program Termination challenge in the district court, sovereign immunity does not bar APA claims with respect to the Program Termination and *ultra vires* relief is unavailable. The fact that Defendants challenge Plaintiff's standing to challenge the Program Termination (in the District Court) *at this present juncture* is not a basis to permit an otherwise impermissible *ultra vires* claim. *NBAA*, 496 F. Supp. 3d at 114 (rejecting contention that "it is uncertain whether the sought-after review will actually be granted" in the other forum).[12]

---

[12] *Ultra vires* review is independently unavailable for the grant termination because the termination of a grant to which Plaintiff has no statutory entitlement is far from a violation of a "specific prohibition" in the DEA. *Ultra vires* claims may not "repackag[e] … APA claims." *Masroor v. Noem*, 2025 WL 2439176, at *4 (D.D.C. Aug. 25, 2025) (Bates, J.) (explaining that *ultra vires* allegations must go "beyond mere legal or factual error"). The term "specific prohibition in the statute" is construed narrowly: an official-capacity defendant "violates a clear and mandatory statutory command only when the error is so extreme that one may view it as jurisdictional or nearly so." *Global Health Council*, 153 F.4th at 20. "Moreover, the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Id.* Putting it all together, *ultra vires* review is available only when Congress imposed an express prohibition on the specific challenged action *as applied to Plaintiff*. In the context of a grant termination,

**B.    The Complaint Fails to Plead a Plausible Spending Clause Claim**

Count II's Spending Clause claim independently fails to plead a plausible entitlement to relief under Rule 12(b)(6) because it does not apply here. Plaintiff contends that "[t]he Executive Branch has no power to amend or rescind appropriations that conflict with its priorities"; that "[i]n enacting the Digital Equity Act and its appropriations, Congress lawfully imposed spending mandates on the Department of Commerce"; and that the "Agency Defendants contravened and defied those mandates by imposing policy in contravention of those mandates and cancelling the Competitive Grant Program, in violation of the U.S. Constitution, art. I, §8, cl. 1." Compl. ¶¶ 80–81.

The Spending Clause is inapplicable here because it only limits Congress' power to legislate and thus has no application to Executive Branch decisions about how to expend funds appropriated by Congress—particularly where, as here, the agency *did not impose any additional funding conditions upon Plaintiff's award beyond the terms of the grant agreement. See Bd. of Educ. for the Silver Consol. Schs. v. McMahon*, 2025 WL 2017177, at *10 (D.N.M. July 18, 2025) ("[T]he Spending Clause is only implicated 'when Congress imposes a spending or funding condition.' And without alleging congressional action, [p]laintiff 'cannot state a claim under the Spending Clause.'" (quoting *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025), *amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025)).

Plaintiff's Spending Clause claim centers purely upon *Executive* action in implementing policies in purported "contravention of [spending] mandates" imposed on the Department by Congress, and in "cancelling the Competitive Grant Program," Compl. ¶ 81—not upon any legislative (or, for that

---

"specific prohibition" means that plaintiffs must find "a statute that specifically prohibits the Government from freezing or terminating *their* grants." *Sustainability Inst.*, 2026 WL 157120, at *12 (emphasis in original). Because the DEA "do[es] not require … that [Plaintiff itself] receive any funds"—only that "certain funding be available for obligation"—*ultra vires* review is unavailable. *Id.* If Congress had earmarked an appropriation for Plaintiff, that might be different. But it did not.

matter, Executive) imposition of spending or funding conditions. Plaintiff has thus failed to state a claim for relief under the Spending Clause. *See McMahon*, 2025 WL 2017177, at *10; *Wilmer Cutler Pickering Hale & Dorr LLP*, 784 F. Supp. 3d at 162. Count II should be dismissed.

## IV.  Plaintiff's APA Claims Fail as a Matter of Law for Other Independent Reasons

The Tucker Act precludes any APA challenge to the grant termination. *See supra* § I. Standing defects warrant dismissal of any APA challenge to the termination of the Competitive Grant Program writ large. *See supra* § I.C. But beyond that, Plaintiff's APA claims fail with respect to all three sets of issues implicated in this case: the grant termination, the termination of the Competitive Grant Program, and an email NTIA sent Plaintiff in April 2025, before the grant termination.

### A.  Counts IV and V Fail to State a Claim Because the Agency Followed Proper Procedures in Terminating Plaintiff's Award

NTIA's termination of Plaintiff's award procedurally complied with applicable Commerce regulations and was expressly authorized by 47 U.S.C. § 1724(g)'s reference to "other authority under applicable law." *Contra* Compl. ¶¶ 89–90 (Count IV), 95–97 (Count V). As the Termination Letter explained, the agency terminated the grant under 2 C.F.R. § 200.340, the termination provision of the Office of Management and Budget's Uniform Administrative Requirements, better known as the Uniform Guidance (OMB and UG). Ex. A.

