# Exhibit B

**NOTICE OF FUNDING OPPORTUNITY**
**DIGITAL EQUITY COMPETITIVE GRANT PROGRAM**
**EXECUTIVE SUMMARY**

### A. Federal Awarding Agency Name

National Telecommunications and Information Administration (NTIA), U.S. Department of Commerce

### B. Funding Opportunity Title

Digital Equity Competitive Grant Program

### C. Announcement Type

Initial

### D. Funding Opportunity Number

NTIA-DECGP-2024

### E. Assistance Listing (CFDA Number)

11.036

### F. Key Dates

Complete applications from Eligible Entities, including Indian Tribes, Alaska Native entities, and Native Hawaiian organizations ("Native Entities") must be received through the NTIA Grants Portal (https://grants.ntia.gov) no later than 11:59 p.m. Eastern Time (ET) on September 23, 2024.

Complete applications from the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other territory or possession of the United States ("U.S. Territories") must be received through the NTIA Grants Portal (https://grants.ntia.gov) no later than 11:59 p.m. Eastern Time (ET) on October 22, 2024.

Application materials are available at https://broadbandusa.ntia.doc.gov.

NTIA expects to begin issuing awards to applicants pursuant to this Notice of Funding Opportunity ("NOFO") by Winter of 2024 and no later than April 20, 2025.  NTIA expects to make awards on a rolling basis.

### G. Application Submission Address

All applicants must submit complete application packets through the NTIA Grants Portal (https://grants.ntia.gov).  Applications or portions thereof submitted through postal mail, courier, email, facsimile, or other means will not be accepted.

### H. Funding Opportunity Description

This Notice of Funding Opportunity solicits applications for the Digital Equity Competitive Grant Program ("Competitive Grant Program" or "Program"), the third of three digital equity programs authorized by the Infrastructure Investment and Jobs Act of 2021, Division F, Title III, Public Law 117-58, 135 Stat. 429, 1209 (November 15, 2021) ("Infrastructure Act") also known as the ("Digital Equity Act" or "DE Act").  The Digital Equity Act appropriated $2.75 billion to be awarded by the Assistant Secretary of Commerce for Communications and Information ("Assistant Secretary") to promote digital equity and inclusion.

The Digital Equity Act consists of three funding programs: (1) the $60 million State Digital Equity Planning Grant Program; (2) the $1.44 billion State Digital Equity Capacity Grant Program; and (3) the $1.25 billion Competitive Grant Program. The Digital Equity Planning Grant Program was launched in May of 2022 and is now complete.  Under the Planning Grant Program, 56 States and U.S. Territories created Digital Equity Plans that identified the barriers to digital equity faced by certain populations defined by the statute (i.e., "Covered Populations")[1] and measurable objectives for addressing those barriers.  The State Digital Equity Capacity Grant Program Notice of Funding Opportunity was released on March 29, 2024, and will provide funds to States and U.S. Territories to implement the Digital Equity Plans created through the Digital Equity Planning Grant Program, as well as provide funds for Indian Tribes, Alaska Native entities, and Native Hawaiian organizations ("Native Entities") to address the digital equity needs of the Covered Populations within those communities.  The Capacity Grant Program is ongoing and will continue to address the needs of the Covered Populations as identified in the State and U.S. Territories' Digital Equity Plans and as identified by Native Entities.

The Competitive Grant Program will make funds available to a wide range of entities to address barriers to digital equity faced by Covered Populations as defined by 47 U.S.C. §1721(8).  The Competitive Grant Program will support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption and meaningful use of broadband among the Covered Populations. Specifically, the Digital Equity Act authorizes funds to be used for the development and implementation of digital inclusion activities that benefit the Covered Populations; programs that facilitate the adoption of broadband by Covered Populations to provide educational and employment opportunities;  training programs that cover basic, advanced, and applied skills; workforce development programs; access to equipment, instrumentation, networking capability, hardware and software, or digital network technology for broadband services at low or no cost; and the construction or operation of public access computing centers for Covered Populations.  Awards will focus on addressing the needs of the Covered Populations not met by the Capacity Grant Program and will strive for a diverse pool of recipients.  To ensure funds are directed to the most effective programs with the greatest reach, and to minimize administrative overhead, NTIA encourages proposals that demonstrate a broad

---

[1] 47 U.S.C. §1721(8) defines the term "Covered Populations" to mean individuals who live in covered households (i.e., a household with income of not more than 150 percent of the poverty level), aging individuals (i.e., individuals 60 years or older), incarcerated individuals, other than individuals who are incarcerated in a Federal correctional facility, veterans, individuals with disabilities, individuals with a language barrier, including individuals who are English learners and have low levels of literacy, individuals who are members of a racial or ethnic minority group, and individuals who reside in rural areas.

partnership of entities with the ability to administer significant resources and address the varied concerns of the Covered Populations.

### I. Funding Instrument

Grant

### J. Eligibility

The following entities are eligible to apply for grants under the Competitive Grant Program so long as that entity is not serving, and has not served, as the administering entity for a State under either the State Digital Equity Planning Grant Program or the State Digital Equity Capacity Grant Program:

(1) A political subdivision, agency, or instrumentality of a State, including an agency of a State that is responsible for administering or supervising adult education and literacy activities, or for providing public housing, in the State.
(2) An Indian Tribe, an Alaska Native entity, or a Native Hawaiian organization ("Native Entity").
(3) A foundation, corporation, institution, or association that is –
    a.  a not-for-profit entity; and
    b.  not a school.
(4) A community anchor institution.
(5) A local educational agency.
(6) An entity that carries out a workforce development program.
(7) A partnership between any of the entities described in paragraphs (1) through (6).

U.S. Territories are eligible to apply for funding under a separate set-aside established exclusively for U.S. Territories pursuant to 47 U.S.C. §1724(j)(3). To apply, U.S. Territories should complete an application as described in Section IV of this NOFO. U.S. Territories are not considered to be "Eligible Entities" for the Competitive Program, however, and their applications will be reviewed separately.

### K. Anticipated Amounts

Grant awards will be made on a competitive basis under the criteria outlined in Section V of this NOFO and will depend upon the number of applicants and the size of the proposals submitted. NTIA expects to make individual Competitive Grant Program awards to Eligible Entities within a range of $5,000,000 and $12,000,000. This funding range is not a required minimum or maximum, but Eligible Entities requesting award amounts outside that range must explain why their application falls below or above this range and must provide a compelling justification for the variance in their project size. NTIA encourages partnerships of multiple eligible entities to consider applying for larger awards. As discussed below, awards to U.S. Territories are not subject to this estimated funding range due to the amount of funds available.

Congress has appropriated $750,000,000, less NTIA's cost of administering the program, for grants under the Digital Equity Competitive Grant Program through fiscal year 2024 ($250,000,000 for each of fiscal years 2022, 2023, and 2024). As statutorily required, five (5) percent ($37,500,000) will be reserved for Native Entities and one (1) percent ($7,500,000) will

be reserved for U.S. Territories.[2]  Congress has also appropriated an additional $250,000,000, less administrative expenses, for fiscal year 2025 which is anticipated to become available in October of 2024.  If these funds become available, NTIA intends to award these additional funds, including a five (5) percent set-aside for Native Entities and a one (1) percent set-aside for U.S. Territories.  Any funds not awarded, including further appropriations, will be made available through future NOFO(s).[3]

47 U.S.C. §1724(j)(2) establishes a five (5) percent set-aside exclusively for Native Entities. Accordingly, NTIA has set aside $37,500,000 for Native Entities and will increase this amount to $50,000,000 if the fiscal year 2025 funds become available.  However, Native Entities are also included within the definition of an Eligible Entity under the Competitive Grant Program. Accordingly, applications from Native Entities will be considered as part of the Competitive Grant Program along with other Eligible Entities. If Native Entities are not funded to at least the amount of the Native Entity set-aside during the initial award process, lower scoring Native Entity Applications will be considered until either the set aside has been exhausted, or until there are no further qualifying Native Entity applications.  Any remaining funds from the Native Entity set-aside that are not distributed under this NOFO will be made available to Native Entities in future NOFO(s).

47 U.S.C. §1724(j)(3) establishes a one (1) percent set-aside for U.S. Territories.  Accordingly, NTIA has set aside $7,500,000 for U.S. Territories and will increase this amount to $10,000,000 if the fiscal year 2025 funds become available.  Individual awards to U.S. Territories will not exceed $2,500,000. While NTIA anticipates that awards to individual U.S. Territories will be greater than $1,000,000, this is not a mandatory minimum and will be determined based on the number of applications and amount of funding requested. See Section V.D.4 of this NOFO for additional information on award selection for U.S. Territories. Any remaining funds from the set aside for U.S. Territories that are not distributed under this NOFO will be made available to U.S. Territories in future NOFO(s).

### L.  Cost Sharing/Matching

As required by 47 U.S.C. §1724(e)(1), the amount of a Competitive Grant awarded to an Eligible Entity through this program may not exceed 90 percent of the total project cost (i.e., there is a 10% matching requirement).  The Assistant Secretary may grant a waiver of this limitation if an applicant petitions for a waiver and demonstrates financial need.  Applications that propose matching funds in excess of 10% (as described in Section V.D.2 of this NOFO) will be given additional consideration over those that meet only the minimum requirement. U.S. Territories may not be subject to the federal cost share/matching requirement depending upon the size of those awards.

---

[2] Administrative costs of implementing the program are deducted from the amount made available after the statutory set asides are applied.

[3] If the additional funds for fiscal year 2025 are made available through this NOFO, there will only be one future Competitive NOFO; if the funds for fiscal year 2025 are not made available through this NOFO, there will be two additional Competitive NOFOs.

**M. NOFO Summary**

The following table provides a summary of key provisions within this Notice of Funding Opportunity.

| U.S. Department of Commerce, NTIA<br>**Digital Equity Competitive Grant Program Notice of Funding Opportunity**<br>Funding Opportunity Number NTIA-DECGP-2024 | |
|---|---|
| **Program Overview** | This Notice of Funding Opportunity ("NOFO") solicits applications for the Digital Equity Competitive Grant Program ("Competitive Grant Program" or "Program"), the third of three digital equity programs authorized by the Infrastructure Investment and Jobs Act of 2021. The Competitive Grant Program will make funds available to a wide range of entities to address barriers to digital equity faced by Covered Populations. |
| **Funding Instrument** | Grant |
| **Award Project Period** | Grant recipients must expend the grant amounts during the four (4) year period after the date on which the entity is awarded the grant. Grant recipients may continue to measure and evaluate the activities supported with the grant amounts for a period of one (1) year after the initial four (4) year Period of Performance. No extensions to the four (4) year Period of Performance or the one (1) year evaluation period will be granted. |
| **Goals & Objectives** | Proposed programs, projects, and activities will support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption and meaningful use of broadband among the Covered Populations. |
| | Develop and implement digital inclusion activities that benefit one or more of the Covered Populations; Facilitate the adoption of broadband by the Covered Populations in order to provide educational and employment opportunities; Implement training programs for the Covered Populations that cover basic, advanced, and applied skills; Implement |

| | |
|---|---|
| **Eligible Projects/Topic Areas** | workforce development programs; Make available equipment, instrumentation, networking capability and digital network technology for broadband services to Covered Populations at low or no cost; Construct, upgrade, expand, or operate new or existing public access computing centers for Covered Populations through community anchor institutions; or undertake any other project or activity the Assistant Secretary finds to be consistent with the purposes of the Program. Grantees may also use not more than 10 percent of the grant amount to measure and evaluate the activities supported with the grant amounts. |
| **Eligible Applicants** | The following entities are eligible to apply for grants under this Program if the entity is not serving, and has not served, as the administering entity for a State under 47 U.S.C. §1723(b):<br><br>(1) A political subdivision, agency, or instrumentality of a State, including an agency of a State that is responsible for administering or supervising adult education and literacy activities, or for providing public housing, in the State.<br>(2) An Indian Tribe, an Alaska Native entity, or a Native Hawaiian organization.<br>(3) A foundation, corporation, institution, or association that is –<br>    a. A not-for-profit entity; and<br>    b. Not a school.<br>(4) A community anchor institution.<br>(5) A local educational agency.<br>(6) An entity that carries out a workforce development program.<br>(7) A partnership between any of the entities described in paragraphs (1) through (6).<br><br><br>U.S. Territories may apply for the territorial set aside provided for at 47 U.S.C. §1724(j)(3) by submitting an application consistent with Section IV of this NOFO. |

6

| | |
|---|---|
| **Funding Amount** | Congress has appropriated $750,000,000 for grants under the Digital Equity Competitive Grant Program through fiscal year 2024.  Five (5) percent ($37,500,000) is reserved for Native Entities and one (1) percent ($7,500,000) is reserved for U.S. Territories.  NTIA expects to make awards to Eligible Entities, including Native Entities, within a range of $5,000,000 and $12,000,000.  Awards to U.S. Territories will not exceed $2,500,000.<br><br>Congress appropriated an additional $250,000,000 for fiscal year 2025 which is anticipated to become available in October of 2024.  If these funds become available, NTIA intends to award these funds under this NOFO, subject to the required statutory set asides and administrative expenses, if there are sufficient meritorious applications. In the event that the additional funds are made available, the Native Entity set aside will increase to $50,000,000 and the U.S. Territory set aside will increase to $10,000,000. |
| **Cost Share/Matching Requirements** | Under the terms of the Digital Equity Act, the amount of a Competitive Grant award may not exceed 90 percent of the total project cost (i.e., grantees must secure at least 10% matching funds). Applicants may apply for a waiver of this cost share requirement as described in Section III.B of this NOFO. Applications that propose matching funds greater than the minimum amount will receive additional consideration as part of the selection process. |
| **Estimated Number and Type of Award(s)** | NTIA anticipates that it will issue between 150 and 200 grant awards under this Notice of Funding Opportunity. |
| **Key Dates** | Applications from Eligible Entities must be received by September 23, 2024.  Applications from U.S. Territories must be received by October 22, 2024. |
| **How to Apply** | Application materials are available at: https://broadbandusa.ntia.doc.gov. |

7

| | |
|---|---|
| **Review and Selection Process** | The application review process will be conducted in three stages: (1) Initial Eligibility and Administrative Review, (2) Merit Review, and (3) Programmatic Review.  To accelerate issuance of awards, Programmatic Review will be conducted using prioritized groupings and award recommendations will be made on a rolling basis.  Following the conclusion of the Programmatic Review for each prioritized grouping, the OICG Associate Administrator will recommend a list of ranked applications, including the identification of awards to Native Entities and U.S. Territories, to the NTIA Assistant Secretary, who is the Selecting Official for this program. Details of the selection process can be found in Section V of this NOFO. |
| **Agency Contacts** | **Please direct programmatic inquiries to:** Angela Thi Bennett Director of Digital Equity Office of Internet Connectivity and Growth National Telecommunications and Information Administration U.S. Department of Commerce 1401 Constitution Avenue, NW Washington, DC 20230 Phone: (202) 482-2048 Email: digitalequity@ntia.gov **Please direct grant management inquiries to:** Darren Olson Grants Officer Grants Management Division National Institute of Standards and Technology 325 Broadway Boulder, CO 80305 Phone: (720) 693-0465 Email: darren.olson@nist.gov **Please direct media inquiries to:** Charles Meisch Director of Public Affairs Office of Public Affairs National Telecommunications and Information Administration |

