**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL DIGITAL INCLUSION
ALLIANCE,

      Plaintiff,

  v.

PRESIDENT DONALD J. TRUMP, *et al.*,

      Defendants.

No. 1:25-cv-03606-JDB

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 3

    A.    Congress Enacted the Digital Equity Act to Close the "Digital Divide"................ 3

    B.    NDIA's Award was to Address Digital Equity ......................................................... 6

    C.    The Executive Followed No Process in Cancelling the Competitive Grant Program
........................................................................................................................................ 7

LEGAL STANDARD .................................................................................................................. 8

ARGUMENT ............................................................................................................................... 8

I.    This Court Has Jurisdiction to Hear All of NDIA's Claims............................................... 8

    A.    NDIA Has Standing to Raise its Claims .................................................................. 9

    B.    NDIA's Challenge to the Termination of the Competitive Grant Program Is Properly
        Before This Court ..................................................................................................... 10

        1.    The Decisions in *Department of Education* and *National Institutes of Health*
            Confirm This Court's Jurisdiction. ........................................................... 10

        2.    The Controlling Precedent of this Circuit Confirms This Court has
            Jurisdiction Over NDIA's Claims. ........................................................... 13

II.    NDIA's Constitutional Challenges Should Not Be Dismissed ......................................... 17

    A.    The Constitutional Rationale for Termination Provided by the Executive Branch Is
        Not Self-Justifying. .................................................................................................. 17

    B.    NDIA's Count I and Count II Are Genuine Constitutional Claims, Not *Ultra Vires*
        Statutory Claims, Thus Neither Counts I, II, or III Should be Dismissed ............ 18

        1.    NDIA's Complaint Sets Out Constitutional Challenges, Not
            *Ultra Vires* Claims in Disguise. ............................................................... 19

        2.    Even Under the *Ultra Vires* Standard, NDIA's Claims Survive................ 21

    C.    NDIA States a Viable Claim that Defendants Violated the Constitution's
        Spending Clause (Count II) ...................................................................................... 23

    D.    NDIA Has Asserted Viable Claims Against the President ..................................... 24

III.    NDIA's APA Claims Are Legally Sufficient and Must Survive Dismissal....................... 24

    A.    Counts IV and V Sufficiently Allege That Defendants Acted Contrary to, and in
        Excess of, Their Statutory Authority........................................................................ 25

    B.    Count VI Plausibly Alleges That Defendants Acted Arbitrarily and Capriciously27

    C.    Plaintiff's Challenge to the April 9, 2025, Email (Count VI) Satisfies All Threshold
        Requirements ............................................................................................................ 27

IV.    Defendants' Challenge to the Constitutionality of the Competitive Grant Program Does Not
    Warrant Dismissal............................................................................................................... 29

A.    The Court Should Not Adjudicate the Constitutionality of the Competitive Grant Program at the Motion to Dismiss Phase. .......................................................... 29

    1.    The Undeveloped Record Regarding Defendants' Basis for Cancelling the Competitive Grant Program Does Not Permit a Ruling on Its Constitutionality ..................................................................................... 31

    2.    Even if the Court Determines That Ruling on Constitutionality Would Be Appropriate at This Stage, the Factual Record Is Insufficient .................. 32

B.    Racial-Consciousness is Not Racial Classification Triggering Strict Scrutiny .... 33

C.    Defendants Have Not Established That Strict Scrutiny Applies to the Competitive Grant Program ...................................................................................................... 35

D.    The Competitive Grant Program Passes Strict Scrutiny ...................................... 36

    1.    A Compelling Government Interest Justifies the Race-Conscious Aspect of the Competitive Grant Program ................................................................. 37

    2.    The Competitive Grant Program Was Narrowly Tailored ........................ 39

E.    If the Act Fails Strict Scrutiny Analysis, Severance is Appropriate ..................... 40

Conclusion ....................................................................................................................... 43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200, 235 (1995)..................................................................................36

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013).................................................................................6, 23, 24, 30

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ......................................................................17, 20

*Am. Fed. of Gov't Emp., AFL-CIO v. Trump*,
782 F. Supp. 3d 793 (N.D. Cal. 2025) ...............................................................19

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ...........................................................................10

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).............................................................................................15

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
896 F.3d 539 (D.C. Cir. 2018) ................................................................41, 42, 43

*Ayotte v. Planned Parenthood of N. New Eng.*,
546 U.S. 320 (2006).............................................................................................41

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
591 U.S. 610 (2020)...............................................................................40, 41, 43

*Bennett v. Spear*,
520 U.S. 154 (1997).............................................................................................28

*Bowen v. Massachusetts*,
487 U.S. 879 (1988).......................................................................................14, 16

*Brokamp v. D.C.*,
No. CV 20-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022).................................32

*Brown v. Corr. Corp. of Am.*,
603 F. Supp. 2d 73 (D.D.C. 2009) .....................................................................36

*Brown v. Gov't of D.C.*,
390 F. Supp. 3d 114 (D.D.C. 2019) ....................................................................30

*Burwell v. Portland Sch. Dist. No. 1J*,
No. 3:19-CV-00385-JR, 2019 WL 9441663 (D. Or. Mar. 23, 2019) ......................................32

*Califano v. Sanders*,
430 U.S. 99 (1977)..................................................................................................................28

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019)................................................................................................35

*Caulfield v. Bd. of Ed. of New York*,
583 F.2d 605 (2d Cir. 1978)....................................................................................................35

*CC Distrib., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989)..................................................................................................9

*Cent. Vermont Ry., Inc. v. I.C.C.*,
711 F.2d 331 (D.C. Cir. 1983)................................................................................................36

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)................................................................................................22

*City of Saint Paul v. Wright*,
816 F. Supp. 65 (D.D.C. 2026)...............................................................................................13

*Clinton v. Jones*,
520 U.S. 681 (1997)......................................................................................................24, 29, 30

*Crowley Gov't Servs. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022).....................................................................................14, 15, 16

*Dalton v.* Specter,
511 U.S. 462, 473-74 (1994) .........................................................................................2, 18, 19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)..........................................................................................................27, 31

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) (per curiam)......................................................................................10, 11

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999)..................................................................................................16

*Eco Tour Adventures, Inc. v. Jewell*,
174 F. Supp. 3d 319 (D.D.C. 2016) ..........................................................................................9

*Fed. Commc'ns Comm'n v. Consumers' Research*,
606 U.S. 656 (2025)..................................................................................................................3

*Fisher v. United States*,
    402 F.3d 1167 (Fed. Cir. 2005)............................................................................16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010).............................................................................................40

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025)...................................................................18, 20, 21

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
    527 U.S. 173 (1999).............................................................................................30

*Grutter v. Bollinger*,
    539 U.S. 306 (2003).............................................................................................39

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015).................................................................................33

*IGas Holdings, Inc. v. Env't Prot. Agency*,
    146 F.4th 1126 (D.C. Cir. 2025)..........................................................................41

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*,
    338 F.3d 1024 (D.C. Cir. 2003)..............................................................................9

*Jafarzadeh v. Duke*,
    270 F. Supp. 3d 296 (D.D.C. 2017) .....................................................................22

*Jeffery v. City of New York*,
    113 F.4th 176 (2d Cir. 2024) ...............................................................................33

*Johnson v. Dade County Public Schools*,
    1992 WL 466902 (S.D. Fla. Nov. 25, 1992)........................................................30

*Judicial Watch, Inc. v. Nat'l Energy Policy Development Grp.*,
    219 F. Supp. 2d 20 (D.D.C. July 11, 2002) .........................................................29

*Kapa'a v. Trump*,
    794 F. Supp. 3d 793 (D. Haw. 2025) ...................................................................29

*Lewis v. U.S. Parole Comm'n*,
    743 F. Supp. 3d 181 (D.D.C. 2024)......................................................................22

*Louisiana v. Callais*,
    No. 24-109, 24-110, 2026 WL 1153054 (Apr. 29, 2026)...............................29, 30

*Martinez v. United States*,
    333 F.3d 1295 (Fed. Cir. 2003).............................................................................17

*Me. Cmty. Health Options v. United States*,
   590 U.S. 296 (2020)......................................................................................................16

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ...............................................................................13, 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).......................................................................................................27

*Myers v. United States*,
   272 U.S. 52 (1926).......................................................................................................18

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
   606 U.S. —, 145 S. Ct. 2658 (2025)...............................................................11, 12, 13, 14

*Nuziard v. Minority Bus. Dev. Agency*,
   721 F. Supp. 3d 431 (N.D. Tex. 2024) ........................................................................34

*Pitney Bowes, Inc. v. U.S. Postal Serv.*,
   27 F. Supp. 2d 15 (D.D.C. 1998).................................................................................8

*Polinski v. United States*,
   178 Fed. Cl. 736 (2025) ...............................................................................................16

*Porwancher v. Nat'l Endowment for the Humanities*,
   792 F. Supp. 3d 107 (D.D.C. 2025).............................................................................26

*Raso v. Lago*,
   135 F.3d 11 (1st Cir. 1998)..........................................................................................35

*Regan v. Time, Inc.*,
   468 U.S. 641 (1984).....................................................................................................41

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
   836 F.3d 57, 72 (D.C. Cir. 2016)............................................................................33, 34

*Rust v. Sullivan*,
   500 U.S. 173 (1991).....................................................................................................24

*S. Educ. Found. v. U.S. Dep't of Educ.*,
   784 F. Supp. 3d 50 (D.D.C. 2025)...............................................................................29

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010).......................................................................................10

*Smith v. D.C.*,
   387 F. Supp. 3d 8 (D.D.C. 2019).................................................................................32

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................................................9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)................................................................................................40

*Susman Godfrey LLP v. Exec. Off. of President*,
    789 F. Supp. 3d 15 (D.D.C. 2025).................................................................2, 19, 20

*Sussman v. Tanoue*,
    39 F. Supp. 2d 13 (D.D.C. 1999)............................................................................35

*Sustainability Institute v. Trump*,
    165 F.4th 817 (4th Cir. 2026) .....................................................................18, 20, 21

*Texas v. EPA*,
    726 F.3d 180 (D.C. Cir. 2013).................................................................................25

*Tootle v. Sec'y of the Navy*,
    446 F.3d 167 (D.C. Cir. 2006).............................................................................14, 16

*Transohio Sav. Bank v. Director, Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992).................................................................................15

*United States v. New Hampshire*,
    539 F.2d 277 (1st Cir. 1976)...................................................................................35

*Van Drasek v. Lehman*,
    762 F.2d 1065 (D.C. Cir. 1985)...............................................................................15

*W. Va. Ass'n of Cmty Health Ctrs., Inc. v. Heckler*,
    734 F.2d 1570 (D.C. Cir. 1984).................................................................................9

*Webster v. Doe*,
    486 U.S. 592 (1988)................................................................................................13

*Weyerhaeuser Co. v. Costle*,
    590 F.2d 1011 (D.C. Cir. 1978)...............................................................................36

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...........................................................................................20, 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015).............................................................................................17, 20

**Statutes and Constitution**

U.S. CONST. art. I, II .............................................................................1, 20, 23, 24

