**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL DIGITAL INCLUSION ALLIANCE,

          Plaintiff,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

          Defendants.

No. 1:25-cv-3606-JDB

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Miriam Becker-Cohen (DC Bar No. 1616670)
Nina G. Henry (DC Bar No. 90017399)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

**TABLE OF CONTENTS**

                                                                                                                        **Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICUS CURIAE* ................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ....................................................................................................................... 5

    I.      To Guard Against the Risk of a Tyrannical President, the Framers Vested
           Control of Appropriations and Spending in Congress, Ensuring the Structural
           Separation of the Sword and the Purse. ..................................................................... 5

    II.     For Over Two Hundred Years, Congress Has Jealously Guarded Its Control
           Over the Purse Strings Through Federal Legislation Governing Spending. .......... 10

    III.   Defendants' Unilateral Termination of the Competitive Grant Program Violates
           the Separation of Powers and the Spending Clause Through Executive
           Usurpation of Congress's Power of the Purse. ........................................................ 13

CONCLUSION ................................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ...................................................................................... 2, 7

*Citizens for Resp. & Ethics in Wash. v. OMB*,
  No. 25-cv-1051, 2025 WL 2025114 (D.D.C. July 21, 2025).................................. 13

*Citizens for Resp. & Ethics in Wash. v. OMB*,
  No. 25-5266, Slip Op. (D.C. Cir. Aug. 9, 2025) ........................................... 13

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018).................................................................... 15, 16

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) .................................................................... 12

*Clinton v. City of New York*,
  524 U.S. 417 (1998) .................................................................................... 1, 14

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) .................................................................................... 8

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1977) .................................................................... 10

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) .................................................................... 4

*INS v. Chadha*,
  462 U.S. 919 (1983) .................................................................................... 5, 14, 16

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) .................................................................................... 13

*Kendall v. United States ex rel. Stokes*,
  37 U.S. 524 (1838) ...................................................................................... 15

*OPM v. Richmond*,
  496 U.S. 414 (1990) .................................................................................... 10

*Rochester Pure Waters Dist. v. EPA*,
  960 F.2d 180 (D.C. Cir. 1992) .................................................................... 7

*South Dakota v. Dole*,
  483 U.S. 203 (1987) .................................................................................... 8, 9, 13

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ................................................................. 2, 7, 11

*United States v. Butler*,
    297 U.S. 1 (1936) ..................................................................................... 9

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) .................................................................. 10

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ................................................................................. 14

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ......................... 16

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ....................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................... 1, 2, 13, 14

CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 5 ....................................... 7

Del. Const. of 1776, art. VII ......................................................................... 7

Mass. Const. of 1780, ch. 2, § 1, art. XI ....................................................... 7

U.S. Const. art. I, § 7, cl. 2 ........................................................................... 14, 16

U.S. Const. art. I, § 8, cl. 1 ........................................................................... 3, 8

U.S. Const. art. I, § 9, cl. 7 ........................................................................... 4, 9, 14

U.S. Const. art. II, § 3 ................................................................................... 5, 14, 16

STATUTES AND LEGISLATIVE MATERIALS

An Act Declaring the Rights and Liberties of the Subject and Settling the Succession
    of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.) ............... 6

Act of Feb. 12, 1868, ch. 8, 15 Stat. 35 ........................................................ 11

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Act of July 12, 1870, ch. 251, 16 Stat. 251 ............................................................... 11

Act of Mar. 3, 1809, ch. 28, 2 Stat. 535 .................................................................... 11

Financial Services and General Government Appropriations Act,
Pub. L. No. 117-103, 136 Stat. 239 (2022) ...................................................... 12

Financial Services and General Government Appropriations Act,
Pub. L. No. 117-328, 136 Stat. 4650 (2022) .................................................... 13

Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. B, tit. VII,
138 Stat. 460 (2024) ......................................................................................... 13

General Appropriations Act of 1951, ch. 896, Pub. L. No. 81-759,
64 Stat. 595 (1950) ........................................................................................... 12

H.R. Rep. No. 117-393 (2022) .......................................................................... 13

Impoundment Control Act, Pub. L. No. 93-344, tit. X, 88 Stat. 297 (1974) ................... 12

