**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL DIGITAL INCLUSION ALLIANCE,<br><br>　　　　　　　*Plaintiff,*<br><br>　　　v.<br><br>PRESIDENT DONALD J. TRUMP, *et al.*,<br><br>　　　　　　　*Defendants.* | Civil Action No. 1:25-cv-03606-JDB |

**BRIEF OF *AMICUS CURIAE* THE BENTON INSTITUTE FOR BROADBAND &
SOCIETY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel certifies that *amicus curiae* the Benton Institute for Broadband & Society has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

    I.   The Digital Equity Act's use of Covered Populations represents a fact-based legislative response to the digital divide. ....................................................................... 3

        A.   The Digital Equity Act's eight Covered Populations face intersectional barriers to broadband access that require targeted responses. .................................................. 3

        B.   Congress was aware of the reasons for the digital divide and spent years gathering empirical evidence prior to the Digital Equity Act's enactment. ........................... 8

    II.  The Digital Equity Act's use of Covered Populations is not a racial classification. .. 10

        A.   The provision of benefits under the Digital Equity Act was not conditioned on membership in a racial or ethnic group. ............................................................... 10

        B.   The Digital Equity Act increases the number of people connected to modern digital services, a benefit that redounds to everyone. .......................................... 12

CONCLUSION ............................................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ................................................................................................................ 10, 11, 15

**Statutes**

47 U.S.C. § 1721 .............................................................................................................. 2

47 U.S.C. § 1724 .............................................................................................................. 2

47 U.S.C. § 1726 ............................................................................................................ 11

**Legislative History**

*Building Resilient Networks: Hearing Before the S. Comm. on Com., Science, and Transp.*, 117th Cong. 117-801 (2021) ............................................................................... 9

*Recent Federal Actions to Expand Broadband: Are We Making Progress?: Hearing Before the S. Comm. on Com., Science, and Transp.*, 117th Cong. 117-705 (2021) ....................................... 9

*The Impact of Broadband Investments in Rural America: Hearing Before the S. Comm. on Com., Science, and Transp.*, 116th Cong. 116-660 (2019) ................................................... 9

**Other Authorities**

Benton Inst. for Broadband & Soc'y, *Visions of Digital Equity* (Aug. 2023) .................... 4, 5, 6, 7

California Community Foundation and Digital Equity Los Angeles, *Slower and More Expensive* (Oct. 2022) ............................................................................................................. 7

Carol Graham, *Does Happiness Pay? An Exploration Based on Panel Data from Russia*, CTR. ON SOC. & ECON. DYNAMICS WORKING PAPER NO. 28 (May 2002) ................................... 14

Cigna, *Does Virtual Care Save Money?* (Jan., 2022) ..................................................... 15

Fed. Commc'ns Comm'n, *In the Matter of Incarcerated People's Communications Services,* FCC 25-75 (Nov. 6, 2025) ......................................................................................... 6

Fed. Commc'ns Comm'n, *Report on Promoting Broadband Internet Access Service for Veterans Pursuant to the Repack Airwaves Yielding Better Access for Users of Modern Services Act of 2018* (May 2019) ...................................................................................................... 6

George W. Zuo, *Wired and Hired: Employment Effects of Subsidized Broadband Internet for Low-Income Americans*, 13 AM. ECON. J.: ECON. POL'Y 447 (2021) ................................. 13

John B. Horrigan, *Are We There Yet? Affordability, Adoption, Equity, and the United States's Universal Broadband Goals*, Benton Inst. for Broadband & Soc'y (Dec. 2023) .................... 4, 5

John B. Horrigan, *End of Progress? New Data Raises Alarm: No Progress May Be New Normal for Digital Divide*, Benton Inst. for Broadband & Soc'y (2023) ....................................... 5, 6

John B. Horrigan, *Home Internet Access for Low-Income Households Helps People Manage Time, Money, and Family Schedules*, Technology Policy Inst. (Sept. 24, 2018) ..................... 14

John B. Horrigan, *The Affordable Connectivity Program Creates Benefits That Far Outweigh the Program's Costs*, Benton Inst. for Broadband & Soc'y (Mar. 2024)........................................ 5

