**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL DIGITAL INCLUSION ALLIANCE,

*Plaintiff*,

v.

No. 1:25-cv-3606-JDB

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Defendants*.

**BRIEF OF *AMICI CURIAE* COMPETITIVE GRANT PROGRAM APPLICANTS AND
SUPPORTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Erik Stallman*
Samuelson Law, Technology
 & Public Policy Clinic
353 Law Building
Berkeley, CA 94720
Telephone: (510) 642-2485
Fax: (510) 643-4625

\*Pro Hac Vice forthcoming

Phillip R. Malone, Bar No. CA00004
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 725-6369
Fax: (650) 723-4426

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

I, the undersigned, counsel of record for *amici curiae* Competitive Grant Program Applicants and Supporters, certify that to the best of my knowledge and belief, the *amici* listed in Appendix A have no parent corporations and that no publicly held corporation owns at least 10% of their stock.

**TABLE OF CONTENTS**

TABLE OF CONTENTS.........................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................ii

IDENTITY AND INTEREST OF *AMICI* ........................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT........................................................................................................................ 4

I.  The Digital Equity Act Recognizes Full Participation in Social and Economic Life as the Goal of Broadband Adoption......................................................................................... 4

    A.  The Ability to Effectively Use Broadband Internet Access Service Has Been a Growing Focus of Our National Broadband Policy................................................ 4

    B.  In the DEA, Congress Recognized That Broadband Access and Broadband Adoption Are Necessary Complements.................................................................. 8

II.  The Competitive Grant Program Supports a Range of Interventions to Overcome Barriers Faced by Different Regions and Communities............................................................... 11

    A.  Municipal and Regional Projects........................................................................ 12

    B.  Trusted Community Partners Working with Specific Covered Populations ........ 16

III.  Termination of the Competitive Grant Programs Would Inflict Unnecessary Harm on Broadband Policy and Broadband Users ........................................................................ 18

    A.  Terminating the CGP Undermines Congressional Intent and the Considerable Efforts Behind Implementation of the Program.................................................... 19

    B.  Terminating the CGP Denies Communities of the Benefits That Broadband Access and Adoption Are Intended to Confer ...................................................... 21

CONCLUSION................................................................................................................... 22

## TABLE OF AUTHORITIES

**Statutes**

47 U.S.C. § 1721 ................................................................................................. 4, 9, 22

47 U.S.C. § 1722 ........................................................................................................ 5

47 U.S.C. § 1723 ...................................................................................................... 10

47 U.S.C. § 1724 ................................................................................... 12, 18, 19, 20, 21

47 U.S.C. § 1725 ...................................................................................................... 18

American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, § 2, div. B, tit. VI (2009). 6, 7

**Legislative Materials**

*Broadband Adoption: The Next Mile: Hearing Before the Subcomm. on Commc'ns, Tech., and the Internet of the S. Comm. on Com., Sci., and Transp.*, 113th Cong. 1 (2013) ........................ 7

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (2021), §§ 60102, 60301–60306 ..... 9

*Oversight of the Federal Communications Commission: Hearing Before the S. Comm. on Commerce, Sci., and Transp.,* 116th Cong. (2020) .................................................... 8

**Administrative Materials**

*Digital Equity Act of 2021, Request for Comment*, 88 Fed. Reg. 13,101 (Nat'l Telecomm. & Info. Admin. Mar. 2, 2023) ................................................................................ 9

Nat'l Telecomm. & Info. Admin., *Broadband Tech. Opportunities Program, Notice of Funds Availability*, 75 Fed. Reg. 3 (Jan. 22, 2010) ............................................................ 6

Nat'l Telecomm. & Info. Admin., *Notice of Funding Opportunity: Digital Equity Competitive Grant* Program, Docket No. NTIA-DECGP-2024 (July 24, 2024) ........................ 10, 11, 20, 21

**Other Authorities**

Amanda Bergson-Shilcock, *The New Landscape of Digital Literacy*, National Skills Coalition (May 2020) ................................................................................................ 8

Ameelio, *Bridging the Digital Divide for the Incarcerated: Digital Tools and Workforce Skills for Re-Entry Success: Executive Summary* (Sept. 21, 2024) ............................... 17, 18

Brian A. Jacob, *The Lasting Effects of the COVID-19 Pandemic on K-12 Schooling: Evidence from a Nationally Representative Teacher Survey*, Annenberg Institute EdWorkingPaper No. 24-1020 (August 2024) ..................................................................................... 8

*Broadband USA Fact Sheet for Project Endeavor*, Nat'l Telecomm. & Info. Admin. (August 2010) ....................................................................................................................... 6

California Dep't. of Tech., *California Digital Equity Plan* (2024) ............................................ 20

City of Bloomington, Ind., *Digital Equity Strategic Plan* (2020) ................................................. 13

City of Bloomington, *Project Plan* 3 (2024) ............................................................... 13, 14

City of Phila., *Philly Digital Empowerment Network Project Plan* (2024)...................... 14, 15, 21

Commc'n Serv. For the Deaf, Inc., *Sustainable Broadband Adoption Non-Infrastructure Application* (Mar. 14, 2010)............................................................................................ 6

Commc'n Serv. for the Deaf*, The Digital Synergy Project* (2024) ............................................. 17

Fed. Commc'ns Comm'n, *Connecting America: The National Broadband Plan* (2010) .............. 7

George W. Zuo, *Wired & Hired: Employment Effects of Subsidized Internet for Low-Income Americans* 13 Am. Econ. J.: Econ. Pol'y (2021) ........................................................ 22