The UG is a set of uniform guidances for federal grants, codified at 2 C.F.R. Part 200. In 2014, various federal grant-making agencies—including the Department of Commerce—adopted the UG by regulation. *See Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 79 Fed. Reg. 75871, 75873, 76050 (Dec. 19, 2014). The regulation for Commerce can be found at 2 C.F.R. § 1327.101. The term "federal award" includes grant agreements. *Id.* § 200.1. Federal agencies that adopt the UG may terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or

agency priorities." *Id.* § 200.340(a)(4). Plaintiff acknowledges that the grant award "incorporat[ed] 2 C.F.R. Part 200." Compl. ¶ 60; *see also* Ex. D at 1 (grant award confirming this), Ex. B at 44 (NOFO further previewing this).

The Complaint does not allege that the award no longer "effectuate[d] the program goals or priorities."[13] Nor could it: paying a grantee that was chosen through unconstitutional criteria furthers no constitutionally legitimate goals or priorities.[14] Instead, it asks the Court to vacate the grant termination under the APA because NIST summarily denied its appeal. Ex. G. Plaintiff suggests in its pleadings that the termination of its grant violated two separate procedural provisions through that termination and appellate denial: *first*, the UG's own appeal procedures, Compl. ¶¶ 51, 98, and *second*, the DEA's procedure for grant terminations (which NTIA incorrectly contends is exclusive), *see* 47 U.S.C. § 1724(g); Compl. ¶¶ 50, 89, 95–96. Both of these purely procedural contentions are premised upon Plaintiff's (contractual) grant agreement, and must go to the CFC as a result. *See Spectrum Leasing*, 764 F.2d at 892–94; *Ingersoll-Rand*, 780 F.2d at 78. In any event, both are wrong. Accordingly, Counts IV and V must be dismissed for failure to state a claim under Rule 12(b)(6).

### 1.  Plaintiff's Grant Termination Was Governed by 2 C.F.R. § 200.340(a)(4), Which Does Not Provide Appellate Rights

The UG's appeal procedures and response rights do not apply here, so Plaintiff was not legally entitled to any further administrative process before termination. To start, the UG permits a grant-making agency to terminate a grant, "in part or its entirety," in four circumstances: (1) by the agency if the grantee "fails to comply with the terms and conditions" of the grant; (2) mutual consent; (3) at

---

[13] The Complaint briefly states that "[t]he Executive Branch has no power to amend or rescind appropriations that conflict with its priorities," but in the context of its constitutional challenge (which, for the reasons discussed above, is actually an *ultra vires* challenge). Compl. ¶ 80. The portion of the Complaint challenging the § 200.340 decision lodges a solely procedural objection. *Id.* ¶ 98.

[14] More broadly, policy shift is a natural outgrowth of the democratic process. Nothing in the Complaint is to the contrary. "[N]ew administrations are entitled to reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 158 (D.C. Cir. 2019).

the grantee's request; and (4) as relevant here, "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). Under any circumstance, the agency "must provide written notice of termination to the recipient or subrecipient[,]" including "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." *Id.* § 200.341(a).

Yet neither the UG writ large nor 2 C.F.R. § 200.342 specifically guarantees a universal right to appeal or further process as Plaintiff pleads. *See* Compl. ¶ 98. Plaintiff alleges that the UG requires the agency to provide "an opportunity to object and provide information challenging the action." *Id.* ¶ 98 (alleging that "[t]he termination … failed to provide Plaintiff or any other recipient with 'an opportunity to object and provide information challenging the action[,]' in violation of the regulations governing Commerce grant awards" (quoting 2 C.F.R. § 200.342 (alternate citation omitted))); *id.* ¶ 51. That's only half of 2 C.F.R. § 200.342, though; the other half, selectively omitted from Plaintiff's complaint, clarifies that Plaintiff has no right to appeal: "*Upon initiating a remedy for noncompliance* (for example, disallowed costs, a corrective action plan, or termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." (Emphasis added.)