8

| | U.S. Department of Commerce<br>1401 Constitution Avenue NW, Room 4897<br>Washington, DC 20230<br>Phone: (202) 482-7002<br>Email: press@ntia.doc.gov |
|---|---|

**FULL ANNOUNCEMENT TEXT**

**Table of Contents**

I.    **Program Description**................................................................................. **13**

A.   Overview of the Digital Equity Competitive Grant Program ........................................... 13

B.   Definitions................................................................................................ 15

II.   **Federal Award Information** ..................................................................... **18**

A.   Funding Availability...................................................................................... 18

B.   Period of Performance ................................................................................. 20

C.   Performance Measurement and Evaluation ......................................................... 20

D.   Award Amount .......................................................................................... 21

E.   Type of Funding Instrument........................................................................... 21

III.  **Eligibility Information**............................................................................. **22**

A.   Eligible Applicants...................................................................................... 22

B.   Cost Sharing or Matching ............................................................................ 23

IV.   **Application and Submission Information**................................................ **24**

A.   Address to Request Application Package ........................................................... 24

B.   Content and Form of Applications ................................................................... 24

C.   Funding Restrictions .................................................................................. 30

    1.   Allowable Uses of Digital Equity Competitive Grant Funds.................................. 30

    2.   Evaluation.......................................................................................... 32

    3.   Focus of Programs and Permitted Activities ................................................. 32

    4.   Limitations on Uses of Digital Equity Competitive Grant Funds................................ 32

D.   Certifications Regarding Debarment and Suspension ............................................. 33

E.   System for Award Management (SAM)................................................................ 33

    1.   SAM Unique Entity Identifier ................................................................... 33

    2.   SAM Registration................................................................................. 34

F.   Submission Dates and Times ........................................................................ 34

G.   Intergovernmental Review ........................................................................... 34

H.   Material Representations and Public Disclosure of Applications.................................... 35

I.    Other Submission Requirements..................................................................... 35

V.    **Application Review Information** .............................................................. **35**

A.   Overview................................................................................................. 35

B.   Initial Eligibility and Administrative Review ....................................................... 36

C.   Merit Review ...................................................................................................... 37

D.   Programmatic Review.......................................................................................... 39

   1.   Prioritization.................................................................................................. 40

   2.   Programmatic Review Process....................................................................... 40

   3.   Native Entity Application Review ................................................................. 41

   4.   U.S. Territory Application Review ................................................................ 41

   5.   Rolling Awards .............................................................................................. 42

E.   OICG Associate Administrator Review ............................................................... 42

F.   Final Project Selection ........................................................................................ 42

G.   Federal Awarding Agency Review of Risk Posed by Applicant ......................... 43

H.   Anticipated Announcement and Award Dates ..................................................... 43

VI.   **Federal Award Administration Information** ...................................................... **43**

A.   Federal Award Notices ........................................................................................ 43

B.   Notification to Unsuccessful Applicants.............................................................. 44

C.   Retention of Unsuccessful Applications .............................................................. 44

D.   De-obligation or Termination of Grant ................................................................ 44

E.   Administrative and National Policy Requirements............................................... 44

   1.   Uniform Administrative Requirements, Cost Principles and Audit Requirements ........ 44

   2.   Department of Commerce Financial Assistance Standard Terms and Conditions ......... 45

   3.   Pre-Award Notification Requirements ........................................................... 45

   4.   Build America, Buy America Act Domestic Content Preference Requirements ........... 45

   5.   National Environmental Policy and Historic Preservation ............................. 46

   6.   Domestic Preference for Procurements........................................................... 46

   7.   Contracting with Small and Minority Businesses, Women's Business Enterprises, and Labor Surplus Area Firms........................................................................... 47

   8.   Cybersecurity Best Practices.......................................................................... 47

   9.   Privacy........................................................................................................... 47

F.   Reporting.............................................................................................................. 47

   1.   Infrastructure Act Reporting Requirements ................................................... 48

   2.   Other Reporting Requirements....................................................................... 48

G.   Recipient Integrity and Performance Matters ...................................................... 49

H.   Audit Requirements ............................................................................................. 49

I.    Federal Funding Accountability and Transparency Act of 2006 ...................................... 50

J.    Public Database............................................................................................................... 50

**VII.  Federal Awarding Agency Contacts ................................................................... 50**

**VIII.  Other Information................................................................................................. 51**

A.    Transparency .................................................................................................................. 51

B.    Protected and Propriety Information............................................................................... 51

C.    Funding Availability and Limitation of Liability ............................................................ 53

D.    Third Party Beneficiaries ............................................................................................... 53

E.    Waiver Authority ........................................................................................................... 53

F.    Paperwork Reduction Act .............................................................................................. 53

G.    Transparency, Accountability, and Oversight Required................................................... 53

    1.    Generally .................................................................................................................. 53

    2.    U.S. Department of Commerce Office of Inspector General ........................................ 54

    3.    Whistleblower Protection ........................................................................................... 55

H.    Unauthorized Use of Funds ........................................................................................... 55

**Appendix A** …………………………..……………………………………………………………………..58

**Appendix B** …………………………………………………………………………………………………62

## I.    Program Description

### A.  Overview of the Digital Equity Competitive Grant Program

The National Telecommunications and Information Administration ("NTIA") issues this Notice of Funding Opportunity ("NOFO") to describe the requirements under which it will award grants under the Digital Equity Competitive Grant Program ("Competitive Grant Program" or "Program"), authorized by § 60305 of the Infrastructure Investment and Jobs Act of 2021, Division F, Title III, Public Law 117-58, 135 Stat. 429, 1222 (November 15, 2021) ("Infrastructure Act") also known as the Digital Equity Act of 2021 ("Digital Equity Act").[4]  The Competitive Grant Program provides funding to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption and use of broadband[5] among the Covered Populations[6] as defined in the Digital Equity Act.

Disparities in digital access and literacy exacerbate existing inequalities and limit the ability of marginalized groups to fully participate in the digital economy of the United States and access essential services.[7]  By leveraging accessible digital technology, individuals can overcome barriers to healthcare, employment opportunities, education, and social services. Regardless of a person's age, race, income, where they live, what languages they speak, what resources they have at their disposal, their disability status, and what specific challenges they may face in their daily lives, affordable, reliable, high speed Internet access is a necessity for all people of the United States.

Recognizing the devastating impact of digital exclusion, President Biden made a commitment that every household in America will have access to affordable, reliable, high-speed Internet, and the resources necessary to realize the Internet's full potential. Passed on a bipartisan basis in both chambers of Congress, the Digital Equity Act of 2021 provides $2.75 billion to address digital inclusion and advance digital equity.  The law charges NTIA – the President's principal adviser on telecommunications and information policy matters, housed within the United States Department of Commerce ("DOC") – with administering these programs.

The Digital Equity Act creates a carefully structured approach to addressing the core concerns of digital equity and digital inclusion for members of the Covered Populations. The first step was the creation of detailed State Digital Equity Plans that identified the barriers to digital equity and established measurable objectives for overcoming them.  NTIA launched the State Digital Equity Planning Grant Program ("Planning Grant Program") on May 13, 2022, awarding $53.7 million

---

[4] 47 U.S.C. §1701 *et seq*.

[5] 47 U.S.C. §1724(a)(1).

[6] 47 U.S.C. § 1721(8).  The Covered Populations are: (1) individuals who live in Covered Households (defined as households with income from the most recently completed year of not more than 150% of the poverty level), (2) aging individuals, (3) incarcerated individuals, other than individuals who are incarcerated in a Federal correctional facility, (4) veterans, (5) individuals with disabilities; (6) individuals with a language barrier, including English learners and those with low levels of literacy, (7) individuals who are members of a racial or ethnic minority group, (8) individuals who primarily reside in a rural area.

[7] *See, e.g.*, 47 U.S.C. §1722.

to 50 states, the District of Columbia, the Commonwealth of Puerto Rico, and four (4) U.S. Territories, to develop Digital Equity Plans which identify the barriers to digital adoption for each of the eight Covered Populations identified in the statute.  That program is now complete.

The second step was the implementation of the State Digital Equity Capacity Grant Program ("Capacity Grant Program") which makes funds available to begin implementation of the State and U.S. Territory Digital Equity Plans and empowers Native Entities to address digital equity and inclusion consistent with the purposes of the Digital Equity Act.  On March 29, 2024, NTIA released the State Digital Equity Capacity Grant Program Notice of Funding Opportunity making more than $750,000,000 available to States and Territories to fund State Digital Equity Plans and begin addressing the barriers to digital equity faced by the Covered Populations, as well as more than $45,000,000 to Native Entities to implement similar programs for the Covered Populations within their jurisdictions. The Capacity Grant Program is ongoing and NTIA will take steps to help ensure that funding under this NOFO does not duplicate or overlap with programs initiated under the Capacity Grant Program.[8]

The Competitive Grant Program is the final component of the Digital Equity Act's framework for addressing digital equity and inclusion.  Through this Program, NTIA seeks applications for programs and activities that will address the gaps in the implementation of existing State Digital Equity Plans, proposals that will supplement or further advance State Digital Equity Plans, and/or proposals that address barriers to digital equity that the current State Digital Equity Plans failed to identify.  While NTIA expects to make funding available for a variety of effective evidenced-based programs, NTIA encourages innovative approaches that transcend existing digital equity programs.

Applications should support efforts to achieve digital equity, promote digital inclusion activities, and/or spur greater adoption of broadband among the Covered Populations.[9]  Specifically, the proposed programs must support at least one of the following activities: (1) Develop and implement digital inclusion activities that benefit one or more of the Covered Populations; (2) Facilitate the adoption of broadband by the Covered Populations in order to provide educational and employment opportunities; (3) Implement training programs for the Covered Populations that cover basic, advanced, and applied skills; (4) Implement workforce development programs; (5) Make available equipment, instrumentation, networking capability, hardware and software, or digital network technology for broadband services to Covered Populations at low or no cost; (6) Construct, upgrade, expand, or operate new or existing public access computing centers for Covered Populations through community anchor institutions; (7) Any other project and/or activity the Assistant Secretary finds to be consistent with the purposes for which the Program is established.[10]

In assessing applications, the Assistant Secretary will consider, to the extent practicable, whether the proposed program will increase Internet access and the adoption of broadband among Covered Populations to be served by the applicant, the comparative geographic diversity of the

---

[8] *See, e.g.,* Section IV.B.(14) & (15) of this NOFO.

[9] 47 U.S.C. §1724(a)(1).  The definitions of "digital equity," "digital inclusion," and "Covered Populations" are set forth in Section I.B of this NOFO.

[10] *See* 47 U.S.C. §1724(d)(2)(A).

applications, and whether the proposed program is duplicative or conflicts with other programs.[11] The Assistant Secretary will also assess the extent to which a project or activity is consistent with the purpose of the Digital Equity Act Competitive Grant Program, which is to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations.[12] NTIA believes that a project or activity is consistent with the purpose of the Digital Equity Act Competitive Grant Program when it furthers one or more of the following goals: (1) economic stability, including workforce development and employment opportunities;[13] (2) access to quality education;[14] (3) access to healthcare;[15] (4) social and civic engagement;[16] and (5) community access to the benefits of Internet technology.[17] Finally, the Assistant Secretary encourages the development of partnerships, as authorized by the statute.[18] The development of broad partnerships will maximize the reach of the Competitive Grant Program funding and minimize administrative overhead.  The full details of the selection process are outlined in Section V of this NOFO.

### B.  Definitions

(1)  Aging Individual: The term "aging individual" means an individual who is 60 years of age or older.

(2) Alaska Native Entity:  The term "Alaska Native entity" will refer to a tribally controlled entity in Alaska whose purpose or mission is to represent or advance the interests of one or more native Alaskan communities.  This will include, but will not be limited to, subsidiary organizations of an Indian Tribe; entities that receive federal funding due to their status as an Indian or Native organization; and the Alaska Native Regional Nonprofit Organizations created to administer social, education and health services for Alaska Native people in their region.

(3) Assistant Secretary: The term "Assistant Secretary" means the Assistant Secretary of Commerce for Communications and Information.

(4) Commission: The term "Commission" refers to the Federal Communications Commission.

(5) Community Anchor Institution: The term "community anchor institution" means a public school, a public or multi-family housing authority, a library, a medical or healthcare provider, a

---

[11] 47 U.S.C. §1724(d)(1).

[12] 47 U.S.C. § 1724(a)(1).

[13] See 47 U.S.C. §1722(1)(A); 47 U.S.C. §1724(d)(2)(A)(ii) & (iii).

[14] See 47 U.S.C. §1722(1)(B); 47 U.S.C. §1724(d)(2)(A)(ii).

[15] See 47 U.S.C. §1722(1)(B).

[16] See 47 U.S.C. §1722(1)(A); 47 U.S.C. §1722(2)(B).

[17] See 47 U.S.C. §1721(10); 47 U.S.C. §1722(1)(A); §1724(d)(2)(A); 47 U.S.C. §1724(d)(2)(A)(vi).

[18] See 47 U.S.C. §1724(b)(7) (authorizing partnerships between Eligible Entities).

community college or other institution of higher education, a State or Territory library agency, and any other nonprofit or governmental community support organization.

(6) Covered Household: The term "covered household" means a household, the income of which for the most recently completed year is not more than 150 percent of an amount equal to the poverty level, as determined by using criteria of poverty established by the Bureau of the Census.

(7) Covered Populations: The term "Covered Populations" means:

> 1. Individuals who live in covered households;
> 2. Aging individuals;
> 3. Incarcerated individuals (as defined by the State or Territory), other than individuals who are incarcerated in a Federal correctional facility;
> 4. Veterans;
> 5. Individuals with disabilities;
> 6. Individuals with a language barrier, including individuals who—
>> a. Are English learners; and
>> b. Have low levels of literacy;
> 7. Individuals who are members of a racial or ethnic minority group; and
> 8. Individuals who primarily reside in a rural area.

(8) Digital Equity: The term "digital equity" means the condition in which individuals and communities have the information technology capacity that is needed for full participation in the society and economy of the United States.

(9) Digital Inclusion: The term "digital inclusion" –

> 1. Means the activities that are necessary to ensure that all individuals in the United States have access to, and the use of, affordable information and communication technologies, such as—
>> a. Reliable fixed and wireless broadband Internet service;
>> b. Internet-enabled devices that meet the needs of the user; and
>> c. Applications and online content designed to enable and encourage self-sufficiency, participation, and collaboration; and
> 2. Includes—
>> a. Obtaining access to digital literacy training;
>> b. The provision of quality technical support; and
>> c. Obtaining basic awareness of measures to ensure online privacy and cybersecurity.

(10) Digital Literacy: The term "digital literacy" means the skills associated with using technology to enable users to find, evaluate, organize, create, and communicate information.