Administrative Procedure Act, 5 U.S.C. §§ 702, 703, 705, 706 ................................2, 9, 13, 15, 29

Tucker Act, 28 U.S.C. § 1491(a)(1) ..................................................................12, 14, 15

28 U.S.C. §§ 2201, 2202 ................................................................................................15

47 U.S.C. §§ 1701 ...................................................................................................37, 38

Digital Equity Act, 47 U.S.C. §§ 1721, 1722, 1724, 1726 .................................... *passim*

Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58 ................3, 38, 39

**Regulations**

2 C.F.R. § 200.340 ...................................................................................................25, 26

2 C.F.R. § 200.342 .............................................................................................7, 25, 26, 28

88 Fed. Reg. 13101 (Mar. 2, 2023) ................................................................................5

Fed. R. Civ. P. 12(b)(1) ..................................................................................................8

Fed. R. Civ. P. 12(b)(6) ............................................................................................8, 30

**Legislative and Executive Materials**

167 Cong. Rec. S5684 (Aug. 3, 2021) ............................................................................5

Anti Digital Redlining Act of 2021, H.R. 4875, 117th Cong. (2021) ...........................38

Constitutionality of Race-Based Department of Education Programs,
    49 Op. O.L.C. (Dec. 2, 2025) ..................................................................................41

Oversight of the Federal Communications Commission: Hearing before the H.
    Comm. on Energy & Com., 116th Cong. 34 (2020) .................................................38

Broadband Equity: Addressing Disparities in Access and Affordability: Hearing
    before H. Comm. on Energy & Com., 117th Cong. 29 (2021) ...............................37

An Economy That Works For Everyone: Investing In Rural Communities:
    Hearing before S. Comm. on Banking, 117th Cong. 289 (2021) ........................4, 37

Letter from Solicitor General Sauer to Speaker Mike Johnson, "Classification of
    Individuals Based on Race in the Digital Equity Act of 2021," U.S. Dep't of
    Justice (Mar. 4, 2026), ......................................................................................18, 42

Recent Federal Actions to Expand Broadband: Are We Making Progress?:
    Hearing before the S. Comm. on Com., Sci. and Transp., 117th Cong. 705
    (2021) ......................................................................................................................37

State of Telehealth: Removing Barriers to Access and Improving Patient
    Outcomes: Hearing before the S. Comm. on Com., Sci. and Transp., 117th
    Cong. 792 (2021) ..................................................................................................37

U.S. Gov't Accountability Off., Closing the Digital Divide for Millions of
    Americans without Broadband (Feb. 1, 2023),
    https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-
    broadband.................................................................................................................3

**Other Authorities**

Benton Institute for Broadband & Society, How Digital Inclusion Fuels Civic
    Engagement (June 3, 2025), https://www.benton.org/headlines/how-digital-
    inclusion-fuels-civic-engagement ..........................................................................4

Colby Leigh Rachfal, Cong. Rsch. Serv., R46613, The Digital Divide: What Is It,
    Where Is It, and Federal Assistance Programs (2021)...............................................1

Comcast Exec. VP David Cohen with Tim Farley, Comcast (Aug. 24, 2012)............................37

Digital Denied: The Impact of Systemic Racial Discrimination on Home-Internet
    Adoption, Benton Institute, December 16, 2016 ....................................................38

Elizabeth Bogue Simpson, *Baseline for Work: 92 Percent of Jobs Require Digital
    Skills, Fed. Reserve Bank of Atlantic: Partners Update* (Aug. 10, 2023) ................................4

Fed. Rsrv. Hist., *Redlining* (June 2, 2023)..................................................................................38

Johns Hopkins Bloomberg School of Public Health, Bridging the Digital Divide
    in Health Care: A New Framework for Equity (Jan. 16, 2025),................................4

*Oversight Republicans threaten to boycott Democrats' virtual committee
    proceedings being conducted in violation of rules and procedures*, H. Comm.
    on Oversight & Gov't Reform (Mar. 27, 2020)......................................................38

**INTRODUCTION**

In this lawsuit, the National Digital Inclusion Alliance ("NDIA") challenges the Executive Branch's unlawful termination of a congressionally mandated grant program, the Digital Equity Act's Competitive Grant Program. The Competitive Grant Program provides funding to facilitate all Americans' participation in our democratic society by closing the digital divide, that is, the "gap between those Americans who have access to telecommunications and information technologies and those who do not."[1] In an overwhelmingly digitized society, those on the wrong side of the digital divide cannot fully participate in our democracy. They face severe barriers in engaging in public discourse, freely accessing information, and availing themselves of basic services, including educational, employment, and healthcare opportunities.

Defendants' cancellation of that program represents a flagrant abuse of executive power. The founders of this nation created a framework with three separate and co-equal branches of government. Under that system of checks and balances, powers between the branches are separated so that no one branch becomes too powerful; the President is bound to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, and Congress legislates and holds the power of the purse. *Id.* art. I, §§ 1; 9, cl. 7; 8, cl. 1. Here, the Executive Branch usurped that framework to further its own policy preference of attacking equity-related initiatives. The President, via social media post, decried the "Digital Equity Program" as "a woke handout," announcing that he was "ending" it immediately, and the next day, the government ended the program. Compl. ¶¶ 14-15. Defendants nullified the Competitive Grant Program by fiat, lawlessly vetoing Congress's authorization.

---

[1] Colby Leigh Rachfal, Cong. Rsch. Serv., R46613, The Digital Divide: What Is It, Where Is It, and Federal Assistance Programs (2021) https://www.congress.gov/crs-product/R46613#:~:text=The%20digital%20divide%20has%20been,and%20those%20who%20do%20not.

NDIA's Complaint challenging the Executive Branch's unconstitutional veto of a congressionally mandated grant program should not be dismissed. NDIA has standing to bring and the Court has jurisdiction to hear NDIA's claims because NDIA challenges the termination of the Competitive Grant Program, not merely the cancellation of its individual award. NDIA's claims are properly before this Court because NDIA seeks "relief other than money damages" and no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," the APA's waiver of sovereign immunity applies, and this Court therefore has authority to review NDIA's claims. 5 U.S.C. § 702.

Nor should NDIA's constitutional challenges be dismissed. Counts I and II are straightforward constitutional claims grounded in the separation of powers and the President's duty to faithfully execute the laws. NDIA's claims are distinct from those in *Dalton v. Specter* because the presidential actions NDIA challenges were undertaken without any statutory (or constitutional) authority at all. Judicial review is not precluded where the President acts without "an executive power that has been designated to the President by the Constitution or statute." *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 55 (D.D.C. 2025).

Moreover, NDIA's APA claims are legally sufficient in all respects. The Complaint plausibly alleges that the Department of Commerce ("DOC") failed to follow proper termination procedures and that defendants acted arbitrarily and capriciously. Nothing more is required at the pleading stage.

Further, Defendants' challenge to the constitutionality of the Competitive Grant Program does not warrant dismissal. Based on well-settled law, the Court should not rule on the constitutionality of the Competitive Grant Program before a record has been developed or before the necessity at this stage for a constitutional ruling has been established.

Even if the constitutional challenge to the Digital Equity Act ("the Act") were considered at this stage—and it should not be—NDIA's Complaint survives. Contrary to Defendants' assertion, the Competitive Grant Program does not contain a facial racial classification, and so strict scrutiny does not apply. Even if the Court finds that it does, the Act satisfies that standard as Congress had a compelling interest in remedying past discrimination that put racial and ethnic minorities on the wrong side of the digital divide, and narrowly tailored the Act accordingly.

Finally, even if the Court were to deem the Competitive Grant Program's reference to racial and ethnic minorities unconstitutional—and it should not—that would still not warrant dismissal of NDIA's Complaint or the destruction of an entire statutory scheme. Rather, deference for Congress's determination of the necessity of funding to close the digital divide requires the Court to sever any constitutionally infirm provision and allow this litigation to continue.

## BACKGROUND

### A.    Congress Enacted the Digital Equity Act to Close the "Digital Divide"

Ensuring universal access to communications services has long been a congressional priority. Nearly a century ago, Congress charged the Executive Branch with "making communications services available, at affordable prices, to all Americans." *Fed. Commc'ns Comm'n v. Consumers' Research*, 606 U.S. 656, 662-63 (2025) (discussing "universal service" mandate). That priority has become even more urgent in the digital age, evidenced by the Infrastructure Investment and Jobs Act of 2021 ("IIJA"), with which Congress enacted the Digital Equity Act (the "Act") to close the digital divide, as millions of Americans lack reliable access to broadband internet.[2] In passing the Act, Congress recognized that broadband access is "critical to

---

[2] *See, e.g.*, U.S. Gov't Accountability Off., Closing the Digital Divide for Millions of Americans without Broadband (Feb. 1, 2023), https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband.

how individuals . . . participate in the society, economy, and civic institutions of the United States; and . . . access health care and essential services, obtain education, and build careers." 47 U.S.C. § 1722.

Correspondingly, Congress also found that "digital exclusion," or being unable to reliably access broadband internet, has profound negative consequences for Americans, including that it "(A) carries a high societal and economic cost; (B) materially harms the opportunity of an individual with respect to the economic success, educational achievement, positive health outcomes, social inclusion, and civic engagement of that individual; and (C) exacerbates existing wealth and income gaps, especially those experienced by covered populations." *Id*. For example, lack of access to a reliable broadband connection prevents Americans from using modern telemedicine,[3] contributes to the "homework gap" where students without reliable internet struggle to complete schoolwork,[4] prevents job seekers from accessing employment opportunities,[5] and inhibits civic engagement.[6]

---

[3] *See* Johns Hopkins Bloomberg School of Public Health, Bridging the Digital Divide in Health Care: A New Framework for Equity (Jan. 16, 2025), https://publichealth.jhu.edu/2025/bridging-the-digital-divide-in-health-care-a-new-framework-for-equity ("[F]or many underserved populations, barriers such as limited broadband access, low digital literacy, and cultural mismatches in technology design exacerbate existing health disparities.")

[4] *See* An Economy That Works For Everyone: Investing In Rural Communities: Hearing before S. Comm. on Banking, 117th Cong. 289 (2021) ("The pandemic has shone a harsh light on the digital divide. I remember even before the pandemic I had introduced a bill to close what we called the 'homework gap,' kids who could not access the internet to do their homework. That has become a full-blown learning gap[.]").

[5] *See* Elizabeth Bogue Simpson, *Baseline for Work: 92 Percent of Jobs Require Digital Skills, Fed. Reserve Bank of Atlantic: Partners Update* (Aug. 10, 2023), https://www.atlantafed.org/research-and-data/publications/partners-update/2023/08/10/baseline-for-work-92-percent-of-jobs-require-digital-skills.