S. Rep. No. 93-688 (1974) ................................................................................. 12

2 U.S.C. § 683 .............................................................................................. 4, 12

2 U.S.C. § 684 .............................................................................................. 4, 12

31 U.S.C. § 1301 .......................................................................................... 4, 11

31 U.S.C. § 1341 ............................................................................................... 4

31 U.S.C. § 1342 .............................................................................................. 11

31 U.S.C. § 1349 .............................................................................................. 11

31 U.S.C. § 1350 .............................................................................................. 11

31 U.S.C. § 1512 .............................................................................................. 11

31 U.S.C. § 1513 .............................................................................................. 11

31 U.S.C. § 1517 .............................................................................................. 11

31 U.S.C. § 1518 .............................................................................................. 11

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

BOOKS, ARTICLES, AND OTHER AUTHORITIES

Bruce Ackerman, *Taxation and the Constitution*,
99 Colum. L. Rev. 1 (1999)..................................................................... 8

William Blackstone, *Commentaries on the Laws of England* 286 (1791 ed.)................. 5, 6

Brutus, Va. J. (Dec. 6, 1787), *reprinted in The Documentary History of the
Ratification of the Constitution by the States: Virginia* (John P. Kaminski et al.
eds., 1988) ................................................................................. 10

Gerhard Casper, *Appropriations of Power*,
13 U. Ark. Little Rock L.J. 1 (1990) .......................................................... 5

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of
Powers* (2017) ............................................................................... 6, 9

*The Debates in the Several State Conventions on the Adoption of the Federal
Constitution* (Jonathan Elliot ed., 1836)...................................................... 2, 3, 9

*The Federalist Papers* (Clinton Rossiter ed., 1961) .......................................... 2, 3, 8-10

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*,
107 Mich. L. Rev. 1207 (2009) ................................................................. 7

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) ............................ 8

David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*
(9th ed. 1966) ............................................................................... 6

Letter to Joseph Jones (May 31, 1780), *in The Writings of George Washington from
the Original Manuscript Sources 1745-1799* (John C. Fitzpatrick ed., 1931)............ 8

F.W. Maitland, *The Constitutional History of England* 309 (1908)............................. 5, 6

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)....................... 3, 7, 8, 10

Robert J. Reinstein, *The Limits of Executive Power*,
59 Am. U. L. Rev. 259 (2009).................................................................. 7

Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring
Myth of a Presidential Power of the Purse*,
155 Mil. L. Rev. 1 (1998)..................................................................... 3

Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*,
23 Cath. U. L. Rev. 359 (1973) ............................................................... 12

Joseph Story, *Commentaries on the Constitution of the United States* § 1342 (1833).... 10

**INTEREST OF *AMICUS CURIAE*[1]**

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

**INTRODUCTION AND
SUMMARY OF ARGUMENT**

This case is about whether our Constitution, which commits the power of the purse to the people's representatives in Congress, allows the President to unilaterally terminate a congressionally mandated grant program created by the Digital Equity Act. The answer is no. As the Supreme Court has made clear, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). That principle applies with special force here, in the context of spending and appropriations, where the President enjoys none of "his own constitutional powers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

Notwithstanding these limitations on executive power, on May 8, 2025, President Trump posted on Truth Social that the Digital Equity Act was a "woke handout[]" which he was "ending . . . IMMEDIATELY." Compl. ¶ 66. The next day, the executive branch formally terminated the Competitive Grant Program created by the Digital Equity Act. In one fell swoop, a congressionally mandated $2.75 billion program designed to close the digital divide was wiped off the books.

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties consent to its filing.

1

Defendants have never cited any statutory provision authorizing the executive branch to cancel this provision of the Digital Equity Act. None exists. Thus, the "President's power, if any" to terminate the Competitive Grant Program "must stem . . . from the Constitution itself." *Youngstown*, 343 U.S. at 585.

The Constitution grants no such authority. Indeed, the text and history of the relevant constitutional provisions point in precisely the opposite direction. They show that President Trump's unilateral effort to effectuate his own policy preferences through the repeal of the Competitive Grant Program usurps Congress's power of the purse, in violation of our Constitution's separation of powers and the Spending Clause.