Leon Yin and Aaron Sankin, *Dollars to Megabits, You May Be Paying 400 Times as Much as Your Neighbor for Internet Service*, The Markup (Oct. 19, 2022) ............................................ 7

Leonie Heyworth et al., *Veterans and Digital Equity: Planning for Success*, Benton Inst. for Broadband & Soc'y (Nov. 2024)........................................................................................... 6

Lindsey R., Hammerslag et al, *Telemedicine Buprenorphine Initiation and Retention in Opioid Use Disorder Treatment for Medicaid Enrollees*, 6 JAMA NETWORK OPEN (2023)............... 15

Medicare and Medicaid Programs Policy and Technical Changes, 83 Fed. Reg. 54982 (Nov. 1 2018) ................................................................................................................................. 15

*Metcalfe's Law,* Precision OT (last visited May 6, 2026) ............................................................ 12

Nat'l Telecomms. & Info. Admin., *Falling Through the Net II: New Data on the Digital Divide* (1998)...................................................................................................................................... 8

Nat'l Telecomms. & Info. Admin., *Falling Through the Net: A Survey of the "Have Nots" in Rural and Urban America* (1995)............................................................................................ 8

*NIH-Designated Populations with Health Disparities*, National Institute on Minority Health and Health Disparities (March 7, 2025) ...................................................................................... 11

OECD, *Education at a Glance 2025: OECD Indicators* (2025) ................................................... 14

Revati Prasad et al., *Older Adults Online: Measuring Internet Access and Use*, Benton Inst. for Broadband & Soc'y (Mar. 2025) .................................................................................. 4, 5, 6

Richard Cole Campbell, *Need for Speed: Broadband and Student Achievement,* Benton Inst. for Broadband & Society (Sept. 16, 2022) ................................................................................. 13

The Pew Charitable Trusts, *What COVID-19 Underscores About How Broadband Connectivity Affects Educational Attainment* (Dec. 7, 2020) ........................................................................ 14

U.S. Census Bureau, 2022 State Data File (2022)........................................................................ 2

## INTEREST OF AMICUS CURIAE[*]

The Benton Institute for Broadband & Society ("Benton") is a 45-year-old, private operating foundation dedicated to bringing "open, affordable, high-performance broadband to all people in the U.S. to ensure a thriving democracy." In order to promote universal, meaningful connectivity, Benton conducts research, produces policy analyses, convenes stakeholders, and provides technical assistance and public education regarding broadband access, affordability, adoption, and digital equity.

Benton has extensively documented the barriers to meaningful connectivity, particularly the relationship between broadband affordability and adoption among low-income households. Benton's Human Infrastructure of Broadband project further highlighted the essential role of direct, community-based support in helping people access broadband service, devices, and digital skills training. Benton works with partners throughout the country and has organized broadband and digital equity coalitions in Pennsylvania, North Carolina and Missouri. Benton provides broadband and digital equity policy analysis, research, technical assistance, and convening support to these coalitions of libraries, health care providers, local governments, community-based organizations, and other stakeholders focused on expanding meaningful connectivity.

Benton has a substantial interest in this litigation because the Digital Equity Act directly supports the goals and activities central to Benton's mission. The Digital Equity Act reflects Congress's evidence-based recognition that many Americans face distinct and overlapping barriers to broadband access and adoption, and that targeted, community-based interventions are necessary to ensure universal, meaningful connectivity. If the Digital Equity Act programs, including its

---

[*] Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4)(E), RSF states that no party's counsel authored the proposed amicus brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than RSF, its members, or its counsel contributed money that was intended to fund preparing or submitting the proposed amicus brief.

competitive grants, were invalidated, narrowed, or otherwise undermined, Benton's ability to support efforts addressing broadband affordability, digital skills, device access, and adoption gaps among underserved populations would be significantly impaired.

## ARGUMENT

The Digital Equity Act ("DEA") requires that the Department of Commerce, through the Competitive Grant Program, "award grants to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations." 47 U.S.C. § 1724(a)(1). "Covered Populations" refer to persons who are aging, incarcerated in non-federal facilities, veterans, low-income, disabled, facing a language barrier, members of any racial or ethnic minority group, and residents of rural areas. *Id*. § 1721(7)-(8). The eight categories are far-reaching: According to a 2022 census, over 97 percent of residents in West Virginia fell into at least one of these covered populations; in Utah, the state with the lowest proportion of covered populations, 62 percent of residents fell into at least one of these groups. U.S. Census Bureau, 2022 State Data File, col. E (2022).