Jessica Dine, Info. Tech. & Innovation Found., *Enabling Equity: Why Universal Broadband Access Rates Matter* (2023) ...................................................................................... 5

John Horrigan, *Analysis of Non-Broadband Users*, Pew Rsch. Ctr. (July 2, 2008) ...................... 6

Land of Sky Reg'l Council, *WNC Connecting All Communities Project Plan* (2024) .......... 16, 22

Matt Kalmus, et al., *A Human Approach to Closing the Digital Divide*, Bos. Consulting Grp. (June 13, 2022)............................................................................................................ 15

Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects*, 8 J. of Econ. Perspectives (1994)...................................................................................................... 4

Nat'l Telecomm. & Info. Admin., *A Nation Online: How Americans Are Expanding Their Use of the Internet* (Feb. 2002) ........................................................................................... 5

Or. Broadband Off., *The State of Oregon Digital Equity Plan* (April 2024) ............................. 11

Press Release, Joint Venture Silicon Valley Selected for $11.6 Million NTIA Grant (Feb. 18, 2025) ......................................................................................................................... 20

Press Release, Nat'l Telecomm. & Info. Admin., *NTIA Receives More Than 250 Comments to Inform Digital Equity Act Programs* (June 12, 2023)................................................................. 19

Press Release, Nat'l Telecomm. & Info. Admin., *Biden-Harris Administration Recommends for Award More Than $250 Million to Expand Digital Skills* (Jan. 6, 2025) ................................. 12

Press Release, Nat'l Telecomm. & Info. Admin., *Biden-Harris Administration Recommends for Award More Than $369 Million to Invest in Digital Skills* (Jan. 17, 2025)........................ 12, 17

Press Release, Off. of Sen. Patty Murray, *Senators Murray, Portman, and King Introduce Major Bipartisan Legislation to Close Digital Divide, Promote Digital Equity* (June 10, 2021)......... 9

Qinyun Lin, et al., *Assessment of Structural Barriers and Racial Group Disparities of COVID-19 Mortality with Spatial Analysis*, JAMA Network Open (2022) ................................................ 21

Soyoung Lee, et al., *Sociocultural Factors in Digital Skills Learning: A Community-Based Intervention Among U.S. Public Housing Adults*, 9 Proc. ACM Hum.-Comput. Interaction (2025)................................................................................................................................... 12

**IDENTITY AND INTEREST OF *AMICI***

*Amici* are municipal and regional governmental organizations, community-based organizations, and other public interest nonprofit organizations who have been working for years to close the digital divide. They have deep roots in broadband adoption and digital literacy programs. *Amici* include advocates for the Digital Equity Act's Competitive Grant Program ("CGP" or "the Program"), organizations that participated in regulatory proceedings to implement the CGP, and applicants and proposed subgrantees for grants under that program. A list of *amici* is provided in Appendix A.[1]

*Amici* submit this brief to help the Court understand the full range of efforts that the Digital Equity Act ("DEA" or "the Act") could support and the full range of communities that those efforts could serve. *Amici* are deeply concerned that terminating the Program harms vulnerable populations and the organizations working with them, as well as broader national policy aims. The DEA is a crucial step forward in our national recognition that broadband deployment alone cannot close the digital divide, and termination of the Competitive Grant Program would be an enormous step backward.

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief. *Amici* wish to thank Berkeley Law student Monica Jeung for her assistance in preparing this brief.

1

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Terminating the Digital Equity Act's Competitive Grant Program ("CGP") undermines a bipartisan national policy recognizing that digital equity—the condition in which individuals and communities have the information technology capacity needed for full participation in social and economic life—is essential to ensuring our nation and all its people reap the benefits of broadband access. The CGPs seek to equip the entire nation with that capacity while recognizing that underserved populations may require targeted interventions to overcome barriers to broadband adoption and use. The termination of the CGP disrupted organizational efforts toward that objective and damaged the communities those organizations serve.

Digital equity has been moving to the center of national broadband policy because policymakers recognize that infrastructure deployment without meaningful use is deployment without impact. Broadband affordability and digital skilling initiatives took on added importance as the COVID-19 pandemic drove more economic, social, and civic activities online, where many have remained. The inclusion of the Digital Equity Act among investments in broadband access and use within the Infrastructure Investment and Jobs Act codifies an understanding that deployment, affordability, and adoption must go together. The Act itself reflects the importance of coordinating those investments at the federal, state, local, and community level.

Many mechanisms and entities are part of the solution to achieve universal broadband adoption. The CGP projects that the National Telecommunications and Information Administration ("NTIA") recommended for grant awards complement state-level efforts by addressing needs better met at the regional, municipal, or community level. Most applicants sought grants to provide infrastructure improvements, device access, skills training, and assistance in acquiring broadband service for individuals in geographic areas regardless of their

2

belonging to one or more covered populations. Other CGP projects focused on overcoming broadband adoption barriers faced by particular communities, while extending the projects' reach beyond those communities. The projects planned under the DEA could fund device access and skills training crafted for rural communities, veterans, older Americans, incarcerated individuals, as well as members of racial and ethnic minorities. By promoting broadband adoption, those projects would further important national goals such as improving access to health care, expanding employment opportunities, or reducing recidivism.

Termination of the DEA's grant programs harms national broadband policy and related national interests, the organizations working to overcome barriers to broadband adoption and use, and the communities they serve. Terminating the DEA programs severs longstanding efforts to unite deployment, adoption, and digital inclusion. Thinly resourced local governments and nonprofit organizations expended considerable effort and resources to design projects, form partnerships, and apply for funds to implement these programs. They did so in reliance on the DEA as a duly authorized statutory program with appropriated funds and prescribed mechanisms for issuing and terminating grants. Those efforts are now wasted unless the programs are reinstated. And the ultimate cost falls on the communities left stranded on the wrong side of the digital divide and on national goals linked to universal broadband access and adoption, such as stronger economies, more accessible health care, and reduced costs in providing government services.