Section 200.342, based on a plain reading, instead guarantees a right to appeal only after "initiating a remedy for noncompliance." *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089–90, 30169 (Apr. 22, 2024) (explaining that this provision "requires Federal agencies to provide administrative appeal rights upon initiating a remedy for noncompliance," and that appeal rights are otherwise governed "by applicable statutes or agency regulations"). And crucially here, the Termination Letter never said Plaintiff's award was terminated for *noncompliance*. Instead, it specifically quoted § 200.340(a)(4)'s statement that awards may be terminated if they "no longer effectuat[e] the program goals or priorities." Ex. A. That distinction matters, as the UG treats noncompliance

40

differently at every step. If the agency terminates an award "due to the recipient's material failure to comply with the terms and conditions of the Federal award"—that is, 2 C.F.R. § 200.340(a)(1)—the agency is required to publicly post the termination on SAM.gov. *Id.* § 200.340(c). Special notification requirements apply to terminations for noncompliance. *Id.* § 200.341(b). A unique guarantee of appeal attaches to terminations for noncompliance. *Id.* § 200.342. And to facilitate that guarantee, a special delay period applies to terminations for noncompliance: the agency may not post the termination on SAM.gov *until* the recipient has either "[e]xhausted its opportunities to object or challenge the decision *(see § 200.342)*", or declares an intent to appeal within 30 days. *Id.* § 200.340(c) (emphasis added).

At bottom, § 200.342 cannot be said to create a general right to appeal when, in that precise section of the Code, OMB created a specific right to appeal for only one of the four bases for termination in § 200.340(a)—that of noncompliance. *See United States v. Johnson*, 529 U.S. 53, 58 (2000).

## 2.    Section 1724(g) Does Not Limit Terminations to Noncompliance

In that same vein, Plaintiff presses the position in Counts IV and V that a 47 U.S.C. § 1724(g) termination for noncompliance is the *only* way to terminate a Competitive Grant Program award. It says the DEA "only permits" termination for the given subject matter for which notice and an opportunity for a hearing is *required*. Compl. ¶ 96; *see also id.* ¶¶ 50, 89 (similar). But once again, the Complaint selectively misquotes the applicable law in its pleading. Section 1724(g) does not provide the exclusive grounds and procedural requirements for deobligating or terminating a Competitive Grant Program award: rather, it operates "*[i]n addition to other authority under applicable law*[.]" 47 U.S.C. § 1724(g) (emphasis added). Here, that "other authority" is § 200.340(a)(4)'s grant termination mechanism—to say nothing of the Executive Branch's independent constitutional determination. So the UG's default guidance for terminations governs under § 200.340(a)(4), foreclosing any appeal right as a result. Because neither statute nor regulation guarantees Plaintiff a right to appeal, Counts IV and V should be dismissed.

41

**B.      Count VI Does Not Plausibly Allege that NTIA's Termination of the Competitive Grant Program Was Arbitrary and Capricious**

As discussed above, Plaintiff lacks standing to mount a general challenge to the agency's termination of the Competitive Grant Program. But even if it had standing to bring such a challenge, Count VI has not plausibly alleged that the policy terminating awards under the Competitive Grant Program, as articulated in the Termination Letter, was arbitrary and capricious. *Contra* Compl. ¶¶ 104– 110. The Termination Letter expressly stated that the grant was terminated for two interrelated reasons: (1) because, as the President and the Secretary concluded, the "Digital Equity Competitive Grant Program, 47 U.S.C. § 172[4], is unconstitutional and grants issued pursuant to it were created with, and administered using, impermissible and unconstitutional racial preferences"; and (2) under 2 C.F.R. § 200.340(4), because the "award no longer effectuates the program goals or priorities." Ex. A.

As for the former rationale—the determination that the Program is unconstitutional—no further explanation was necessary. Under the equal protection component of the Fifth Amendment's Due Process Clause, race-based classifications are presumptively unconstitutional. *See, e.g.*, *Adarand*, 515 U.S. at 234, 235; *see also Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) ("[T]he moral imperative of racial neutrality is the driving force of the Equal Protection Clause, and racial classifications are permitted only as a last resort."). The Complaint does not proffer any facts sufficient to show why, under the circumstances, the agency was obligated to offer a more detailed explanation for terminating an award issued under a presumptively unconstitutional, racially discriminatory Program. Indeed, a court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). That is plainly the case here.

As for the latter rationale—that Plaintiff's award no longer "effectuate[d] the program goals or [agency] priorities"—no further explanation was necessary, either. As noted above, awarding federal monies to a grantee that was selected using unconstitutional, racially discriminatory criteria, by definition, advances no constitutionally permissible goals or agency priorities. Plaintiff may disagree

with the Department's appraisal of its own priorities, but under the APA, it is the agency's assessment that is entitled to deference. *See, e.g., Plunkett v. Castro*, 67 F. Supp. 3d 1, 10 (D.D.C. 2014) ("The arbitrary and capricious standard of review is highly deferential; the reviewing court will 'defer to the wisdom of the agency, provided its decision is reasoned and rational.'" (quoting *Dillmon v. Nat'l Transp. Safety Bd.,* 588 F.3d 1085, 1089 (D.C. Cir. 2009) (quotation marks and citations omitted)); *cf. California v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (noting that a court is "prohibited from 'second-guessing the [agency's] weighing of risks and benefits and penalizing [it] for departing from the … inferences and assumptions' of others" (citation omitted)). In sum, the agency reasonably terminated Plaintiff's award under the Competitive Grant Program for the reasons set forth in the Termination Letter; and neither the governing regulations nor the APA's deferential arbitrary and capricious standard require anything more.