16

(11) <u>Disability</u>: The term "disability" means, with respect to an individual—

    1. A physical or mental impairment that substantially limits one or more major life activities of such individual;

    2. A record of such an impairment; or

    3. Being regarded as having such an impairment.

(12) <u>Eligible Entity</u>: The term "Eligible Entity" means one of the following entities so long as that entity is not serving, and has not served, as the administering entity for a State under either the State Digital Equity Planning Grant Program or the State Digital Equity Capacity Grant Program:

    (1) A political subdivision, agency, or instrumentality of a State, including an agency of a State that is responsible for administering or supervising adult education and literacy activities, or for providing public housing, in the State.

    (2) An Indian Tribe, an Alaska Native entity, or a Native Hawaiian organization.

    (3) A foundation, corporation, institution, or association that is –
        a. a not-for-profit entity; and
        b. not a school.

    (4) A community anchor institution.

    (5) A local educational agency.

    (6) An entity that carries out a workforce development program.

    (7) A partnership between any of the entities described in paragraphs (1) through (6).[19]

(13) <u>Indian Tribe</u>: The term "Indian Tribe" means any Indian tribe, band, nation, or other organized group or community (i.e., Tribal Organizations), including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq., which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(14) <u>Native Hawaiian Organization (NHO)</u>: An organization that is registered with the U.S. Department of the Interior's Office of Native Hawaiian Relations and Hawaiian Homes Commission Act Beneficiary Associations and Homestead Associations, as defined under 43 C.F.R. §§ 47.10 and 48.6, or is the Department of Hawaiian Home Lands.

(15) <u>Native Entity</u>: As used in this NOFO, the term "Native Entity" refers to Indian Tribes, Alaska Native entities, and Native Hawaiian organizations as referenced in 47 U.S.C. 1724(j)(2).

(16) <u>Rural Area</u>: The term "rural area" means any area other than –

    1. A city or town that has a population of greater than 50,000 inhabitants;

---

[19] 47 U.S.C. §1724(b)(8) also permits the Assistant Secretary to make other entities eligible by rule if the Assistant Secretary deems them in the public interest and they are not a school, however, the Assistant Secretary has not exercised that authority under this NOFO at this time.

2. Any urbanized area contiguous and adjacent to a city or town that has a population of greater than 50,000 inhabitants; and

3. In the case of a grant or direct loan, a city, town, or incorporated area that has a population of greater than 20,000 inhabitants.

(17) State: The term "State" means:

1. any State of the United States;
2. the District of Columbia; and
3. the Commonwealth of Puerto Rico.

(18) Tribal Organization: The term "Tribal Organization" means the recognized governing body of any Indian Tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: provided, that in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant.

(19) U.S. Territory: The term "U.S. Territory," "U.S. Territories" or "Territory" means the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other territory or possession of the United States that is not a State.

(20) Veteran: The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released therefrom under conditions other than dishonorable.

## II.    Federal Award Information

### A. Funding Availability

Congress appropriated $750,000,000 to fund grants under the Digital Equity Competitive Grant Program through fiscal year 2024.[20] NTIA expects to make individual Competitive Grant Program awards within a range of $5,000,000 and $12,000,000. This funding range is not a required minimum or maximum, but Eligible Entities requesting award amounts outside that range must explain why their application falls below or above this range and must provide a compelling justification for that variance. Congress has also appropriated an additional $250,000,000, for fiscal year 2025 which is anticipated to become available in October of 2024. If these funds become available, NTIA intends to award these additional funds, subject to the

---

[20] Infrastructure Act, Division J, Title II, 135 Stat. 1354, allocated $250,000,000 for fiscal years 2022, 2023, and 2024. Because the Digital Equity Act prohibited the establishment of the Competitive Grant Program before the date on which awards were issued under the State Digital Equity Capacity Grant Program, the funding from years prior to the Capacity Grant Program awards are being combined in this NOFO. *See,* 47 U.S.C. §1724(a)(1).

18

required statutory set asides and administrative expenses.  Any funds not awarded, including further appropriations, will be made available through future NOFO(s).

47 U.S.C. §1724(j)(2) requires the Assistant Secretary to reserve five (5) percent of the amount made available to carry out the Program in a fiscal year to award grants to, or enter into contracts or cooperative agreements with, Indian Tribes, Alaska Native entities, and Native Hawaiian organizations ("Native Entities") to allow those tribes, entities and organizations to carry out the activities described in the Competitive Grant Program.  Accordingly, NTIA will reserve $37,500,000 for grant awards to Native Entities ($50,000,000 if fiscal year 2025 funds are made available).  Because Native Entities are included within the definition of an Eligible Entity under the Competitive Grant Program, applications from Native Entities will be considered as part of the Competitive Grant Program along with all other Eligible Entities.  If Native Entities are not funded to at least the amount of the Native Entity set aside during the initial award process, lower scoring Native Entity applications will be considered until either the set aside has been exhausted, or until there are no further qualifying Native Entity applications.  Any Native Entity set-aside funds not awarded will be made available to Native Entities through future NOFO(s).  See Section V.D.3 of this NOFO for additional information on award selection for Native Entities.

47 U.S.C. §1724(j)(3) requires the Assistant Secretary to reserve one (1) percent of the amount made available to carry out the Program in a fiscal year to award grants to, or enter into contracts or cooperative agreements with, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other territory or possession of the United States that is not a State ("U.S. Territories") to enable those entities to carry out the activities described in the Competitive Grant Program.  Accordingly, NTIA will reserve $7,500,000 for grant awards to U.S. Territories ($10,000,000 if fiscal year 2025 funds are made available).  Because U.S. Territories are not Eligible Entities, and thus cannot participate directly in the Competitive Grant Program, these funds will be made available to the Territories through a separate review process using the same application requirements.  As required by statute, these funds are being made available on a competitive basis, but no award will exceed $2,500,000.  While NTIA expects award amounts to be above $1,000,000, this is not a required minimum and will be determined based on the number of applications and amount of funding requested.  If any U.S. Territory set-aside funds remain after the Competitive Grant awards are completed, the remaining funds will be reserved for U.S. Territories to be awarded through future NOFO(s).  See Section V.D.4 of this NOFO for additional information on award selection for U.S. Territories.

Congress has also permitted the Assistant Secretary to set aside funding for salaries and expenses, administration, and oversight of the grants awarded under this NOFO. Accordingly, NTIA will set aside up to approximately $75,000,000 from available funds to cover the lifecycle costs for the administration and oversight of awards made under this Notice of Funding Opportunity.

19

### B. Period of Performance

Except for measurement and evaluation activities required under the Digital Equity Act and this NOFO, Grant recipients must expend the grant amounts within four (4) years after the date on which the entity is awarded the grant.[21] The consolidated budget submitted with the application must reflect completion of all projects and interventions during the four (4) year period of performance.  As permitted by the Digital Equity Act, grant recipients may continue to measure and evaluate the activities supported with the grant amounts for a period of one (1) year after the initial four (4) year Period of Performance.[22] Measurement and evaluation costs are capped at 10 percent and should be reflected in the consolidated budget. This timeline is required by the Competitive Grant Program's statutory authority and no extensions to the four (4) year Period of Performance, or the one (1) year evaluation period, may be granted.

### C. Performance Measurement and Evaluation

Competitive Grant recipients and subrecipients are required to incorporate program measurement and evaluation activities as part of their program design and implementation.  These activities must include documentation of the success of specific funded projects in meeting the performance objectives of the Program.  As required by 47 U.S.C. §1724(d)(2)(B), an entity to which the Assistant Secretary awards a grant shall use not more than 10% of the grant amounts to measure and evaluate the activities supported with the grant amounts.

Information collected should include, but is not limited to:

a. The Covered Population(s) being served.

b. The total number of individuals being served.

c. The number of individuals that belong to each Covered Population.

d. For each activity or intervention, explain how the activity or intervention facilitates the purposes of the Digital Equity Competitive Grant program, specifically by promoting one or more of the following[23]:

> (1) Economic stability including workforce development and employment opportunities;
>
> (2) Education access;
>
> (3) Health care access;
>
> (4) Social and civic engagement;
>
> (5) Community access to the benefits of Internet technology.

---

[21] 47 U.S.C. §1724(d)(2)(D).  The four-year period begins on the first day of the period of performance identified in the grant agreement.

[22] 47 U.S.C. §1724(d)(2)(D).

[23] *See Supra,* n.13-17.

e. Anecdotal/personal testimony demonstrating the positive experiences generated through the Program.

f. An assessment of Program effectiveness, including:

(1) Whether the grant's intended objectives were accomplished, including whether it achieved its intended outcomes;

(2) Whether the program resulted in measurable changes in participants from the Covered Populations, such as in knowledge or skills, including collecting data before, during, and after the program to understand potential changes;

(3) Whether the activity or intervention is making/has made progress toward the goals and objectives of the grant;

(4) How efficiently the program achieved its goals.

At the end of the Period of Performance (*see,* Section II.B above), the grant recipient receiving funds under the Competitive Grant Program must submit an overall assessment of the effectiveness of the programs along with the results, protocols, and instruments used to collect the above data to NTIA. All program evaluation materials must be submitted in accordance with the terms and conditions of the subject grant award and no later than the final award closeout. The program evaluation materials may be posted publicly on NTIA's website. In addition, these measurement and evaluation activities must be reported on an annual and semiannual basis as outlined in Section VI.F of this NOFO. Finally, grantees should be prepared to participate in an NTIA-sponsored evaluation of the program, if NTIA conducts one.

### D. Award Amount

Grant awards will be made on a competitive basis under the criteria outlined in Section V of this NOFO and will depend upon the number of applicants and the size of the proposals submitted. NTIA expects to make individual Competitive Grant Program awards to Eligible Entities within a range of $5,000,000 and $12,000,000. This funding range is not a required minimum or maximum, but Eligible Entities requesting award amounts outside that range must explain why their application falls below or above this range and must provide a compelling justification for that variance.

Awards to U.S. Territories will be made based upon the criteria outlined in Section V of this NOFO and will not exceed $2,500,000. While NTIA expects award amounts to be above $1,000,000, this is not a required minimum and will be determined based on the number of applications and amount of funding requested. If any U.S. Territory set-aside funds remain after the Competitive Grant awards are completed, the remaining funds will be reserved for U.S. Territories to be awarded through future NOFO(s).

### E. Type of Funding Instrument

The funding instrument for awards made to Eligible Entities pursuant to this NOFO will be a grant. NTIA also expects to award grants to U.S. Territories and Native Entities, although NTIA

and the NIST Grants Officer reserve the right to issue cooperative agreements or contracts to such entities in accordance with 47 U.S.C. §§1724(j)(2) & (3).

## III.   Eligibility Information

### A.  Eligible Applicants

The following entities are eligible to apply for grants under this Program if the entity is not serving, and has not served, as the administering entity for a State under 47 U.S.C. §1723(b):

(1) A political subdivision, agency, or instrumentality of a State, including an agency of a State, including an agency of a State that is responsible for administering or supervising adult education and literacy activities, or for providing public housing, in the State.
(2) An Indian Tribe, an Alaska Native entity, or a Native Hawaiian organization.
(3) A foundation, corporation, institution, or association that is –
   a. A not-for-profit entity; and
   b. Not a school.
(4) A community anchor institution.
(5) A local educational agency.
(6) An entity that carries out a workforce development program.
(7) A partnership between any of the entities described in paragraphs (1) through (6).[24]

NTIA recognizes that partnerships are an effective means of serving the Covered Populations and they are encouraged.  When applying as a partnership, one Eligible Entity must be designated as the applicant for the partnership and serve as the "Authorized Representative."  An Eligible Entity may submit only _**one application**_ for Competitive Grant Program funding (regardless of whether the application is as an Authorized Representative of a partnership or as an individual applicant).  However, an Eligible Entity _**may participate as a member of more than one partnership**_ so long as it is not the Authorized Representative for more than one partnership. Only Eligible Entities may be members of a partnership.

The Authorized Representative of a partnership must submit a binding Letter of Commitment ("LOC") from each member of the partnership demonstrating authority to file on behalf of the partners.  The LOC must set forth the role or scope of work of the participating partner, a commitment from the partner to serve in that role, identification of any funding the partner will receive from the Authorized Representative (either as a subrecipient or otherwise, as applicable), and a commitment from the Authorized Representative to keep each partner informed of progress on the project or activity. The LOC must be executed by both the partner member and the Authorized Representative.

---

[24] 47 U.S.C. §1724(b)(8) also permits the Assistant Secretary to make other entities eligible by rule if the Assistant Secretary deems them in the public interest and they are not a school, however, the Assistant Secretary has not exercised that authority under this NOFO.

A Native Entity making an application for Competitive Grant Program funds, whether on its own behalf, as an Authorized Representative of a partnership, or as a participant in a partnership, must submit a Tribal Government Resolution or equivalent formal authorization from the governing body of the Native Entity providing express authority to apply for Competitive Grant Funds or to participate as a partner in a partnership that is submitting an application for grant funds.

To qualify for participation in the Native Entity set aside amount identified by 47 U.S.C. §1724(j)(2), the applicant must be a Native Entity and the intended beneficiaries of the proposed programs (i.e., the recipients of the proposed outputs) must be Covered Populations that are members of a Native Entity.  A Native Entity partnership may have non-Native Entity partners so long as the Authorized Representative is a Native Entity, and all intended beneficiaries of the proposed programs are members of a Native Entity. The intent in allowing partnerships between Native Entities and non-Native Entity partners is to allow outside entities to provide assistance to Native Entities (for instance, to help satisfy the cost match or administer particular aspects of the program), while still ensuring that the funding required by the set-aside is provided to Native Entities and allows them to carry out the activities supported by this grant program.

Although U.S. Territories are not defined as Eligible Entities under the broader Competitive Grant Program, they may apply for funding under the territorial set aside created by 47 U.S.C. §1724(j)(3).  U.S. Territories should submit applications using the same application process as Eligible Entities as outlined in Section IV of this NOFO.

## B.  Cost Sharing or Matching

As required by 47 U.S.C. §1724(e), the amount of a Competitive Grant awarded to an Eligible Entity through this program may not exceed 90 percent of the total project cost (i.e., there is a 10% matching requirement). The Assistant Secretary may grant a waiver of this matching requirement if an applicant petitions the Assistant Secretary for a waiver and the Assistant Secretary determines that the petition demonstrates financial need.  To maximize the reach of available funding, NTIA will give additional consideration to applications that exceed the minimum matching requirement during the review process as outlined in Section V.D of this NOFO. U.S. Territories may not be subject to the federal share/matching requirement depending upon the size of those awards.[25]

Matching funds may be in the form of either cash or in-kind contributions consistent with the requirements outlined in 2 C.F.R. 200.306. In-kind contributions, which include third-party in-kind contributions, are non-cash donations of property, goods, or services, which benefit a federally assisted project, and which may count toward satisfying the non-federal matching

---

[25] U.S. Territories are exempt from matching requirements if the cost share amount is less than $200,000 and agencies have the discretion to waive the match requirement for U.S. Territories for amounts greater than $200,000.  *See,* Office of Management and Budget, Controller Alert 23-04 (Feb. 6, 2023), *available at* (https://www.cfo.gov/wp-content/uploads/2023/CA-23-4_Insular%20Areas%20Matching%20Funds.pdf) and Pub. L. No. 96-205 as applied to 48 U.S.C. 1469a(d).