[6] *See* Benton Institute for Broadband & Society, How Digital Inclusion Fuels Civic Engagement (June 3, 2025), https://www.benton.org/headlines/how-digital-inclusion-fuels-civic-engagement ("In an increasingly connected world, the ability to participate in civic life often depends on reliable internet access and digital skills. From voting to community organizing, digital *Continued*

4

The Act established the mandatory Competitive Grant Program to decrease digital exclusion and "award grants to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations." 47 U.S.C. § 1724(a)(1) ("the Assistant Secretary *shall* establish in the Department of Commerce the Digital Equity Competitive Grant Program" (emphasis added)). To carry out the Act, Congress authorized and appropriated a total of $2.75 billion in funding under the Act, $1.25 billion of which was specifically appropriated for the Competitive Grant Program.[7]

The Act included eight "covered populations," who Congress found had rates of broadband adoption lower than the national average. More than 80% of Americans fall into at least one of these populations, and in most states the largest percentage of covered populations are residents of rural areas and low-income Americans.[8] One of the covered populations is individuals who are "members of a racial or ethnic minority group." 47 U.S.C. § 1721(8)(G).

These eight words—covering but one of eight covered populations—are the lone mention of race in the entire Act, a statute that, at its core, is not primarily or even secondarily about race. To wit, the Act does not require that any grants serve any specific covered populations and does not require that a grant serve any one or all of the covered populations. *Id.* § 1724(d)(1). It does not prevent anyone outside of a covered population from benefitting from digital access and inclusion programing. *Id.* It does not prioritize certain covered populations over others. *Id.* It also expressly prohibits discrimination. *Id.* § 1726(a)(1) ("No individual in the United States may, on

---

inclusion—ensuring everyone has the technology, connectivity, and skills they need—is essential for building a more inclusive and engaged society.")

[7] 167 Cong. Rec. S5684 (Aug. 3, 2021), https://www.congress.gov/117/crec/2021/08/03/167/138/CREC-2021-08-03-pt1-PgS5683-9.pdf (statement of Sen. Collins); Digital Equity Act of 2021; Request for Comments, 88 Fed. Reg. 13101 (Mar. 2, 2023).

[8] Compl. ¶¶ 8-9.

the basis of actual or perceived race, color, religion, national origin, sex, gender identity, sexual orientation, age, or disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under' any Digital Equity Act program.").

Congress passed the Act because it found that "achieving digital equity for *all* people of the United States requires additional and sustained investment and research efforts" 47 U.S.C. § 1722 (emphasis added). Equity in the Act is about *digital* equity and preventing the deleterious effects of the digital divide for *all* Americans. Treating any "equity" program as presumptively unconstitutional, as Defendants have done, robs Americans of the considerable resources Congress mandated to address this pressing need.

### B.    NDIA's Award was to Address Digital Equity

NDIA is a 501(c)(3) organization whose mission is to "advance digital equity by supporting community programs and equipping policymakers to act." Compl. ¶ 22. NDIA sought and received a grant award under the Act's Competitive Grant Program and planned to seek future awards. NDIA's Complaint challenges Defendants' unconstitutional, arbitrary and capricious exercise of power to terminate that Program and thereby deprive it of the ability to pursue grants. NDIA seeks relief other than money damages; namely, it seeks the reinstatement of the Competitive Grant Program.

NDIA sought a grant award under the Competitive Grant Program and planned to seek future awards because its mission and the purpose of the Act were aligned—to advance *digital* equity. *Id.* On January 6, 2025, NDIA received a $25,755,652.64 award for its Digital Navigator Plus ("DN+") program and its annual "Net Inclusion" conference.[9] Compl., ¶¶ 55-60. Digital

---

[9] NDIA's net inclusion conference brings together practitioners, advocates, academics, interest service providers, and policymakers to discuss topics including: 1) government policies impacting digital equity; 2) sources of financial and programmatic support for digital inclusion; and 3) digital inclusion best practices. Compl. ¶ 56.

Navigators ("DNs") are trained experts that overcome barriers to digital equity by helping populations who have difficulty accessing online resources get and stay online. *Id.* ¶ 55. The DN+ program would have equipped 13 already-existing local DN programs ("Sites") in 11 states with additional resources to make them sustainable and scalable. *Id.* NDIA estimated that their DN+ program would help individuals from all eight covered populations in urban, rural, suburban, and Tribal communities. *Id.* NDIA's services and site selection were driven by need, and the need was a lack of digital resources, consistent with the Act's purpose of addressing the digital divide and promoting digital equity.

### C. The Executive Followed No Process in Cancelling the Competitive Grant Program

A select few key facts about the end of the Competitive Grant Program are undisputed: on April 9, 2025, Defendant National Telecommunications and Information Administration ("NTIA") emailed NDIA with the subject line "Digital Equity Act of 2021 Grant Programs: Alignment with Exec. Order No. 14151 for Conferences, Trainings, and other Activities" announcing the agency would newly "not allow" certain costs as a result of anti-equity administration policy. Compl. ¶ 65. On May 8, 2025, President Trump posted on Truth Social that he was "ending [the Act] immediately." *Id.* ¶ 66. The next day, on May 9, 2025, Defendant National Institute of Standards and Technology ("NIST") terminated the Competitive Grant Program and, consequently, NDIA's award. *Id.* ¶ 67. On June 6, 2025, NDIA appealed the termination pursuant to 47 U.S.C. § 1724(g)(1) and 2 C.F.R. § 200.342. *Id.* ¶ 69. On June 10, 2025, NTIA summarily denied NDIA's appeal. *Id.* ¶ 70.

On the current record, the entirety of the process involved in dismantling a $2.75 billion statutory program lawfully enacted by Congress to address a serious problem affecting millions of Americans, appears to be that the President issued a social media post after a single meeting with

the Secretary of Commerce. Defendants' Motion to Dismiss maintains—without support—that that decision was made only after "careful consideration . . . from the President" that the Act was "unconstitutional" and "no longer a priority of the Department of Commerce" Motion to Dismiss ("Mot."), Dkt. 32-1 at 1.

## LEGAL STANDARD

When considering a Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction or a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, a "district court must accept all of the complaint's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998). "A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim." *Id.* As such, a "court may dismiss a complaint for failure to state a claim only if 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Id.* (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## ARGUMENT

**I.    This Court Has Jurisdiction to Hear All of NDIA's Claims.**

Lacking a jurisdictional challenge to the complaint that NDIA *actually filed*, Defendants' Motion to Dismiss attacks a straw man that challenges the termination of NDIA's individual grant award. *See* Mot. at 8-20. But NDIA did not file that complaint. Instead, NDIA challenged Defendants' unconstitutional exercise of power to terminate the Competitive Grant Program and thereby deprive it of the ability to pursue future grants. Because NDIA seeks "relief other than money damages" and "no other statute that grants consent to suit expressly or impliedly forbids

the relief which is sought[,]" the APA's waiver of sovereign immunity applies, and this Court has authority to review NDIA's claims. 5 U.S.C. § 702.

### A.      NDIA Has Standing to Raise its Claims

NDIA was a recipient of a grant under the Competitive Grant Program and, but for Defendants' unlawful acts, would compete for future awards under the Program. These facts alone are sufficient to demonstrate standing. To establish standing, every plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). NDIA meets that test: NDIA suffered a loss of ability to compete for future Competitive Grant Program awards due to Defendants' illegal termination of the Program, and the relief NDIA requests would afford it the opportunity to compete as provided under the Act.

Though Defendants incorrectly suggest otherwise, the D.C. Circuit has long held that entities have standing to challenge the denial of an opportunity to compete for funds, benefits, or contracts, even where such entities cannot show that they would have received the final award or that a decision in its favor would necessarily result in a benefit becoming available. *See, e.g.*, *Eco Tour Adventures, Inc. v. Jewell*, 174 F. Supp. 3d 319, 329 (D.D.C. 2016) (finding jurisdiction to hear challenge on federal government contracting award decision for a non-procurement case); *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003) ("[A] claim of lost contracting opportunities is ordinarily sufficient to establish injury in fact."); *CC Distrib., Inc. v. United States*, 883 F.2d 146, 149-51 (D.C. Cir. 1989) (government contractor had standing to challenge decision not to allow competitive bid on future contracts); *W. Va. Ass'n of Cmty Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1574 (D.C. Cir. 1984) (finding standing where plaintiffs alleged injury from lost "opportunity to compete" for funding from state, even though state "would have complete discretion" to award funding to another party).

Similarly, NDIA here challenges the termination of the Competitive Grant Program because NDIA lost the opportunity to compete under the Program.[10] NDIA does not challenge the termination of its individual award; it seeks the opportunity to compete. Compl. ¶ 22 (alleging NDIA "intends to apply for and receive such Digital Equity Act grant funding in the future, should the Program be restored"); *see also id.* ¶¶ 75, 81, 85, 90, 97. Further, NDIA's "claims fall arguably within the zone of interests to be protected or regulated by the statute in question[,]" here, the Digital Equity Act. *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (internal quotations omitted). Its interests are "consistent with the purposes of the statute in question." *Amgen, Inc. v. Smith*, 357 F.3d 103, 108-09 (D.C. Cir. 2004) (citation omitted). Contrary to Defendants' vague argument against standing (Mot. at 9), NDIA has standing to challenge the termination of the Competitive Grant Program because no claim could be more within a statute's "zone of interest" than a challenge to the termination of one of that statute's key programs. Thus, NDIA's challenge to the illegal termination of the Competitive Grant Program falls within the Act's interests.

**B.    NDIA's Challenge to the Termination of the Competitive Grant Program Is Properly Before This Court**

Defendants' efforts to mischaracterize NDIA's challenge and dismiss that strawman must fail, as all of NDIA's claims challenge the termination of the Competitive Grant Program rather than the termination of its individual award.

**1.    The Decisions in *Department of Education* and *National Institutes of Health* Confirm This Court's Jurisdiction.**

Defendants further argue that two recent Supreme Court emergency docket opinions favor dismissal because those opinions allegedly demonstrate that jurisdiction over NDIA's claims lies with the U.S. Court of Federal Claims ("CFC"). *See Dep't of Educ. v. California*, 604 U.S. 650

---

[10] For these same reasons, NDIA has standing to challenge the policies announced in the April 9 Email as applied to any future Competitive Grant Program.

(2025) (per curiam); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n* ("*NIH*"), 606 U.S. —, 145 S. Ct. 2658 (2025) (mem.). Not so.

Defendants' reliance on these opinions is misplaced and supported only by its distortions to NDIA's Complaint and misreading of the applicable law. First, *Department of Education* is inapposite, as it is an APA challenge to individual grant terminations where the jurisdiction turned on the district court's order for the government to make payments under the terminated grants. Second, *NIH* affirms that district courts retain jurisdiction over programmatic challenges that impact grants like the one here, while affirming that district courts do not have jurisdiction over claims "based on" grants that require monetary remedies. Both decisions make clear that NDIA's challenge is exactly the type of grant-related claim over which district courts retain jurisdiction.

In *Department of Education*, the Supreme Court considered the government's application to stay pending appeal of a district court order barring the termination of certain education grants as arbitrary and capricious under the APA and requiring the agency to pay invoices on those grants. 604 U.S. at 652. In a truncated order, the Supreme Court explained that while "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *id.* at 651 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)), "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" *Id.* (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Here, NDIA does not seek an order enforcing a contractual obligation to pay.