To the Framers of our Constitution, perhaps no tenet was more central to the preservation of liberty than the need to separate the powers of the sword and the purse. As Alexander Hamilton put it, "neither one nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 348-49 (Jonathan Elliot ed., 1836) ["*Elliot's Debates*"]. "The power over the purse" was thus "one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *The Federalist No. 51*, at 320 (Clinton Rossiter ed., 1961) (James Madison)).

While the choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 431 (2024), that consensus marked the culmination of centuries of struggle in England. Historically, British kings had used their royal prerogatives both to legislate and to tax and spend without the

2

approval of Parliament. The result was a blurring of the lines between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased. Only after the Glorious Revolution, when "[t]he whole basis for the monarchy had transformed," Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring Myth of a Presidential Power of the Purse*, 155 Mil. L. Rev. 1, 42 (1998), were royal attempts to seize the purse strings finally squelched.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch." 1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson). Indeed, almost every post-Revolution state constitution vested the spending and appropriations authorities in a legislative body. Even the Articles of Confederation, despite leaving the federal government without the critical power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

Against that backdrop, when the Framers gathered in Philadelphia to draft the new Constitution, there was no question that Congress would be granted the powers to tax, spend, and appropriate funds. The authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, *supra*, at 188 (Alexander Hamilton). At the same time, the choice to vest this sweeping power in Congress—the people's representatives—was designed to check executive power by giving the legislature complete control over payments from the Treasury. That is why, as Edmund Randolph explained at the Virginia ratifying convention, the new office of the President need not be feared: "He can handle no part of the public money except what is given him by law." 3 *Elliot's Debates*, *supra*, at 201.

While the Spending Clause affirmatively empowers Congress, the text of the Appropriations Clause evinces a clear limitation on executive authority. Phrased in the negative, it declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because appropriations must be made "by Law," *id.*, and the President's role in lawmaking is highly circumscribed, he has no power to spend funds, rescind funds, or alter the terms of appropriations without Congress's authorization.

In recognition of these constitutional principles, Congress has repeatedly passed legislation reasserting its power of the purse in the face of executive overreach. This practice dates back to the Founding. For instance, the Tenth Congress passed the precursor to what is now called the Purpose Statute, providing that "[a]ppropriations shall be applied only to the objects for which [they] were made." 31 U.S.C. § 1301(a). Congress then passed the Antideficiency Act in 1870, explicitly prohibiting the executive branch from spending more than Congress appropriates. *Id.* § 1341(a)(1)(A). And with the Impoundment Control Act of 1974, Congress made clear that the President is prohibited from deferring funds for policy reasons, 2 U.S.C. § 684(b), or rescinding funds without obtaining Congress's approval, *id.* § 683. These laws, along with others passed more recently to enhance accountability and transparency in apportionment decisions, reaffirm Congress's exclusive power of the purse.

The upshot of this constitutional text and history, as well as congressional practice, is that the President has no power to, for "policy reasons[,] . . . spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Where Congress has not delegated any discretion to the executive branch to alter conditions on federal funds, the President may not make an end-run around the "step-by-step, deliberate and deliberative process" the Framers prescribed for legislating,

4

including in the realm of spending and appropriations. *INS v. Chadha*, 462 U.S. 919, 959 (1983). To the contrary, the Constitution requires that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, even when he disagrees with those laws.

These principles are at the heart of Plaintiff's constitutional claims, as the President's post-hoc assertion that he unilaterally canceled the Competitive Grant Program because it unconstitutionally classifies based on race is mere pretext for his policy objections to the Program, *see* Pl. Opp. MTD 31. This Court should reject President Trump's blatant effort to substitute his own policy preferences for those of Congress.