Despite the DEA's broad reach, the government mischaracterizes it as a discriminatory preference program that requires racial classification. *See* Def. Mem. at 20-24 (ECF No. 32-1). This does not reflect reality. Each of the eight Covered Populations faces distinct barriers to broadband access. The legislative history of the DEA demonstrates Congress knew this and designed the Covered Populations so that grant awards could be tailored to the specific needs of identifiable groups, ensuring effective use of government funds. As Plaintiff explains, DEA grants were not conditioned on membership in a racial or ethnic group. *See* Pl. Mem. at 33-35 (ECF No. 38). *Amicus* writes separately to emphasize that broadband access, and thus DEA grants, create benefits across and even outside of Covered Populations. Contrary to the government's characterization, DEA grants are not "zero-sum." Def. Mem. at 23. Rather, by facilitating

increased broadband access to the Covered Populations, the grants bring broad social benefits to all Americans.

**I.    The Digital Equity Act's use of Covered Populations represents a fact-based legislative response to the digital divide.**

Far from carving out narrow, exclusionary benefits, the DEA's Covered Populations represent the vast majority of the American public. However, that does not mean the Covered Populations are homogenous. Each Covered Population faces severe, intersectional barriers that create gaps in access to broadband connectivity and other digital resources—a phenomenon known as "the digital divide." Moreover, various sub-groups in the population face different, sometimes multiple, barriers to digital access. In enacting the DEA, Congress sought to remove these barriers by promoting targeted, effective interventions. To this end, the DEA grant program required applicants to demonstrate that proposals were appropriate to the Covered Populations they sought to help. However, neither the DEA nor the National Telecommunications and Information Administration's ("NTIA") implementation of it required applicants to "target" racial or ethnic minorities as the government claims. Def. Mem. at 20.

**A. The Digital Equity Act's eight Covered Populations face intersectional barriers to broadband access that require targeted responses.**

The DEA is an important element of Congress's reasoned response to the digital divide. Each of the Covered Populations identified in the DEA has significantly less access to broadband connectivity than the general population, which in turn prohibits access to other digital resources such as remote work, online learning, and telehealth. However, while all Covered Populations are affected by the digital divide, the root causes for the various Covered Populations may be different. Thus, tailored interventions are needed to effectively close the broadband gap. It is this purpose, not discriminatory intent, that animates the DEA's recognition of distinct Covered Populations.

3

For example, one of the primary barriers facing rural populations is their ability to adopt broadband. Lower population densities in such areas results in higher costs per user, reducing significantly the economic incentive to lay costly broadband cables. Left with low-speed networking as the only option, rural residents may choose not to invest in internet access. John B. Horrigan, *Are We There Yet? Affordability, Adoption, Equity, and the United States's Universal Broadband Goals* 6, Benton Inst. for Broadband & Soc'y (Dec. 2023).[1] As a result, of the 46 million United States residents that live in rural areas, only 72 percent have home broadband subscriptions. *Id.* This in turn harms rural residents' access to essential services. Data from the Centers for Medicare & Medicaid Services shows that while 91 percent of Medicare beneficiaries in urban areas have Internet access, that number drops to 86 percent in rural areas. Revati Prasad et al., *Older Adults Online: Measuring Internet Access and Use* 32, Benton Inst. for Broadband & Soc'y (Mar. 2025).[2] Consequently, only 22 percent of rural beneficiaries use the Internet to fill prescriptions, compared to 32 percent of urban beneficiaries. *Id.*

The daunting challenges rural populations face because of their low population density are compounded by poverty; of the 341 persistently poor counties in the United States, 85 percent are nonmetro or rural. Benton Inst. for Broadband & Soc'y, *Visions of Digital Equity* 15 (Aug. 2023).[3] Low-income households face a distinct challenge: even if they have the option of purchasing broadband access, they may not be able to afford it. Horrigan, *Are We There Yet?* at 7. Recent analysis of the 2023 American Community Survey demonstrates that national broadband adoption has stagnated, a trend that disproportionately harms this demographic. John B. Horrigan, *End of Progress? New Data Raises Alarm: No Progress May Be New Normal for Digital Divide*,