This case is not about one specific award, project, recommendation, or covered population. This case contests summary cancellation of an entire statutory program that could advance national broadband policy dramatically and at scale. The program should never have

been terminated: doing so damaged our nation's efforts to provide education, health care, economic opportunity, and civic engagement. The DEA programs must be reinstated.

## ARGUMENT

### I.    The Digital Equity Act Recognizes Full Participation in Social and Economic Life as the Goal of Broadband Adoption

Our national broadband policy has evolved from a near-exclusive focus on deployment of broadband infrastructure to a recognition that the ability to use broadband for economic opportunity, education, health care access, and civic engagement requires more than access to broadband service. Through the Digital Equity Act of 2021 ("the Act"), Congress added to the Telecommunications Title of the U.S. Code a definition of "the adoption of broadband" as a "process" that includes being able to access the internet "with the digital skills that are necessary for the individual to participate online." 47 U.S.C. § 1721(1). The Act also recognized that the process by which broadband adoption is achieved requires coordinated efforts at the national, state, local, and community levels.

### A.    The Ability to Effectively Use Broadband Internet Access Service Has Been a Growing Focus of Our National Broadband Policy

Like other networks, the value and capabilities of broadband internet for each user grow with the number of users and communities connected via the network. *See* Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects*, 8 J. of Econ. Perspectives 93, 94 (1994). Those network effects contribute directly to the U.S. economy, with "fixed broadband adoption account[ing] for 10.9 percent of economic growth in the United States from 2010 through 2020." Jessica Dine, Info. Tech. & Innovation Found., *Enabling Equity: Why Universal Broadband Access Rates Matter* 3 (2023).[2] As Congress has found, those network effects also contribute to

---

[2] https://itif.org/publications/2023/08/14/enabling-equity-why-universal-broadband-access-rates-matter/.

our ability to use broadband service to accomplish other national priorities related to employment, health care, and education. 47 U.S.C. § 1722(1)(B) (finding that broadband access is critical to how individuals "access health care and essential services, obtain education, and build careers").

At the same time, network effects also help explain why communities do not adopt or do not know how to use broadband service. Even as more American households adopted broadband, NTIA in 2002 observed that disparities and differences among specific communities persisted and, in some cases, widened. *See* Nat'l Telecomm. & Info. Admin., *A Nation Online: How Americans Are Expanding Their Use of the Internet* 17–24 (Feb. 2002).[3] NTIA's report framed disparities in adoption as partially a matter of network effects: "Under this concept, if a person's family, friends and broader community are Internet users, there would be increased incentive for them to go online. On the other hand, if a few of the person's family, friends or community were online, there would be less of an incentive[.]" *Id.* at 78. In view of these network effects, it became clear that community-specific approaches were needed to encourage widespread broadband adoption.

NTIA's insight that factors other than availability influence broadband adoption rates was confirmed in a series of reports issued by the Pew Research Center in the late 2000s. Based on survey data from 2008, those reports found that even when broadband was available, issues of affordability, perceived relevance, and unfamiliarity with information technology posed barriers to adoption. John Horrigan, *Analysis of Non-Broadband Users*, Pew Rsch. Ctr. (July 2, 2008),[4]

---

[3] https://www.commerce.gov/sites/default/files/migrated/reports/anationonline2.pdf.
[4] https://www.pewresearch.org/internet/2008/07/02/analysis-of-non-broadband-users/.

Again, these factors varied by gender, age, race/ethnicity, income level, and community type (rural, suburban, urban). *Id*.

Congress began addressing barriers to adoption alongside barriers to access in the Broadband Technology Opportunities Program ("BTOP"), part of the American Recovery and Reinvestment Act of 2009 ("ARRA"). American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, §2, div. B, tit. VI (2009). While most of the funding went to access projects like community infrastructure, computer center construction, and middle or last mile infrastructure, BTOP also devoted funding to sustainable broadband adoption ("SBA") projects. American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, div. A, tit. II, § 6001(b)(5) (2009). These projects focused on "providing broadband education, awareness, training, access, equipment, or support, particularly among vulnerable population groups that traditionally have underutilized broadband technology." Nat'l Telecomm. & Info. Admin., *Broadband Tech. Opportunities Program, Notice of Funds Availability*, 75 Fed. Reg. 3,794 (Jan. 22, 2010). For example, the nonprofit organization Communication Service for the Deaf ("CSD") received a grant for Project Endeavor, a program that engaged in outreach through community contacts to support the deaf and hard of hearing communities with device distribution and digital skills training conducted through American Sign Language, captioning, or video calls.[5] Early broadband adoption initiatives like SBA projects recognized that different communities required tailored interventions.

---

[5] *Broadband USA Fact Sheet for Project Endeavor*, Nat'l Telecomm. & Info. Admin. (August 2010), https://www2.ntia.doc.gov/sites/default/files/grantees/CommunicationsServiceDeaf.pdf; Commc'n Serv. For the Deaf, Inc., *Sustainable Broadband Adoption Non-Infrastructure Application*, 7–8, 11–12 (Mar. 14, 2010), https://www2.ntia.doc.gov/sites/default/files/grantees/communicationsservicesforthedeaf_sba_infrastructure_part1.pdf.