### C.    Count III Fails Because the Constitutional Claims Fail

"An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." *Nat'l Educ. Ass'n v. U.S. Dep't. of Educ.*, 779 F. Supp. 3d 149, 197 (D.N.H. 2025). Because Plaintiff lacks viable constitutional claims, *see supra* § III (discussing Counts I-II), Plaintiff's APA § 706(2)(B) contrary to constitutional right, power, privilege, or immunity claim (Count III) should be dismissed with them.

### D.    Plaintiff's Attack on the April 9, 2025 Email Fails on Threshold Grounds

Plaintiff separately brings an APA arbitrary and capricious challenge to an email NTIA sent on April 9, 2025, where NTIA said that it would disallow cost recovery for "diversity, equity, and inclusion conferences, trainings, and/or professional development." Compl. ¶¶ 13, 65, 103, 109 (citing 5 U.S.C. § 706(2)(A)). The April 9 Email set forth general principles and promised to "provide additional information" as "more information becomes available." Ex. C.

The April 9 Email may come before a court someday, but today is not that day. A basic

principle of administrative review is that the agency has the first opportunity to resolve a challenge to administrative action. The agency can clarify its position, apply it to specific situations, consider counterarguments, and maybe even withdraw a policy. *See generally Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006). Even if administrative processes fail to defuse the dispute, they will at least give a reviewing court "a useful record for subsequent judicial consideration." *Id.* at 89. Such processes never played out here—and that generates several threshold problems precluding judicial review.

*First*, administrative exhaustion. "[C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 34 U.S. 33, 37 (1952). Here, Plaintiff doesn't appear to have lodged a contemporaneous objection. Its administrative appeal never mentioned the April 9 Email. Ex. F. The fact that the Secretary cancelled the underlying grant program a month later is not a basis to challenge the email in the first instance in district court. *Tesoro Refining & Mktg. Co. v. FERC*, 552 F.3d 868, 873–74 (D.C. Cir. 2009).

*Second*, finality. A vaguely worded policy is unlikely to be a final agency action. *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943–44 (D.C. Cir. 2012) (FDA warning letter saying "it *appears* your ear candles are intended to mitigate or treat" health issues and that "FDA *will evaluate* the information you submit and decide whether your product may be legally marketed" was too "tentative or interlocutory" for judicial review) (emphasis in original). The April 9 Email did not define the term "DEI." Ex. C. In fact, it acknowledged that further elaboration might be needed. It added—in language the Complaint does not quote—that "[a]s more information becomes available, we will provide additional information." Ex. C. This is a quintessentially non-final statement.

*Third*, standing and ripeness. The April 9 Email would not be ripe for review because even assuming for standing purposes that this Court may restore Plaintiff's grant, Plaintiff has not presented NIST with a claim for cost recovery. *See generally* Compl. ¶¶ 64–67. Plaintiff's challenge to

the email would likely have a constitutional component, and a court should not reach a constitutional issue until the agency has an opportunity to liquidate the email's meaning and effect. *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1106–07 (D.C. Cir. 2011). For that same reason, Plaintiff has not suffered a concrete injury for Article III standing purposes. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (rejecting argument based on "allegations of *possible* future injury").

The Court should not reach the April 9 Email, whose inclusion in the Complaint is an improper invitation to short-circuit the administrative decision-making process.[15]

## CONCLUSION

The Complaint should be dismissed for lack of jurisdiction, or in the alternative, for failure to state a claim.

---

[15] Depending on how the Court rules on the earlier issues, further jurisdictional barriers could also apply to the Complaint's arbitrary and capricious challenge to the April 9 Email (Count VI; Compl. ¶ 109). If the Court dismisses the challenge to the termination of the Competitive Grant Program, the termination of the program supersedes the email and moots any challenge to it. *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 359 (D.C. Cir. 1997). If the Court denies Tucker Act channeling and upholds the grant termination on the merits, Plaintiff would lack standing to challenge the policy because the termination of Plaintiff's grant prevents the policy from applying to Plaintiff in the future. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) (former criminal defendants lacked standing to challenge judicial procedures after release).

Dated: February 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

*/s/ Winston Shi*
WINSTON SHI (NY Bar No. 5747068)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel.: 202-880-0387
E-mail: winston.g.shi@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

The Department of Justice electronically filed this document today, February 6, 2026, by the Court's CM/ECF system. This document was distributed via that system.

*/s/ Winston Shi*
Winston Shi