23

requirement of a project's total budgeted costs when such contributions meet certain criteria.[26] In-kind contributions must be allowable and allocable project expenses.

The rules governing allowable in-kind contributions are detailed and encompass a wide range of properties and services. NTIA encourages applicants to thoroughly consider potential sources of in-kind contributions, which, depending on the particular property or service and the applicable federal cost principles, could include employee or volunteer services; equipment; supplies; indirect costs; computer hardware and software; and use of facilities. It is important to note that federal funds may not be used as non-federal match, except as expressly provided by federal statute.[27]

## IV.    Application and Submission Information

### A. Address to Request Application Package

Application forms and instructions are available on the NTIA Grants Portal at https://grants.ntia.gov and on its BroadbandUSA website https://broadbandusa.ntia.gov. Applicants must follow the instructions set forth below and are encouraged to submit their applications early.

NTIA recommends that applicants participate in application technical assistance webinars and review the program and application guidance that will be posted on NTIA's BroadbandUSA website https://broadbandusa.ntia.gov.  Applications submitted by email, paper, or facsimile will not be accepted.  With respect to electronic methods for providing information about funding opportunities or accepting applicants' submissions of information, NTIA is responsible for compliance with Section 508 of the Rehabilitation Act of 1973, as amended by the Workforce Act of 1998.

### B. Content and Form of Applications

Applications for Grants under the Competitive Grant Program must be complete, must adhere to the instructions provided in this NOFO, and must be submitted in the format requested in the NTIA Grants Portal (https://grants.ntia.gov). NTIA will not consider applications that fail to comply with these requirements or that are untimely submitted.  Any Eligible Entity or U.S. Territory applying for a Competitive Grant must submit an application that includes the information listed below, which is inclusive of the elements required by 47 U.S.C. §1724(c):

(1) If the Applicant represents a partnership[28]:

    a.  The Eligible Entity that will serve as the Authorized Representative (i.e., the applicant) for the partnership.

---

[26] 2 C.F.R. §200.306.

[27] 2 C.F.R. §200.306(b)(5).

[28] 47 U.S.C. §1724(b)(7).

    b. Evidence of the Authorized Representative's experience managing similar partnerships or coalitions and the plans the partnership has in place to ensure ongoing collaboration.

    c. A table that includes:
       i. A list of all members of the partnership.
       ii. Verification that each partner is an Eligible Entity.
       iii. The category of Eligible Entity of each partner (*See* 47 U.S.C. §1724(b)).
       iv. The scope of work/role of each partner.
       v. Whether a partner has applied for funding under any other partnership, and if so, the Authorized Representative for each other partnership.
       vi. How award funds will be allocated among partners.
       vii. How the required federal share/matching requirement will be allocated among partners, as applicable.

    d. A Letter of Commitment ("LOC"), from each member of the partnership, executed by both the Authorized Representative and the partner member, outlining:
       i. The role/scope of work of the participating member.
       ii. A commitment from the partner to serve in that role.
       iii. Any funding the partner will receive from the Authorized Representative, either as a subrecipient or otherwise, as applicable.
       iv. A commitment from the Authorized Representative to keep each partner informed of project or activity progress.

(2) If the applicant is a Native Entity, a Tribal Government Resolution or equivalent formal authorization from the governing body of the Native Entity providing express authority to file an application for Competitive Grant Funds. This resolution is required both when the Native Entity is an applicant and when the Native Entity is a member of a partnership.

(3) If the applicant seeks to qualify for the Native Entity set aside identified in 47 U.S.C. §1724(j)(2), a certification that all beneficiaries of the proposed activities and interventions are members of a Native Entity.

(4) If the applicant is a U.S. Territory applying for the territorial set aside provided for at 47 U.S.C. §1724(j)(3), a letter from the governor (or equivalent official) of the U.S. Territory that authorizes the applicant to apply for the Digital Equity Competitive Grant Program on its behalf.

(5) If the applicant, or any of its partners, is a political subdivision, agency, or instrumentality of a State, a certification that the applicant shall appropriate or otherwise unconditionally obligate from non-Federal sources the funds necessary to meet the matching requirements outlined in 47 U.S.C. §1724(e).

(6) If the applicant seeks a waiver of the federal share (i.e., matching) requirement, a petition to the Assistant Secretary for a waiver of the federal share requirement demonstrating

financial need and setting forth the basis upon which the applicant seeks a waiver of this requirement.

(7) **A Project Narrative**: The Project Narrative must provide a description of the overall goals of the grant proposal and the portfolio of activities the grant award would support (hereinafter, the "Digital Equity Project") and how the Digital Equity Project will promote the goals of the Digital Equity Act and this Program. The Project Narrative must include the following information:

   a. **An Executive Summary**. The executive summary should include:  (1) An overview of the goals of the Digital Equity Project; (2) The specific barriers to digital equity the Digital Equity Project will address; (3) the Covered Populations to be served including the expected number of individuals to be served within each Covered Population; (4) The amount of funding to be devoted proportionally to each Covered Population; (5) A high level overview of the activities and/or interventions proposed, how they will address the barriers to equity identified, and how they will increase Internet access and the adoption of broadband among the Covered Populations; (6) A baseline assessment with supporting data showing a need for these services; (7) A description of how the Digital Equity Project aligns with, or addresses a gap in, the State Digital Equity Plan of the State or Territory within which it will be implemented; (8) The timeline on which funds will be expended; (9) The geographic scope of the project; and (10) The basis on which the applicant believes the Digital Equity Project will be effective in increasing Internet access and adoption of broadband.

   Please note, NTIA may use all or a portion of the Executive Summary as part of a press release issued by NTIA, or for other public information and outreach purposes.  Applicants are advised not to include information that concerns business trade secrets or other confidential commercial or financial information as part of the Executive Summary.  *See* 15 C.F.R. §4.9(b) concerning the designation of business information by the applicant.

   b. **Activities and Interventions.**  For each specific implementation activity and/or intervention that will be part of the Digital Equity Project, and which will use Competitive Grant Program funding, include the following elements:

      i.    A brief summary of the specific activity or set of activities the project intends to complete or implement.

      ii.   The barrier(s) or challenges to digital equity the project will address.

      iii.  The total number of individuals the project will serve and the percentage of that population that belongs to each Covered Population (e.g., "out of the 100 individuals served by the project, 80% are U.S. Veterans and 50% live in rural areas").

26

iv.   Whether the proposed activity or intervention facilitates the purpose of the Digital Equity Competitive Grant Program, specifically by promoting one or more of the following:

  a.   Economic stability, including workforce development and employment opportunities;

  b.   Access to quality education;

  c.   Access to healthcare;

  d.   Social and civic engagement; and/or

  e.   Community access to the benefits of Internet technology.

v.   The applicant's evaluation strategy for measuring successful implementation, including both near-term and long-term outcomes of the activity or intervention.  This should include (at a minimum):

  a.   proposed data collection and analysis procedures, including frequency and scope;

  b.   key outcomes to be measured; and

  c.   a plan for continuous improvement to use evaluation findings to inform project activities, including obtaining input from beneficiaries and stakeholders to inform project adjustments and maximize effectiveness and sustainability.

vi.   Whether the project will be implemented by the applicant directly or will be sub-granted, and if sub-granted, the name(s) of the subgrantee(s).

vii.   To the extent the State Digital Equity Plan is available for review, how the project aligns with, or addresses a gap in, the State Digital Equity Plan of the State or Territory within which it will be implemented.

viii.   The specific geographies to be served or a statement that the activities will be state or territory wide.

ix.   The percentage of covered households within the geographic area to be served.

x.   Estimates of the anticipated outputs of each activity or project (e.g., the number of hours of training to be provided, the curricula to be developed, or the number of certifications to be awarded).

xi.   If the proposed project involves construction, ground disturbance, or installation of fixed equipment, include a description of the physical project location(s) and surroundings, total extent and method of ground disturbance (if applicable), ground-level and aerial photos of the proposed project sites, and ages of any buildings which would be impacted.  For buildings that are 50 years old or older, provide photos of installation sites, as well as exterior and interior photos of the building.

27

c. **A project plan:** A description of all major project activities and timelines, including the timing of planning and implementation stages, key milestones and when each major project activity will start and end, and potential risks to the timeline and proposed mitigation strategies.

(8) **A Consolidated Budget Form**: All budget information in the Consolidated Budget Form must support the dollar amounts identified in the SF-424 and demonstrate that the project or activity meets the eligible use requirements in the Digital Equity Act and this NOFO. The Consolidated Budget Form is an Excel spreadsheet that includes budget details for all costs as well as a narrative explanation of those costs. The budget details must reflect the cost categories that appear on the SF-424 and include itemized calculations for each cost placed under those categories. Each cost must include a narrative that explains the necessity and basis for the cost and reflect only allowable costs that are consistent with the project(s)' scope. Allowable costs are determined in accordance with the cost principles identified in 2 C.F.R. Part 200, including Subpart E of such regulations and the Digital Equity Act. Consolidated Budget Form entries must reflect costs in the appropriate cost categories listed in the form and include itemized calculations for each cost placed in those categories.

The budget must account for the recipient's administrative costs, capped at 10% of the grant amount, and program evaluation costs, capped at 10% of the grant amount. For this purpose, the 10% limitation on administrative costs includes the combined total of indirect and direct administrative costs charged to the award. If indirect costs are included in the proposed budget, the applicant must either provide a copy of their approved negotiated indirect cost rate agreement or include a statement that they are electing to charge the *de minimis* rate, in accordance with 2 C.F.R. 200.414. [29] **The applicant must clearly describe in the budget narrative how it applied or calculated its administrative costs and demonstrate that its combined direct and indirect administrative costs are both at or under the 10% statutory limit and consistent with their negotiated indirect cost rate agreement or the *de minimis* rate, as applicable.**

(9) If an Eligible Entity seeks funding outside of the $5,000,000 to $12,000,000 award range, the applicant's demonstration of a compelling justification for deviating from this range (e.g., the need to serve a smaller community in a remote area that would otherwise not have access to funds or a partnership serving a larger community of multiple schools, libraries, and community organizations in a city). U.S. Territories are not subject to this requirement due to the size of those awards.

---

[29] As discussed in VI.E.1 of this NOFO, revisions to 2 CFR 200 recently published by OMB will apply to awards issued under this NOFO. These revisions include changes to the calculation of the *de minimis* rate under 2 CFR 200.414(f), and may be reviewed at: https://www.federalregister.gov/documents/2024/04/22/2024-07496/guidance-for-federal-financial-assistance.

(10) Demonstrative evidence that the applicant is capable of carrying out the project or function of the proposed grant and is capable of meeting the reporting requirements outlined in 47 U.S.C. §1724(h).  This evidence must include:

    a.  A description of the organizational structure of the applicant and evidence of the financial capacity/stability of the organization to implement the proposed project.

    b.  A description of the implementation team and its experience with the programmatic/technical aspects of project management, including past successes and relevant experience managing similar large programmatic initiatives and a demonstrated ability to manage large federal grant awards effectively.

    c.  A description of the applicant's experience with providing services to one or more of the Covered Populations and the extent to which the applicant has facilitated direct support, technical assistance, and capacity building across the Covered Populations.

    d.  A description of the applicant's strategy and experience in managing and fostering collaboration among subrecipients and subcontractors (e.g., conflict management plans, team agreements) (if applicable).

    e.  Resumes of Key Personnel: One-page resumes of no more than five (5) key personnel from the applicant (not subrecipients) may be included. Any information beyond one (1) page for each resume and any additional resumes submitted will not be considered.

(11) A scenario and risk mitigation plan describing the steps taken to ensure that any proposed deployment of technology will not have adverse consequences for the Covered Populations (e.g., privacy protections, algorithmic biases), if applicable.

(12) A data stewardship plan including a technology impact assessment demonstrating a plan to ensure that data collection, management, and utilization are conducted ethically, transparently, and with a strong emphasis on safeguarding the rights and privacy of individuals.

(13) A description of strategies to be undertaken to ensure the project or activity will create a sustainable long-term impact on digital equity and inclusion or will lead to the permanent elimination of a barrier to digital equity.

(14) The percentage of the award the applicant will match, the source of the matching funds, and the amount of the matching funds to be provided in cash versus in-kind donations. In the alternative, include a statement that the applicant is seeking a waiver of the cost match requirement, pursuant to Section IV.B.5 above.

(15) A detailed disclosure of the source and amount of other Federal, State, or outside funding sources the entity receives, or has applied for, that fund the activities or projects to which the application relates, including, for example, any funding requests through the Digital Equity Capacity Grant Program; the Broadband Equity, Access, and Deployment Program; the Capital Projects Fund, or the Tribal Broadband Connectivity Program.

(16) A certification that the applicant is not seeking funding for a project or program that is duplicative of previously awarded Federal or State funding. If NTIA identifies a project or program that is duplicative of prior funding, NTIA may decline funding for those portions of the project that are duplicative. Applicants have an affirmative obligation to disclose duplicative funding for the same project or program whether received before or after the award of a grant under this Program.

(17) A certification that the receipt of the grant will increase Internet access and the adoption of broadband among covered populations to be served by the applicant and not result in the unjust enrichment of the applicant or subrecipient.

(18) A certification that the intended beneficiaries of the proposed project(s) are members of one or more Covered Populations.

(19) A certification that the applicant, if using Competitive Grant funds for an "infrastructure project" (as defined in 2 C.F.R. 184.3), will abide by the requirements of the Build America, Buy America Act (Pub. L. NO. 117-58, §§70901-52) and by the regulations promulgated thereunder at 2 C.F.R. part 184, if applicable.

(20) A signed copy of the assurances required under 47 U.S.C. §1724(f) and set forth in Appendix B to this NOFO.

(21) An assurance that the entity shall follow such additional procedures as the Assistant Secretary may require to ensure that grant funds are used and accounted for in an appropriate manner.

(22) The following standard federal financial assistance forms and documentation:

    a. Standard Form 424: Application for Federal Assistance;

    b. CD-511 Certification Regarding Lobbying;

    c. Standard Form LLL, Disclosure of Lobbying Activities (if applicable); and

    d. Negotiated Indirect Cost Rate Agreement (as applicable).

## C. Funding Restrictions

### 1. Allowable Uses of Digital Equity Competitive Grant Funds

Grant recipients may only use federal award funds to pay for allowable costs under the Digital Equity Competitive Grant Program. Allowable costs are determined in accordance with the cost

principles identified in 2 C.F.R. Part 200, including Subpart E of such regulations and the Digital Equity Act.  In addition, costs must be reasonable, necessary, allocable, and allowable for the proposed Digital Equity Project, and conform to generally accepted accounting principles.  Grant funds may be used to cover only eligible costs incurred by the recipient during the period of performance, allowable costs incurred by the recipient during the grant closeout process, and limited pre-application expenses as outlined below.