The Supreme Court provided more explanation in *NIH*, where, also in response to an application to stay a district court order requiring payments under certain terminated grants, the Court held that district courts lack jurisdiction to adjudicate APA claims "***based on***" ***grants***. 145

11

S. Ct. at 2659 (emphasis added). This holding appears to invoke the Tucker Act's grant of exclusive jurisdiction to the CFC over claims "founded . . . upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1).

Contrary to Defendants' implicit argument, *NIH* does not mean that all claims related to grants must be litigated at the CFC. In a controlling plurality opinion, Justice Barrett explained that "[p]laintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court," and this "does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* at 2661 (Barrett, J., concurring) (plurality opinion) (omission in original) (quoting 28 U.S.C. § 1491(a)(1)). Further, because "[v]acating the guidance does not reinstate terminated grants[,]" it is appropriate to "channel[] challenges to the grant terminations and guidance to different forums." *Id.*

NDIA's primary relief sought is the reinstatement of the Competitive Grant Program, it does not seek the payment of money damages for its grant termination, or reinstatement of its individual award, both the types of relief that district courts may lack jurisdiction to grant under *Department of Education* and *NIH*. The Complaint challenges programmatic actions—namely, the termination of the Competitive Grant Program—that are akin to the internal agency guidance at issue in *NIH*. NDIA's challenge thus falls under district courts' exclusive jurisdiction; that NDIA could theoretically have brought a *different* suit in the CFC has no bearing on the Complaint NDIA actually filed in this Court. The *NIH* plurality affirmed the "[t]wo-track litigation" system that this circuit has long recognized, *see id.* at 2662, and Defendants cannot defeat years of precedent based on their deliberate misreading of NDIA's Complaint. Under the logic of the *NIH* plurality, and based on the claims NDIA actually brought, NDIA's claims belong squarely in district court.

12

Following *Department of Education* and *NIH*, it remains true that district courts have jurisdiction over constitutional and statutory claims, regardless of whether those claims "arise from a contractual relationship with the government[.]" *City of Saint Paul v. Wright*, 816 F. Supp. 65, 71 (D.D.C. 2026) (citing *Transohio Sav. Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) ("[U]nder § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the [CFC], but they may bring statutory and constitutional claims for specific relief in federal district court."); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) (discussing the "serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (citation omitted)). Further, just because "a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Against the headwinds of both recent and longstanding precedent, Defendants' argument would create such a rule and so must fail.

### 2. The Controlling Precedent of this Circuit Confirms This Court has Jurisdiction Over NDIA's Claims.

As discussed above, NDIA challenges the termination of the Competitive Grant Program, not the termination of its individual grant. Compl. ¶¶ 75, 81, 85, 90, 97. As remedies, NDIA seeks declarations that the Competitive Grant Program is lawful and constitutional and that the termination of the Program was unconstitutional, and vacatur of the Program's termination and any related actions. *Id.* at 25-26. The declaratory relief NDIA requests are not, in other words, money damages, so the claims that NDIA has raised are not the type of claims for payment of money or contractual claims over which the CFC has exclusive jurisdiction.

13

The Supreme Court has long held—and recently affirmed in *NIH*—that claims seeking such specific relief belong in district court, regardless of whether the specific relief could reasonably include payment of money. *See Bowen*, 487 U. S. at 900-01 ("The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief."). Even if the Court granted NDIA's requested relief in full, the result would require the DOC reinstate the Competitive Grant Program, not pay NDIA. *See* April 13, 2026 Order, Dkt. 37 at 6 ("But NDIA challenges the termination of the Competitive Grant Program, not merely the cancellation of its individual award (although reinstatement of its award may flow from the relief it seeks)."); *cf. Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief." (alteration in original) (citation omitted)).

Under 28 U.S.C. § 1491(a)(1), the CFC has exclusive jurisdiction over claims founded in contract, which courts have interpreted to mean any claim that is "at its essence a contract claim[.]" *Megapulse, Inc.*, 672 F.2d at 967. To make that determination, courts must consider (1) "the source of the rights upon which plaintiff bases its claims" and (2) "the type of relief sought." *Id.* at 968. Moreover, courts (3) "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). For the CFC to have jurisdiction, all three factors must point to a claim's purely contractual nature, *see Crowley*, 38 F.4th at 1106-07, 1107 n.6, and courts "must consider" the plaintiff's "claims individually,"

14

*Transohio Sav. Bank*, 967 F.2d at 609. As applied to NDIA, each factor confirms this Court's jurisdiction.

**Source of the rights**. NDIA's claims arise from Defendants' violation of federal statutes and constitutional protections, not the terms of "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). NDIA challenges Defendants' termination of the Competitive Grant Program as contrary to the law establishing that Program, not the terms of its individual grant.

Defendants attempt to recast NDIA's claims as seeking payment under its grant. Mot. at 8-9. But NDIA does not seek to enforce the terms of that grant. Instead, NDIA's challenges seek to vindicate Defendants' violation of the Act and the Constitution's separation of powers principles. Compl. ¶¶ 75, 81, 85, 90, 97. NDIA's "rights exist[ed] prior to and apart from rights created under the contract." *Crowley*, 38 F.4th at 1107 (citation omitted). And claims that seek to enforce constitutional or statutory rights are cognizable "even when the claims depend on the existence and terms of a contract with the government." *Transohio*, 967 F.2d at 610. The question is not "whether a case involves contract issues, but . . . whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution." *Id.* at 609.

**Type of relief sought**. NDIA seeks declaratory and injunctive relief to prevent Defendants' ongoing constitutional and statutory violations. These remedies are available under the APA and this Court's equitable powers. *See* 5 U.S.C. §§ 702, 703, 705, 706; 28 U.S.C. §§ 2201, 2202; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "[T]he Tucker Act is not implicated when the plaintiff seeks only declaratory and injunctive relief." *Van Drasek v. Lehman*, 762 F.2d 1065, 1068 (D.C. Cir. 1985). That is especially so here, where "a naked money judgment

15

against the United States" would not be "an adequate substitute for [the] prospective relief" NDIA seeks. *Bowen*, 487 U.S. at 905. NDIA seeks "neither the prototypical contractual remedy of damages" nor the "classic contractual remedy of specific performance." *Crowley*, 38 F.4th at 1110 (internal quotations omitted).

Further, NDIA's action "is a suit seeking to enforce the statutory mandate itself." *Bowen*, 487 U.S. at 900. NDIA's requested declaration would speak only to Defendants' obligations under the Act and the Constitution. It would not "in any way constitute[] an adjudication of [NDIA's] rights under its [agreements]"—so the "Tucker Act does not speak to [its] propriety." *DSE, Inc. v. United States*, 169 F.3d 21, 34 (D.C. Cir. 1999). This suit does not seek retroactive damages for harms NDIA has suffered due to Defendants' termination of its grant. Instead, it seeks vacatur of the unlawful termination of the Competitive Grant Program and "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations"—relief that the Court of Federal Claims "does not have the general equitable powers" to grant. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020).

***Lack of Jurisdiction in the Court of Federal Claims***. Defendants' jurisdictional argument also fails because the CFC could not adjudicate NDIA's claims. *See Tootle*, 446 F.3d at 176. To fall within that court's jurisdiction under the Tucker Act, "a plaintiff must identify a . . . source of substantive law that creates the right to money damages" or is "money-mandating." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). The CFC lacks jurisdiction over claims arising under violations of the Constitution that are not money-mandating. *Polinski v. United States*, 178 Fed. Cl. 736, 742 (2025), *aff'd*, No. 2026-1249, 2026 WL 776608 (Fed. Cir. Mar. 19, 2026) ("While this Court adjudicates certain cases arising under the Constitution, its jurisdiction is limited to money-mandating claims."). Nor could NDIA bring a case in the CFC under the Act or

16

the APA, because those statutes are not money-mandating in that they do not require payment of a sum-certain or based on a fixed formula to an identified party or class. *See, e.g.*, *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (statutory claims under the APA do not confer jurisdiction).

Accordingly, under the well-established law applicable to NDIA's actual Complaint (not the straw man created by Defendants), this Court has jurisdiction to hear NDIA's claims, and should do so. Defendants' Motion to Dismiss should be denied and this case should proceed to be heard on the merits.

## II.    NDIA's Constitutional Challenges Should Not Be Dismissed

Contrary to Defendants' assertion, NDIA's constitutional claims (Counts I & II) are properly pled and are not statutory *ultra vires* claims in disguise. Mot. at 33-38. Even if Defendants were correct, which they are not, NDIA's challenges would survive review.

### A.    The Constitutional Rationale for Termination Provided by the Executive Branch Is Not Self-Justifying.

Defendants' arguments for dismissal primarily rely on this Court's acceptance of the President's determination that the Act is "presumptively unconstitutional," and that such determination moots the entirety of NDIA's claims. But Defendants themselves acknowledge that the President may decline to follow a statutory mandate only in circumscribed ways, and only "unless and until a final Court order dictates otherwise." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013). The President may exercise prosecutorial discretion, "encompass[ing] the discretion not to enforce a law against private parties" but the President may not use his "discretion" to opt "not to follow a law imposing a mandate or prohibition on the Executive Branch." *Id.* at 262. The President may also exercise the power to declare a law unconstitutional when the law relates to areas in his sole authority under the Constitution. *See, e.g.*, *Zivotofsky ex*

17

*rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (foreign affairs); *Myers v. United States*, 272 U.S. 52 (1926) (presidential power to remove officers). The President may ***not*** use these narrow exceptions to justify the wholesale repudiation of a statutorily mandated program.

In this case, no court has ruled the Act unconstitutional. In fact, Defendants represented to this Court that the Solicitor General has determined, presumably on the President's behalf, that only the racial and ethnic minority-related "covered population" is unconstitutional.[11] Thus, Defendants violated the Constitution's separation of powers principles by terminating the Competitive Grant Program entirely, unilaterally, and without judicial sanction. NDIA has properly pled such claims and, at a minimum, given the disputed facts on this issue, it would be inappropriate to dismiss NDIA's claims at this stage.

**B.      NDIA's Count I and Count II Are Genuine Constitutional Claims, Not *Ultra Vires* Statutory Claims, Thus Neither Counts I, II, or III Should be Dismissed**

Defendants' reliance on *Dalton v. Specter* to recast NDIA's constitutional claims as statutory *ultra vires* claims fails. *Dalton's* holding is confined to cases where the President acts within, or in excess of, a delegated statutory framework. 511 U.S. 462, 473-74 (1994). *Dalton* does not apply to situations where, as here, the President eliminated the governing statute. But even if the *ultra vires* standard applied (it does not), Defendants' fallback authorities in *Global Health Council* and *Sustainability Institute* are distinguishable on the same ground and, in any event, neither addresses the wholesale termination of a statute like NDIA advances in this action.

---

[11] Letter from Solicitor General Sauer to Speaker Mike Johnson, "Classification of Individuals Based on Race in the Digital Equity Act of 2021," U.S. Dep't of Justice (Mar. 4, 2026), https://www.justice.gov/oip/media/1430066/dl?inline.