## ARGUMENT

I. **To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse.**

**A.** When the Framers wrote the Constitution more than two centuries ago, they took pains to deny the President the kind of sweeping powers the King of England had enjoyed. In the sixteenth and seventeenth centuries, British kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament. Historically, the British monarch was entitled to various sources of "ordinary revenue," such as rents from crown lands and fines imposed in royal courts. 1 William Blackstone, *Commentaries on the Laws of England* 286, 289 (1791 ed.). Parliament had no say in how "the king's revenue" was spent, and there was no firm distinction "between the national revenue and the king's private pocket money." F.W. Maitland, *The Constitutional History of England* 309, 433 (1908). "[U]nconstrained by the need to consult the representatives of the people," Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (quotation marks omitted), English kings generally spent public money on whatever they pleased. For many kings, that meant war with other European nations.

5

But because the crown's "ordinary revenue" often fell short when funding these endeavors, *see* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 46 (2017), there developed a second stream of "*extraordinary* revenue," financed by taxes specially levied for the king's use, 1 Blackstone, *supra*, at 306-07.  These grants of "extraordinary" tax revenue required Parliamentary authorization, David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*, at 38 (9th ed. 1966), and, increasingly, Parliament also "claimed the power to appropriate the supplies granted to the king, to say that they shall be spent in this or that manner," Maitland, *supra*, at 183-84.  Parliament asserted that authority only sporadically until its struggle with the Stuart kings led to a reconfiguration of the British constitution around the principle of parliamentary supremacy.

After decades of struggle marked by civil war and regicide, Parliament finally succeeded in curtailing the king's abuses of power attendant to his sweeping authority over the purse.  Following the Glorious Revolution, "in granting money to the crown," Parliament always "appropriated the supply to particular purposes more or less narrowly defined."  *Id.* at 433.  At the same time, the Bill of Rights of 1689 prohibited the various devices the king had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal."  An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.).  Finally, in 1782, Parliament eliminated the king's prerogative to determine how the "civil list"—the domestic budget—would be spent.  Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

**B.** In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers." Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 308 (2009). After the American Revolution, most state governments required legislative authorization for the withdrawal of any funds from a state treasury. *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI. The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of money to be raised for the service of the united states, and to appropriate and apply the same for defraying the public expenses," although they failed to give the central government the power to levy taxes, instead relying on the states for raising revenue. Articles of Confederation of 1781, art. IX, para. 5.

Still, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement." *CFPB*, 601 U.S. at 431. It was "uncontroversial" that the authority to raise, spend, and appropriate funds should "reside in the Legislative Branch" rather than with the chief executive. *Id.*; *see* 2 *Farrand's Records*, *supra*, at 131, 274 (debate limited to whether power of the purse should be further confined to the *direct* representatives of the people in the House of Representatives). The Framers thus gave Congress, not the President, "exclusive power over the federal purse." *Dep't of Navy*, 665 F.3d at 1346 (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).

In the Taxing and Spending Clause, the Framers granted Congress the affirmative power to raise revenue and spend funds. The Clause articulates the first and one of the most sweeping enumerated powers the Constitution confers upon Congress, providing the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence

and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. It responded to the Articles of Confederation's failure to grant Congress the authority to tax and spend for the defense and general interests of the union, creating such an ineffectual central government that, according to George Washington, it nearly cost Americans victory in the Revolutionary War. *See* Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799*, at 453 (John C. Fitzpatrick ed., 1931).

Indeed, it was the need "to provide adequate fiscal powers for the national government" that motivated the Framers to write a new Constitution. Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 6 (1999). Alexander Hamilton called the power to raise and spend funds "an indispensable ingredient in every constitution," *The Federalist No. 30*, *supra*, at 188, deeming "revenue" "the essential engine by which the means of answering the national exigencies must be procured," *The Federalist No. 31*, *supra*, at 195. James Madison similarly explained that "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon . . . for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *The Federalist No. 58*, *supra*, at 359.