---

[1] https://www.benton.org/sites/default/files/arewethereyet1.pdf
[2] https://www.benton.org/sites/default/files/Older-Adults.pdf
[3] https://www.benton.org/sites/default/files/VisionsDigitalEquity.pdf

4

Benton Inst. for Broadband & Soc'y (2023).[4] Currently, 40 percent of households making under $25,000 lack wireline broadband. John B. Horrigan, *The Affordable Connectivity Program Creates Benefits That Far Outweigh the Program's Costs* 3, Benton Inst. for Broadband & Soc'y (Mar. 2024).[5] Nearly half of low-income households are considered "subscription vulnerable," meaning their internet access is incredibly tenuous; when it becomes difficult to afford food and housing, low-income households cancel or forgo broadband. Horrigan, *Are We There Yet?* at 4. Fifty-five percent of these individuals cite the monthly subscription cost as too expensive, *id*. at 7, and 40 percent of households making under $50,000 struggle to afford a monthly fee for internet access, Benton Inst., *Visions of Digital Equity* at 15. Without targeted digital navigation assistance, low-income populations unable to reliably access the internet suffer a scarcity of capacity to manage everyday affairs, severely limiting their economic mobility. Horrigan, *Affordable Connectivity Program* at 11.

Data shows that other Covered Populations face equally prohibitive hurdles. Currently, 42 percent of seniors lack wireline broadband at home. Prasad, *Older Adults Online* at 18. While 80 percent of adults under 60 have access, that number drops to 66 percent for those 75 and older, and plummets to 45 percent for those 91 and older. *Id.* at 19. Only 26 percent of Americans with disabilities have a full suite of digital tools, and they face significantly higher employment barriers. Benton Inst., *Visions of Digital Equity* at 18. Language can also act as a barrier to access: in Philadelphia, 83 percent of Hispanic residents taking a municipal survey in English reported having broadband, versus only 67 percent for those taking the exact same survey in Spanish. *Id*. at 28. Incarcerated individuals have often faced predatory communication pricing, Fed. Commc'ns

---

[4] https://www.benton.org/blog/end-progress-new-data-raises-alarm-no-progress-may-be-new-normal-digital-divide
[5] https://www.benton.org/sites/default/files/ACP-Cost-Benefit1.pdf

Comm'n, *In the Matter of Incarcerated People's Communications Services,* FCC 25-75 (Nov. 6, 2025), and are often cut off from learning digital skills necessary to reenter the modern workforce, Horrigan, *End of Progress?*. Veterans, many of whom already face challenges entering the civilian workforce, are 24 percent less likely to use the Internet for work than the general population. *Id.*

Many individuals in Covered Populations face intersecting barriers that present unique challenges. A 2019 Federal Communications Commission report found that 2.2 million veteran households lack consistent broadband access. Fed. Commc'ns Comm'n, *Report on Promoting Broadband Internet Access Service for Veterans Pursuant to the Repack Airwaves Yielding Better Access for Users of Modern Services Act of 2018* 12 (May 2019).[6] Notably, a significant proportion of the veteran population falls within other Covered Populations: a quarter of veterans nationwide live in rural areas, the majority are 65 or older, and nearly 30 percent have a service-connected disability—nearly twice the rate of the general public. Leonie Heyworth et al., *Veterans and Digital Equity: Planning for Success* 5-6, 8, Benton Inst. for Broadband & Soc'y (Nov. 2024).[7] Age and disability follow a similar pattern; older adults reporting poor health are over three times as likely to lack internet access. Benton Inst., *Visions of Digital Equity* at 4. Poverty also impacts aging populations differently, with 63 percent of older adults in poverty living entirely alone (compared to 26 percent of those not in poverty). Prasad, *Older Adults Online* at 21. The combination of age, disability, and poverty, and lack of broadband access can result in severe social and medical isolation.