The ARRA also directed the Federal Communications Commission to create a national broadband plan with a strategy to achieve both affordable broadband services and "maximum utilization of broadband infrastructure and service by the public." Recovery Act, § 6001(k); 47 U.S.C. § 1305(k)(2)(B). Among the Plan's relevant findings were that "lack of digital skills, irrelevance of online content and inaccessible hardware and software often work together to limit adoption." Fed. Commc'ns Comm'n, *Connecting America: The National Broadband Plan* 170 (2010).[6] The Plan recommended a series of interventions to address these interlocking barriers, including expanding the capacity of digital literacy partners and community-based organizations. *Id.* at 174.

Congress soon took up this focus on overcoming barriers to broadband adoption. The Senate Commerce Subcommittee on Communications, Technology, and the Internet held a hearing on "Broadband Adoption: The Next Mile," in 2013. *Broadband Adoption: The Next Mile: Hearing Before the Subcomm. on Commc'ns, Tech., and the Internet of the S. Comm. on Com., Sci., and Transp.*, 113th Cong. 1 (2013). There, former Senator John Sununu observed that national figures on broadband adoption "can obscure regional and community-specific challenges." *Id*. at 8. In addressing those challenges, Sununu urged "community engagement" and "empower[ing] partners in our neighborhoods and direct relevant messages to underserved communities." *Id.*

The COVID-19 pandemic underscored the urgency of addressing those challenges. The pandemic drove work, employment opportunities, education, access to health care, and government services online, resulting in lasting effects. For example, the widespread use in K-12 education of Learning Management Systems, remote parent-teacher communication, and a shift

---

[6] https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf.

towards individualized, technology-aided work is likely here to stay. Brian A. Jacob, *The Lasting Effects of the COVID-19 Pandemic on K-12 Schooling: Evidence from a Nationally Representative Teacher Survey*, Annenberg Institute EdWorkingPaper No. 24-1020 (August 2024).[7] Digital skills have thus become a "threshold competency" for education, employment, and other areas of modern life. Amanda Bergson-Shilcock, *The New Landscape of Digital Literacy*, National Skills Coalition (May 2020) at 3.[8] As Senator Maria Cantwell noted in remarks during the June 2020 Senate Commerce Hearing on Oversight of the Federal Communications Commission: "If we were still in any doubt that the COVID crisis has made its impact clear to us, it is very clear today when it comes to the issue of broadband." *Oversight of the Federal Communications Commission: Hearing Before the S. Comm. on Commerce, Sci., and Transp.,* 116th Cong. 3 (2020). Along with efforts at expanding broadband access, Senator Cantwell called for investment in "digital literacy and digital adoption, targeting [ ] marginalized communities." *Id.* The Digital Equity Act answered that call.

### B.    In the DEA, Congress Recognized That Broadband Access and Broadband Adoption Are Necessary Complements

The value of broadband service lies not in the physical infrastructure but in the capacity of individuals and communities to use that infrastructure to engage in socially and economically beneficial activity connected to broader national policy objectives. It is unsurprising, then, that the bipartisan Infrastructure Investment and Jobs Act ("IIJA") included both the Broadband Equity, Access, and Deployment Program ("BEAD") to promote broadband access and the Digital Equity Act to promote broadband adoption and digital equity. Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (2021), §§ 60102, 60301–60306. Congress was clear they are

---

[7] https://edworkingpapers.com/sites/default/files/ai24-1020.pdf.
[8] https://nationalskillscoalition.org/wp-content/uploads/2020/12/05-20-2020-NSC-New-Landscape-of-Digital-Literacy.pdf.

complements. As DEA cosponsor Senator Patty Murray noted, investment in broadband infrastructure "isn't much help if [people] don't have the tools and skills to actually use their broadband connection." Press Release, Off. of Sen. Patty Murray, *Senators Murray, Portman, and King Introduce Major Bipartisan Legislation to Close Digital Divide, Promote Digital Equity* (June 10, 2021).[9] NTIA also recognized that the Act's grant programs are "designed to work in tandem with other high-speed internet programs, including the Affordable Connectivity Program." *Digital Equity Act of 2021, Request for Comment*, 88 Fed. Reg. 13,101 (Nat'l Telecomm. & Info. Admin. Mar. 2, 2023).

The Act's key definitions also reflect a focus on effective use of broadband rather than access alone. "Adoption of broadband" is not acquisition of a broadband subscription, but rather a process by which one obtains daily access to the internet "with the digital skills that are necessary for the individual to participate online." 47 U.S.C. § 1721(1). "Digital equity" concerns the effective use of those skills to participate in social and economic activity. 47 U.S.C. § 1721(10). And "digital inclusion" encompasses the activities necessary to ensure that "all individuals in the United States have access to, and the use of, affordable information and communication technologies[.]" 47 U.S.C. § 1721(11)(A). Those activities include digital literacy training, the provision of quality technical support, and "obtaining basic awareness of measures to ensure online privacy and cybersecurity." 47 U.S.C. § 1721(11)(B). These terms or concepts are about ensuring that *all* individuals in the U.S. can be effective and self-determined broadband users rather than passive broadband consumers without the skills or support to fully

---

[9] https://www.murray.senate.gov/senators-murray-portman-and-king-introduce-major-bipartisan-legislation-to-close-digital-divide-promote-digital-equity/.

benefit from connectivity. These definitions reflect policy development over time from access to affordability to adoption to full inclusion.