Applicants must comply with the requirements of 47 U.S.C. §1724(d)(2) of the Digital Equity Act and this NOFO.  An Eligible Entity or U.S. Territory to which a Competitive Grant is awarded must use the grant funds to support **not less than 1** of the following activities:

(a) To develop and implement digital inclusion activities that benefit one or more of the Covered Populations.

(b) To facilitate the adoption of broadband by Covered Populations to provide educational and employment opportunities to those populations.

(c) To implement training programs for Covered Populations that cover basic, advanced, and applied skills or other workforce development programs, including, for example, digital inclusion projects that address online safety, and work to prevent online harassment and abuse.

(d) To make available equipment, instrumentation, networking capability hardware and software, or digital network technology for broadband services to Covered Populations at low or no cost.

(e) To construct, upgrade, expand, or operate new or existing public access computing centers for Covered Populations through community anchor institutions.

(f) To undertake any other project or activity that the Assistant Secretary finds to be consistent with the purposes for which the Program is established.

**Pre-Award Costs:**  Reasonable, post-NOFO, pre-application expenses in an amount not to exceed $50,000 may be recoverable under 2 C.F.R. §200.458. Pre-application expenses, which include expenses related to preparing an application, may be reimbursed if they are incurred after the publication date of this NOFO and prior to the date of issuance of the grant award from NTIA, except that lobbying costs and contingency fees are not reimbursable from grant funds. These costs should be clearly identified in the proposed project budget and must be approved by NTIA and the Grants Officer in writing to be considered allowable. Pre-application costs are incurred at the sole risk of the applicant and will not be reimbursed by NTIA if the proposed project does not receive an award pursuant to this Program. If approved, pre-award costs would be considered to be administrative costs, and would count against the administrative cost cap for the award.

### 2. Evaluation

A recipient that receives a grant under the Program shall use not more than 10 percent of the grant amounts to measure and evaluate the activities supported with the grant amounts. The grant recipient must submit each measurement and evaluation performed to NTIA no later than 15 months after the date on which the entity is awarded the grant amounts and annually thereafter during each year in which the entity expends funds under this program. See Section VI.F of this NOFO for additional information on reporting obligations.

### 3. Focus of Programs and Permitted Activities

NTIA encourages the development of new and innovative strategies to address barriers to digital equity. As with the Capacity Grant Program, these proposed activities must focus on creating the necessary conditions to empower individuals and communities with the technological capacity to fully participate in society and the economy. In examining whether a proposed strategy or intervention furthers the goals of the Digital Equity Competitive Grant Program, grant recipients must consider the following criteria and focal points:

i. **Focus on Covered Populations**: The project will align with the goals of the Digital Equity Act and focus on the priorities of the Covered Populations being served, including subgroups within each Covered Population. Applicants should prioritize projects with the greatest potential impact, such as targeting Covered Households (i.e., low-income individuals) within other Covered Populations.

ii. **Long-lasting and Meaningful Change**: The proposed Digital Equity Project should address systemic barriers and gaps to digital access. Projects/activities should reflect this goal and consider the sustainability of initiatives created through this funding.

iii. **Measurable Implementation Strategies**: Proposed programs and activities should be based on objectives that are measurable, achievable, sustainable, timebound, and are designed to address identified disparities directly and logically.

iv. **Stakeholder Engagement**: Stakeholders who are directly affected by the proposed strategies and interventions should be involved to encourage ongoing feedback regarding the effectiveness of the interventions and to seek input on potential solutions and improvements.

### 4. Limitations on Uses of Digital Equity Competitive Grant Funds

#### a. 10 Percent Cap on Evaluation

A recipient shall use no more than 10 percent of the grant amount to measure and evaluate the activities supported with the grant amounts.

#### b. 10 Percent Cap on Administrative Costs

A recipient shall use no more than 10 percent of the grant amount for administrative costs in carrying out any of the activities described in Section IV.C.1 of this NOFO. The 10% limitation on administrative costs includes the combined total of indirect and direct administrative costs charged to the award.

### c.  Prohibition on Supplanting

Pursuant to 47 U.S.C. §1724(i), a grant or subgrant awarded under the Competitive Grant Program shall supplement, not supplant, other federal or State funds that have been made available to carry out activities described at 47 U.S.C. §1724 and in this NOFO.  Broadband Equity, Access, and Deployment Program funds, including funds used for non-deployment expenditures, as well as the Tribal Broadband Connectivity Program, are subject to separate financial assistance award terms and conditions and must not be supplanted by Competitive Grant Program funding.

### d.  Prohibition on Profit or Fees

A profit, fee, or other incremental charge above actual cost is not an allowable cost under this program.

### e.  Prohibition on Use of Grant Funds to Support or Oppose Collective Bargaining

Grant funds awarded pursuant to this program may not be used, whether directly or indirectly as an offset for other funds, to support or oppose collective bargaining.

### f.  Prohibition on General Research

Projects must be limited to serving the Covered Populations and may not include general research projects or academic studies of digital equity or the Covered Populations.

## D.  Certifications Regarding Debarment and Suspension

By signing and submitting an application for funding pursuant to the Competitive Grant Program, the applicant is making the certifications outlined in Appendix A to this NOFO (see Line 21 on the SF-424, Application for Federal Assistance).

## E.  System for Award Management (SAM)

Pursuant to 2 C.F.R. Part 25, an applicant or recipient (as the case may be) is required to: (i) be registered in SAM before submitting its complete application packet; (ii) provide a valid unique entity identifier (UEI) in its application; and (iii) continue to maintain an active SAM registration with current information at all times during which it has an active federal award or an application or plan under consideration by a federal awarding agency, unless otherwise excepted from these requirements pursuant to 2 C.F.R. §25.110.  NTIA will not make a federal award to an applicant until the applicant has complied with all applicable unique entity identifier and SAM requirements and, if an applicant has not fully complied with the requirements by the time that NTIA is ready to make a federal award pursuant to this NOFO, NTIA may determine that the applicant is not qualified to receive a federal award.

### 1.  SAM Unique Entity Identifier

All applicants must supply a SAM Unique Entity Identifier (UEI) number.  As of April 4, 2022, the U.S. government stopped using the Dun and Bradstreet (D&B) Data Universal Numbering System (D-U-N-S) nine-digit number as the unique identifier for entities

throughout the federal awarding cycle, in SAM.gov, Integrated Award Environment (IAE) systems, required forms, or in downstream government systems.  Now, entities doing business with the federal government must use the Unique Entity ID created in SAM.gov.  Applicants who are new to SAM.gov may register their entity or receive a UEI by signing into SAM.gov and selecting "Get Started," then "Register Entity."  If you are a sub-awardee who just needs a UEI for subaward reporting, choose "Get Unique Entity ID."

For more information on the retirement of the DUNS, as well as the establishment of an entity's UEI, please visit http://www.sam.gov.

### 2.  SAM Registration

All applicants must register with SAM before submitting an application pursuant to this program.  Additionally, the applicant must maintain an active SAM registration with current information at all times during which it has an active federal award or an application or plan under consideration by a federal awarding agency. Applicants can register for the SAM at https://www.sam.gov/.  Entities without an active SAM.gov registration and/or UEI at the time of application submission and award may be deemed ineligible for a grant award.

### F.  Submission Dates and Times

Applications for the Competitive Grant Program must be complete and must adhere to the instructions provided in this NOFO and be submitted in the format required by the NTIA Grants Portal (www.grants.ntia.gov). Complete applications from Eligible Entities must be received by the NTIA application portal no later than 11:59 p.m. Eastern Time (ET) on September 23, 2024. Complete applications from U.S. Territories must be received by the NTIA application portal no later than 11:59 p.m. Eastern Time (ET) on October 22, 2024.

When developing the submission timeline, each applicant should keep in mind that: (a) all applicants are required to have current registrations in the electronic System for Award Management (SAM.gov) and (b) the free annual registration process in SAM.gov generally takes between three (3) and five (5) business days but can take more than three (3) weeks.

NTIA expects to complete its review, select successful applicants, and begin award processing by Winter of 2024. NTIA will, subject to NIST Grants Office Approval, announce awards made under the Competitive Grant Program on a rolling basis.

### G.  Intergovernmental Review

Applications from a State or a political subdivision of the State under this program are subject to Executive Order 12372, "Intergovernmental Review of Federal Programs," which requires intergovernmental consultation with state and local officials.  All applicants are required to

submit a copy of their applications to their designated state Single Point of Contact (SPOC) offices.[30]

### H. Material Representations and Public Disclosure of Applications

All forms and supporting documents submitted as part of the application packet, as well as all reports submitted pursuant this NOFO, must be true and complete and will be treated as a material representation of fact upon which NTIA and NIST's Grant Management Division will rely. Applicants acknowledge and understand that any false, fictitious, or fraudulent statements (or concealment or omission of a material fact) in the forms and supporting documents, including any required certifications or disclosures, submitted to NTIA may subject applicants to criminal prosecution (including under 18 U.S.C. § 1001 and/or 1621), and may subject applicants to civil and administrative penalties and other remedies. Applicants should be aware that NTIA, in coordination with the NIST Grants Officer, may make all or portions of their applications for grants under the Digital Equity Competitive Grant Program publicly available as required under applicable federal laws. See Section VI.B of this NOFO for additional information concerning the confidentiality of information contained in an application.

### I. Other Submission Requirements

All applicants must submit complete application packets electronically through the NTIA Grants Portal (www.grants.ntia.gov). Complete applications or portions thereof submitted by postal mail, courier, email, facsimile, or other means will not be accepted.

#### a. Timely Receipt Requirements and Proof of Timely Submission

*Online Submission.* Proof of timely submission is automatically recorded by the NTIA Grants Portal. An electronic date/time stamp is generated within the system when the application is successfully submitted in the NTIA application portal. The applicant with the Authorized Organizational Representative (AOR) role who submitted the application will receive an email acknowledgement of receipt from the NTIA application portal with the successful transmission of their application. Applications received in the NTIA application portal after the established due date for the program will be considered late and will not be considered for funding by NTIA.

#### b. Amendments

Any amendments to this NOFO or additional program guidance will be announced on NTIA.gov, Internetforall.gov, and BroadbandUSA.NTIA.gov.

## V.    Application Review Information

### A. Overview

The application review process will be conducted in three stages: (1) Initial Eligibility and Administrative Review, (2) Merit Review, and (3) Programmatic Review. The Initial Eligibility

---

[30] The current Intergovernmental Review Listing (SPOC List) is accessible at: https://www.whitehouse.gov/wp-content/uploads/2023/06/SPOC-list-as-of-2023.pdf

and Administrative Review serves as the initial screening of all applications to determine if the applicant is eligible,[31] the application materials are complete, and the applications were timely submitted.  Applications which pass this Initial Eligibility and Administrative Review will proceed to Merit Review.  During Merit Review, applications will be assigned a numerical score based upon the evaluation factors described in the Merit Review section below.  Applications which receive a Merit Review score of 70 to 100 points will be deemed "Qualified for Programmatic Review."  Applications with a Merit Review score of 0-69 are "Unqualified for Funding" and will not proceed to Programmatic Review.  Applications which are Qualified for Programmatic Review will proceed to Programmatic Review according to the prioritized groups described in V.D below. During Programmatic Review, the application will receive a programmatic review score, based upon the additional factors described below. Not all prioritized groups will receive Programmatic Review, depending on availability of funding.

Once Programmatic Review is completed for a prioritized grouping, the OICG Associate Administrator will review the ranked list of applications and will recommend a final list of applications to the Assistant Secretary, who will act as the selecting official. The Assistant Secretary will then submit a final award slate, along with the basis for the selection decisions, to the National Institute of Standards and Technology (NIST) Grants Officer, who serves as the Grants Officer for the Competitive Grant Program.  The final approval of selected applications and the issuance of awards will be made by the NIST Grants Officer.

## B.  Initial Eligibility and Administrative Review

During the Initial Eligibility and Administrative Review stage, NTIA will conduct an initial review of all submitted applications to ensure they contain the information and documentation required under Section IV.B of this NOFO ("Content and Form of Applications") and that this information was submitted in a timely manner as required by Section IV.F.

The following applicants will be eliminated from review:

- An entity that does not meet the definition of an Eligible Entity or is not a Territory;
- A partnership that fails to submit the required Letters of Commitment from each member of the partnership as described in Section IV.B of this NOFO; or
- A Native Entity applicant that does not submit an authorization to support an application from its governing body.

In addition, NTIA will remove applications from consideration if submitted materials are incomplete or untimely.

In its discretion, NTIA may provide an applicant with an incomplete application one (1) opportunity to cure its application, in which case NTIA will provide the applicant up to seven (7)

---

[31] Either an Eligible Entity as defined by the Digital Equity Act or a U.S. Territory.

calendar days to submit information responsive to the feedback provided by NTIA, unless this time period is extended by NTIA.

### C. Merit Review

Applications satisfying the "Initial Eligibility and Administrative Review" will move to "Merit Review." Applications that reach Merit Review will be reviewed by at least two (2) merit reviewers, which may be Federal personnel or non-Federal personnel, who have demonstrated expertise in the programmatic aspects of digital equity and inclusion. As applicable, merit reviewers will be required to sign and submit a nondisclosure and confidentiality form pertaining to the dissemination of confidential information and to potential financial and other conflicts of interest. In accordance with the below criteria, the Merit Reviewers will review applications for Competitive Grant Program awards to ensure conformity with the Program objectives, eligible activities, and related costs/budget. The evaluation criteria that will be used by the Merit Reviewers to review and analyze applications for Competitive Grant funds are grouped into four (4) categories as outlined below. Reviewers will evaluate applications according to these evaluation criteria and independently score each application based on a scale of 0-100 points. Based on an average of the reviewers' scores, applications that score 70 or more will be considered "Qualified for Programmatic Review" under the prioritization process outlined below. Applications with a score below 70 will not proceed to Programmatic Review and will not be considered for funding.

Applications that are Qualified for Programmatic Review will proceed to Programmatic Review according to the prioritized groupings described in V.D below, with each subsequent prioritized grouping of applications reaching Programmatic Review only if: (1) there are insufficient qualified applications to exhaust available funding, (2) the Native Entity set aside has not been satisfied, or (3) there is a need to balance the proposed award list based on the factors outlined in the OICG Associate Administrator review and Final Project Selection process outlined below.

### Evaluation Criteria for Merit Review:

*A. Project Need, Purpose, and Benefits (40 points)*

- Reviewers will assess the extent to which the applicant's proposed Digital Equity Project, including the specific activities or interventions to be implemented, addresses a root cause or systemic barrier to digital equity for one or more Covered Populations.
- Reviewers will consider the extent to which the application includes a baseline assessment supported by objective data showing a need for services.
- Reviewers will assess whether the project aligns with, or addresses a gap in, the State Digital Equity Plan of the State or Territory within which it will be implemented if the State Digital Equity Plan is available.
- Reviewers will assess whether the proposed program is duplicative of or conflicts with existing programs.
- Reviewers will assess how effectively the Digital Equity Project will increase Internet access and the adoption of broadband among the Covered Populations to

37

be served by the applicant (and not result in unjust enrichment), including how tailored the Digital Equity Project is in addressing the needs of the Covered Population(s) and whether the Digital Equity Project is consistent with the baseline assessment.