### 1. NDIA's Complaint Sets Out Constitutional Challenges, Not *Ultra Vires* Claims in Disguise.

*First*, Defendants' arguments fail to recognize the crucial distinction between NDIA's case and *Dalton*: the statutory authority. *Dalton* held that claims alleging that the President exceeded his statutory authority are not "constitutional" claims subject to judicial review, and that where a "statute in question commits the decision to the discretion of the President[,]" review of the President's decision is "not available." 511 U.S. at 474. *Dalton*'s holding is therefore confined to the universe of cases in which the President acted within, or in excess of, authority granted to him by statute. It does not apply where, as here, the President acted without any statutory or constitutional authority at all.

In *Dalton*, the President acted squarely within a statutory scheme—specifically, the Defense Base Closure and Realignment Act of 1990—which committed decision-making authority to presidential discretion following an elaborate multi-step procedure involving a public comment period, an independent commission, and congressional review. 511 U.S. at 464-66. The plaintiffs in *Dalton* complained that the President violated the terms of the statute by accepting a procedurally flawed recommendation from the Secretaries of Navy and Defense. *Id.* at 466. The question in *Dalton* was whether the President exceeded the authority already granted to him.

The facts here bear no resemblance to *Dalton*, which "is inapplicable" where the President acted without "an executive power that has been designated to the President by the Constitution or statute." *Susman Godfrey LLP*, 789 F. Supp. 3d at 55 (granting summary judgment over defendants' argument that a separation-of-powers claim was a statutory *ultra vires* case). Judicial review is not precluded where the President acts "without *any* authority, constitutional or statutory." *Am. Fed. of Gov't Emp., AFL-CIO v. Trump*, 782 F. Supp. 3d 793, 821 (N.D. Cal. 2025) (emphasis in original). Here, the President did not purport to act under the statute or exercise any

19

discretion delegated to him by the Act. Instead, the President declared the Act "totally UNCONSTITUTIONAL" and ordered the immediate termination of the Competitive Grant Program, claiming a unilateral power not granted to him by statute or the Constitution. The President did not operate within the Act—he acted against it. As this Court has recognized, the scenario in *Dalton* is distinct from the facts here. *See Susman Godfrey*, 789 F. Supp. 3d at 55.

The precedent applicable to NDIA's challenge is *Youngstown*, not *Dalton*. Under *Youngstown*, when the President takes measures incompatible with the express or implied will of Congress or his constitutional authority, "his power is at its lowest ebb," and such action "must be scrutinized with caution, what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring); *see also Zivotofsky*, 576 U.S. at 10 (finding the President had constitutional authority to refuse to implement a statute in area of foreign affairs); *In re Aiken.*, 725 F.3d at 261-62 (acknowledging presidential power to violate congressional statutes through prosecutorial discretion and where constitutional authority permits).

NDIA's Counts I, II, and III are not about how the President exercised his statutory authority, but about the President arrogating to himself a power that belongs exclusively to Congress: the power of the purse. By declaring the Act unconstitutional and unilaterally terminating a mandatory congressional grant program, the President violated both his duty to faithfully execute the laws and Congress's exclusive legislative and appropriations authority. *See* U.S. CONST. art. II, § 3; art. I, §§ 1, 8, cl. 1.

***Second***, Defendants' reliance on *Global Health Council* and *Sustainability Institute* as fallback authorities is misplaced. Neither case salvages Defendants' *Dalton* argument because both cases share the same fatal limitation: they address presidential action taken within (or at the edges

20

of) a delegated statutory framework, and stem from alleged statutory violations, not action taken without statutory authority.

In *Global Health Council*, the D.C. Circuit applied *Dalton* to find that the plaintiffs' claims were about executive actions taken in violation of annual appropriations acts—that is, action taken against the backdrop of a statutory scheme within which the President was operating. *Global Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025). Similarly, in *Sustainability Institute*, the Fourth Circuit held that the plaintiffs' separation-of-powers claims were statutory in substance because they were premised on the executive violating the law. *Sustainability Institute v. Trump*, 165 F.4th 817, 831-32 (4th Cir. 2026). Neither case addresses a President who refused to carry out a statutory scheme based on his own pronouncement of unconstitutionality.

That is precisely what distinguishes NDIA's claims. The President did not purport to act within or in excess of the Act. Instead, he declared it unconstitutional and terminated the Competitive Grant Program based solely on his own constitutional interpretation. NDIA's challenge here is thus about presidential actions in the absence of any authority, which falls squarely within *Youngstown*, not *Dalton*. Neither *Global Health Council* nor *Sustainability Institute* considered actions at the "lowest ebb" of presidential power without statutory or constitutional authority, and thus neither forecloses NDIA's claims.

For both reasons, Defendants' motion to dismiss Counts I and II as statutory-*ultra vires*-claims-in-disguise should be denied. This also means that the Motion to Dismiss Count III should be denied for the same reasons because Count III is based on the same underlying constitutional challenges as Counts I and II. Compl. ¶¶ 83-85.

### 2. Even Under the *Ultra Vires* Standard, NDIA's Claims Survive

But, even accepting Defendants' recharacterization of NDIA's constitutional separation-of-powers claims as *ultra vires* arguendo, NDIA's claims would survive because NDIA can show that:

21

> (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim[,] and (3) the challenged action is plainly in excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.

*Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (cleaned up).

First, review is not precluded by statute. Defendants' Motion to Dismiss is silent on this prong entirely and for good reason—there is no statute that precludes the Court's review here.

Second, while Defendants assert that an *ultra vires* claim is unavailable where an APA claim exists, if NDIA's Counts I and II were dismissed, NDIA would have no alternative avenue to seek review of the President's actions. Defendants' argument rests on a narrow proposition, drawn from two cases, that courts will not review an *ultra vires* claim that is duplicative of an identical APA claim "because an *ultra vires* claim is incompatible with a well-pleaded statutory cause of action such as one under the APA." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199, 200 (D.D.C. 2024) (dismissing *ultra vires* claim "because plaintiffs have advanced both a well-pleaded APA claim and a duplicative *ultra vires* claim[.]"); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017) ("[B]ecause plaintiffs are able to assert the same claim through the APA, they cannot obtain relief . . . through the Court's inherent power to review *ultra vires* agency actions.").

If, arguendo, NDIA's constitutional claims in Counts I and II were *ultra vires* claims (they are not), this Court would retain jurisdiction over all NDIA's claims because NDIA's constitutional claims in Counts I and II are not duplicative of its APA claims in Counts III through VI. While all counts are based on the same operative facts, they allege harm based on different legal theories that provide different remedies. The constitutional questions raised in Counts I and II are not cognizable under APA review and require the declaratory and injunctive relief that NDIA seeks, and that this Court alone can provide.

22

Third, NDIA challenges an action—the termination of the Competitive Grant Program—that was plainly in excess of Defendants' delegated powers and contrary to the Act's mandatory and specific requirements. The Act prescribes specific procedural predicates that must be satisfied before any grant can be terminated, including notice, an opportunity for a hearing, and other enumerated requirements. None of those procedures were followed here. *See infra* § III.

Even if the exacting standard for *ultra vires* review applied to NDIA's claims in Counts I and II (it does not), NDIA asserts valid claims. Defendants' arguments that the *ultra vires* standard of review bars NDIA from this Court must be dismissed.

> ### C.    NDIA States a Viable Claim that Defendants Violated the Constitution's Spending Clause (Count II)

The Court should reject Defendants' argument that Count II must be dismissed because the Spending Clause "only limits Congress' power to legislate" and "has no application to Executive Branch decisions about how to expend funds appropriated by Congress." Mot. at 37. Defendants' characterization of NDIA's claims is, once again, categorically false—NDIA adequately pled a claim that Defendants violated the spending clause, and that claim must survive dismissal. Under the Spending Clause, Congress has the power to "impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (citing *Rust v. Sullivan*, 500 U.S. 173, 195, n. 4 (1991) ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.")).

Limits on the use of funds necessarily include requirements that the Executive Branch implement a particular type of program, like the Act's requirement that the DOC carry out the Competitive Grant Program and follow certain terms when awarding and administering grants under the Program. *See, e.g.*, 47 U.S.C. §§ 1724(b), (d). These statutory conditions are guarantees

23

"that public funds [are] spent for the purposes for which they were authorized." *Rust*, 500 U.S. at 196. Defendants' contention that the wholesale termination of the Competitive Grant Program does not implicate the Spending Clause ignores that Defendants terminated the Competitive Grant Program precisely because they disagreed with the Program's terms, calling it a "woke handout" because of the spending provisions Congress deliberately put in place. When Defendants chose to substitute their will for that of Congress, Defendants violated the Spending Clause. *See Agency for Int'l Dev.*, 570 U.S. at 213.

Defendants' remaining arguments fare no better. Even assuming arguendo that the President held a genuine constitutional objection to the Act sufficient to justify terminating the Competitive Grant Program, that provides no basis for dismissal. *See supra* § II.A. Rather than undermining Count II, this framework confirms that judicial resolution is precisely the appropriate remedy. Dismissal of this claim would be inappropriate here.

### D.      NDIA Has Asserted Viable Claims Against the President

It is well established that unlawful action by the President may be challenged in federal court with the President named as a defendant, and that when the President takes official action, a court has the authority to determine whether he has acted within the law. *Clinton v. Jones*, 520 U.S. 681, 702 (1997). Defendants only reframe NDIA's claim as *ultra vires*. They have identified no authority compelling dismissal of the President at this stage, and this aspect of Defendants' motion should be denied.

### III.    NDIA'S APA Claims Are Legally Sufficient and Must Survive Dismissal

Defendants' arguments for dismissal of NDIA's claims under the APA are essentially a motion for summary judgment based on a nonexistent factual record. On their face, Defendants' arguments are an admission that NDIA has stated a valid claim. Accordingly, this Court should

24

deny Defendants' motion because NDIA has validly pled that Defendants violated the APA by terminating the Competitive Grant Program in violation of statute, without constitutional or statutory authority, and in a manner that was arbitrary and capricious.

### A.    Counts IV and V Sufficiently Allege That Defendants Acted Contrary to, and in Excess of, Their Statutory Authority

Defendants' argument that the cancellation of the Competitive Grant Program complied with the procedures for individual grant termination set forth in 2 C.F.R. § 200.340, thereby warranting dismissal of Counts IV and V, fails for two reasons.

First, Counts IV and V are not about award termination procedures, but rather, Defendants' termination of the Competitive Grant Program, which violated the Act's mandates to establish and administer the grant program, 47 U.S.C. §§ 1724(a)(1), (d)(2)(A), and its express limits on award termination. *Id.* § 1724(g). Regulations setting forth termination procedures for individual awards or the disputes process that applies in such a case has no bearing on NDIA's challenge to the termination of an entire statutorily mandated grant program.

Second, Defendants' argument fails because it would elevate regulations—2 C.F.R. § 200.340(a)(4) permitting grant termination "if an award no longer effectuates the program goals or agency priorities" and 2 C.F.R. § 200.342 requiring notice and an opportunity to respond to noncompliance—to nullify the Act termination provisions. Controlling precedent requires otherwise. The D.C. Circuit has made clear that "[a] valid statute always prevails over a conflicting regulation," *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales,* 468 F.3d 826, 829 (D.C. Cir. 2006)), and a regulation can never "trump the plain meaning of a statute." *Id.* (quoting *Atl. City Elec. Co. v. FERC,* 295 F.3d 1, 11 (D.C. Cir. 2002)).