The Framers thus adopted Edmund Randolph's recommendation that Congress should have the power "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1; *see* 2 *Farrand's Records*, *supra*, at 493, 497, choosing a phrase that was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 55 (1791). This Clause authorizes Congress to "attach conditions on the receipt of federal funds . . . 'to further [its] broad policy objectives,'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)), including even those "objectives not thought to be within Article I's 'enumerated legislative

8

fields,'" *id.* at 207 (quoting *United States v. Butler*, 297 U.S. 1, 65 (1936)). The Founders were resolute in their conviction that such sweeping authority should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

At the same time that they empowered Congress through the Spending Clause, the Framers limited executive authority over federal funding through the Appropriations Clause: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause's simple, uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Chafetz, *supra*, at 57. Alexander Hamilton explained that "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 *Elliot's Debates*, *supra*, at 349. George Nicholas emphasized that "[a]ny branch of government that depends on the will of another for supplies of money, must be in a state of subordinate dependence, let it have what other powers it may." 3 *id.* at 17; *see, e.g.*, 3 *id.* at 393 (James Madison) (responding to allegations that the President would be king by explaining that "[t]he purse is in the hands of the representatives of the people"); 4 *id.* at 330 (Charles Pinckney) ("With this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments.").

Popular writings and treatises similarly conveyed that because the President could not "appropriate the public money to any use, but what is expressly provided by law," the President's powers would leave "dignity enough for the execution" of the office "without the possibility of making a bad use of it." An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 295

9

(John P. Kaminski et al. eds., 1988); *see, e.g.*, Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 215 (John P. Kaminski et al. eds., 1988) (Appropriations Clause mandates that "any evils which may arise from an improper application of the public money must either originate with, or have the assent of the immediate Representatives of the people"). As Joseph Story put it, the Appropriations Clause prevents the executive from "apply[ing] all [the United States'] monied resources at his pleasure." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833).

The text and history of the Spending Clause and Appropriations Clause thus embody the fundamental principle that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *OPM v. Richmond*, 496 U.S. 414, 425 (1990). The Clauses play a critical role in the "Constitution's separation of powers among the three branches of government," *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016), protecting against the tyranny that would arise if "the legislative and executive powers [were] united in the same person or body," *The Federalist No. 47*, *supra*, at 302 (James Madison) (quoting Montesquieu); *see* 3 *Farrand's Records*, *supra*, at 149 (James McHenry) ("[T]here can be no regulation more consistent with the Spirit of Economy and free Government [than] that it shall only be drawn forth under appropriation by Law.").

## II.    For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Strings Through Federal Legislation Governing Spending.

Since the earliest days of the Republic, Congress has exercised its "plenary power to give meaning to the [Appropriations Clause]" through federal laws. *Harrington v. Bush*, 553 F.2d 190, 194-95 (D.C. Cir. 1977). These laws both reinforce and underscore Congress's exclusive power

10

of the purse, guarding against executive efforts to impose non-statutory conditions on federal funding or cancel federal grant programs without congressional approval.

The story begins in the Tenth Congress with the predecessor of what is known today as the Purpose Statute. *See* 31 U.S.C. § 1301(a) (current version). By passing that law, Congress commanded that "the sums appropriated by law for each branch of expenditure in the several departments shall be solely applied to the objects for which they are respectively appropriated, and to no other." Act of Mar. 3, 1809, ch. 28, 2 Stat. 535, 535. As originally enacted, the law included a narrow exception for instances when Congress was on recess and the secretary of a department petitioned the President for funds "necessary for the public service," *id.*, but even this limited exception was later repealed by Congress, *see* Act of Feb. 12, 1868, ch. 8, 15 Stat. 35, 36. The foundational principle that appropriations must be carried out as authorized by Congress has been a "core tenet of appropriations law" ever since. *Dep't of Navy*, 665 F.3d at 1348 (Kavanaugh, J.).

A few decades later, Congress passed the first version of the Antideficiency Act, making it unlawful "for any department of the government to expend . . . any sum in excess of appropriations made by Congress for that fiscal year." Act of July 12, 1870, ch. 251, § 7, 16 Stat. 251. Congress subsequently amended the law to strengthen it, including by authorizing administrative and criminal penalties for certain violations, *see* 31 U.S.C. §§ 1349-50, 1518. The law's core provisions establish an apportionment process, *id.* §§ 1512-13, prohibit accepting voluntary services, *id.* § 1342, and prohibit obligating funds in advance or in excess of an appropriation, *id.* §§ 1341, 1517(a).