The inclusion of racial and ethnic minorities as one element to be balanced in meeting the needs of Covered Populations is no different: a recognition that certain populations suffer from

---

[6] https://docs.fcc.gov/public/attachments/doc-357270a1.pdf
[7] https://www.benton.org/sites/default/files/Veterans-Digital-Equity.pdf

barriers to access that need specific, targeted interventions. Studies show that minority populations, like other Covered Populations, face intersecting barriers to access. For example, a 2016 study showed that, within the sub-$20,000 income bracket, 58 percent of White Americans had home internet, compared to 51 percent of Hispanics and 50 percent of Blacks. Benton Inst., *Visions of Digital Equity* at 20. Using income alone does not fully address the shortfall; at higher income levels, this gap narrowed, but did not disappear. Moreover, members of different racial and ethnic groups access the internet differently. A quarter of Hispanics rely on a smartphone to access the internet, compared to 12 percent of White and 17 percent of Black adults. *Id.* These differences are related to income and the urban/rural divide, but also include distinct factors like disparities in the cost and speed of broadband access in different neighborhoods. *See, e.g.*, California Community Foundation and Digital Equity Los Angeles, *Slower and More Expensive* (Oct. 2022)[8]; Leon Yin and Aaron Sankin, *Dollars to Megabits, You May Be Paying 400 Times as Much as Your Neighbor for Internet Service*, The Markup (Oct. 19, 2022).[9]

Ultimately, racial or ethnic minority status is just one indicator of the complex, intersecting barriers that limit Covered Populations' broadband access. As explained above, different populations face different challenges and need tailored interventions. Identifying which populations a grantee seeks to help is, therefore, an important step in gauging the appropriateness of a proposal. Effective assistance for veterans in a low-income, rural, predominantly White community might look different than effective assistance for non-native English speakers or a

---

[8] https://static1.squarespace.com/static/6165cb6ecbf6d70401a212f6/t/6345ca9c147af0682276fb3d/1665518251184/Broadband+Pricing+Disparities+Report+-+Oct+2022.pdf
[9] https://themarkup.org/still-loading/2022/10/19/dollars-to-megabits-you-may-be-paying-400-times-as-much-as-your-neighbor-for-internet-service

middle-income, urban, predominantly Hispanic community. Recognition of this fact—and the distinct challenges faced by minority communities—does not render the DEA unconstitutional.

**B. Congress was aware of the reasons for the digital divide and spent years gathering empirical evidence prior to the Digital Equity Act's enactment.**

Decades of published research support Congress' decision to devise the categories that make up the DEA's Covered Populations. Government efforts to address the digital divide trace back to the 1990s when the NTIA compiled data that articulated how factors like income, geography, and age structurally isolate Americans from critical telecommunications infrastructure. *See, e.g.*, Nat'l Telecomms. & Info. Admin., *Falling Through the Net: A Survey of the "Have Nots" in Rural and Urban America* (1995)[10]; Nat'l Telecomms. & Info. Admin., *Falling Through the Net II: New Data on the Digital Divide* (1998).[11] By 2021, significant research had been done into the causes and effects of the digital divide, only a fraction of which is described above. This research—and much more—was available to Congress when it passed the DEA and its parent legislation, the Infrastructure Investment and Jobs Act of 2021. As a result, Congress was able to identify a set of distinct, apolitical categorizations comprising millions of Americans who, according to empirical evidence, disproportionately experience broadband inequity.

In the years leading up to the passage of the DEA, the Senate Committee on Commerce, Science, and Transportation held extensive evidentiary hearings on the digital divide. On March 12, 2019, during a hearing specifically focused on the importance of expanding broadband into rural areas, Senator John Thune began the hearing stating that access to broadband connectivity "provides opportunities for advancements in health care, education, and economic development," but noted that rural areas are behind more populated areas when it comes to broadband

---

[10] https://www.ntia.gov/page/falling-through-net-survey-have-nots-rural-and-urban-america
[11] https://www.ntia.gov/report/1998/falling-through-net-ii-new-data-digital-divide

accessibility. *The Impact of Broadband Investments in Rural America: Hearing Before the S. Comm. on Com., Science, and Transp.*, 116th Cong. 116-660 (2019). In his testimony at that hearing, Mark Jamison from the American Enterprise Institute cited research from the Journal of Medical Internet Research revealing that when low-income Americans "begin using the Internet they use it for a variety of capital enhancing activities, including education, job seeking and obtaining health information." *Id.* at 23-24. Jamison also supported his testimony with research that broadband expansion in rural areas increases employment rates, noting that a 2016 study by the Hudson Institute found that in 2015 rural broadband accessibility supported over 69,000 jobs and $100 billion in e-commerce. *Id.* at 24.