Just as BEAD and the DEA are complements to promote deployment and adoption together, the grant programs within the Act are complements to achieve digital equity at a national level. The Act's Digital Equity Capacity Grant Program makes funds available to "build capacity for efforts by States relating to the adoption of broadband by residents of those States." 47 U.S.C. § 1723(a)(1)(A). The program funds the creation and implementation of State Digital Equity Plans ("DEPs"), which identify barriers to digital equity and measures to promote affordable access to broadband, online public resources and services, digital literacy, privacy and cybersecurity awareness, affordable consumer devices, and technical support. 47 U.S.C. § 1723(c)(1)(B). While the plans are developed and implemented at the state level, the Act requires states to explain how they will collaborate with key stakeholders including county and municipal governments, community anchor institutions, and nonprofit organizations in implementing those plans. *See* 47 U.S.C. § 1723(c)(1)(D). The DEA's directive to reach out to local communities, community anchors, and specialized nonprofits aligns with the FCC's 2009 recommendations to increase the capacity of community anchors and nonprofit organizations to ensure effective and sustainable broadband adoption.

Those organizations, in turn, are eligible for grant awards under the Competitive Grant Program ("CGP"), "the final component of the Digital Equity Act's framework for addressing digital equity and inclusion." Nat'l Telecomm. & Info. Admin., *Notice of Funding Opportunity: Digital Equity Competitive Grant Program* 14 Docket No. NTIA-DECGP-2024 (July 24, 2024) [hereinafter "DEA NOFO"].[10] One purpose of the CGP is to fund projects that supplement state

---

[10] https://www.ntia.gov/sites/default/files/2024-07/de-competitive-nofo-fy24.pdf.

DEPs or overcome adoption barriers that those plans failed to address. *Id.* State digital equity plans often envision potential competitive grant projects as elements of the state's overall approach to overcoming adoption barriers and achieving digital equity. For example, Oregon's DEP proposes collaborating with localities, nonprofits, and community anchor organizations seeking competitive grants to ensure the sustainability of the DEP. Or. Broadband Off., *The State of Oregon Digital Equity Plan* 1, 192, (April 2024).[11]

In combining BEAD, the ACP, and the DEA, Congress mandated a comprehensive framework of broadband deployment, affordability, and adoption initiatives. Further, the DEA codifies a nuanced understanding of broadband adoption as access to both the resources and the skills necessary to achieve digital equity. The DEA also made clear that achieving digital equity requires collaboration between federal, state, and local governments, and community groups. By terminating the DEA's grant programs, Defendants sever the connection between access, affordability, and adoption, and the collaboration prioritized by Congress, undermining a national broadband policy years in the making and of great need in the modern day.

## II.    The Competitive Grant Program Supports a Range of Interventions to Overcome Barriers Faced by Different Regions and Communities

As shown by the projects that NTIA recommended for grant awards, the CGP is not a preference program for specific communities.[12] Rather, it furthers the DEA's goal of universal adoption and digital equity by reaching as many households facing adoption barriers as possible. The Act requires the consideration of "comparative geographic diversity in relation to other eligible applicants" in part to ensure the broad reach of the CGP. 47 U.S.C. § 1724(d)(1)(B).

---

[11] https://www.oregon.gov/biz/Publications/Broadband/ORDigitalEquityPlan.pdf.

[12] As explained in NTIA's Notice of Funding Opportunity, NTIA was charged with reviewing the merits of project applications and making recommendations to the National Institute of Standards & Technology, which would perform risk assessments before making awards. DEA NOFO at 43.

11

The vast majority of CGP applications recommended for an award target multiple and overlapping covered populations—as well as individuals who did not fall in any covered populations—who live in a specific geographic region or within the service area of an anchor institution. *See* Press Release, Nat'l Telecomm. & Info. Admin., Biden-Harris Administration Recommends for Award More Than $250 Million to Expand Digital Skills (Jan. 6, 2025);[13] Press Release, Nat'l Telecomm. & Info. Admin., Biden-Harris Administration Recommends for Award More Than $369 Million to Invest in Digital Skills (Jan. 17, 2025).[14] At the same time, many of those projects include partnerships with community-based organizations. Those partnerships offer peer support and trusted social networks, which lead to greater success with digital literacy and digital skills training programs. *See* Soyoung Lee, et al., *Sociocultural Factors in Digital Skills Learning: A Community-Based Intervention Among U.S. Public Housing Adults*, 9 Proc. ACM Hum.-Comput. Interaction 172:3, 172:20 (2025) (finding that "nurturing a community for learning digital skills as part of community life can enhance digital capacity of the entire community). Whether regional or community-based, all projects included interventions tailored to specific barriers to broadband adoption and digital equity.

### A.    Municipal and Regional Projects

Many local government-led CGP projects build on state or municipal digital equity plans in partnership with other organizations. The Bloomington, Indiana Digital Equity Project ("BDEP") is instructive. The BDEP implements the city's 2020 Digital Equity Strategic Plan, a set of recommendations based on stakeholder input, residential survey findings, and initiatives in

---

[13] https://web.archive.org/web/20250131083303/https://broadbandusa.ntia.gov/news/latest-news/biden-harris-administration-recommends-award-more-250-million-expand-digital.
[14] https://web.archive.org/web/20250131082448/https://broadbandusa.ntia.gov/news/latest-news/biden-harris-administration-recommends-award-more-369-million-invest-digital.

other cities. *See* City of Bloomington, Ind., *Digital Equity Strategic Plan* (2020).[15] The city has partially deployed a city-wide fiber-to-the-premises network, planned for completion in 2027, even in the poorest areas of Bloomington. Despite this infrastructure, the city found that some covered communities were not adopting broadband or making full use of broadband subscriptions due to three mutually reinforcing barriers: lack of digital literacy, lack of awareness and use of measures to secure online privacy and cybersecurity, and lack of affordable consumer devices along with technical support. City of Bloomington, *Project Plan* 3 (2024), https://n2t.net/ark:/85779/j4cw87.[16]