- Reviewers will consider the number of different identifiable Covered Populations to be served as well as the total number of individuals within the Covered Populations to be served.
- Reviewers will assess whether the proposed Digital Equity Project maximizes the effectiveness of the proposed activities and interventions by recognizing the intersectionality of the Covered Populations and the opportunity to serve individuals that are included in multiple Covered Population categories.

B. *Strength of Applicant's Organizational Capability. (25 points)*

- Reviewers will assess the strength of the applicant's organizational capability to implement the proposed Digital Equity Project including the programmatic and technical experience of the implementation team.
- Reviewers will assess whether the applicant has the breadth and depth of experience, as an organization or through partnerships, that demonstrates the experience with the Covered Populations necessary to effectively complete the proposed projects.
- Reviewers will assess the applicant's ability to manage large federal grant awards effectively, either based on demonstrated management of past projects, or based on an explanation and description in the applicant's application materials indicating their capacity to do so.
- Reviewers will assess the applicant's ability to manage large programmatic initiatives, either based on the applicant's past success and relevant experience, or based on an explanation in the applicant's materials indicating their capacity to do so.
- Reviewers will assess the extent to which the applicant has included measures to facilitate direct support, technical assistance, and capacity building across the Covered Populations.
- Finally, reviewers will assess the strength of the applicant's strategy to manage and foster collaboration among subrecipient(s) and subcontractor(s) (if applicable).

C. *Strength of Project Implementation Plan and Budget (25 points)*

- Reviewers will assess the overall soundness of the proposed Digital Equity Project plan and milestones and whether the proposed activities and timelines are reasonable and can be conducted within the period of performance.
- Reviewers will assess the extent to which the application demonstrates access to the resources and elements needed to fulfill the project activities.
- Reviewers will assess whether the application materials provide sufficient detail regarding the proposed Digital Equity Project, including specific activities and

38

interventions to be conducted, to demonstrate they are achievable and are consistent with the allowable programmatic activities.

- Reviewers will assess the extent to which the applicant has established realistic measurable objectives, and whether the requested funds, implementation milestones, and timelines are sufficient to complete the tasks described in the Project Narrative.
- Reviewers will assess the feasibility and appropriateness of the proposed project budget, including an assessment of whether the amounts budgeted can realistically achieve Digital Equity Project goals and whether the award funds would be used in an effective and efficient manner.
- Reviewers will assess whether the applicant has assembled an implementation team, whether as an organization or through partnerships, that will increase the strength and efficiency of its implementation plan and budget.
- Reviewers will consider the applicant's strategy for assessing intervention effectiveness and adjusting interventions based on lessons learned, obtaining input from beneficiaries and stakeholders to inform project adjustments, and maximize effectiveness and sustainability.

D. *Project Results and Evaluation (10 points)*

- Reviewers will assess the applicant's strategy for measuring both near-term and long-term outcomes of its proposed Digital Equity Project, including an assessment of the clarity, specificity, and alignment of metrics with project objectives.
- Reviewers will assess the extent to which the proposed evaluation strategies are achievable and capable of measuring project outcomes, including direct and indirect effects on digital inclusion.
- Reviewers will consider the applicability and/or efficacy of the proposed data collection and analysis procedures, including evaluation frequency and scope, to ensure comprehensive measurement of project outcomes.

## D. Programmatic Review

Only applications which pass the Initial Administrative and Eligibility Review, and score at least 70 points during the Merit Review, will be considered for Programmatic Review using the prioritization process outlined below. Programmatic Review will be prioritized by Merit Review score, with like-scoring applications consolidated into prioritized groupings. NTIA will generally not move to Programmatic Review of applications in the next prioritized grouping unless: (i) all applications in the prior prioritized grouping are reviewed by NTIA, and (ii) either (a) the slate of proposals being recommended for funding does not utilize the entirety of funds available; or (b) evaluation of other applications is warranted to ensure geographic diversity, to ensure that all Covered Populations are being served or to balance the Covered Populations being served, or to ensure the statutory Native Entity set aside is satisfied. *See,* Section V.E of this NOFO.

### 1. Prioritization

To accelerate issuance of awards under this program, NTIA will combine like-scoring projects for Programmatic Review and award issuance into prioritized groupings. Each prioritized grouping will consist of applications with Merit Review scores within a 5 to 10-point range, beginning with the highest scoring applications. Applications within each grouping will enter Programmatic Review at the same time and will remain in their grouping through consideration by the Selecting Official. NTIA may limit the total amount of funding made available for each prioritized grouping.  After the award slate has been completed for a specific prioritized grouping, NTIA will proceed to the next highest scoring group.  If an application in a higher scoring group is not selected for an award during its initial consideration, that application will be included for consideration in the next highest scoring group.  This batching and award selection process will continue until all funds, including the Native Entity set-aside, are expended.

### 2. Programmatic Review Process

NTIA will assess applications that reach Programmatic Review (subject to the prioritization process outlined above) based upon the criteria listed below and will calculate weighted Programmatic Review scores accordingly.  Specifically, each application's average Merit Review Score will be multiplied by an additional 0.1 for each of the six (6) factors outlined below that the application meets.  So, for example, projects that do not meet any of the factors listed below would be multiplied by 1.0, while projects that meet all six (6) criteria would be multiplied by 1.6. The Programmatic Review scores generated by this multiplication will be organized into a ranked list and submitted to the OICG Associate Administrator for review. The six (6) criteria are:

i.  The Digital Equity Project addresses an aspect of the digital divide without a current solution or supplements an existing solution in an innovative manner and uses a unique, novel, and/or creative approach tailored to the unique needs and challenges faced by the Covered Populations.

ii.  The application includes matching funds of twenty (20) percent or greater.

iii.  The application includes matching funds of thirty (30) percent or greater.

iv.  The proposed Digital Equity Project facilitates the purpose of the Digital Equity Competitive Grant Program, specifically by promoting two or more of the following: (1) Economic stability, including workforce development and employment opportunities; (2) Access to quality education; (3) Access to healthcare; (4) Social and civic engagement; or (5) Community access to the benefits of Internet technology.

v.  The proposed project focuses services on one or more Covered Populations in geographic areas in which more than 50% of households are "covered households" within the meaning of the Digital Equity Act.

vi.  The proposed project will create a sustainable long-term impact on digital equity and inclusion (e.g., by demonstrating ongoing funding sources, a broad range of appropriate partners or other indicators of an ability to continue the project(s) past the period of performance) or will lead to the permanent elimination of a barrier to digital equity.

With respect to each item above, the applicant should specify in its application the criteria it believes its project(s) meets and provide evidence that supports its position with respect to each criterion in the project narrative. Programmatic reviewers will consider the evidence presented on its own merit and will not seek out or consider material not included in the application except as described immediately below.

During Programmatic Review, NTIA may ask applicants to submit additional information, as appropriate, to clarify or to further substantiate the representations made in their applications. Applicants will have up to 10 calendar days to submit information responsive to the feedback provided by NTIA, unless this period is extended by NTIA.  NTIA Program Staff will review the supplemental information, along with all information submitted with the application, to confirm eligibility and evaluate the applications with respect to the requirements and priorities of the Competitive Grant Program.  Applicants whose supporting documents are not complete, accurate, and timely submitted, or who do not adequately substantiate the representations in their applications, may be denied at this point in the review process.

Upon completion of the Programmatic Review, NTIA Program Staff will summarize their analysis and scoring for each application reviewed and will provide a ranked list of proposed projects (i.e., the proposed award slate), based on each project's weighted score, to the Associate Administrator for the Office of Internet Connectivity and Growth (OICG Associate Administrator). This list will identify which awards qualify for the Native Entity set-aside. In addition, NTIA Program Staff will provide a separate list of awards for U.S. Territories, as applicable.

### 3.  Native Entity Application Review

NTIA has set aside $37,500,000 for awards to Native Entities as required by 47 U.S.C. §1724(j) and will increase this amount to $50,000,000 if fiscal year 2025 funds become available. Because Native Entities are Eligible Entities under the Digital Equity Act, Native Entity and Native Entity partnership applications will be considered as part of the Competitive Grant Program review process outlined above.  When the NTIA Program Staff submit proposed awards to the OICG Associate Administrator for his recommendation, they will identify which awards qualify for the statutory set-aside amount. If, after the initial programmatic review process, there are not sufficient Native Entity awards to satisfy the statutory set aside amount, NTIA will consider additional Native Entity applications that exceed a Merit Review score of 70 as outlined in Section V.D.1 above for funding under the statutory set-aside. If there are insufficient qualified Native Entity applications to exhaust the set aside, any remaining funds will be made available to Native Entities through future Competitive Grant Program NOFO(s).

### 4.  U.S. Territory Application Review

NTIA has set aside $7,500,000 for awards to the U.S. Territories as required by 47 U.S.C. §1724(j) and will increase this amount to $10,000,000 if fiscal year 2025 funds become available.  Because the Digital Equity Act does not include Territories as Eligible Entities for the Competitive Grant Program, applications from U.S. Territories will be considered separately. U.S. Territories must submit applications consistent with the instructions in Section IV of this NOFO.  Each such submission will be reviewed by NTIA program staff consistent with the review criteria outlined in the Initial Eligibility and Administrative Review, Merit Review, and

41

Programmatic Review sections outlined above and will be determined to be qualified or unqualified for funding based upon those criteria. The maximum amount to be awarded to any U.S. Territory will be $2,500,000. While NTIA anticipates that awards to U.S. Territories will exceed $1,000,000, this is not a mandatory minimum and the actual funding amount will be determined based on the number of applications and amount of funding requested.  Any remaining funds will be made available to U.S. Territories through future NOFO(s).

### 5.  Rolling Awards

As described above, applications will be organized into prioritized groupings based on their Merit Review scores and proceed through Programmatic Review together. Applications will remain in these groupings for consideration by the Selecting Official, who will develop a slate of awards for submission to the Grants Officer on a rolling basis.  Within each prioritized grouping, the OICG Associate Administrator will consider each application's Merit Review and Programmatic Review Score and will take into account the selection factors listed in Section V.E of this NOFO when recommending awards for final review and approval by the Assistant Secretary.  Any application that is not selected for an award within a prioritized grouping will be considered for funding within the next highest scoring prioritized group.

### E.  OICG Associate Administrator Review

Following the conclusion of the Programmatic Review for each prioritized grouping, the OICG Associate Administrator will review the ranked list of applications and recommend a list of awards to the NTIA Assistant Secretary, who is the Selecting Official for this program. This recommendation will identify which awards qualify for the Native Entity set-aside. In addition, the OICG Associate Administrator will include a separate list of awards for U.S. Territories, as applicable. The OICG Associate Administrator's recommendations to the Selecting Official may differ from the proposed award slate developed during the Programmatic Review based on consideration of the following selection factors: (a) geographic diversity, (b) ensuring that all Covered Populations are being served or to balance the Covered Populations being served, and (c) ensuring that the Native Entity set aside is satisfied. Based on these selection factors, the OICG Associate Administrator may recommend lower ranked applications within a particular priority grouping to the Selecting Official, as warranted, and will appropriately document the basis of this recommendation.

### F.  Final Project Selection

After conducting the review described above, the OICG Associate Administrator shall provide a proposed award slate to the NTIA Assistant Secretary for final review.  As the Selecting Official, the NTIA Assistant Secretary retains discretion to select and recommend an application for funding that was not recommended by the OICG Associate Administrator based on the selection factors listed above in Section V.E. of this NOFO.  The NTIA Assistant Secretary also retains discretion to not recommend an application for funding that was recommended by the OICG Associate Administrator if the Assistant Secretary disagrees with the OICG's use of the selection factors listed above and will appropriately document the basis of this decision.

The NTIA Assistant Secretary will submit the applications recommended for funding, along with the bases for the selection decisions, to the NIST Grants Officer, who serves as the Grants Officer for the Competitive Grant Program.  The final approval of selected applications and the issuance of awards will be made by the NIST Grants Officer.  The award decisions of the NIST Grants Officer are final.

NTIA expects to begin issuing awards to applicants pursuant to this Notice of Funding Opportunity by Winter of 2024 but no later than April 20, 2025.  NTIA expects to make additional awards on a rolling basis. NTIA reserves the right to modify or rescind funding, including in the post-award period, if it determines there is a duplication of funding between proposed projects. If duplicative projects are identified, NTIA will work with the grantee(s) to identify a path forward to maximize the use of funds. Unsuccessful applicants will be notified in writing by email.

### G.  Federal Awarding Agency Review of Risk Posed by Applicant

After applications are proposed for funding by the Selecting Official, the NIST Grants Management Division (GMD) will perform pre-award risk assessments in accordance with 2 C.F.R. § 200.206, which may include a review of the financial stability of an applicant, the quality of the applicant's management systems, the history of performance, reports and findings from audits, and/or the applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-federal entities.  In addition, prior to making an award where the total federal share is expected to exceed the simplified acquisition threshold (currently $250,000), NIST GMD will review and consider the non-publicly available information about that applicant in the Federal Awardee Performance and Integrity Information System (FAPIIS), which is now located in SAM.gov as the responsibility/qualifications (R/Q) reports. Upon completion of the pre-award risk assessment, NIST GMD will determine whether the applicant is qualified to receive the award and, if so, whether appropriate specific award conditions that correspond to the degree of risk posed by the applicant should be applied to the award.

### H.  Anticipated Announcement and Award Dates

NTIA expects to begin making awards under this NOFO by Winter of 2024 but no later than April 20, 2025. NTIA plans to issue awards made under the Competitive Grant Program on a rolling basis.

## VI.    Federal Award Administration Information

### A.  Federal Award Notices

Applicants will be notified in writing by the NIST Grants Officer if their application is selected for an award.  If the application is selected for funding, the NIST Grants Officer will issue the grant award (Form CD-450), which is the authorizing financial assistance award document.  By signing and returning the Form CD-450, the recipient agrees to comply with all award provisions, terms, and conditions.

If an applicant is awarded funding, neither NTIA nor NIST is under any obligation to provide any additional future funding in connection with that award or to make any future award(s). Amendment of an award to extend the period of performance is at the discretion of NTIA and the NIST Grants Officer and is subject to the limitations contained in 47 U.S.C. §1724(d)(2)(D), the terms and conditions of the award, available funding, and this NOFO.

### B. Notification to Unsuccessful Applicants

Unsuccessful applicants will be notified in writing by email and will have the opportunity to receive a debriefing. Applicants must make a request within 10 business days of the email or written notification to receive a debrief from NTIA. NTIA will then work with the unsuccessful applicant to arrange a date and time for the debrief.

### C. Retention of Unsuccessful Applications

Unsuccessful applications will be retained in accordance with NTIA recordkeeping requirements.