Defendants argue that 47 U.S.C. § 1724(g)(1) operates "[i]n addition to other authority under applicable law[,]" suggesting they think the DOC could skirt its statutory obligations by terminating under 2 C.F.R. § 200.340(a)(4). But Section 1724(g)(1) permits the termination of Competitive Grant Program awards only "after notice to the entity and opportunity for a hearing," and only when the DOC has demonstrated that "the grant funds are not being used in a manner that is consistent with the application" or the recipient "is not upholding assurances" in its award, or "the grant is no longer necessary to achieve the original purpose" for which it was awarded.[12] Those statutory specifics could not be rendered null by a general regulation that includes caveating language permitting termination based on agency priorities only to the extent consistent with law. *See* 2 C.F.R. § 200.340(a)(4). If Defendants' interpretation were correct, Section 1724(g)'s statutory protections would be illusory.

Even if the Court determined that a regulation nullifies the Act's procedures, Defendants' argument still fails because it rests on a selective reading of the grant termination notice regulations at 2 C.F.R. § 200.342, which the courts in this District have rejected. Grant recipients are entitled to object and provide information challenging a grant termination under 2 C.F.R. § 200.340(a)(4). *Porwancher v. Nat'l Endowment for the Humanities*, 792 F. Supp. 3d 107, 115-116 (D.D.C. 2025) (finding grant termination claim likely to succeed on an APA "contrary to law" claim where agency failed to provide the required procedural notices or "an opportunity to object and provide information and documentation challenging the termination."). Defendants' contention that NDIA was not entitled to this process must fail.

---

[12] While inappropriate for decision on a motion to dismiss, it is undisputed that Defendants have not met Section 1724(g)(1)'s obligations because they have not so much as asserted, let alone demonstrated, that NDIA's performance was deficient or that it was not upholding its obligations and assertions under the award. Defendants also have not shown that NDIA's grant is no longer necessary for the purpose it was awarded.

**B.    Count VI Plausibly Alleges That Defendants Acted Arbitrarily and Capriciously**

Defendants erroneously contend that Count VI fails to plausibly allege arbitrary and capricious agency action because they were not required to explain the termination beyond the grounds set forth in the Termination Letter: (1) that the Competitive Grant Program is "unconstitutional," and (2) the "award no longer effectuates the program goals or priorities." Mot. at 42-43. This is not an argument for dismissal; it is an argument on a motion for summary judgment, which must be decided on a factual record not yet before this Court.[13] And even on the limited factual record available now, Defendants have made clear that they did not meaningfully consider the constitutionality of the Act until *after* filing their motion.[14] The Court should reject Defendants' attempt to hold APA claims to a heightened pleading standard of its own invention.

**C.    Plaintiff's Challenge to the April 9, 2025, Email (Count VI) Satisfies All Threshold Requirements**

Defendants raise three baseless arguments to attack NDIA's APA challenge to the April 9, 2025 email ("the April 9 Email), in which NTIA stated that "any costs associated with diversity, equity, and inclusion conferences, trainings, and/or professional development are not allowable": administrative exhaustion, lack of final agency action, and lack of standing and ripeness. Each argument fails.

---

[13] *See Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (explaining that under the APA, the reviewing court must decide, based on the agency record, whether the agency examined "the relevant data[,]" and articulated "a satisfactory explanation . . . including a rational connection between the facts found and the choice made"); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30-31, 48 (1983) (explaining that under the APA, the reviewing court must assess whether the decision was based on "relevant factors" and free from "clear error of judgment" based on the agency's records, which must "cogently explain why [the agency] has exercised its discretion in a given manner").

[14] *See supra* n.12.

*Administrative Exhaustion*. Defendants wrongly assert that administrative exhaustion bars NDIA's challenge to the April 9 Email, as NDIA's administrative appeal did not mention the April 9 Email. Mot.at 44. This argument fails because no statutory or regulatory exhaustion requirement applies here, *see generally* 2 C.F.R. § 200.342, and in any event, NTIA had already declared its decision final. Compl. ¶ 68. Also, an administrative forum is inappropriate to hear NDIA's constitutional challenge that raises questions "obviously [ ] unsuited to resolution in administrative hearing procedures[.]" *Califano v. Sanders*, 430 U.S. 99, 109 (1977). To dismiss NDIA's claim on this ground would violate the Supreme Court's presumption of availability of judicial review absent clear and convincing evidence of congressional intent. *Id.*

*Final Agency Action*. The Court should reject Defendants' argument that the April 9 Email does not qualify as final agency action because it is a "vaguely worded policy" that is "too tentative or interlocutory for judicial review." Mot. at 44. Agency action is final when it (1) marks the consummation of the agency's decision-making process and is not tentative or interlocutory, and (2) determines rights or obligations or produces legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The April 9 Email definitively and unconditionally states that "any costs associated with diversity, equity, and inclusion conferences, trainings, and/or professional development are not allowable" and that "NTIA and NIST will not approve this as an allowable cost." Compl. ¶ 65. That is not a preliminary signal that a determination is forthcoming; it was a statement with immediate legal consequences barring NDIA from using its annual Net Inclusion conference as a core grant activity.

In any event, the May 9, 2025 termination letter independently constitutes final agency action. It terminated NDIA's Award effective immediately, declared "[t]his decision is final and there is no right of administrative appeal," and immediately deprived NDIA of access to all

28

previously awarded funds. Compl. ¶ 68. Courts have consistently held that a grant termination letter that takes immediate effect and forecloses further administrative process constitutes final agency action. *See S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 73 (D.D.C. 2025), *dismissed*, No. 25-5262, 2025 WL 2793138 (D.C. Cir. Sept. 30, 2025); *cf. Kapa'a v. Trump*, 794 F. Supp. 3d 793, 821 (D. Haw. 2025). Thus, even if the Court declines to reach the April 9 Email, NDIA's APA challenge to the May 9 termination letter provides a fully independent basis for relief. That letter is final agency action under 5 U.S.C. § 702 and § 706, and NDIA's arbitrary and capricious challenge to it stands on its own without reference to the April 9 Email.

***Standing and Ripeness***. NDIA challenges final agency action, which is definitionally ripe. As established in § I.A., *supra*, NDIA has standing.

## IV.    Defendants' Challenge to the Constitutionality of the Competitive Grant Program Does Not Warrant Dismissal

### A.    The Court Should Not Adjudicate the Constitutionality of the Competitive Grant Program at the Motion to Dismiss Phase.

Principles of constitutional avoidance counsel against a ruling on the constitutionality of the Competitive Grant Program at this phase in the litigation. *Judicial Watch, Inc. v. Nat'l Energy Policy Development Grp.*, 219 F. Supp. 2d 20, 45 (D.D.C. July 11, 2002) ("The doctrine of constitutional avoidance counsels against answering such an important constitutional question at the motion to dismiss stage."). As the Supreme Court has recognized, courts should not decide a constitutional question "in advance of the necessity for its decision . . ." *Clinton v. Jones*, 520 U.S. 681, 690 n.11 (1997).

Indeed, last week, the Supreme Court issued its decision in *Louisiana v. Callais*, addressing strict scrutiny in the context of redistricting under the Voting Rights Act—but only after a robust trial record was developed. *Louisiana v. Callais*, No. 24-109, 24-110, 2026 WL 1153054 (Apr. 29, 2026). Moreover, when discussing how the Court should approach interpreting a statute enacted

by Congress, the Court noted that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *Callais*, 2026 WL 1153054, at *12. (citing *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001)). Here, the most plausible reading of the Act avoids a "serious constitutional problem." Given the Act's non-discrimination clause and lack of facial racial classification, Congress enacted the Act not to benefit individuals in a particular racial or ethnic group, but to broadly combat digital exclusion and to "achiev[e] digital equity for *all* people of the United States." 47 U.S.C.§ 1722(1)-(3) (emphasis added).

The Court therefore should decline Defendants' invitation to strike down an entire statutory scheme established by Congress when it need only determine whether NDIA has alleged facts sufficient to state a claim for which relief may be granted. *See Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114, 126 (D.D.C. 2019) (discussing whether a court should consider the application of strict scrutiny on a motion to dismiss and saying that the "abandonment of Rule 12(b)(6) first principles is especially egregious where, as here, the ultimate legality of a statute is based on complex and overlapping legal and factual determinations"); *Johnson v. Dade County Public Schools*, 1992 WL 466902, at *5 n.4 (S.D. Fla. Nov. 25, 1992) ("[T]he constitutional standard under which the government's conduct will be evaluated is not at issue at this juncture."). The Court especially should decline to do so based upon an inadequate and undeveloped record. *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184 (1999) (courts "do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground."); *Clinton*, 520 U.S. at 690 n.11 (courts should not "formulate a rule of constitutional law broader than is required by the precise facts to which it

30

is to be applied . . . or . . . decide any constitutional question except with reference to the particular facts to which it is to be applied. . . ").

As set forth below, in the absence of a factual record, the Court need not accept without skepticism that Defendants cancelled the *entire* Competitive Grant Program because the Act included "racial and ethnic minorit[ies]" as one of eight "covered populations"—a rationale provided to NDIA for the first time in Defendants' Motion to Dismiss. Even if such a ruling were necessary or appropriate at this stage, which it is not, the Court's determination of the proper level of scrutiny to apply to the Competitive Grant Program and whether it survives both require development of a factual record.

### 1. The Undeveloped Record Regarding Defendants' Basis for Cancelling the Competitive Grant Program Does Not Permit a Ruling on Its Constitutionality

The Court should not resolve the constitutionality of the Competitive Grant Program on a motion to dismiss where NDIA's allegations question whether Defendants actually terminated it on constitutional grounds, let alone those articulated by Defendants in their Motion to Dismiss. Doing so would require accepting at face value Defendants' explanation of their decision to terminate the Competitive Grant Program expressed in the Motion to Dismiss, but not in the grant termination notice NDIA received. "Accepting contrived reasons would defeat the purpose" of judicial review, and courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 784. This holds true here, as NDIA has alleged that Defendants failed to articulate a sufficient basis for cancelling the entire Competitive Grant Program and that Defendants' vaguely stated constitutional basis for doing so appears to be pretextual cover for their policy preference against "equity" plans, actions, grants, and initiatives. Compl. ¶¶ 12-19, 61-70.

Further, the only information in the record about Defendants' decision to terminate the Act comes in the form of a Truth Social post, which claimed the Act, not the Competitive Grant

Program, was unconstitutional, and did not identify a constitutional defect with regard to a particular provision of the statute as Defendants have done in their Motion to Dismiss. *See* Compl. ¶ 14. The Court therefore should not take as true Defendants' factual assertions until they are tested as part of a robust and complete factual record. While strict scrutiny review is too fact-intensive an inquiry for a motion to dismiss, should the Court proceed with that analysis, NDIA's Complaint sets forth facts that plausibly plead that Congress had a compelling interest in bridging the digital divide and working towards digital equity and did so in a narrowly tailored fashion. *See* Compl. ¶¶ 2, 8, 33-37, 39-41, and 43-44.