Notably, in 1950, Congress amended the Antideficiency Act to clarify that "reserves may be established to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or other developments

subsequent to the date on which such appropriation was made available."  General Appropriations Act of 1951, ch. 896, § 1211(a)-(c)(2), Pub. L. No. 81-759, 64 Stat. 595, 765-66 (1950).  Although the full text and structure of the 1950 amendment made clear that it modernized and reaffirmed the central requirements of existing law, President Nixon abused the Act's new provision permitting reserves for "other developments," relying on it to unilaterally cut billions of dollars from federal programs that conflicted with his policy priorities.  *See* Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*, 23 Cath. U. L. Rev. 359, 369 (1973).

Nixon's unauthorized cuts resulted in an explosion of litigation and congressional "furor," leading to a "reassert[ion]" of Congress's "control over the budgetary process" with the passage of the Impoundment Control Act of 1974.  *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).  To avoid presidential subversion of congressional policy, the Impoundment Control Act deleted the Antideficiency Act's provision that had authorized the establishment of a reserve for "other developments," *see* Pub. L. No. 93-344, tit. X, § 1002, 88 Stat. 297, 332 (1974), making clear that "[t]he apportionment process is to be used only for routine administrative purposes such as to avoid deficiencies in Executive branch accounts, not for the making of policy or the setting of priorities," S. Rep. No. 93-688, at 72 (1974).  Congress thus expressly prohibited the President from deferring spending for policy reasons, 2 U.S.C. § 684(b), or rescinding appropriated funds without affirmative congressional approval, *id.* § 683.

More recently, Congress has also enacted statutes requiring the Office of Management and Budget (OMB) to report its apportionment decisions to the public, and agencies to report to Congress any delays or unlawful conditions imposed on appropriated funds by the executive branch through the apportionment process.  Financial Services and General Government Appropriations Act, Pub. L. No. 117-103, §§ 204(a)-(d), 748, 136 Stat. 239, 256-57, 306 (2022); Financial

Services and General Government Appropriations Act, Pub. L. No. 117-328, §§ 204, 748-49, 136 Stat. 4650, 4667, 4718 (2022).  These transparency and reporting requirements were implemented to ensure that the executive treats appropriations statutes as "laws like any other," which "can be rescinded only through the bicameralism and presentment procedures that the Constitution pre-scribes."  H.R. Rep. No. 117-393, at 12 (2022).  The measures have been enacted in subsequent appropriations laws, *e.g.*, Pub. L. No. 118-47, div. B, tit. VII, §§ 748-49, 138 Stat. 460, 586-87 (2024), reaffirming Congress's plenary power of the purse and pushing back against unauthorized executive attempts to usurp that power.[2]

**III.    Defendants' Unilateral Termination of the Competitive Grant Program Violates the Separation of Powers and the Spending Clause Through Executive Usurpation of Congress's Power of the Purse.**

The President's authority to act "must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585.  As to the former, although Congress has the exclusive power to spend and "attach conditions on the receipt of federal funds," *Dole*, 483 U.S. at 206, it may delegate the authority to impose conditions on federal grants to the executive branch provided that it cabins the executive's discretion with an "intelligible principle," *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

In this case, however, there is no statutory delegation.  Indeed, Defendants have never pointed to any statutory provision—in the Digital Equity Act or anywhere in the U.S. Code—

---

[2] In March 2025, the OMB ceased complying with the requirement to make apportionments public, leading to multiple lawsuits.  In July, a district court ordered the OMB to restore the public website with apportionment data, *Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-cv-1051, 2025 WL 2025114, at *1 (D.D.C. July 21, 2025), and the OMB complied after the D.C. Circuit denied its motion seeking a stay pending appeal, *Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-5266, slip op. at 2 (D.C. Cir. Aug. 9, 2025) (per curiam).

authorizing the executive branch to amend or rescind appropriated funds that conflict with its policy priority of ending what it deems "woke handouts based on race," Compl. ¶ 66.

Thus, in the absence of congressional authorization, Defendants' actions are only lawful if authorized by the Constitution itself. And, as discussed above, the Constitution requires that appropriations be "made by Law," U.S. Const. art. I, § 9, cl. 7, meaning that spending must be authorized by the "single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment set forth in the Constitution. *Clinton*, 524 U.S. at 439-40 (quoting *Chadha*, 462 U.S. at 951); *see* U.S. Const. art. I, § 7, cl. 2. Under that procedure, "except for recommendation and veto, [the President] has no legislative power," *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring), for the Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts," *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915); *see, e.g.*, *Clinton*, 524 U.S. at 447 (President lacks "unilateral power to change the text of duly enacted statutes").