In 2021, both majority and minority party members of the Senate Commerce Committee further emphasized the systemic issues faced by specific populations. Statistics cited include the fact that rural Americans pay upwards of 37 percent more for broadband than Americans living in cities, for speeds that are vastly inferior. *Recent Federal Actions to Expand Broadband: Are We Making Progress?: Hearing Before the S. Comm. on Com., Science, and Transp.*, 117th Cong. 117-705 (2021). Senator Ed Markey noted that the over 12 million American children that do not have broadband access at home largely come from poor and racially marginalized communities. *Id.* at 51. Personal stories were shared, like a middle-school student in a Native American Pueblo community in New Mexico who got heatstroke trying to complete his assignments because he lacked internet at home and had to sit outside in the sun to connect to a community Wi-Fi hotspot to do his work. *Id.* at 62. Congress also relied on experts who suggested the need for government intervention to address these systemic issues. *See Building Resilient Networks: Hearing Before the S. Comm. on Com., Science, and Transp.*, 117th Cong. 117-801 (2021). When Congress passed the DEA later that year, the eight Covered Populations in the Act were not the result of ideological

engineering, but a response to empirical data regarding the desperate need for an infrastructural intervention.

**II.    The Digital Equity Act's use of Covered Populations is not a racial classification.**

As explained above, the DEA's Covered Populations were necessary for the government to determine which proposals are suited to which populations, and award grants accordingly. The government nevertheless argues that this approach was unconstitutional. Def. Mem. at 20-24. Specifically, the government misinterprets *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), to say that the DEA's mere reference to "members of a racial or ethnic minority group" constitutes an explicit facial racial classification. Def. Mem. at 21-23. This interpretation is incorrect, for at least three reasons.

First, despite the government's stringent language, the DEA Competitive Grant Program did not "expressly require[]" grantees to target racial minorities or the government to consider racial classifications. *Id*. at 20. Second, the benefits of grant programs were not limited to Covered Populations, let alone to members of racial minorities as the government suggests. *See id*. at 22. Finally, facilitating increased broadband access to underserved populations is not, as the government says, a "zero-sum" proposition. *Id*. at 23. Rather, enhancing *some* individuals' ability to access broadband benefits *everyone*.

**A.  The provision of benefits under the Digital Equity Act was not conditioned on membership in a racial or ethnic group.**

The Supreme Court in *SFFA* reaffirmed that racial classification by a governmental actor is presumptively unconstitutional and must satisfy strict scrutiny. *See* 600 U.S. at 207. However, as Plaintiff explains, not every recognition of race is a racial classification. *See* Pl. Mem. at 33-35 (collecting cases). Indeed, many publicly funded efforts recognize the existence of racial disparities and seek, through the application of race-neutral interventions, to eliminate them. For

example, the National Institute on Minority Health and Health Disparities, part of the National Institutes of Health, conducts research into health disparities in the United States, including racial disparities. *See NIH-Designated Populations with Health Disparities*, National Institute on Minority Health and Health Disparities (March 7, 2025).[12] The DEA similarly works to reduce disparities, including racial disparities, identifying and remediating the root causes of inequity.

This type of program—one that is aware of race but does not require racial classification—is outside the scope of *SFFA*. In *SFFA*, the challenged programs treated race as an "essential feature" of the admissions decision, such that it explained a measurable percentage of admissions outcomes. 600 U.S. at 218–19. Here, race is not an "essential feature" of grant allocation. An applicant that proposes to serve rural, low-income households, with no particular impact on racial minorities, could receive a DEA grant. Likewise, a proposal that focuses on racial minorities to the exclusion of other Covered Populations might be rejected. The inclusion of race in one of the Covered Populations is neither necessary nor sufficient to qualify an applicant for a grant award.