In line with the DEA's collaborative format, the city worked with Indiana University's Ostrom Workshop and Ivy Tech for digital skills training and workforce development opportunities. The city also worked with community partners and anchor institutions to address identified barriers. Because many who need affordable devices and digital skills training live in low-income households and experience housing instability, the city planned to work with the Bloomington Housing Authority and nonprofit organizations like the South Central Community Action Program. The city chose these partners because they are trusted entities among low-income individuals. *Id.* at 8. The city also identified a partner that can provide childcare for those attending digital skills training and workforce development courses because low-income residents might otherwise fail to complete the courses due to childcare needs. *Id.* at 3. The project includes a partnership with Beacon, a nonprofit organization specializing in working with those experiencing housing instability, to train technical support specialists from that

---

[15] https://bloomington.in.gov/sites/default/files/2020-12/City%20of%20Bloomington%20Digital%20Equity%20Strategic%20Plan%2020201220.pdf.

[16] The CGP project plans discussed in this brief were submitted to NTIA separate from the formal grant application form. The links provided for these project plans point to digital copies housed in a repository hosted at the University of California, Berkeley.

community. Beacon could publicize the project, assist with trainee enrollment, assist with training for technical support specialists, and offer trainees "the opportunity to provide feedback to a trusted entity." *Id.* at 8. For device access, the city planned to work through the Monroe County Public Library, which has specialized programs for providing devices to aging individuals and persons with disabilities. *Id.*

The City of Philadelphia's "Philly Digital Empowerment Network" has similar features. City of Phila., *Philly Digital Empowerment Network Project Plan* 2–3 (2024), https://n2t.net/ark:/85779/j4836m. Broadly, the project seeks to "ensure[] that members of the highest-need covered population groups will be reached with tailored supports that are the most effective at addressing their particular barriers to achieving digital equity and economic stability." *Id.* at 1. To this end, the city sought experienced partner organizations such as the United Way of Philadelphia and the Technology Learning Collaborative, a community-based digital equity coalition that grew out of Philadelphia's BTOP projects. *Id.* at 5–6. The project would include grants from partners to match 30 percent of the federal contribution. *Id*. at 11.

For service delivery, Philadelphia would work with groups "selected for their deep expertise in providing digital inclusion support to the covered populations, their geographic focus in many of Philadelphia's highest-need neighborhoods, and their trusted relationships with community members." *Id.* at 7. The project includes partnerships with Philadelphia's public library system and five organizations that specialize in working with seniors and people with disabilities. Among them is Generations on Line, which offers in-person and online digital skills training at senior centers, libraries, and assisted living centers. *Id*. Their curriculum uses familiar language and instruction materials in large fonts, and accommodates those with compromised short-term memory. *Id.*

The city also connected with local community-based organizations that focus on working with individuals and communities facing language barriers, because those individuals and communities "require additional assistance to overcome barriers to digital equity." *Id.* at 8. Partners include Philadelphia's leading literacy agency, Beyond Literacy, which operates three mobile tech labs and three centers throughout the city that provide adult language learners with "an open and low-stakes" learning environment." *Id*. Adults who enroll in a basic education program would receive a no-cost device and assistance signing up for affordable broadband. *Id*. The city would also partner with SEAMAAC, an organization that operates a Digital Navigator program using "a multilingual outreach team consisting of trusted community advocates who link immigrants to resources." *Id*. Digital navigators are highly effective at overcoming barriers that individuals and communities face in signing up for broadband benefit programs, learning to use digital technologies competently and safely, and using those technologies for "targeted purposes, such as finding employment in certain fields, advancing education, or delivering health care services." Matt Kalmus, et al., *A Human Approach to Closing the Digital Divide*, Bos. Consulting Grp. 12 (June 13, 2022).[17]

CGP projects proposed by regional governmental bodies and regional nonprofit organizations similarly involve interconnected partnerships to address specific barriers. Land of Sky Regional Council is a multi-county, local government, planning, and development organization operating in Western North Carolina that provides technical assistance to local governments and administers programs to benefit the region's citizens. NTIA recommended for a grant award a project to provide device access and digital skills training across communities in

---

[17] https://web-assets.bcg.com/pdf-src/prod-live/how-to-close-digital-divide-with-human-approach.pdf.

18 counties. The specific interventions grew out of recommendations from the North Carolina Digital Equity Plan as well as digital equity plans completed for Western North Carolina's 24-county territory. Land of Sky Reg'l Council, *WNC Connecting All Communities Project Plan* 1 (2024), https://n2t.net/ark:/85779/j44d4q.

The plan adopts a "hub and spoke model," leveraging local organizations and trusted community partners to overcome barriers to digital equity. *Id*. Because many people in the region live in unserved areas, a key feature of the project involves equipping partners with a "Digi-Bus," a van outfitted with a mobile computer lab that can travel to any space for training and digital navigation services. *Id.* at 5. Working with local libraries and food banks, the computer labs "will be coupled with digital literacy training for skills such as basics of computers, telehealth, education access, cybersecurity, and access to social/government services." *Id.* at 4. The project also involves partnering with a veterans' service organization to provide veterans with tablets, mobile broadband service, and "digital literacy training to engage with health portals and basic computer skills." *Id.* at 6. While these projects employ the unique capabilities of community-specific partners, the goal is to reach everyone in need of support in the region.