### D. De-obligation or Termination of Grant

The Assistant Secretary may de-obligate or terminate a grant awarded to a recipient under the Competitive Grant Program if the grant funds are not being used in a manner that is consistent with the application submitted by the recipient, the recipient is not upholding the assurances made pursuant to Section IV.B.18 and Appendix B of this NOFO, or the Assistant Secretary determines that the grant is no longer necessary to achieve the original purpose for which the Assistant Secretary awarded the grant. Prior to de-obligation or termination of a grant for these reasons, the Assistant Secretary will provide notice to the recipient, including a rationale and supporting information demonstrating the basis of the Assistant Secretary's decision and an opportunity for a hearing. Any grant funds the Assistant Secretary de-obligates or terminates will be competitively awarded to another applicant consistent with the requirements of the Competitive Grant Program through future NOFO(s).

### E. Administrative and National Policy Requirements

Recipients of funding pursuant to this program must comply with applicable statutes and regulations, including but not limited to:

#### 1. Uniform Administrative Requirements, Cost Principles and Audit Requirements

Through 2 C.F.R. § 1327.101, the Department of Commerce adopted Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards at 2 C.F.R. Part 200, which apply to awards in this program. Refer to http://go.usa.gov/SBYh and http://go.usa.gov/SBg4. NTIA will apply the updated Uniform Guidance Provisions, published by OMB on April 22, 2024, in the Federal Register at 89 FR 30046, to all awards under this NOFO. The updated Uniform Guidance Provisions may be reviewed here: https://www.federalregister.gov/documents/2024/04/22/2024-07496/guidance-for-federal-financial-assistance.

### 2. Department of Commerce Financial Assistance Standard Terms and Conditions

The Department of Commerce will apply to each award in this program, the Financial Assistance Standard Terms and Conditions in effect on the date of award. The current version, dated November 12, 2020, is accessible at Department of Commerce Financial Assistance Standard Terms and Conditions. Refer to Section VII of this NOFO, Federal Awarding Agency Contacts, Grant management inquiries, if you need more information.

### 3. Pre-Award Notification Requirements

The Department of Commerce will apply the Pre-Award Notification Requirements for Grants and Cooperative Agreements dated December 30, 2014 (79 FR 78390), accessible at http://go.usa.gov/hKkR. Refer to Section VII of this NOFO, Federal Awarding Agency Contacts, Grant management inquiries, for more information.

### 4. Build America, Buy America Act Domestic Content Preference Requirements

Pursuant to the Build America, Buy America Act (BABA) (Pub. L. No. 117-58, §§ 70901-52) and regulations promulgated thereunder at 2 C.F.R. part 184, recipients of an award of federal financial assistance from the Department of Commerce are hereby notified that none of the funds provided under such award may be used for an "infrastructure project" (as defined in 2 C.F.R. 184.3) unless:

a. all iron and steel used in the project are produced in the United States – this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

b. all manufactured products used in the project are produced in the United States – this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

c. all construction materials are manufactured in the United States – this means that all manufacturing processes for the construction material occurred in the United States.

The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

To help federal agencies and recipients meet BABA requirements, the Hollings Manufacturing Extension Partnership (MEP) National Network™ of the National Institute for Standards and Technology (NIST) provides a service to connect stakeholders, including recipients, to U.S. manufacturers that have relevant production capabilities and capacities to help fulfill current

market and supply chain needs. Recipients considering requesting a BABA nonavailability waiver are strongly encouraged to contact the NIST/MEP for assistance with supplier scouting services prior to seeking a BABA nonavailability waiver. Further information on the NIST/MEP supplier scouting services is available at: https://www.nist.gov/mep/supplier-scouting.

*Waivers*

When necessary, recipients may apply for, and the Department may grant, a waiver from these requirements. The Department will provide the recipient with information on the process for requesting a waiver from these requirements. When the Department has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the Department determines that:

  i.     applying the domestic content procurement preference would be inconsistent with the public interest;

  ii.    the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

  iii.   the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the domestic content procurement preference must be in writing. NTIA will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 calendar days and must be reviewed by the Made in America Office of the Office of Management and Budget (OMB).

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.commerce.gov/oam/build-america-buy-america.

**5.  National Environmental Policy and Historic Preservation**

In general, deployment of broadband infrastructure to connect broadband serviceable locations should be accomplished through other programs, including the Broadband Equity, Access, and Deployment program. However, to the extent that installation of broadband infrastructure is necessary to accomplish an eligible program, activity, or intervention (e.g., installing fixed equipment on a building as part of a strategy to promote access to affordable broadband service), additional information will be required to determine the potential for environmental impacts under the National Environmental Policy Act (42 U.S.C. §4321 et seq.) and potential impacts to historic properties under the National Historic Preservation Act of 1966 (54 U.S.C. 300101 et seq.).

**6.  Domestic Preference for Procurements**

Pursuant to 2 C.F.R. § 200.322, as appropriate and to the extent consistent with law, a nonfederal entity should, to the greatest extent practicable under a federal award, provide a preference for

46

the purchase, acquisition, or use of goods, products, or materials produced in the United States (including, but not limited to, iron, aluminum, steel, cement, and other manufactured products). The requirements of this Section must be included in all subawards, including all contracts and purchase orders for work or products pursuant to this program.

### 7. Contracting with Small and Minority Businesses, Women's Business Enterprises, and Labor Surplus Area Firms

Pursuant to 2 C.F.R. § 200.321, a non-federal entity must take all necessary affirmative steps (as described in 2 C.F.R. § 200.321) to assure that minority businesses, women's business enterprises, and labor surplus area firms are used when possible.

### 8. Cybersecurity Best Practices

Recipients and subrecipients must ensure that the planning, design, and project oversight phases of the programs and activities funded through the Competitive Grant Program are consistent with current industry best practices for cybersecurity, such as the NIST Cybersecurity Framework[32] and Cybersecurity and Infrastructure Security Agency (CISA) Cybersecurity Performance Goals (CPGs).[33]  These performance goals provide a baseline set of cybersecurity practices that are broadly applicable, with known risk-reduction value.  NTIA reserves the right to review a recipient's cybersecurity framework and recipients must review the cybersecurity framework of its subrecipients.

### 9. Privacy

Recipients and subrecipients must comply with all applicable state and federal privacy laws and regulations, including 2 C.F.R. §200.303, and take steps to ensure that data collection, management, and utilization are conducted ethically, transparently, and with a strong emphasis on safeguarding the rights and privacy of individuals and that any use of automated systems or technologies includes an assessment of the potential consequences for individuals in the Covered Populations.

### F. Reporting

Recipients will be required to comply with reporting requirements. All reports submitted pursuant to this NOFO must be true and complete and will be treated as a material representation of fact upon which NTIA will rely.  In addition to the reporting requirements found in 2 C.F.R. Part 200, NTIA will provide additional reporting instructions in connection with the requirements set forth in this Section, including details on the manner and format in which

---

[32] NIST Cybersecurity Framework, https://www.nist.gov/cyberframework/framework.

[33] Cybersecurity & Infrastructure Security Agency, Cross-Sector Cybersecurity Performance Goals, https://www.cisa.gov/cross-sector-cybersecurity-performance-goals.

recipients will be required to report information in support of federal agency obligations under the ACCESS BROADBAND Act, 47 U.S.C. § 1307, and Section 60105 of the Infrastructure Act.

### 1. Infrastructure Act Reporting Requirements

**Annual Report**

As set forth in 47 U.S.C. §1724(h)(1)(A), any entity to which the Assistant Secretary awards a grant under this program shall be required to publicly report, for each year during the period of performance of a program grant, in a format to be specified by the Assistant Secretary, on:

  a. The amount of the grant;

  b. The use by the entity of the grant amounts; and

  c. The progress of the entity towards fulfilling the objectives for which the grant was awarded.

The Annual Report will be for the period ending December 31 and be due thirty (30) days after the close of the calendar year.  The Annual Report will also require the submission of the information identified in Section II.C and Section VI.F.2.b of this NOFO.  The final Annual Report will be due 120 days after the end of the period of performance.  The Assistant Secretary may establish additional reporting and information requirements for any recipient of a grant as necessary to fulfil the requirements of the Digital Equity Act.

**Evaluation Report**

As required by 47 U.S.C. §1724(d)(2)(B), not later than 15 months after the date on which a recipient is awarded a grant under this Program, and annually thereafter, the recipient shall submit a report of each measurement and evaluation performed of the activities funded by the grant for any year in which the entity expends grant amounts.  NTIA may request this information be incorporated into both the Annual Report and the Performance (Technical) Report (discussed below).

### 2. Other Reporting Requirements

The following reporting requirements described in Section A.01, Reporting Requirements, of the Department of Commerce Financial Assistance Standard Terms and Conditions (12 November 2020), apply to awards in this program:

### a. Financial Reports

Each award recipient will be required to submit an SF-425, Federal Financial Report on a semiannual basis for the periods ending December 31 and June 30 of each year.  Reports will be due within thirty (30) days after the end of the reporting period to the NTIA Federal Program Officer, Grants Officer, and Grants Specialist named in the award documents.  If awarded, further instructions on where and how to submit reports will be provided via a specific award condition.  A final financial report is due within 120 days after the end of the project period.

### b. Performance (Technical) Report

Each award recipient will be required to submit a technical progress report to the NTIA Federal Program Officer, Grants Officer, and Grants Specialist named in the award documents for the

six-month period ending June 30 of each year and will be due thirty (30) days after the close of the period.   A Performance Report will not be required during the initial year of the award.  If awarded, further instructions on where and how to submit reports will be provided via a specific award condition. Technical progress reports shall contain information as prescribed in 2 C.F.R. § 200.329 and Department of Commerce Financial Assistance Standard Terms and Conditions (dated November 12, 2020), Section A.01. Competitive Grant Program reporting elements may include, but are not limited to: the Performance Measurement and Evaluation data required under Section II.C of this NOFO, the evaluation information required under Section IV.C.2 of this NOFO, status on achieving project implementation milestones and measurable objectives, and alignment to expenditures, project outputs (e.g., number of devices provided/subsidized, number of digital literacy/training programs developed, number of training hours provided, number of Internet subscriptions provided/subsidized), project output beneficiaries, including number of beneficiaries across the Covered Populations, number of jobs created for project implementation, and other results from program evaluation activities.

### c.  Human Subjects Research

All Competitive Grant Program recipients must comply with Department of Commerce regulations relating to the protection of human subjects for all research conducted or supported pursuant to a NTIA grant award (per 15 C.F.R. Part 27).  Recipients must review forthcoming guidance for human subjects research protection and make an independent assessment of their planned activities and act in accordance with Human Subjects Research protection requirements and report any new research activities or updates to planned activities on an ongoing basis.

### G.  Recipient Integrity and Performance Matters

In accordance with Section 872 of Public Law 110-417, as amended; see 41 U.S.C. § 2313, if the total value of a recipient's currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of an award made under this NOFO, then the recipient shall be subject to the requirements specified in Appendix XII to 2 C.F.R. Part 200,[34] for maintaining the currency of information reported to SAM that is made available in the Federal Awardee Performance and Integrity Information System (FAPIIS) about certain civil, criminal, or administrative proceedings involving the recipient.

### H.  Audit Requirements

The federal financial assistance regulations in 2 C.F.R. Part 200, Subpart F require any non-federal entity that expends federal awards of $1,000,000 or more in the recipient's fiscal year to conduct a single or program-specific audit in accordance with the requirements set out in the Subpart.  Additionally, unless otherwise specified in the terms and conditions of the award, entities that are not subject to Subpart F of 2 C.F.R. Part 200 (e.g., for-profit subrecipients) that expend $1,000,000 or more in grant funds during their fiscal year must submit to the Grants Officer either: (i) a financial related audit of each DOC award or subaward in accordance with Generally Accepted Government Auditing Standards; or (ii) a project specific audit for each

---

[34] *See* 2 C.F.R. Part 200, Appendix XII, *available at* http://go.usa.gov/cTBwC.

49

award or subaward in accordance with the requirements contained in 2 C.F.R. § 200.507.   See Section D.01.c. of the Department of Commerce Financial Assistance Standard Terms and Conditions.  Applicants are reminded that NTIA, the NIST Grants Office, the Department of Commerce Office of Inspector General, or another authorized federal agency may conduct an audit of an award at any time.

### I.   Federal Funding Accountability and Transparency Act of 2006

In accordance with 2 C.F.R. Part 170, all recipients of a federal award made on or after October 1, 2010, are required to comply with reporting requirements under the Federal Funding Accountability and Transparency Act of 2006 (Pub. L. No. 109-282).  In general, all recipients are responsible for reporting sub-awards of $30,000 or more.  In addition, recipients that meet certain criteria are responsible for reporting executive compensation. Applicants must ensure they have the necessary processes and systems in place to comply with the reporting requirements should they receive funding.[35]

### J.   Public Database

Pursuant to 47 U.S.C. §1724(h)(1)(C), NTIA will create and maintain a fully searchable database, which shall be accessible on the Internet at no cost to the public, that contains, at a minimum: (i) a list of each entity that has applied for a grant under the Program; (ii) a description of each application including the proposed purpose of each grant described in that application; (iii) the status of each application, including whether the Assistant Secretary has awarded a grant with respect to the application and, if so, the amount of the grant; (iv) each report submitted by an entity as required by 47 U.S.C. §1724(h)(1)(A) and Section VI.E.1 of this NOFO; and (v) any other information that is sufficient to allow the public to understand and monitor grants awarded under the Program.

In accordance with federal policy, any publications and their supporting data resulting from federally funded research should be made publicly accessible without an embargo on their free and public release, no later than December 31, 2025. https://www.whitehouse.gov/wp-content/uploads/2022/08/08-2022-OSTP-Public-Access-Memo.pd

## VII.   Federal Awarding Agency Contacts

### A. Please direct programmatic inquiries to:

Angela Thi Bennett
Director of Digital Equity
Office of Internet Connectivity and Growth
National Telecommunications and Information Administration
U.S. Department of Commerce

---

[35] *See* OMB, Requirements for Federal Funding Accountability and Transparency Act Implementation, Interim final guidance to agencies with opportunity to comment, 75 FR 55663 (Sept. 14, 2010), *available at* http://go.usa.gov/hKnQ.

1401 Constitution Avenue, NW
Washington, DC 20230
Phone: (202) 482-2048
Email: digitalequity@ntia.gov

### B. Please direct grant management inquiries to:

Darren Olson
Grants Officer
Grants Management Division
National Institute of Standards and Technology
325 Broadway
Boulder, CO 80305
Phone: (720) 639-0465
Email: darren.olson@nist.gov

### C. Please direct media inquiries to:

Charles Meisch
Director of Public Affairs
Office of Public Affairs
National Telecommunications and Information Administration
U.S. Department of Commerce
1401 Constitution Avenue NW, Room 4897
Washington, DC 20230
Phone: (202) 482-7002
Email: press@ntia.doc.gov

## VIII. Other Information

### A. Transparency

The Infrastructure Act contains robust reporting requirements for grant recipients, and requires NTIA, the Commission, and other agencies to coordinate to make information regarding federal broadband funding, low-cost plans, and other aspects of the Competitive Grant Program readily available to and understandable by the public. NTIA will fulfill its obligations to the fullest extent possible. Recipients of U.S. Department of Commerce and NTIA grants also should be cognizant of the access to records requirements set forth at 2 C.F.R. § 200.337.