### 2.    Even if the Court Determines That Ruling on Constitutionality Would Be Appropriate at This Stage, the Factual Record Is Insufficient

A determination of the constitutionality of the Competitive Grant Program requires development of a factual record. The level of scrutiny to be applied is a factual question not to be decided at the pleading stage where, as here, there is no facial racial classification. *Brokamp v. D.C.*, No. CV 20-3574, 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022) citing, *Brown*, 390 F. Supp. 3d at 125; *Smith v. D.C.*, 387 F. Supp. 3d 8, 30 (D.D.C. 2019) (a strict-scrutiny claim cannot be resolved on a motion to dismiss because the government "bears the burden . . . to prove the infringement is narrowly tailored to serve a compelling state interest").

And, whether the Competitive Grant Program meets the applicable level of scrutiny is a factual question. "[R]esolving the appropriateness of the government action inquiry is fact-intensive and inappropriate on a motion to dismiss. *Burwell v. Portland Sch. Dist. No. 1J*, No. 3:19-CV-00385-JR, 2019 WL 9441663, at *7 (D. Or. Mar. 23, 2019), *report and recommendation adopted as modified, Burwell v. Portland Sch. Dist. No. 1J*, No. 3:19-CV-00385-JR, 2020 WL 2083965 (D. Or. Apr. 30, 2020). "[W]hen a constitutional challenge to a law triggers heightened scrutiny—whether strict or intermediate—dismissal 'will rarely, if ever, be appropriate at the

32

pleading stage.'" *Jeffery v. City of New York*, 113 F.4th 176, 188 (2d Cir. 2024), *cert. denied sub nom. Jeffery v. City of New York, New York*, 145 S. Ct. 1174 (2025). "Rather, the burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality . . . must be met after its Motion to Dismiss." *Hassan v. City of New York*, 804 F.3d 277, 306 (3d Cir. 2015), as amended (Feb. 2, 2016).

### B.    Racial-Consciousness is Not Racial Classification Triggering Strict Scrutiny

Throughout their Motion, Defendants erroneously conflate race-conscious policy with racial classification, ignoring the well-recognized distinction between race-conscious policies and those that treat persons differently because of their race. As demonstrated below, the Competitive Grant Program falls firmly in the former category. While the Act directs the DOC to—"the extent practicable"—consider if a grant application would "increase internet access and the adoption of broadband among covered populations," grant applicants are free to project how their proposals may impact *any* of the covered populations identified in the statute, not just racial and ethnic minorities. 47 U.S.C. § 1742(d)(1). The statute does not require that any specific covered population be served, nor does it identify how much weight (if any) the DOC should allocate to the consideration of specific covered populations served. Congress' goal was straightforward—to identify historically marginalized populations and include them in an effort to achieve the goal of digital equity. As the D.C. Circuit stated in *Rothe Dev., Inc. v. U.S. Dep't of Def.*:

> Policymakers may act with an awareness of race—unaccompanied by a facial racial classification or a discriminatory purpose—*without thereby subjecting the resultant policies to the rigors of strict constitutional scrutiny.* The Supreme Court has specified that race may be considered in certain circumstances and in a proper fashion . . . . [M]ere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor [to foster diversity and combat racial isolation] at the outset.

836 F.3d 57, 72 (D.C. Cir. 2016) (emphasis added) (internal quotation omitted).

33

This is exactly what Congress did in the Act. While the Act reflects Congress's awareness of race in the context of bridging the digital divide, the Act does not facially discriminate against any individual based on race and indeed such discrimination is expressly prohibited. *See* 47 U.S.C. § 1726 (a)(1) ("No individual in the United States may . . . be subjected to discrimination under any program or activity that is funded in whole or in part with funds made available to carry out this subchapter").

Defendants' only rejoinder to this anti-discrimination provision is that the Act was designed to "benefit covered populations." Mot. at 24. However, simply because a government program may also benefit racial minorities does not mean that it employs an impermissible racial classification. Further illustrating this point, in *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431 (N.D. Tex. 2024), *appeal dismissed*, No. 24-10603, 2024 WL 5279784 (5th Cir. July 22, 2024), the court struck down a race-based presumption applied in determining individual applicants' eligibility for services. However, the court expressly declined to strike down the entire Minority Business Development Agency Statute. *Id.* at 498. It rejected the argument that the statute was unconstitutional because "the Agency has been purposed for a race-based mission, down to its very name." *Id.* (internal quotation omitted). In rejecting that argument, the court reasoned that "it is not unconstitutional for a program to serve minorities." *Id.* The same logic applies here; simply because Congress may have intended the Act to benefit covered populations, which may or may not include "racial or ethnic minority group[s]," does not render it constitutionally suspect.

Race-consciousness, such as a reference to a potentially covered population, is about including, not excluding, groups or populations, while racial classification results in individualized determinations based on race. For example, in *Sussman v. Tanoue*, the court held that a race-conscious action to increase minority applicants in a housing pool did not constitute a racial

classification requiring strict scrutiny. 39 F. Supp. 2d 13 (D.D.C. 1999), *abrogated on other grounds by Smith-Thompson v. D.C.*, 657 F. Supp. 2d 123 (D.D.C. 2009). The court held that a program expressly directing outreach to minority communities "falls within the category of programs, those conscious of race but devoid of ultimate preferences, which have been consistently upheld by courts." *Id.* at 27; *see Raso v. Lago*, 135 F.3d 11 (1st Cir. 1998) (policy targeting minority communities for outreach to broaden applicant pool did not constitute racial classification); *cf. Caulfield v. Bd. of Ed. of New York*, 583 F.2d 605, 611-12 (2d Cir. 1978) (collection of racial demographic data does not trigger strict scrutiny); *United States v. New Hampshire*, 539 F.2d 277 (1st Cir. 1976) (same).

## C.    Defendants Have Not Established That Strict Scrutiny Applies to the Competitive Grant Program

Defendants' argument that the Competitive Grant Program contains a racial classification because it "requires NTIA to consider projected benefits to covered populations, including minorities, when picking winners and losers," Mot. at 23, fails because it assumes that consideration of a statutory factor necessarily means that the Act allocates grants on the basis of that factor. Contrary to Defendants' assertion, the Act does not *mandate* consideration of race at all. Instead, the Act provides that the DOC "shall, to the extent practicable," consider if an application will benefit covered populations, which can, *but does not necessarily*, include racial or ethnic minorities. 47 U.S.C. § 1724(d)(1). It is potentially inclusive, but it is by no means racially exclusive. The D.C. Circuit has interpreted statutory directives to agencies to consider certain factors, such as the one at issue here, to provide the agency with discretion regarding how to weigh those factors. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (acknowledging that agencies have "significant discretion" in deciding how much weight to accord statutory factors); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1045 (D.C. Cir. 1978) (stating that

35

Congress left the agency "with discretion to decide how to account for the consideration factors, and how much weight to give each factor."). In fact, absent a statutory or regulatory requirement otherwise, agencies are not required to "give any specific weight to [a] factor" at all. *Cent. Vermont Ry., Inc. v. I.C.C.*, 711 F.2d 331, 336 (D.C. Cir. 1983) (internal quotation omitted).

The Act does not assign a specific weight to any factor (*i.e.*, benefits to a "covered population") it recommends for grant consideration, and so can be administered in a facially race-neutral manner. This not only shows that the statute does not contain a facial racial classification, but also that any finding that the Competitive Grant Program contains a racial classification at all would hinge on how applications were evaluated and selected by the DOC in practice, which requires development of a factual record. Defendants' arguments about NDIA's grant application and how the DOC would evaluate said applications (Mot. at 32) rely on cherrypicked facts and documents beyond the Complaint, which further shows that determining whether the Competitive Grant Program contained a racial classification in practice raises factual issues not appropriate for consideration on a motion to dismiss. *See Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 79 (D.D.C. 2009) ("[F]actual issue[s][are] plainly inappropriate to resolve on a motion to dismiss.").

### D.    The Competitive Grant Program Passes Strict Scrutiny

If the Court determines that strict scrutiny applies to the Act, then such a review requires NDIA demonstrate Congress had both a compelling interest in using race in the Act and narrowly tailored the statute to achieve that compelling interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). While strict scrutiny review is too fact-intensive an inquiry for a motion to dismiss, should the Court proceed with that analysis, NDIA's Complaint sets forth facts that plausibly plead that Congress had a compelling interest in bridging the digital divide and working towards digital equity and did so in a narrowly tailored fashion. *See* Compl. ¶¶ 2, 8, 33-37, 39-41, and 43-44.

36

### 1.   A Compelling Government Interest Justifies the Race-Conscious Aspect of the Competitive Grant Program

The Competitive Grant Program remedies specific instances of past discrimination that put certain groups, including racial and ethnic minority groups, on the wrong side of the digital divide. Congress passed the Act during a global pandemic, at a time when connectivity could mean the difference between life and death in terms of obtaining vital information about COVID-19, as well as accessing healthcare (including telehealth) and the ability to work or study remotely.[15] These risks, particularly for those most impacted communities, spurred Congress to pass sweeping legislation to comprehensively address America's need for digital equity.[16] At the time of the Act's passage, members of Congress had recognized the digital divide as "the civil rights issue of the 21st century."[17] Congress took testimony and evidence that reinforced that providing reliable digital access to all Americans was an urgent national concern.[18]

Further, Congress determined that "the 2019 novel coronavirus pandemic underscored the critical importance of affordable, high-speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing," 47 U.S.C. § 1701(5), and that the "digital divide" "disproportionately affect[ed] communities of color" and other vulnerable populations. 47 U.S.C. §§ 1701(3); 1722(2)(B). When considering the Act, Congress had at its disposal numerous hearings in 2021 alone, on top of decades of research and

---

[15] *See, e.g.*, Recent Federal Actions to Expand Broadband: Are We Making Progress?: Hearing before the S. Comm. on Com., Sci. and Transp., 117th Cong. 705 (2021).

[16] *Id.*; *see also, e.g.*, State of Telehealth: Removing Barriers to Access and Improving Patient Outcomes: Hearing before the S. Comm. on Com., Sci. and Transp., 117th Cong. 792 (2021).

[17] Rep. John Lewis (D-GA) and Comcast Exec. VP David Cohen with Tim Farley, Comcast (Aug. 24, 2012), https://corporate.comcast.com/comcast-voices/rep-john-lewis-d-ga_and_comcast_exec_vp_david_cohen_discuss_internet_essentials_with_tim_farley (follow first hyperlink to SoundCloud clip).

[18] *See, e.g.*, n.4, n.15, n.16, *supra*; Broadband Equity: Addressing Disparities in Access and Affordability: Hearing before H. Comm. on Energy & Com., 117th Cong. 29 (2021).