This means that the President may not make an end-run around the "step-by-step, deliberate and deliberative process" the Framers prescribed for legislating, including in the realm of spending and appropriations. *Chadha*, 462 U.S. at 959. Where Congress has not delegated any discretion to alter the terms of the Competitive Grant Program created by the Digital Equity Act, the President has no "unilateral power to change the text of [this] duly enacted statute[]," *Clinton*, 524 U.S. at 447, much less wipe it off the books completely.

To the contrary, the Constitution requires that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, even when he disagrees with those laws. Of course, this is no less true in the context of appropriations than in any other legislative context—after all, "[b]ecause Congress's legislative power is inextricable from its spending power, the President's

14

duty to enforce the laws necessarily extends to appropriations." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). As the Supreme Court put it in *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 613.

In *Kendall*, the Supreme Court unanimously rejected newly appointed Postmaster General Amos Kendall's claim that he could withhold money that Congress had, by statute, required him to spend. *Id.* Notably, in *Kendall*, as here, the executive branch asserted a policy justification for withholding the appropriated funds: the Postmaster General claimed the funding rescission was necessary because his predecessor had negotiated a contract tainted by political favoritism. *Id.* at 608-09.

But the Court soundly rejected the notion that the executive could cancel federal funding because of Kendall's asserted moral high ground: "The act required by the law to be done by the postmaster general is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, purely ministerial; and about which the postmaster general had no discretion whatever." *Id.* at 613. Put another way, the executive's policy justifications for withholding funds—however sound they might be—were irrelevant because the executive lacked discretion to withhold the funds in the first place. Allowing the executive branch's policy preferences to displace those of Congress "would be clothing the President with a power entirely to control the legislation of congress," a principle "which has no countenance for its support in any part of the constitution." *Id.*

The same applies here. If President Trump wants to end federal funding for organizations that help bridge the digital divide, he is welcome to recommend such a law to Congress, and

Congress can decide whether such a law would be sound policy and consistent with other constitutional provisions. *See* U.S. Const. art. II, § 3 (authorizing the President to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient"). In the future, President Trump may also attempt to veto any appropriations statutes that fund grant programs implementing policies with which he disagrees. *Id.* art. I, § 7, cl. 2 (granting the President the power to veto laws presented to him, while authorizing Congress to override a veto by a two-thirds vote in each House). But for now, he may not refrain from the execution of duly enacted statutes based on a post-hoc and pretextual "constitutional" objection—one that really boils down to pure policy disagreement with what he deems a "woke handout[] based on race," Compl. ¶ 66. Doing so amounts to the "effective[] repeal[]" of that "duly enacted law" in violation of "the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (vacating panel decision "substantially for the reasons explained by Judge Pillard").

Thus, as the Ninth Circuit has succinctly put it, "[a]bsent congressional authorization, the [executive branch] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco*, 897 F.3d at 1235. This rule ensures that the executive branch does not undermine the careful "choices [that] were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked." *Chadha*, 462 U.S. at 959.

16

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.


Dated: May 8, 2026                                    Respectfully submitted,

                                                      /s/ Brianne J. Gorod
                                                      Elizabeth B. Wydra (DC Bar No. 483298)
                                                      Brianne J. Gorod (DC Bar No. 982075)
                                                      Miriam Becker-Cohen (DC Bar No. 1616670)
                                                      Nina G. Henry (DC Bar No. 90017399)
                                                      CONSTITUTIONAL ACCOUNTABILITY CENTER
                                                      1730 Rhode Island Ave. NW, Suite 1200
                                                      Washington, D.C. 20036
                                                      (202) 296-6889
                                                      brianne@theusconstitution.org

                                                      *Counsel for Amicus Curiae*

17

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

I further certify that the attached *amicus* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point Times New Roman font.

Executed this 8th day of May, 2026.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*