Indeed, nothing in the DEA restricts access to the grant-funded programs to individuals who are members of a Covered Population. In fact, the statutory anti-discrimination provision, 47 U.S.C. § 1726, affirmatively *prohibits* grantees from excluding any individual from participation on the basis of any protected characteristic. In this sense, DEA-funded programs can be likened to the "curb cut effect" arising from the Americans with Disabilities Act ("ADA"). In brief, in response to the ADA's prohibition on discrimination against individuals with disabilities, curb cuts were installed on sidewalks and intersections. This benefitted not only individuals with disabilities, but all individuals who used sidewalks and intersections. Like the DEA, the ADA's accommodation requirements are grounded in the documented exclusion of a specific

---

[12] https://www.nimhd.nih.gov/about/nih-designated-populations-health-disparities.

population—individuals with disabilities—from infrastructure that the general public could access. Also like the DEA, curb cuts benefit a broad population, well beyond individuals with disabilities: parents with strollers, cyclists, delivery workers, elderly pedestrians, and travelers with luggage all benefit from the infrastructure improvement prompted by the targeted mandate.

Just as curb cuts do not reserve their benefits for users with accessibility needs, broadband adoption programs funded under the DEA do not reserve their benefits for minority community members; when there is improved access for marginalized groups, the improvement benefits all members of that community, not merely those who satisfy a demographic criterion. The "Covered Populations" framework identifies where the deficit is most acute and where different types of improvements are required; it does not create an exclusive entitlement to the benefits of remedying that deficit. The statute has no racial set-aside, racial quota, or racial eligibility requirement. As such, the DEA is distinguishable from the admissions programs in *SFFA*, which used racial identity as an input variable in an individualized decision, with clear winners and losers. Under the DEA, community demographic data helps determine which types of services would be effective, which is a categorically different exercise. The former sorts individuals; the latter describes communities. Equal protection doctrine has never prohibited the government from using demographic data to identify where public infrastructure investment is needed, so long as the resulting programs do not distribute individualized benefits or impose individualized burdens along racial lines.

**B. The Digital Equity Act increases the number of people connected to modern digital services, a benefit that redounds to everyone.**

"Metcalfe's Law" illustrates that the value of a network is proportional to the square of the number of users. *Metcalfe's Law,* Precision OT (last visited May 6, 2026).[13] Put differently, every

---

[13] https://www.precisionot.com/metcalfes_law/

newly connected household does not simply increase the value of the internet for the household itself; the new connection increases the value of the internet for everyone. In practical terms, benefits extend beyond the newly connected household because not only is the household connected to the internet, but the people living there can also use the internet to connect with other households. When the telephone was introduced, the value of any given telephone connection to its user increased as more people bought telephone service. Similarly, as broadband access increases, the value of a broadband connection, and the demand for it, grows as well. This pushes companies to compete for customers by lowering prices, which in turn could allow households that could not previously afford broadband access to now access such services. Richard Cole Campbell, *Need for Speed: Broadband and Student Achievement,* Benton Inst. for Broadband & Society (Sept. 16, 2022).[14]

As economic activity increasingly uses the internet as a foundation, increased broadband access becomes more critical for economic opportunity. Digital marketplaces like Facebook Marketplace and eBay enable the buying and selling of goods and services without a physical storefront. Job recruitment platforms like Indeed and LinkedIn allow browsing of job opportunities without having to make in-person visits to offices. Households that have broadband access tend to see increases in their incomes—a phenomenon described as the "wired and hired" effect. George W. Zuo, *Wired and Hired: Employment Effects of Subsidized Broadband Internet for Low-Income Americans*, 13 AM. ECON. J.: ECON. POL'Y 447 (2021). Other less direct contributions to economic growth include the convenience offered by the internet, which results in time savings for day-to-day activities, John B. Horrigan, *Home Internet Access for Low-Income Households Helps People*

---

[14] https://www.benton.org/blog/need-speed-broadband-and-student-achievement

*Manage Time, Money, and Family Schedules*, Technology Policy Inst. (Sept. 24, 2018),[15] as well as reducing the "bandwidth tax," which allows households to decrease the cognitive effort spent on figuring out how to make ends meet in the short run and focus on long-term goals, Carol Graham, *Does Happiness Pay? An Exploration Based on Panel Data from Russia*, CTR. ON SOC. & ECON. DYNAMICS WORKING PAPER NO. 28 (May 2002).