**B.    Trusted Community Partners Working with Specific Covered Populations**

Other CGP projects backed by nonprofit and community-based organizations center on specific covered populations facing barriers to broadband adoption and digital equity, complementing geographically targeted efforts. The individuals to be served by these projects generally belong to multiple covered populations facing broadband adoption barriers. In many cases, lead organizations would partner with organizations with expertise in specific skill training or in working with local communities.

16

NTIA recommended grants for organizations working with individuals with disabilities, such as the Center for Independent Living and Communication Service for the Deaf ("CSD"). Press Release, Nat'l Telecomm. & Info. Admin., Biden-Harris Administration Recommends for Award More than $369 Million to Invest in Digital Skills (Jan. 17, 2025). CSD's Digital Synergy Project could provide device access, digital literacy training, and remote interpretation services to 20,000 Deaf, Hard of Hearing, and DeafBlind individuals across the U.S. Commc'n Serv. for the Deaf, *The Digital Synergy Project* 2 (2024), https://n2t.net/ark:/85779/j40m2s. These individuals face unique barriers to broadband adoption due to limited availability of accessible technology and the lack of digital literacy training in American Sign Language. *Id.* at 1. The program builds on the earlier success of CSD's BTOP-funded Project Endeavor, exemplifying the continuous work of broadband adoption policy.

Similarly, the NTIA-recommended project proposed by the nonprofit corporation Ameelio would focus on the unique broadband adoption barriers faced by incarcerated individuals. Those barriers include "a shortage and/or complete lack of hardware devices . . . and insufficient network infrastructure." Ameelio, *Bridging the Digital Divide for the Incarcerated: Digital Tools and Workforce Skills for Re-Entry Success: Executive Summary* 2 (Sept. 21, 2024), https://n2t.net/ark:/85779/j4vw8k. The project, a partnership with the Idaho and Utah Departments of Corrections and others, would include network improvements, device access, digital skills training, and assistance with workforce development training and job placement programs. In addition to the state departments of corrections, Ameelio would partner with an organization that provides tutoring for incarcerated people and a workforce development platform that offers job postings, a learning management system, and a career exploration tool.

17

*Id.* at 2–3. These efforts would serve both national broadband adoption policy and important efforts to reduce recidivism.

These CGP projects show the Act's intention and framework. Following on from the state digital equity plans, municipal and regional CGP projects would address adoption barriers faced by multiple covered populations and communities in specific geographic areas while community-specific plans focus on the barriers faced by a specific covered population, often scattered over a larger geographic area. Both the regional and community-specific partnerships involve working with local organizations and anchor institutions that enjoy the trust of the communities they serve. Covered populations face specific barriers to broadband adoption that require these specific interventions to overcome. The DEA appropriately requires ongoing evaluation and reporting to assess the efficacy of these measures. 47 U.S.C. § 1724(d)(2)(B), 1725(a)(1)(B). We cannot achieve digital equity at the national level without effective local and targeted interventions.

### III.  Termination of the Competitive Grant Programs Would Inflict Unnecessary Harm on Broadband Policy and Broadband Users

Termination of the CGP undermines national broadband policy, damages the governmental and nongovernmental organizations who seek to implement that policy, and deprives broadband users facing adoption barriers of the full benefit of the infrastructure deployed in their communities. Termination squanders the work that went into developing and implementing digital equity plans, and thwarts partnerships and financial commitments that the DEA encouraged. Finally, terminating the DEA deprives those most in need of assistance in overcoming barriers to broadband adoption of the full benefits of broadband access. When fewer people are connected, it harms whole communities and whole economies.

18

###### A.    Terminating the CGP Undermines Congressional Intent and the Considerable Efforts Behind Implementation of the Program

When Congress authorized and appropriated funds for BEAD and the DEA, it intended these programs to function as a unit and to complement other broadband programs. 47 U.S.C. § 1724(a)(2)(B)(ii) (stating that the CGP should "complement[] and enhance[] other broadband programs"). Terminating the DEA's grant programs leaves only bare deployment efforts, returning us to the broadband policy of the late 1990s. However, deployment alone will fail to fully achieve the network effects that make investment in broadband infrastructure worthwhile.

Moreover, terminating the DEA's grant programs unjustifiably wastes the time and effort that went into implementation: seeking and providing stakeholder and community input, designing projects, forming partnerships, and securing matching funds. Stakeholders attended one or more of NTIA's four listening sessions and submitted 250 comments in NTIA's proceeding on DEA implementation. *See* Press Release, Nat'l Telecomm. & Info. Admin., NTIA Receives More Than 250 Comments to Inform Digital Equity Act Programs (June 12, 2023).[18] Once NTIA settled on the contours of the CGP, stakeholders put tremendous effort into designing and implementing qualifying projects and forming partnerships to carry them out.

Similar efforts went into the state, county, and municipal digital equity plans intended to complement the CGP. For example, California's Digital Equity Plan grew out of four statewide planning meetings, 24 outcome area working groups, 20 in-person planning meetings, and input from more than 50,000 residents. California Dep't. of Tech., *California Digital Equity Plan* 2 (2024).[19] From those meetings, the state identified specific adoption barriers and strategies to overcome them. *Id.* at 84–109. As part of that effort, the state created a *Broadband for All* portal

---

[18] https://web.archive.org/web/20250319043356/https://broadbandusa.ntia.doc.gov/news/latest-news/ntia-receives-more-250-comments-inform-digital-equity-act-programs.

[19] https://broadbandforall.cdt.ca.gov/california-digital-equity-plan-04-2024/.

to provide resources and tools to support other "digital equity efforts, including those funded by capacity and competitive grants." *Id.* at 131.