### B. Protected and Propriety Information

Recipients of Competitive Grant Program grants acknowledge and understand that information and data contained in applications for financial assistance, as well as information and data

51

contained in financial, performance, and other reports submitted by an entity, may be used by the Department of Commerce in conducting reviews and evaluations of its financial assistance programs and for statistical purposes.  For this purpose, information and data may be accessed, reviewed, and evaluated by Department of Commerce employees, other federal employees, federal agents and contractors, and/or by non-federal personnel, all of whom enter into appropriate confidentiality and nondisclosure agreements covering the use of such information.

As may be provided in the terms and conditions of a specific financial assistance award, recipients are expected to support Program reviews and evaluations by submitting required financial and performance information and data in an accurate and timely manner, and by cooperation with the Department of Commerce and external program evaluators.  In accordance with 2 C.F.R. § 200.303(e), program participants are reminded that they must take reasonable measures to safeguard protected personally identifiable information and other confidential or sensitive personal or business information created or obtained in connection with a Department of Commerce financial assistance award.

NTIA will protect confidential and proprietary information from public disclosure consistent with applicable law, including the Trade Secrets Act, as amended (18 U.S.C. § 1905) and the Economic Espionage Act of 1996 (18 U.S.C. §§1831 et seq.).  In the event that a submission contains information or data deemed to be confidential commercial information or that otherwise should not be publicly disclosed, that information should be identified, bracketed, and marked as Privileged, Confidential, Commercial or Financial Information.  See 15 C.F.R. § 4.9(b).  Based on these markings, the confidentiality of the contents of those pages will be reviewed for protection consistent with applicable law.  As discussed above, 47 U.S.C. 1724(h)(1)(C) requires that NTIA create and maintain a fully searchable public database that includes the application of each applicant that has applied for a grant under this program, among other information.

Additionally, some of the information submitted in the course of applying for funding under this Program or provided in the course of its grant management activities, may be considered law enforcement sensitive or otherwise important to national security interests.  This may include threat, risk, and needs assessment information, and discussions of demographics, transportation, public works, and industrial and public health infrastructures.  In the event that a submission contains such information or data, that information should be identified, bracketed, and marked appropriately.  Based on these markings, the confidentiality of the contents of those pages will be reviewed for protection consistent with applicable law. Applicants that are interested in participating in this program should be familiar with the regulations governing Protected Critical Infrastructure Information (6 C.F.R. Part 29) and Sensitive Security Information (49 C.F.R. Part 1520), as these designations may provide additional protection to certain classes of homeland security information.

In addition to the public disclosure requirements of this Program, each applicant interested in participating in this program is encouraged to consult its own laws and regulations regarding the release of information, which should be considered when reporting sensitive matters in the grant application. The applicant may consult with NTIA regarding concerns or questions about the

release of information or how omitting sensitive information could impact NTIA's assessment of the application.

## C. Funding Availability and Limitation of Liability

Funding for the Competitive Grant Program described in this NOFO is contingent upon the continued availability of appropriations. In no event will NTIA, NIST, or the Department of Commerce be responsible for application preparation costs, including, but not limited to, if the program fails to receive funding or is cancelled because of agency priorities. Publication of this NOFO does not oblige NTIA, NIST or the Department of Commerce to award any specific project or to obligate any available funds. NTIA will recommend for funding only projects that are deemed likely to achieve the Competitive Grant Program's goals and for which funds are available.

## D. Third Party Beneficiaries

The Competitive Grant Program is not intended to and does not create any rights enforceable by third party beneficiaries.

## E. Waiver Authority

It is the general intent of NTIA not to waive any of the provisions set forth in this NOFO. However, under extraordinary circumstances and at the discretion of the Assistant Secretary, NTIA, upon its own initiative or when requested, may waive the provisions in this NOFO. Waivers may only be granted for requirements that are discretionary and not mandated by statute or other applicable law. Any request for a waiver must set forth the extraordinary circumstances for the request.

## F. Paperwork Reduction Act

This NOFO contains an information collection requirement subject to the Paperwork Reduction Act (PRA) (44 U.S.C. § 3501 et seq.). The PRA requires each federal agency to seek and obtain OMB approval before collecting information from the public. Federal agencies may not collect information unless it displays a currently valid OMB control number. For purposes of the Competitive Grant Program, NTIA will use the Competitive Grant Program forms in the Application for Broadband Grant Programs information collection (0660-0055) and Standard Forms 424 (Application for Federal Assistance), 425 (Federal Financial Report), and SF-LLL (Disclosure for Lobbying Activities) under the respective control numbers 4040-0004, 4040-0014, and 4040-0013.

## G. Transparency, Accountability, and Oversight Required

### 1. Generally

NTIA and all Competitive Grant Program recipients have a critical role to play in ensuring that the Competitive Grant Program is implemented in a manner that ensures transparency, accountability, and oversight sufficient to, among other things:

    a. Minimize the opportunity for waste, fraud, and abuse;

b. Ensure that recipients of grants under the Program use grant funds to further the overall purpose of the Program in compliance with the requirements of 47 U.S.C. §1724 of the Digital Equity Act, this NOFO, 2 C.F.R. Part 200, the terms and conditions of an award, and other applicable law; and

c. Allow the public to understand and monitor grants awarded under the Program.

To that end, NTIA shall, as appropriate:

a. Conduct such audits of award recipients as are necessary and appropriate;

b. Develop monitoring plans, subject to the approval of the Assistant Secretary, which may include site visits or desk reviews, technical assistance, and random sampling of compliance requirements; and

c. Impose special conditions on grant awards designed to mitigate the risk of nonperformance where appropriate.

Each Eligible Entity or U.S. Territory receiving a Competitive Grant award shall, as appropriate:

a. Comply with the reporting requirements set forth in Section VI.F of this NOFO;

b. Conduct audits of sub-recipients and award management as necessary and appropriate. Eligible entities and U.S. Territories shall report the full results of any audits they conduct to the appropriate Federal Program Officer and NIST Grants Officer;

c. Comply with the obligations set forth in 47 U.S.C. §1724 of the Digital Equity Act, this NOFO, 2 C.F.R. Part 200, the terms and conditions of an award, and other applicable laws; and

d. Establish and widely publicize telephone numbers and email addresses for the Eligible Entity or U.S. Territory's Office of Inspector General (or comparable entity) for the purpose of reporting waste, fraud or abuse, in the Program. Eligible entities and U.S. Territories shall produce copies of materials used for such purpose upon request of the Federal Program Officer or the Grants Officer.

## 2. U.S. Department of Commerce Office of Inspector General

The U.S. Department of Commerce Office of Inspector General (OIG) seeks to improve the efficiency and effectiveness of the Department's programs, including through deterring and detecting fraud, waste, abuse, and mismanagement. The OIG accomplishes this mission primarily through investigations, audits, and inspections of Department activities, including grants, cooperative agreements, loans, and contracts.

### a. Disclosures

Recipients of financial assistance originating from the U.S. Department of Commerce, including NTIA, as well as applicants applying to this funding opportunity, shall timely disclose, in writing, to the OIG and awarding agency, whenever, in connection with the award, performance, or closeout of this grant or subaward thereunder, the recipient has credible evidence that a principal, employee, agent, or subrecipient has committed:

i. A violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code;

54

      ii.     A violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733); or

      iii.    A violation of the Federal Antitrust Laws found in Title 15 of the United States Code.

**b. Reporting**

The OIG maintains a hotline to receive allegations of fraud, waste, or abuse. To report such allegations, please visit https://www.oig.doc.gov/Pages/Hotline.aspx to submit a complaint or call toll-free at 800-424-5197.  The OIG will accept complaints via U.S. mail at the following address:

U.S. Department of Commerce
Office of Inspector General
1401 Constitution Avenue
Washington, D.C. 20230

Upon request, the OIG will take appropriate measures to protect the identity of any individual who reports misconduct, as authorized by the Inspector General Act of 1978, as amended. Reports to the OIG may also be made anonymously.

**3. Whistleblower Protection**

Recipients, sub-recipients, and employees working on this grant award will be subject to the whistleblower rights and remedies established under 41 U.S.C. § 4712.  An employee of a recipient or sub-recipient may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of: gross mismanagement of a federal contract or award; a gross waste of federal funds; an abuse of authority (i.e., an arbitrary and capricious exercise of authority that is inconsistent with the mission of NTIA or the U.S. Department of Commerce or the successful performance of a contract or grant awarded by NTIA or the Department) relating to a federal contract or award; a substantial and specific danger to public health or safety; or a violation of a law, rule, or regulation related to a federal contract (including the competition for or negotiation of a contract) or grant.

The recipient or sub-recipient shall inform its employees and contractors, in writing, in the predominant language of the workforce or organization, of employee whistleblower rights and protections under 41 U.S.C. § 4712, as described above and at https://www.oig.doc.gov/Pages/Whistleblower-Protection-Program.aspx.

**H. Unauthorized Use of Funds**

In the event of non-compliance with 47 U.S.C. § 1724, this NOFO, 2 C.F.R. Part 200, the terms and conditions of an award, or other applicable law, NTIA and the NIST Grants Officer shall take appropriate enforcement action against an Eligible Entity or U.S. Territory, and as necessary, against an Administering Entity or Administering Organization, as authorized in 2 C.F.R. §§ 200.339 - 200.343.

56

**Appendix A: Certifications Regarding Debarment and Suspension**

By signing and submitting an application for funding pursuant to the Competitive Grant Program, the applicant is making the certifications set forth below (see Line 21 on the SF-424, Application for Federal Assistance)**.**

**Instructions for Primary Tier Participant Certification**

i. By signing and submitting this proposal, the prospective primary tier participant is providing the certification set out below and agrees to comply with the requirements of 2 C.F.R. Parts 180, 1200, and 1326.[36]

ii. The inability of a person to provide the certification required below will not necessarily result in denial of participation in this covered transaction.  The prospective primary tier participant shall submit an explanation of why it cannot provide the certification set out below.  The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction.  However, failure of the prospective primary tier participant to furnish a certification or an explanation shall disqualify such person from participation in this transaction.

iii. The certification in this clause is a material representation of fact upon which reliance was placed when the department or agency determined to enter into this transaction.  If it is later determined that the prospective primary tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the federal government, the department or agency may terminate this transaction for cause or default or may pursue suspension or debarment.

iv. The prospective primary tier participant shall provide immediate written notice to the department or agency to which this proposal is submitted if at any time the prospective primary tier participant learns its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

v. The terms *covered transaction, civil judgment, debarment, suspension, ineligible, participant, person, principal, and voluntarily excluded,* as used in this clause, are defined in 2 C.F.R. Parts 180, 1200, and 1326.  You may contact the department or agency to which this proposal is being submitted for assistance in obtaining a copy of those regulations.

vi. The prospective primary tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. Part 9, Subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

vii. The prospective primary tier participant further agrees by submitting this proposal that it will include the clause titled "Instructions for Lower Tier Participant Certification" including the "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," provided by the department or agency entering into this

---

[36] In the context of the Competitive Grant Program, the primary tier participant would be the Eligible Entity or U.S. Territory receiving a Competitive Grant from NTIA.

covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions and will require lower tier participants to comply with 2 C.F.R. Parts 180, 1200, and 1326.

viii. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 C.F.R. Part 9, Subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any prospective lower tier participants, each participant may, but is not required to, check the System for Award Management (SAM) Exclusions website (https://www.sam.gov/).

ix. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

x. Except for transactions authorized under paragraph 6 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. Part 9, Subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the federal government, the department or agency may terminate the transaction for cause or default.

**Certification Regarding Debarment, Suspension, and Other Responsibility Matters - Primary Tier Covered Transactions**

i. The prospective primary tier participant certifies to the best of its knowledge and belief, that it and its principals or associated entities:

1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any federal department or agency;

2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state or local) with commission of any of the offenses enumerated in paragraph i(2) of this certification; and

4) Have not within a three-year period preceding this application/proposal had one or more public transactions (federal, state, or local) terminated for cause or default.

ii. Where the prospective primary tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

58

**Instructions for Lower Tier Participant Certification (applies to subrecipients)**

    i.    By submitting this proposal and accepting federal funding, the prospective lower tier participant is providing the certification set out below and agrees to comply with the requirements of 2 C.F.R. Parts 180, 1200, and 1326.[37]

    ii.    The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into.  If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension or debarment.

    iii.    The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

    iv.    The terms *covered transaction, civil judgment, debarment, suspension, ineligible, participant, person, principal, and voluntarily excluded,* as used in this clause, are defined in 2 C.F.R. Parts 180, 1200, and 1326. You may contact the person to whom this proposal is submitted for assistance in obtaining a copy of those regulations.

    v.    The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. Part 9, Subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

    vi.    The prospective lower tier participant further agrees by submitting this proposal that it will include the clause titled "Instructions for Lower Tier Participant Certification," including the "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions and will require lower tier participants to comply with 2 C.F.R. Parts 180 and 1200.

    vii.    A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 C.F.R. Part 9, Subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions.  To verify the eligibility of its principals, as well as the eligibility of any prospective lower tier participants, each participant may, but is not required to, check the System for Award Management Exclusions website (https://www.sam.gov).

---

[37] In the context of the Competitive Grant Program, lower-tier participants would be the entities that receive subgrants from, enter into contracts with, or otherwise receive program funding from the Eligible Entity or U.S. Territory that has received a Competitive Grant from NTIA.

viii.    Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause.  The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

ix.    Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. Part 9, Subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transactions**

i.    The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals or associated entities is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any federal department or agency.

ii.    Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**Appendix B: Assurances required under 47 U.S.C. §1724(f)**

When applying for a grant under this section, an entity shall include in the application for that grant assurances that the entity shall –

(1) use any grant funds that the entity is awarded --

(A) in accordance with any applicable statute, regulation, and application procedure; and

(B) to the extent required under applicable law;

(2) adopt and use proper methods of administering any grant that the entity is awarded, including by –

(A) enforcing any obligation imposed under law on any agency, institution, organization, or other entity that is responsible for carrying out a program to which the grant relates;

(B) correcting any deficiency in the operation of a program to which the grant relates, as identified through an audit or another monitoring or evaluation procedure; and

(C) adopting written procedures for the receipt and resolution of complaints alleging a violation of law with respect to a program to which the grant relates;

(3) cooperate with respect to any evaluation –

(A) of any program that relates to a grant awarded to the entity; and

(B) that is carried out by or for the Assistant Secretary or another Federal official;

(4) use fiscal control and fund accounting procedures that ensure the proper disbursement of, and accounting for, any Federal funds that the entity is awarded under the Program;

(5) submit to the Assistant Secretary any reports that may be necessary to enable the Assistant Secretary to perform the duties of the Assistant Secretary under the Program; and

(6) maintain any records and provide any information to the Assistant Secretary, including those records, that the Assistant Secretary determines is necessary to enable the Assistant Secretary to perform the duties of the Assistant Secretary under the Program.

61