37

testimony establishing that present day digital exclusion of communities of color was a direct result of intentional redlining and community disinvestment sustained through decades of federal policy.[19] It was through consideration of that testimony, evidence, and research that Congress enacted, contemporaneously with the Act, prohibitions on digital discrimination and broadband deployment discrimination. Pub. L. No. 117-58, Title V, § 60506 (requiring the FCC to promulgate rules prohibiting digital discrimination based on numerous factors including race and ethnicity, and prohibiting broadband deployment discrimination based on "the predominant race or ethnicity composition of an area."). This history supports a compelling interest in the race-conscious aspect of the Competitive Grant Program.

Defendants' arguments challenging the sufficiency of the congressional record are also defective because they fail to take into account that the pandemic presented unprecedented challenges for Congress—rules were suspended, meetings and deliberations usually reserved to formal, in-person proceedings were channeled to new and more informal, remote channels.[20] Legislative history from this era may not incorporate the full evidentiary record supporting urgent and immediate congressional action. For all of these reasons, applying strict scrutiny here, at the motion to dismiss phase and without a fully developed factual record, would be improper.

---

[19] *See supra* n.4, n.15, n.16, n.17; *see also, e.g.*, Fed. Rsrv. Hist., *Redlining* (June 2, 2023), https://www.federalreservehistory.org/essays/redlining; Digital Denied: The Impact of Systemic Racial Discrimination on Home-Internet Adoption, Benton Institute, December 16, 2016 https://www.benton.org/blog/digital-denied-systemic-discrimination-keeps-communities-offline ; Oversight of the Federal Communications Commission: Hearing before the H. Comm. on Energy & Com., 116th Cong. 34 (2020); Anti Digital Redlining Act of 2021, H.R. 4875, 117th Cong. (2021).

[20] *See, e.g.*, *Oversight Republicans threaten to boycott Democrats' virtual committee proceedings being conducted in violation of rules and procedures*, H. Comm. on Oversight & Gov't Reform (Mar. 27, 2020) https://oversight.house.gov/release/oversight-republicans-threaten-to-boycott-democrats-virtual-committee-proceedings-being-conducted-in-violation-of-rules-and-procedures/.

### 2.    The Competitive Grant Program Was Narrowly Tailored

Defendants' arguments that the Competitive Grant Program was not narrowly tailored are similarly unpersuasive. First, their assertion that the purported racial classification was not "necessary" because the IIJA contained race-neutral proposals, Mot. at 30, lacks support. They have cited to no precedent showing that Congress must wait to see how facially race-neutral policies play out prior to enacting other race conscious legislation. Regardless, Congress was not required to exhaust "every conceivable race-neutral alternative." *Grutter v. Bollinger*, 539 U.S. 306, 309 (2003). In *Grutter*, the Supreme Court held that an admissions policy that considered race or ethnicity as a "plus" in an applicant's file but was otherwise flexible enough to consider other "pertinent elements" was sufficiently "narrowly tailored." 539 U.S. at 309. The Act's use of race here is even narrower than that in *Grutter* in that the DOC is only directed to "consider"—not give weight to—whether a grant application would "increase internet access and the adoption of broadband" among eight covered populations, which include, but are not limited to, racial or ethnic minority groups. 47 U.S.C. §§ 1721(8), 1724(d)(1).

Second, Defendants' assertion that the Competitive Grant Program lacks a "logical endpoint," Mot. at 31, ignores that it was funded by a one-time appropriation that Congress would have to renew to allocate additional funding. Defendants' third argument—that the term "racial or ethnic minority group" is undefined and therefore overinclusive—fares no better. *Id.* It disregards that this term is not an operative limitation, and neither includes nor excludes any specific racial groups. Finally, Defendants' argument that the Act lacks a measurable basis for determining when the Competitive Grant Program has achieved its goal suffers from similar defects, as it again does not account for the fact that the program does not exist in perpetuity and, was a one-time appropriation. *Id.* at 32.

39

Further, the Act contains measures ensuring that any consciousness of race is narrowly tailored. It does not require that the administering agency consider any specific covered population, *infra* § IV(B). It does not require any specific covered population be served or to prioritize any covered population over another. It does not contain a quota. It does not prefer grant applicants of certain races, and in fact bars grant recipients from discriminating, requiring they make services equally available to all. It does not call for "racial balancing," Mot. at 27, as the goal of the Act is "universal" access to broadband. And finally, it does not use race as a proxy for participation in funded programs nor does race operate as a negative. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 219 (2023).

Accordingly, the Competitive Grant Program is narrowly tailored to achieve a compelling government interest of digital equity, satisfying even the heightened level of strict scrutiny review.

### E.    If the Act Fails Strict Scrutiny Analysis, Severance is Appropriate

If the Court determines that strict scrutiny applies to the Act's Competitive Grant Program and that the Competitive Grant Program does not satisfy that standard of review, then the Court should sever the section of the statute it considers unconstitutional and provide NDIA's requested relief for the remaining portions of the statute. In situations where the alleged unconstitutionality of a statute is the result of a discriminatory provision, the proper course of action is to sever the discriminatory classification, "rather than nullifying the benefits or burdens for all." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 632 (2020).

The Supreme Court has recognized "a strong presumption of severability" whereby courts should presume that "an unconstitutional provision in a law is severable from the remainder of the law or statute." *Id.* at 625; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (finding that unconstitutional provisions of a statute are severable from the remainder); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29 (2006) (stating that the

40

"normal rule" for courts when confronting potentially unconstitutional statute is "partial" invalidation (*i.e.*, severance)). In fact, the Department of Justice recently recognized this presumption as well. *See* Constitutionality of Race-Based Department of Education Programs, 49 Op. O.L.C. (Dec. 2, 2025) (slip op. at 14) ("In cases involving mandatory appropriations, the President must decide whether such unconstitutional provisions are severable from the rest of a program, thus allowing him to execute the remaining part of the law by spending funds in a manner consistent with the Constitution.").

This presumption applies "even in the absence of a severability clause," *Barr*, 591 U.S. at 626, 632, and reflects traditional notions of the separation of powers, whereby the judicial branch should "act cautiously" when "exercising its power to review the constitutionality of a legislative act" so as not to overly encroach on the legislature's domain and "frustrate[] the intent" of the public's elected representatives. *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984). Therefore, a court should limit holdings of unconstitutionality to what is absolutely necessary. *See id.*

The D.C. Circuit has also weighed in on courts' use of severability, holding that "[a]n unconstitutional provision is 'presumed severable' from the statute only 'if what remains after severance is fully operative as a law.'" *IGas Holdings, Inc. v. Env't Prot. Agency*, 146 F.4th 1126, 1136 (D.C. Cir. 2025) (quoting *INS v. Chadha*, 462 U.S. 919, 934 (1983)). The statute subject to a "curative severance" must also, "as a matter of statutory construction . . . comport with congressional objectives." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 896 F.3d 539, 548-49 (D.C. Cir. 2018).

Here, Defendants challenge only a singular portion of the Competitive Grant Program as unconstitutional, claiming that the inclusion of individuals who are "members of a racial or ethnic minority group" as a "covered population" under the Act is an "explicit and unconstitutional racial

41

classification[]." *See* Mot. at 21 (referring to 47 U.S.C. § 1721(8)(G)). NDIA disagrees. However, if the Court finds that this provision of the Competitive Grant Program is unconstitutional, then it is easily severed and the rest of the statute—unchallenged by Defendants—should remain. Indeed, the Solicitor General, in his letter to Congress, made clear that he determined only Section 1721(8)(G) is unconstitutional.[21] And yet at no time since the President's Truth Social declaration, Compl. ¶ 66, have Defendants recognized this principle, undertaken an analysis, nor adhered to the congressionally mandated portions of the statute not impacted by their constitutional challenge.

As the Complaint makes clear, the Competitive Grant Program provides grants to increase digital equity and access to entities who will serve at least one of eight "covered populations." Compl. ¶ 8. But the statute does not require that grant recipients serve any specific covered population. *Id.* ¶ 47. Defendants challenge only one of the eight potential covered populations— "members of a racial or ethnic minority group." Since the Competitive Grant Program does not require that a grant recipient serve that specific covered population, the Act would remain a "functioning statutory scheme" even if that one covered population were severed, since seven covered groups would remain. *See Ass'n of Am. Railroads*, 896 F.3d at 549. Additionally, Congress passed the Act because "achieving digital equity is a matter of social and economic justice and is worth pursuing." Compl. ¶ 39 (citing 47 U.S.C. § 1722(5)). This purpose would still apply to the remaining seven covered populations even if 47 U.S.C. § 1721(8)(G) was severed, thus ensuring that the post-severance version of the Competitive Grant Program would still "comport with congressional objectives." *See Ass'n of Am. Railroads*, 896 F.3d at 549.

---

[21] Letter from Solicitor General Sauer to Speaker Mike Johnson, "Classification of Individuals Based on Race in the Digital Equity Act of 2021," U.S. Dep't of Justice (Mar. 4, 2026), https://www.justice.gov/oip/media/1430066/dl?inline.

42

Historically, courts' "remedial preference after finding a provision of a federal law unconstitutional has been to salvage rather than destroy the rest of the law[.]" *See Barr*, 591 U.S. at 626. And that is what NDIA asks the Court to do for the Competitive Grant Program if it finds that 47 U.S.C. § 1721(8)(G) is unconstitutional.

**CONCLUSION**

NDIA respectfully requests that this Court deny Defendants' Motion to Dismiss.

Dated: May 4, 2026                                      Respectfully submitted,


By: */s/ Edward G. Caspar*                        By: */s/ Keith J. Harrison*
Edward G. Caspar, D.C. Bar No. 1644168            Keith J. Harrison, D.C. Bar No. 416755
Leah Frazier, D.C. Bar No. 492540*                Christian N. Curran, D.C. Bar No. 1004269
Gillian Cassell-Stiga, D.C. Bar No. 90032319*     Alexandra Barbee-Garrett,* D.C. Bar No. 187886
Marc P. Epstein, D.C. Bar No. 90003967
                                                  CROWELL & MORING LLP
LAWYERS' COMMITTEE FOR                            1001 Pennsylvania Avenue, N.W.
CIVIL RIGHTS UNDER LAW                            Washington, DC 20004-2595
1500 K Street N.W. Suite 900                      Tel: (202) 624-2500
Washington, D.C. 20005                            KHarrison@crowell.com
Tel: 202-662-8300                                 CCurran@crowell.com
ecaspar@lawyerscommittee.org                      ABarbee-Garrett@crowell.com
lfrazier@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org
mepstein@lawyerscommittee.org                     */s/ Warrington Parker*
                                                  Warrington Parker, CA Bar No. 14803

                                                  CROWELL & MORING LLP
                                                  3 Embarcadero Center, 26th Floor
                                                  San Francisco, CA 94111
                                                  Tel: (415) 986-2800
                                                  WParker@crowell.com

                                                  Attorneys for National Digital Inclusion Alliance

                                                  *Pro Hac Vice*

43

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5 and LCvR 5.4, I hereby certify the foregoing document was filed using the Court's ECF system:

Dated: May 4, 2026                                  /s/ Keith J. Harrison
                                                    Keith J. Harrison