Closely linked to the economic benefits are the educational benefits arising from access to the internet. Students with no home access, slow home access, or cell-only access to the internet suffer from lower test scores than students with fast home access to the internet. The Pew Charitable Trusts, *What COVID-19 Underscores About How Broadband Connectivity Affects Educational Attainment* (Dec. 7, 2020).[16] Intermittent home access to the internet affects students' ability to finish their homework. *Id*. Furthermore, given the link between educational outcomes and employment opportunities, intermittent home access to the internet could detrimentally affect students' later years, long after they have graduated. OECD, *Education at a Glance 2025: OECD Indicators* 18-19 (2025).[17] By mitigating these long-term effects, broadband connectivity supports an educated workforce for years to come.

Last but not least, broadband access improves the overall health of communities. The COVID-19 pandemic exemplified the importance of internet access for public health. Telehealth services provide quick access to healthcare services. Telehealth services also offer savings for healthcare services, ranging from non-urgent, urgent, to specialist visits. Cigna, *Does Virtual Care*

---

[15] https://techpolicyinstitute.org/publications/broadband/home-internet-access-for-low-income-household-helps-people-manage-time-money-and-family-schedules/

[16] https://www.pew.org/en/research-and-analysis/articles/2020/12/08/what-covid-19-underscores-about-how-broadband-connectivity-affects-educational-attainment

[17] https://www.oecd.org/content/dam/oecd/en/publications/reports/2025/09/education-at-a-glance-2025_c58fc9ae/1c0d9c79-en.pdf

*Save Money?* (Jan., 2022).[18]  Medicare patients are estimated to have saved $100 million in 2024 from using telehealth services; by 2029, that figure is expected to increase to $170 million. Medicare and Medicaid Programs Policy and Technical Changes, 83 Fed. Reg. 54982, 55055 (Nov. 1 2018) (to be codified at 42 C.F.R. pts. 422, 423, 438, and 498). For patients with substance abuse problems, telehealth services results in a greater chance of retention in treatment plans. Lindsey R., Hammerslag et al, *Telemedicine Buprenorphine Initiation and Retention in Opioid Use Disorder Treatment for Medicaid Enrollees*, 6 JAMA NETWORK OPEN (2023).[19] Improving health outcomes while lowering costs benefits all of society, not just the individual beneficiaries of a grant-funded service.

Despite the government's characterization, Def. Mem. at 23, the benefits from DEA grants are the very opposite of "zero-sum." Every grant program involves a disbursement of finite funds, but this does not strictly circumscribe the program's benefits. The relevant constitutional question is not whether grant dollars are finite, but whether the distribution of program *benefits* at the service delivery level is zero-sum, as in the manner of university admissions or competitive contracting. In *SFFA*, the zero-sum character of admissions decisions was constitutionally significant because each admissions slot awarded to one applicant on racial grounds was unavailable to another applicant of a different race. The racial classification directly caused a cognizable disadvantage to identifiable non-preferred individuals. *See* 600 U.S. at 218–19 ("[A] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter."). The DEA's service delivery model does not operate in this manner but instead operates to expand broadband access and adoption generally. A Digital Navigator who assists a low-income minority

---

[18] https://connectwithcare.org/wp-content/uploads/2022/01/does-virtual-care-save-money.pdf
[19] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2810828

household in adopting broadband service does not thereby reduce the broadband connectivity of a non-minority household. A digital literacy training program serving an underserved community does not cut off digital literacy resources to other communities. Instead, each of these programs benefits the Covered Population, the community generally, and society as a whole.

**CONCLUSION**

Years of research shows that certain populations face greater challenges when it comes to benefiting from broadband access. The DEA grantmaking program instructs applicants to consider these populations when proposing interventions to spur broadband adoption. It does not, however, require the government to engage in forbidden racial classification. For this reason, and the reasons stated above, *amicus curiae* respectfully urges the Court to deny the Defendants' Motion to Dismiss.

Dated: May 11, 2026

Respectfully submitted,

/s/ Mason A. Kortz

Mason A. Kortz, #MA0057
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138
Tel: 858-922-1990
Email: mkortz@law.harvard.edu

*Counsel for Amicus Curiae*

16