Applying for CGP grants required swift action from thinly resourced local governments, nonprofits, and community-based organizations. NTIA's Notice of Funding Opportunity gave entities only two months to develop and submit applications. DEA NOFO at 1. In addition to developing the project proposals, applicants had to identify additional funding either from their own resources or partnerships. 47 U.S.C. § 1724(e) (setting the limit for the Federal share of a project at 90 percent). NTIA expressly "encourage[d] the development of partnerships, as authorized by statute," in part by taking matching grants into account when scoring applications. DEA NOFO at 15. Applicants accordingly sought out partners who could extend the reach of their efforts, provide additional funding, or both. Thus, Joint Venture Silicon Valley assembled the Silicon Valley Digital Equity Partnership, including three public library systems and 11 nonprofit and community-based organizations. Press Release, Joint Venture Silicon Valley Selected for $11.6 Million NTIA Grant (Feb. 18, 2025).[20] For example, the City of Philadelphia secured 30 percent matching funds from partners to support their efforts. City of Phila., *Philly Digital Empowerment Network Project Plan* at 11. With the termination of the DEA, this partnership either must proceed without federal support or not proceed at all.

Local governments and other entities undertook these efforts in reliance on the fact that the CGP is a congressionally mandated federal program with appropriated funds and that NTIA would issue grant awards on a rolling basis. *See* DEA NOFO at 1. Further, the DEA provided a specific mechanism for terminating grants. The Act's explicit provision of notice and

---

[20] https://jointventure.org/news-and-media/news-releases/2704-joint-venture-silicon-valley-selected-for-11-6-million-ntia-grant.

opportunity for a hearing prior to deobligation or termination of a grant gave assurance that grant awards would stay in place, justifying the efforts of seeking them. *See* 47 U.S.C. § 1724(g) (setting forth the procedures and criteria for termination or deobligation of grants). Effectively terminating an entire statutory provision without due process leaves applicants with a significant expenditure of scarce resources, strained partnerships, and nothing to show for the effort.

### B.    Terminating the CGP Denies Communities of the Benefits That Broadband Access and Adoption Are Intended to Confer

More so than the organizations providing digital literacy programs, digital skills training, and technical support pursuant to the DEA's grant programs, the communities served will bear the cost of termination. Overcoming barriers to broadband adoption is vital in part because broadband adoption leads to greater access to education, employment, and health care services. The COVID-19 pandemic underscored the link between access to the internet and health outcomes, with higher mortality rates in communities that lacked broadband access. Qinyun Lin, et al., *Assessment of Structural Barriers and Racial Group Disparities of COVID-19 Mortality with Spatial Analysis*, 5 JAMA Network Open 1 (2022).[21] And research has established a link between affordable broadband and better outcomes in the labor market. George W. Zuo, *Wired & Hired: Employment Effects of Subsidized Internet for Low-Income Americans* 13 Am. Econ. J.: Econ. Pol'y 447, 447–482 (2021).

Some CGP projects included direct efforts to confer these benefits. For example, Land of Sky Regional Council's project could provide digital literacy training to veterans specifically geared toward helping them engage with telehealth portals designed for veterans. Land of Sky Reg'l Council, *WNC Connecting All Communities Project Plan* at 6–7. Ameelio's project would

---

[21] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789619.

provide remote job training to incarcerated people with the specific goal of reducing recidivism. Those benefits are now lost.

Without support for device access, digital and skills training, the assistance of digital navigators, and other interventions the DEA would support, we will not achieve "the condition in which individuals have the information technology capacity that is needed for full participation in the society and the economy of the United States." 47 U.S.C. § 1721(10). Terminating the Digital Equity Act grant programs violates the plain text of the statute and congressional intent. It also damages the delicate web of local governments, nonprofits, and communities working together to guarantee all communities' ability to use broadband to participate fully in the society and economy of the United States.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that the Court deny Defendants' motion to dismiss.

Respectfully submitted,

Dated: May 12, 2026

 /s/ Phillip R. Malone
Phillip R. Malone, Bar No. CA00004
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 725-6369
Fax: (650) 723-4426
pmalone@law.stanford.edu

Erik Stallman
Samuelson Law, Technology
 & Public Policy Clinic
353 Law Building
Berkeley, CA 94720
Telephone: (510) 642-2485
Fax: (510) 643-4625

*Attorney for Amici Curiae*

22

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4), and does not exceed 25 pages in length.


Dated: May 12, 2026                                         /s/ Phillip R. Malone
                                                          Phillip R. Malone

23

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2026, I electronically filed the original of this Motion, its accompanying appendix, and its attached proposed brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Respectfully submitted,

Dated: May 12, 2026

 /s/ Phillip R. Malone

Phillip R. Malone, Bar No. CA00004
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 725-6369
Fax: (650) 723-4426

24

## APPENDIX A

## LIST OF COMPETITIVE GRANT PROGRAM APPLICANTS AND SUPPORTERS

American Library Association

City of Bloomington, Indiana

City of Portland, Oregon

Civic Technologies Initiative, Joint Venture Silicon Valley

Common Sense

Communication Service for the Deaf

Communications Workers of America

County of Santa Clara, California

Everyone On

Hack the Hood

Hispanic Federation, Inc.

Japanese American Citizens League

Land of Sky Regional Council

Media Alliance

Multicultural Media, Telecom and Internet Council

National Association of Telecommunications Officers and Advisors

NTEN

Technology Learning Collaborative

Through the Trees

Oakland Tech Exchange

UnidosUS

United Church of Christ Media Justice Ministry, Inc.

25