# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL DIGITAL INCLUSION ALLIANCE,

      Plaintiff,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Defendants.

No. 1:25-cv-3606-JDB

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I.    The Digital Equity Act's Racial Classifications Are Unconstitutional ..........................2

      A.    Strict Scrutiny Applies to the DEA's Express Racial Classification ...............................2

            1.    Plaintiff May Not Contort the DEA's Text to Evade Strict Scrutiny ...............2

            2.    Plaintiff Cannot Delay Strict Scrutiny Review ......................................................7

                  i.    The Court May Address Equal Protection on a Motion to Dismiss..................................................................................................................7

                  ii.    Plaintiff's Pretext Allegation Is Unsupported and Irrelevant...............9

      B.    Plaintiff Has Identified No Compelling Government Interest, And Certainly Not One Congress Itself Made..........................................................................................10

            1.    Congress Recited Allegations of Disparate Impacts, But Did Not Find Intentional Discrimination ......................................................................................11

            2.    Prophylactic Anti-Discrimination Conditions on Future Actions Are Not Findings of Intentional Discrimination ....................................................14

            3.    There Is No COVID-19 Exception to Strict Scrutiny ....................................15

      C.    Plaintiff Makes No Real Argument on Narrow Tailoring.............................................16

      D.    Regardless of Severability, It Is Proper for the Court to Address the Equal Protection Question at This Time ...................................................................................17

II.    By Disclaiming the Grant, Plaintiff Disclaimed Its Challenges to the Grant Termination and the Grant Conditions ..........................................................................18

      A.    Plaintiff Misconstrues *NIH*'s Two-Track Process............................................................18

      B.    The CFC Can Properly Address Plaintiff's Individual Grant Termination.................21

      C.    DOC Appropriately Terminated Plaintiff's Grant ..........................................................22

      D.    Without Its Grant, Plaintiff May Not Challenge the April 9, 2025 Email...................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)................................................................................................................2

*Aiken v. City of Memphis,*
37 F.3d 1155 (6th Cir. 1994).................................................................................................8

*Alaska Dep't of Envtl. Conservation v. EPA,*
540 U.S. 461 (2004)..............................................................................................................10

*American Petroleum Inst. v. SEC,*
953 F. Supp. 2d 5 (D.D.C 2013).........................................................................................8

*Bain v. Office of Attorney Gen.,*
648 F. Supp. 3d 19 (D.D.C. 2020)....................................................................................11

*Brokamp v. District of Columbia,*
2022 WL 681205 (D.D.C. Mar. 7, 2022).........................................................................9

*Brown v. Government of D.C.,*
390 F. Supp. 3d 114 (D.D.C. 2019)....................................................................................9

*Brusewitz v. Wyeth LLC,*
562 U.S. 223 (2011)................................................................................................................8

*Burwell v. Portland Sch. Dist. No. 1J,*
2019 WL 9441663 (D. Or. Mar. 23, 2019) .....................................................................9

*Carlson v. Postal Regul. Comm'n,*
938 F.3d 337 (D.C. Cir. 2019) ............................................................................................4

*Caulfield v. Board of Educ.,*
583 F.2d 605 (2d Cir. 1978).................................................................................................7

*Central Vt. Ry., Inc. v. ICC,*
711 F.2d 331 (D.C. Cir. 1983) ............................................................................................4

*CIR v. Lundy,*
516 U.S. 235 (1996)................................................................................................................5

*City of Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989)........................................................................................................*passim*

ii

*Clinton v. Jones,*
  520 U.S. 681 (1997)......................................................................................................9

*Consolidated Edison Co. of N.Y. v. U.S. Dep't of Energy,*
  247 F.3d 1378 (Fed. Cir. 2001)................................................................................22

*Davis v. FEC,*
  554 U.S. 724 (2008)..................................................................................................24

*Department of Agric. Rural Dev. Hous. Serv. v. Kirtz,*
  601 U.S. 42 (2024)......................................................................................................5

*Department of Commerce v. New York,*
  588 U.S. 752 (2019)..................................................................................................10

*Department of Educ. v. California,*
  604 U.S. 650 (2025)..................................................................................................20

*Doe #1 v. AFGE,*
  554 F. Supp. 3d 75 (D.D.C. 2021)...........................................................................21

*Eco Tour Adventures, Inc. v. Jewell,*
  174 F. Supp. 3d 319 (D.D.C. 2016).........................................................................18

*Feliciano v. Department of Transp.,*
  605 U.S. 38 (2025)......................................................................................................3

*Fisher v. Univ. of Texas at Austin,*
  570 U.S. 297 (2013)..................................................................................................16

*Free Air Corp. v. FCC,*
  130 F.3d 447 (D.C. Cir. 1997) .................................................................................18

*George Moore Ice Cream Co. v. Rose,*
  289 U.S. 373 (1933)....................................................................................................3

*Gomez-Perez v. Potter,*
  553 U.S. 474 (2008)..................................................................................................24

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
  527 U.S. 173 (1999)....................................................................................................9

*Grutter v. Bollinger,*
  539 U.S. 306 (2003)............................................................................................. 1, 16

*Hassan v. City of New York,*
  804 F.3d 277 (3d Cir. 2015).......................................................................................8

*Husain v. Smith,*
   2016 WL 4435177 (D.D.C. Aug. 19, 2016) ...................................................................................11

*In re Aiken County,*
   725 F.3d 255 (D.C. Cir. 2013) ...........................................................................................................9

*Jeffery v. City of New York,*
   113 F.4th 176 (2d Cir. 2024)...........................................................................................................8

*Johnson v. Dade County Pub. Schs.,*
   1992 WL 466902 (S.D. Fla. Nov. 25, 1992).................................................................................9

*Jones v. Air Line Pilots Ass'n,*
   713 F. Supp. 2d 29 (D.D.C. 2010)................................................................................................21

*Jones v. Hendrix,*
   599 U.S. 465 (2023)............................................................................................................................5

*Judicial Watch, Inc. v. National Energy Policy Dev. Grp.,*
   219 F. Supp. 2d 20 (D.D.C. 2002)..................................................................................................9

*Louisiana v. Callais,*
   146 S. Ct. 1131 (2026).......................................................................................................................8

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)..........................................................................................................................18

*Mellouli v. Lynch,*
   575 U.S. 798 (2015)............................................................................................................................5

*Methodist Hosp. of Sacramento v. Shalala,*
   38 F.3d 1225 (D.C. Cir. 1994) .......................................................................................................10

*Morgan Stanley Cap. Group v. Public Util. Dist. No. 1,*
   554 U.S. 527 (2008).........................................................................................................................10

*Minnesota Telecom All. v. FCC,*
   __ F.4th __, 2026 WL 1239430 (8th Cir. May 6, 2026)................................................. 14, 15

*National Elec. Mfrs. Ass'n v. Dep't of Energy,*
   654 F.3d 496 (4th Cir. 2011)..........................................................................................................10

*National Institutes of Health v. American Public Health Association,*
   145 S. Ct. 2658 (2025).................................................................................................... 18, 20

*NLRB v. Wyman-Gordon Co.,*
   394 U.S. 759 (1969)..........................................................................................................................10

*Nuziard v. Minority Bus. Dev. Agency*,
    721 F. Supp. 3d 431 (N.D. Tex. 2024)............................................................................ 5, 6

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).............................................................................................................24

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)......................................................................................................... 6, 13

*Personnel Admin. of Mass. v. Feeney*,
    442 U.S. 256 (1979)...............................................................................................................7

*Porwancher v. National Endowment for the Humanities*,
    792 F. Supp. 3d 107 (D.D.C. 2025).....................................................................................24

*Pulsifer v. United States*,
    601 U.S. 124 (2024)............................................................................................................ 3, 5

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)...............................................................................................................9

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020).................................................................................................................15

*Rothe Development, Inc. v. United States Dep't of Defense*,
    836 F.3d 57 (D.C. Cir. 2016)...............................................................................................5

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)................................................................................................................10

*Shaw v. Hunt*,
    517 U.S. 899 (1996)...............................................................................................................8

*Shaw v. Reno*,
    509 U.S. 630 (1993)...............................................................................................................7

*Smith v. District of Columbia*,
    387 F. Supp. 3d 8 (D.D.C. 2019).........................................................................................7

*Strickland v. USDA*,
    736 F. Supp. 3d 469 (N.D. Tex. 2024).................................................................................6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023)........................................................................................................*passim*

*Sussman v. Tanoue*,
    39 F. Supp. 2d 13 (D.D.C. 1999).........................................................................................6

v

*Texas v. EPA,*
   726 F.3d 180 (D.C. Cir. 2013) ...............................................................................23

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1988) ...................................................................................................4

*United States ex rel. El-Amin v. George Wash. Univ.,*
   533 F. Supp. 2d 12 (D.D.C. 2008) ........................................................................11

*United States v. Johnson,*
   529 U.S. 53 (2000) ...................................................................................................24

*United States v. New Hampshire,*
   539 F.2d 277 (1st Cir. 1976) ....................................................................................6

*United States v. Paradise,*
   480 U.S. 149 (1987) ................................................................................................16

*United States v. Stevens,*
   559 U.S. 460 (2010) ...................................................................................................3

*Vitolo v. Guzman,*
   999 F.3d 353 (6th Cir. 2021) .................................................................................15

*Washington v. Davis,*
   426 U.S. 229 (1976) ................................................................................................11

*Weyerhaeuser Co. v. Costle,*
   590 F.2d 1011 (D.C. Cir. 1978) ...............................................................................4

**Statutes**

15 U.S.C. § 644 .............................................................................................................5

15 U.S.C. § 775 ...........................................................................................................14

15 U.S.C. § 9501 ...........................................................................................................5

23 U.S.C. § 324 ...........................................................................................................14

29 U.S.C. § 3248 .........................................................................................................14

34 U.S.C. § 50104 .......................................................................................................14

40 U.S.C. § 14702 .......................................................................................................14

42 U.S.C. § 3123 .........................................................................................................14

42 U.S.C. § 6102...............................................................................................................14

42 U.S.C. § 9849...............................................................................................................14

42 U.S.C. § 18116 ............................................................................................................14

47 U.S.C. § 1721.........................................................................................................2, 3, 16, 25

47 U.S.C. § 1723.................................................................................................................4

47 U.S.C. § 1724..........................................................................................................*passim*

47 U.S.C. § 1726............................................................................................................ 3, 4

47 U.S.C. § 1754...............................................................................................................14

49 U.S.C. § 40127 ............................................................................................................14

Pub. L. No. 116-260, 134 Stat. 1182 (2021) ................................................................13

Pub. L. No. 117-58, 135 Stat. 429 (2021)...................................................................14

**Regulations**

2 C.F.R. § 200.340 .................................................................................................21, 22, 23

**Other Authorities**

*An Economy That Works For Everyone: Investing In Rural Communities:*
    *Hearing before S. Comm. on Banking,* S. Hrg. 117-289 (Apr. 20, 2021).......................................13

*Broadband Equity: Addressing Disparities in Access and Affordability:*
    *Hearing before H. Comm. on Energy & Com.,* H. Hrg. 117-29 (May 6, 2021) .............................12, 13, 16

"Digital Denied: The Impact of Systemic Racial Discrimination on Home-Internet Adoption,"
    BENTON INSTITUTE, (Dec. 16, 2016),
    benton.org/blog/digital-denied-systemic-discrimination-keeps-communities-offline.....................11

*National Digital Inclusion Alliance, Livestream at Net Inclusion 2019,* (YouTube, Apr. 3, 2019),
    https://www.youtube.com/watch?v=P5tD3UfE_uw&t=18090s.....................................................8

*Oversight of the Federal Communications Commission:*
    *Hearing before the H. Comm. on Energy & Com., S. Hrg. 116-589 (June 24, 2020)*.................................12

*Recent Federal Actions to Expand Broadband: Are We Making Progress?:*
    *Hearing before the S. Comm. on Com., Sci. and Transp.,* S. Hrg. 117-705 (Mar. 17, 2021) ................. 12, 16

*State of Telehealth: Removing Barriers to Access and Improving Patient Outcomes:*
  *Hearing before the S. Comm. on Com., Sci. and Transp.,*
    S. Hrg. 117-792 (Oct. 7, 2021) ...............................................................................................................12

## INTRODUCTION

This case is not just another challenge to the termination of a federal grant. The central issue in this case is whether the Digital Equity Act's (DEA) racial classifications violate the Constitution's guarantee of equal protection under the law. The case divides into two parts: the Department of Commerce's (DOC) termination of Plaintiff's grant under the DEA's Competitive Grant Program, and DOC's termination of the Program itself. Plaintiff, however, no longer seeks restoration of its terminated grant. Rather, it seeks restoration of the Program as a whole. To even consider such relief, the Court first must address whether the Constitution authorizes the DEA's racial classifications, which are explicit and unavoidable—and wrong.

DOC rightly rejected the DEA's invitation to racially discriminate in federal grantmaking. Even Plaintiff struggles to defend the DEA on the merits, relying on the effectively-overruled *Grutter v. Bollinger*, 539 U.S. 306 (2003), to rebut the inevitable application of strict scrutiny. Clinging to the past, Plaintiff says racial balancing can be narrowly tailored as long as Congress cites a bare statistical disparity and packages the balancing as a fixed-term grant program. Plaintiff cannot glide over *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*) so easily. Perhaps recognizing this reality, Plaintiff argues that strict scrutiny does not apply primarily because the Court (and DOC) has discretion to ignore the DEA's textual mandate to consider race when allocating broadband benefits. But the mandate is not discretionary. Even if it were, discretion is no cure to discrimination. Only a court order invalidating the racial preference will put this issue to rest.

Nor does Plaintiff identify a compelling interest for a racial preference. Congress did not provide a justification for its mandate that DOC consider race. Instead, it fast-tracked the DEA through a 1,039-page appropriations bill with little substantive discussion or debate. Of course the record is thin. When Congress fast-tracks a bill, the record is usually thin by design. But strict scrutiny asks for more by design. When equal protection is on the line, the basis for a racial classification must "be clearly identified and unquestionably legitimate." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504-05 (1989) (majority) (citation omitted). The DEA's use of race is nothing of the sort. Worse yet, Congress contemporaneously tried to support *other* race-conscious legislation by holding hearings and

making factual findings. It knew what the standards were, and Plaintiff should have, too—as one Senate staffer put it, Capitol Hill called the DEA "the NDIA bill." What Congress (and Plaintiff) failed to do at the time, Plaintiff cannot make up for today.

## ARGUMENT

### I.      The Digital Equity Act's Racial Classifications Are Unconstitutional

Plaintiff's defenses of the DEA's racial classifications fail as a matter of law. Rather than tackle strict scrutiny's presumption of unconstitutionality head-on, Plaintiff leads with collateral defenses. It argues that that a court should not address a constitutional claim on a motion to dismiss, Plaintiff's Memo. of Points & Authorities In Opposition to Defs.' Mot. to Dismiss (Opp.) at 29-31, 32-33, ECF 32-1; that DOC's equal protection rationale for the Grant and Program Terminations was pretextual, *id.* at 31-32; and that DOC can read the racial classifications out of the statute, *id.* at 33-34. Each of these arguments is both meritless and peripheral to the core constitutional dispute. The DEA's racial classifications are explicit, and Plaintiff's contorted response violates a host of statutory construction principles. Also, racial classifications are presumed unconstitutional, so the Court may readily *reject* such classifications on a motion to dismiss. And Plaintiff's allegation of pretext is both baseless and irrelevant: the racial preference is unconstitutional, and DOC has said that since day one.

To survive strict scrutiny, Plaintiff offers well-worn theories of compelling interests based on claims of bare statistical disparities and disparate impacts. But that is precisely the sort of raw racial balancing that *SFFA* rejected. 600 U.S. at 223. And on narrow tailoring, Plaintiff summarily tries to resurrect arguments that *Croson* and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) laid to rest. It may "want [the] law to be different," but at the end of the day, "the entirety of [its] analysis of the Equal Protection Clause … has been considered and rejected before." *SFFA*, 600 U.S. at 227.

### A.      Strict Scrutiny Applies to the DEA's Express Racial Classification

#### 1.      Plaintiff May Not Contort the DEA's Text to Evade Strict Scrutiny

The DEA's statutory requirement to consider race in grantmaking triggers strict scrutiny. Plaintiff does not dispute that the DEA includes racial and ethnic minorities in the definition of its keystone phrase "covered populations." 47 U.S.C. § 1721(8)(G). It does not dispute that the DEA

2

directs applicants to target their offerings at covered populations. *Id.* § 1724(d)(2)(A)(ii). And it does not dispute that the DEA directs the National Telecommunications and Information Administration (NTIA) to prioritize grant applications that assist covered populations. *Id.* § 1724(d)(1)(A)(i). Instead, Plaintiff argues that the DEA is facially race-neutral because NTIA purportedly has discretion to weigh § 1721(8)'s eight, discrete covered populations unequally and as it sees fit, and can thereby pretend that § 1721(8)(G) does not exist. *See* Opp. at 29-31, 35-36. Plaintiff adds that the DEA's prophylactic anti-discrimination provision in 47 U.S.C. § 1726 enhances NTIA's discretion to administer § 1724 in a race-neutral manner. Opp. at 34.

This argument is wrong on its own terms. An agency's delegated discretion to weigh factors unequally is not *carte blanche* for NTIA to red-pen the statutory text. Indeed, under Plaintiff's erroneous, race-neutral reading, § 1724's constitutionality would turn on the whims of whoever was in charge of NTIA at any given time—a result that, for obvious reasons, courts strain to avoid. A court may "not uphold an unconstitutional statute merely because the Government promised to use it responsibly," as the Constitution "does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010) (noting that one President offered to enforce a law in a limited manner, but his successors disagreed). Nor may the Court invoke constitutional avoidance or § 1726's general anti-discrimination rule to achieve the same result. Section 1724's directives are clear. Because Plaintiff cannot rewrite the DEA in race-neutral terms, "the problem must be faced and answered." *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933). Plaintiff's sleight of hand ultimately violates at least three cardinal principles of statutory construction.

*First*, if NTIA could ignore the DEA's racial classifications, then the term "members of a racial or ethnic minority group" would be a nullity. "Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable." *Feliciano v. Department of Transp.*, 605 U.S. 38, 51-52 (2025) (citation omitted). And "a statutory construction [that would] render[] an entire subparagraph meaningless" is particularly improbable. *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (simplified). Plaintiff replies that agencies may weigh § 1721(8)'s factors unequally. That cannot justify the linguistic amputation on offer. In fact, Plaintiff's three cited cases

3

each confirms that "[e]ven when an agency 'has significant discretion in deciding how much weight to accord each statutory factor,' that does not mean it is 'free to ignore any individual factor entirely.'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (citation omitted).[1]

Plaintiff responds that the DEA's prophylactic anti-discrimination provision in § 1726 supports reading the DEA in a race-neutral manner. But that provision does not operate in tandem with § 1724, as it regulates grantees and how they use grants—not NTIA and how it allocates grants. *See* 47 U.S.C. § 1726(a)(1) (banning discrimination under activities "funded in whole or in part with [DEA grant] funds"). (Indeed, § 1726 directs NTIA to make and enforce rules to prevent such discrimination, so Plaintiff's position would require NTIA to police itself. *Id.* § 1726(a)(2)-(3).) And even if § 1726 is relevant to the interpretation of § 1724, Plaintiff's anti-discrimination argument would fail for the same reason as its discretion argument: Plaintiff must defend the statute Congress wrote, not the statute Plaintiff wishes it wrote.

*Second,* Plaintiff's argument fails to account for the Capacity Grant Program, *see* 47 U.S.C. § 1723, and its own use of race—which Plaintiff *does not* defend, *cf.* Defs.' Memo. in Support of Mot. to Dismiss (MTD) at 3 n.2, ECF 32-1. The Capacity Grant Program's allocation formula is keyed to all eight covered populations and requires grantee states to target *each* of the covered populations, including racial and ethnic minorities. Even isolated to the Competitive Grant Program, Plaintiff's reading is wrong, as § 1724's racial classifications are unambiguous. But § 1723 slams that door shut. Plaintiff's reading does not "produce[] a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (citation omitted). Here, even assuming NTIA could stretch the Competitive Grant Program's directive to consider race "to the extent practicable" into total discretion to ignore race, the Capacity Grant Program contains no such off-ramp. The DEA's structure confirms that the DEA does not authorize

---

[1] *See also Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1046 (D.C. Cir. 1978) (agency has discretion to weigh factors differently, but it must still "pay[] some attention to the congressionally specified factors"); *Central Vt. Ry., Inc. v. ICC*, 711 F.2d 331, 336 (D.C. Cir. 1983) ("[W]hen a statute requires an agency to 'consider' a factor, the agency must reach 'an 'express and considered conclusion' about the bearing of [the factor]….'") (citation omitted).

NTIA to selectively ignore an applicant's targeting of grant money to minorities when administering the DEA. *Cf. Department of Agric. Rural Dev. Hous. Serv. v. Kirtz*, 601 U.S. 42, 62 (2024) ("The power to correct for an absurdity 'in one portion of a statute' does not imply a 'license to distort other provisions of the statute.'") (citation omitted).

*Third*, on the flip side, under Plaintiff's theory, § 1721(8)(G) would be simultaneously constitutional for the Competitive Grant Program but unconstitutional for the Capacity Grant Program. Yet courts presume Congress does not "inten[d] to render a statute so internally inconsistent." *Jones v. Hendrix*, 599 U.S. 465, 479 (2023) (citation omitted). Plaintiff's argument thus violates "the normal rule of statutory construction[,] that identical words used in different parts of the same act are intended to have the same meaning." *CIR v. Lundy*, 516 U.S. 235, 250 (1996) (citation omitted). It also violates the principle that "[s]tatutes should be interpreted 'as a symmetrical and coherent regulatory scheme.'" *Mellouli v. Lynch*, 575 U.S. 798, 809-10 (2015) (citation omitted). And it is particularly inappropriate for a "distinctive[]" term like "covered populations," which is not an ordinary phrase with several context-dependent uses, but rather a term created by and specially defined in the DEA that undergirds both of the DEA's statutory grant programs. *Pulsifer*, 601 U.S. at 149 (distinctive terms are "likely to … [be] standardize[d]").

To try and further avoid the DEA's plain racial classifications, Plaintiff cites *Rothe Development, Inc. v. United States Dep't of Defense*, 836 F.3d 57 (D.C. Cir. 2016) and *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431 (N.D. Tex. 2024). Opp. at 33-34. But both cases actually support Defendants' position. *Rothe* upheld an affirmative action statute for "socially and economically disadvantaged individuals," a facially race-neutral term. 836 F.3d at 62 (citing 15 U.S.C. § 644(g)(1)). By contrast, when Congress added to the *Rothe* formula the gloss that certain racial and ethnic minorities qualified as socially or economically disadvantaged, *Nuziard* invalidated the law, explaining that while the agency might find it easier to administer a blanket racial classification, "[b]ureaucratic convenience does not hold a flame to the rigors of strict scrutiny." 721 F. Supp. 3d at 498 (citing 15 U.S.C. § 9501(15)(B)). *Nuziard*'s racial preferences were subject to strict scrutiny (as the agency conceded) even if non-minorities were still allowed to apply: racial minorities were eligible for funds, while non-minorities

5

were subject to a rebuttable presumption of ineligibility. *Id.* at 453; *see also Strickland v. USDA*, 736 F. Supp. 3d 469, 476, 480-81 (N.D. Tex. 2024) (strict scrutiny applied over agency objections when non-minority farmers received disaster relief funds with a 90% reduction). Plaintiff cites *Nuziard*'s observation that "it is not unconstitutional for a federal program to serve minorities," 721 F. Supp. 3d at 498, but that misses the point. Of course federal programs may serve people of all races. But they may not *classify* by race without satisfying strict scrutiny. The DEA includes a racial classification that requires the agency to consider race in distributing broadband benefits. That is materially different, and *Nuziard* confirms this Court must apply strict scrutiny to the DEA.

Plaintiff likewise missteps when it claims the DEA's use of race is really "about including, not excluding, groups or populations[.]" Opp. at 34. For starters, that characterization ignores the zero-sum nature of allocating government benefits. As previously explained, MTD at 23, the DEA allows NTIA to allocate Competitive Grant Program awards to an applicant that plans to work with race-neutral groups—e.g., veterans and prisoners. But it also requires NTIA to *consider* projected benefits to covered populations, including minorities, when picking winners and losers. 47 U.S.C. § 1724(d)(1)(A)(i). And when an agency allocates a finite resource, its selections are inherently zero-sum. It is simply wrong to say that "race is never a negative factor," as a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. Strict scrutiny thereby applies to the DEA's use of race as a selection factor—even if it is one of several criteria and not always outcome-determinative. MTD at 23 (citing *id.* at 219 & n.6).

Plaintiff's other cases are inapposite and only confirm that strict scrutiny applies to the DEA. *Sussman v. Tanoue*, 39 F. Supp. 2d 13 (D.D.C. 1999) endorsed "outreach efforts to minorities which *do not* accompany actual preferences," unlike the explicit preference at issue here. *Id.* at 25 (emphasis added). And the other cases allowing agencies merely to *collect* demographic data are equally off the mark; to collect data is not to "distribute[] burdens or benefits," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), based on said data. *See United States v. New Hampshire*, 539 F.2d 277, 280 (1st Cir. 1976) (leaving allegation that demographic data "might be misused in a [future]

6

relief program improperly relying on quotas" for another day); *see also Caulfield v. Board of Educ.*, 583 F.2d 605, 611-12 (2d Cir. 1978) (allowing government to track teacher demographics). *Contra* Opp. at 34-35; Amicus Brief of Benton Institute at 11 (Benton Br.), ECF 42-1 (comparing the DEA to tracking racial disparities in healthcare). The Competitive Grant Program allocates race-based benefits, so it triggers strict scrutiny.[2]

### 2.    Plaintiff Cannot Delay Strict Scrutiny Review

To avoid the obvious implications of the DEA's plain text, Plaintiff offers two ways to postpone a constitutional ruling. Neither has merit.

### i.    The Court May Address Equal Protection on a Motion to Dismiss

Plaintiff asks this Court to delay ruling on the constitutionality of the DEA's racial classifications until summary judgment. But a court may reject a racial classification on a motion to dismiss, as racial classifications are "presumptively invalid," *Shaw v. Reno*, 509 U.S. 630, 643-44 (1993) (quoting *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)); and presumptively-unconstitutional laws enacted without evidence may be rejected without evidence. Plaintiff says motions to dismiss in constitutional litigation are rare, but that is just another way of saying this case's posture is rare. In a typical equal protection case, a regulated party says the law is invalid, and the Executive defends the law. And typically, the party that bears the burden of proving constitutionality will not move to dismiss. *See Smith v. District of Columbia*, 387 F. Supp. 3d 8, 30 (D.D.C. 2019) (cited in Opp. at 32) ("[B]ecause the District bears the burden under strict scrutiny … the [equal protection

---

[2] Amicus Benton Institute inverts Plaintiff's argument for equally flawed reasons. It says Congress may sidestep strict scrutiny by characterizing racial disparities in broadband access as "demographic data" it uses "to identify where public infrastructure investment is needed," and by funding technologies that may indirectly benefit all Americans. Benton Br. at 12, 15. But these are just strict scrutiny arguments dressed up as statutory interpretation arguments, and as strict scrutiny arguments, they are nonstarters. As *SFFA* explained, racially balancing a student body is not a valid goal for strict scrutiny, and the defendant universities' amorphous claims that student body diversity benefited the entire world—i.e., by "producing new knowledge stemming from diverse outlooks" and "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes"— were "not sufficiently coherent for purposes of strict scrutiny." 600 U.S. at 214, 222-24 (citation omitted). More to the point, this theory is unsupported by the DEA's plain text, which uses race and ethnicity as criteria to allocate the benefits it gatekeeps. *See* MTD at 2-4, 21-24.

and right to travel] claim[s] cannot be resolved on the District's own motion to dismiss."). But here, it is *Plaintiff* who must rebut the presumption of unconstitutionality, so that paradigm does not apply.[3]

Plaintiff appears to propose discovery to augment—or compensate for—the DEA's threadbare legislative record. *See* Opp. at 38. But discovery would serve no valid purpose in this case. In other situations (e.g., election law), proving *discriminatory intent* (or a strong inference thereof) may require fact or expert discovery. *See Louisiana v. Callais*, 146 S. Ct. 1131 (2026). This case, however, does not turn on factual findings of discriminatory intent: it turns on the explicit racial classifications in the statutory text, and on the utter absence of legislative findings to support those classifications in either the DEA itself or its legislative history. Plaintiff may not use discovery to establish that Congress had the appropriate factual findings in mind when it enacted the DEA, but simply forgot to write them down. *Contra* Opp. at 38 (saying "[l]egislative history from [the COVID-19 pandemic] may not incorporate the full evidentiary record"). "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *American Petroleum Inst. v. SEC*, 953 F. Supp. 2d 5, 20 (D.D.C 2013) (Bates, J.) (quoting *Brusewitz v. Wyeth LLC*, 562 U.S. 223 (2011)). In practical terms, Congress' failure to show its work opens the DEA to facial attack on a motion to dismiss.

By a similar token, a court may not uphold a racial classification based on "speculation about what 'may have motivated' the legislature." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996). Discovery on background facts indulges just that, improperly inviting courts to speculate that "individual members may have recalled [those facts] from personal experience." *Id.* at 910 (on strict scrutiny, expert reports commissioned for that lawsuit, by definition, were not considered by legislators at the time of enactment and were not fair game now). Plaintiff cites two cases where courts treated separation of

---

[3] Plaintiff's other cases are not to the contrary. *Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015), says only that a city *defending* a suspect classification faces an uphill battle on a motion to dismiss. *Id.* at 305-06. The panel recognized that "the party defending" the classification—not necessarily the defendant—bears the burden of producing evidence that the plan is constitutional." *Id.* at 306 (quoting *Aiken v. City of Memphis*, 37 F.3d 1155, 1162-63 (6th Cir. 1994) (en banc)). *Jeffery v. City of New York*, 113 F.4th 176 (2d Cir. 2024) is even more generous: it *affirmed* a dismissal even when the plaintiff filed the constitutional challenge and the government moved to dismiss. *Id.* at 194 ("conclud[ing] from the pleadings and judicially noticeable facts … that there can be no question" of a compelling interest).

powers as a fact issue, but not every issue labeled "separation of powers" is a fact issue. Plaintiff invokes separation of powers as a sword, saying that as a matter of law, the Executive violated the separation of powers by declining to enforce a constitutional law; and the Executive has responded that it "may decline to follow" an *un*constitutional law. *Compare* MTD at 21 (quoting *In re Aiken County*, 725 F.3d 255, 261 (D.C. Cir. 2013)) *with* Opp. at 17 (citing *Aiken County*, 725 F.3d at 262). But in Plaintiff's cases, the Executive invoked separation of powers as a shield, thereby triggering "a fact-intensive, case-by-case analysis of the specific nature of the intrusion into the President's performance of his constitutional duties." *Judicial Watch, Inc. v. National Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 45 (D.D.C. 2002); *see also Clinton v. Jones*, 520 U.S. 681, 690 n.11 (1997).[4] Defendants are not saying that administering the DEA as written impermissibly intrudes into the Executive's functions. They are saying it is unlawful. In that way, Plaintiff's separation of powers claim is only relevant if DOC's constitutional determination was erroneous—and that question, in turn, hinges on the DEA's text and legislative record, not any further factual development.

### ii.    Plaintiff's Pretext Allegation Is Unsupported and Irrelevant

Plaintiff says the Court may not uphold DOC's equal protection analysis on a motion to dismiss because it was pretextual, and pretext is a fact question. Opp. at 31-32; *see also* Amicus Brief of Constitutional Accountability Center at 16, ECF 41. As a matter of law, these allegations do not add up to pretext here, so that argument is a red herring.

The President told the public the DEA's racial classifications were unconstitutional. And DOC told Plaintiff in the Grant Termination Letter that the Secretary of Commerce agreed the

---

[4] Plaintiff adds that courts have found uses for discovery in First Amendment cases, but they have done so based on the contours of First Amendment doctrine, which does not apply here. *Contra* Opp. at 29-32 (citing *Brown v. Government of D.C.*, 390 F. Supp. 3d 114, 126 (D.D.C. 2019) (First Amendment); *Johnson v. Dade County Pub. Schs.*, 1992 WL 466902, at *5 n.4 (S.D. Fla. Nov. 25, 1992) (same); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184 (1999) (same)); *Burwell v. Portland Sch. Dist. No. 1J*, 2019 WL 9441663, at *7 (D. Or. Mar. 23, 2019) (same); *Brokamp v. District of Columbia*, 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022) (same)). Content-neutrality and public-forum questions often (though not always) turn on the facts. *Brown*, 390 F. Supp. 3d at 126 (finding an open fact question about whether the restriction was actually content-based); *but cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 380, 396 (1992) (resolving the seminal case on content-based restrictions on a state-law criminal motion to dismiss). Here, the DEA facially classifies by race, so it is subject to facial attack.

classifications were unconstitutional. *See* MTD Ex. A, ECF 32-5 (explaining that Plaintiff's grant was "created with, and administered using, impermissible and unconstitutional racial preferences"). DOC has maintained that position to this day. That is the opposite of pretext.[5] True, Defendants' briefing presents "more sophisticated legal arguments" than the Grant Termination Letter. *National Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 515 (4th Cir. 2011). But agency litigation often follows that pattern. *See, e.g.*, *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1233 n.11 (D.C. Cir. 1994). "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *National Elec. Mfrs. Ass'n*, 654 F.3d at 514-15 (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)).

In fact, this entire line of argument is academic. Even if the Court does not take the Grant Termination Letter at its word, the DEA's racial preference is unconstitutional, and the Court may not remand for DOC to restate the arguments it has made in this case. An agency making a *discretionary* decision may not "offer[] a justification in court different from what it provided in its opinion." *Morgan Stanley Cap. Group v. Public Util. Dist. No. 1*, 554 U.S. 527, 544 (2008) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943)). But when the decision is *nondiscretionary*—i.e., the agency provides "a different rationale [in court] for [a] [legally] necessary result"—remand would be a waste of time. *Id.* at 545 (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766-67 & n.6 (1969) (plurality)).

### B.    Plaintiff Has Identified No Compelling Government Interest, And Certainly Not One Congress Itself Made

Plaintiff briefly asserts (mostly in footnotes) that Congress found a compelling interest to support the DEA's racial preferences. Congress did no such thing. The most Plaintiff can muster here is bare citations to hundred-page committee hearing transcripts (but no statements in said transcripts) and blog posts. Plaintiff fails to explain how any of those sources help its case, and they do not.

---

[5] The only case Plaintiff cites for this point, *Department of Commerce v. New York*, 588 U.S. 752 (2019), undermines its position. In that case, the Supreme Court reaffirmed the general principle that "a court may not reject an agency's stated reasons for acting simply because the agency might also have other unstated reasons," or "because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* at 781. That general principle would control here.

10

### 1. Congress Recited Allegations of Disparate Impacts, But Did Not Find Intentional Discrimination

Plaintiff does not dispute that "disparate impacts driven by causes beyond intentional discrimination are not constitutional violations." MTD at 27 (citing *Washington v. Davis*, 426 U.S. 229, 239-41 (1976)). But it bases its support of the DEA's racial preferences on allegations sounding in disparate impact. As evidence that the DEA purportedly "remedies specific instances of past discrimination," Plaintiff provides five footnotes that cite five committee hearings without pincites;[6] a nine-minute corporate publicity interview from 2012 with the late Rep. John Lewis; a study and associated blog post from 2016 about racial disparities in broadband access and affordability;[7] and a short Federal Reserve Bank of St. Louis essay about mortgage redlining from 2023, which Congress, by definition, could not have considered when it enacted the DEA nearly two years prior,[8] and has nothing to do with broadband (the essay mentions only "lingering financial inclusion issues"). Opp. at 37-38 nn. 15-19; *see also id.* at 4 n.4 (one more hearing cited in n.18). It provides no further elaboration. This argument is most notable for what it does not provide: citations to relevant statutory

---

[6] Plaintiff's unexplained citations improperly ask the Court to "scour the record for evidence that will support [Plaintiff's] assertions." *United States ex rel. El-Amin v. George Wash. Univ.*, 533 F. Supp. 2d 12, 20 (D.D.C. 2008). But even on a motion to dismiss, *Twombly* still requires a plaintiff to support its position with specific allegations. *Bain v. Office of Attorney Gen.*, 648 F. Supp. 3d 19, 29 (D.D.C. 2020) (a court may still grant a motion to dismiss when the plaintiff asks the Court to consider "thousands of pages of attachments" to the complaint and "often refers generally to an exhibit … without including any citation to a specific page, even when the exhibit is hundreds of pages long"); *Husain v. Smith*, 2016 WL 4435177, at *7-8 (D.D.C. Aug. 19, 2016) (similar). These glaring omissions show that Plaintiff has "not support[ed] [its] arguments with specific evidence and references to the record because [it] cannot." *El-Amin*, 533 F. Supp. 2d at 19.

[7] The publisher of the study and blog post, the Benton Institute, filed an amicus brief in this action. Summarizing the study, Benton's brief wrote that after controlling for income, whites were slightly more likely to have home internet in the sub-$20,000 income bracket than Hispanics or African-Americans, and that the gap narrowed (but did not completely disappear) at higher income levels. Benton Br. at 7. Benton's 2016 blog post trumpeted claims of "structural racial discrimination," *see* "Digital Denied: The Impact of Systemic Racial Discrimination on Home-Internet Adoption," BENTON INSTITUTE, (Dec. 16, 2016), benton.org/blog/digital-denied-systemic-discrimination-keeps-communities-offline, but its amicus brief does not repeat this claim. Indeed, the blog post identifies no examples of intentional discrimination in the broadband industry, and focuses on affordability. Thus, it reflects the blogger's personal belief that wealth disparity *is* intentional discrimination—*i.e.*, precisely the kind of "societal discrimination" argument the Supreme Court has repeatedly rejected.

[8] Plaintiff's background section points to other post-2021 sources, which the Court may not consider for the same reasons. *See* Opp. at 4-5 nn.3, 5-7.

11

text, committee reports, or even floor statements from the drafters of the bill. *See* MTD at 26-30 (explaining that "[f]urthest down the totem pole [of legislative evidence] lie 'excerpts from committee hearings,'" and that not even committee hearings supported Plaintiff's position). If this is the best Plaintiff can find, there is nothing left to discuss.

In any event, none of Plaintiff's citations, individually or collectively, identifies specific instances of past racial discrimination, much less a "strong basis in evidence" for a racial classification under the Fifth Amendment. Legislators and witnesses occasionally mentioned race, but only to identify statistical disparities and disparate impacts. *See Recent Federal Actions to Expand Broadband: Are We Making Progress?: Hearing before the S. Comm. on Com., Sci. and Transp.* at 51, S. Hrg. 117-705 (Mar. 17, 2021) (cited in Opp. at 37 n.15) (statement of Sen. Markey); *State of Telehealth: Removing Barriers to Access and Improving Patient Outcomes: Hearing before the S. Comm. on Com., Sci. and Transp.* at 46, 61, S. Hrg. 117-792 (Oct. 7, 2021) (cited in Opp. at 37 n.16) (statements of Sen. Peters and Krista Drobach); *Broadband Equity: Addressing Disparities in Access and Affordability: Hearing before H. Comm. on Energy & Com.* at 1, 41, 84, 99, 101, 105, H. Hrg. 117-29 (May 6, 2021) (cited in Opp. at 37 n.18) (statements of Reps. Doyle, Ochillo, Soto, Dingell, and Cardenas, and Joi Chaney); *Oversight of the Federal Communications Commission: Hearing before the H. Comm. on Energy & Com.* at 2, 4, 28, 71, S. Hrg. 116-589 (June 24, 2020) (cited in Opp. at 39 n.19) (statements of Sens. Cantwell and Rosen and FCC Commissioner Starks); *see also* Benton Br. at 8-9 (citing Sen. Markey's statement that minority and low-income households had broadband access issues, without elaboration).[9]

---

[9] Plaintiff adds that Congress had a "compelling interest in bridging the digital divide and working towards digital equity." Opp. at 36 (citing Compl. ¶¶ 2, 8, 33-37, 39-41, 43-44). But its citations are statistical disparity all the way down. Plaintiff still has not identified any past discrimination causing the statistical disparities—and statistical disparities, standing alone, fail strict scrutiny. *See* MTD at 27-28; Compl. ¶ 8 (explaining that the Competitive Grant Program aims to serve "groups with lower rates of broadband internet adoption than the national average"), ¶¶ 33-37 (explaining that the digital divide targets people who "lack reliable broadband access and the essential services it provides"), ¶¶ 39-41 (noting that Congress identified "'wealth and income gaps' faced by groups without internet access"), ¶¶ 43-44 (listing the statutorily enumerated goals of the Competitive Grant Program). To the contrary, Plaintiff freely uses "digital equity" and "bridging the digital divide" as bywords for disparate impact. *See* Opp. at 1 (defining the digital divide as a "gap between those Americans who have access to telecommunications and information technologies and those who do not"), 37 (arguing that in the DEA, Congress found that "the 'digital divide' 'disproportionately affect[ed] communities of color'").

There is minimal evidence that Congress, as a body, diagnosed the asserted racial disparities in any way. And there is *no* evidence whatsoever that Congress attributed the claimed disparities to intentional discrimination in the broadband industry. Individual speakers who raised the disparity issue at hearings focused on affordability and the racial wealth gap—not industry or government misconduct. *Id.*; H. Hrg. 117-29 at 86 (statement of Rep. Rice); *An Economy That Works For Everyone: Investing In Rural Communities: Hearing before S. Comm. on Banking* at 19, 89, S. Hrg. 117-289 (Apr. 20, 2021) (cited in n.4, cross-referenced in n.18) (statement of Bill Bynum).[10] One witness added that racial disparities were narrowing. H. Hrg. 117-29 at 66-67.

Some legislators discussed past or proposed legislation, but nothing they said or did supports the explicit race-based grantmaking criteria they voted for when passing the DEA. Rep. Pallone noted that Congress had passed a $50/month subsidy for Internet access and cited racial disparities in broadband access as a basis for that subsidy. *Id.* at 7-8. But that subsidy was tied to low-income status, not minority status. *See* Consolidated Appropriations Act § 904(a)(6)-(7), Pub. L. No. 116-260, 134 Stat. 1182, 2130-31 (2021). Rep. Clarke noted that she was drafting legislation to prevent "digital redlining"—which ripened into the proposed (but not enacted) "Anti Digital Redlining Act." H. Hrg. 117-29 at 74. She also proposed a prophylactic rule against discrimination in broadband deployment. *Id.* But as Defendants already said, her point was that landlords and internet service providers should not collude to drive up the price for internet access. MTD at 29-30. And the deployment discrimination provision that eventually entered the Infrastructure Investment and Jobs Act (IIJA) reflected, "at most, a bare suspicion that racial discrimination *might* occur." *Id.* at 28; *see infra* § I.B.2.

* * *

This is not a topic about which Plaintiff can plead ignorance. NDIA helped *write* the DEA. In 2019, Senator Murray's staff presented the bill at NDIA's annual conference and quipped that

---

[10] The final hearing, which covered both banking and broadband issues, mentioned discrimination in the mortgage lending industry (but not the broadband industry). S. Hrg. 117-289 at 3, 19, 24-25, 90. As Defendants already explained, *Croson* says that these industries are not comparable. The Supreme Court has repeatedly rejected attempts to bootstrap historical lending discrimination into a general exception to strict scrutiny for all manner of racial classifications untethered to homeownership. *See* MTD at 29 & n.9 (citing *Parents Involved*, 551 U.S. at 731-32 and *Croson*, 488 U.S. at 505 (majority)).

13

"this bill has been called 'the NDIA bill.'"[11] Despite all these natural advantages, Plaintiff has identified no contemporary findings of intentional discrimination. It follows that no such findings ever existed. The DEA's racial preference is repugnant to the Constitution, and the Court should reject it.

### 2. Prophylactic Anti-Discrimination Conditions on Future Actions Are Not Findings of Intentional Discrimination

Plaintiff points to a separate provision of the IIJA, which directed the FCC to promulgate rules prohibiting broadband deployment discrimination. Opp. at 38 (citing IIJA § 60506, Pub. L. No. 117-58, 135 Stat. 429, 1245-46 (2021), *codified at* 47 U.S.C. § 1754). Defendants have already explained why this does not save the DEA. MTD at 28-29. Congress routinely attaches prophylactic anti-discrimination rules to federal activities and expenditures—even before a single dime is spent.[12]

Plaintiff says the IIJA reflects Congress' view that today's "digital exclusion of communities of color was a direct result" of racial discrimination. Opp. at 38. That is wrong. The fact that Congress did not want discrimination to happen in the future says little about whether Congress had a "strong basis in evidence" to find past or current discrimination. Indeed, after Congress passed § 1754 and the DEA in the IIJA, the Biden-era FCC conceded there was "'little or no evidence' that intentional discrimination causes impediments to broadband access." *Minnesota Telecom All. v. FCC*, _ F.4th _, 2026 WL 1239430, at *3 (8th Cir. May 6, 2026). Of course, even if the FCC *had* found intentional discrimination, that would not have mattered, since Congress may only enact racial classifications based on evidence in front of it when it passed the law. But if even the Biden Administration found no intentional discrimination following a Biden-era law banning intentional discrimination, that confirms § 1754 was statutory boilerplate. It would not be the first or the last time Congress has banned the unlikely, the unthinkable, or the simply obscure.[13]

---

[11] National Digital Inclusion Alliance, *Livestream at Net Inclusion 2019*, at 5:16:42, (YouTube, Apr. 3, 2019), https://www.youtube.com/watch?v=P5tD3UfE_uw&t=18090s.

[12] *See, e.g.*, 15 U.S.C. § 775 (federal energy administration); 23 U.S.C. § 324 (highways); 29 U.S.C. § 3248 (Work Force Innovation Opportunity Act); 34 U.S.C. § 50104 (provision of federal law enforcement assistance); 40 U.S.C. § 14702 (Appalachian Regional Development); 42 U.S.C. § 3123 (Public Works and Economic Development Act; *id.* § 6102 (age discrimination); *id.* § 9849 (Head Start); *id.* § 18116 (Affordable Care Act); 49 U.S.C. § 40127 (Ford Aviation Investment and Reform Act)

[13] If Plaintiff is implying that by enacting an anti-discrimination rule, Congress implicitly ratified a

### 3.    There Is No COVID-19 Exception to Strict Scrutiny

Finally, Plaintiff argues that the Court should absolve Congress of its constitutional duties since "the pandemic presented unprecedented challenges for Congress" and "meetings and deliberations usually reserved to formal, in-person proceedings were channeled to new and more informal, remote channels." Opp. at 38. The COVID-19 pandemic was an extraordinary moment in American history. "But even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). Six months *before* the IIJA and thus the DEA, the Sixth Circuit invalidated racial preferences in a COVID-19 emergency grant fund. *Vitolo v. Guzman*, 999 F.3d 353, 361-62 (6th Cir. 2021) (rejecting the agency's contention that racial preferences were necessary because a disproportionate share of minority-owned small businesses were impacted by the pandemic). Congress was on notice that the Bill of Rights was still in effect.

Plaintiff says holding Congress to the rules of strict scrutiny would be unduly burdensome. But strict scrutiny is *supposed* to burden Congress. Legislative factfinding may be an "administrative headache" and an "'onerous documentary obligatio[n].'" *Croson*, 488 U.S. at 504-05 (majority) (quoting dissent of Marshall, J., *id.* at 548). Even so, "because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *Id.* at 505 (citation omitted). And even if public health considerations justified heightened deference in the first months of the pandemic, that argument had no force in November 2021—1.5 years after lockdowns began. *Cf. Roman Catholic Diocese*, 592 U.S. at 23 (Gorsuch, J., concurring) (saying in late 2020 that "[e]ven if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical"). Indeed, Congress refreshed

---

disparate-impact theory of broadband access, the Eighth Circuit squarely rejected that argument two days after Plaintiff filed its opposition brief. As previously noted, in *Minnesota Telecom Alliance*, the FCC accepted that there was "little or no evidence" of intentional discrimination in the broadband industry. 2026 WL 1239430 at *3. To expand its own investigatory remit, it interpreted § 1754 to penalize *both* discriminatory intent and disparate impact. *Id.* at *2. The Eighth Circuit rejected the FCC's position. The panel said that under the leading disparate-impact cases, "the plain meaning of discrimination … suggest[s] an element of intent." *Id.* at *7. It concluded that § 1754 simply "lacks the 'results-oriented' language that would signal Congress's intent to cover disparate impact claims." *Id.* at *8.

statutory findings and reauthorized a different affirmative action program in the IIJA. MTD at 29 (citing IIJA § 11101, 135 Stat. 448-49). As Plaintiff itself recognizes, Congress held several hearings on broadband issues in 2020 and 2021, at least one of which was conducted virtually, and another of which featured some virtual testimony. *See supra* § I.B.1; H. Hrg. 117-29; S. Hrg. 117-705 at 21. Congress was open for business, so Plaintiff's COVID-19 constitutional exceptionalism rings hollow.

### C.    Plaintiff Makes No Real Argument on Narrow Tailoring

Plaintiff does not meaningfully argue the DEA's racial classifications were narrowly tailored. Instead, it principally argues that "Congress was not required to exhaust 'every conceivable race-neutral alternative.'" Opp. at 39 (citing *Grutter v. Bollinger*, 539 U.S. 306, 309 (2003)). Leaving aside the peculiarity of citing *Grutter* in a post-*SFFA* world, *Croson* still mandates "consideration of the use of race-neutral means[.]" 488 U.S. at 507 (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987)). So did *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013), a pre-*SFFA* case. *See* MTD at 21 (under *Fisher*, the standard is whether "no workable race-neutral alternatives" would suffice). And even Plaintiff's talisman *Grutter* confirmed this rule. *See* 539 U.S. at 339 ("The Court is satisfied that the [l]aw [s]chool adequately considered the available alternatives," and the law school was required to present a "good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks"). Here, in enumerating the eight covered populations in § 1721(8), Congress cobbled together a list of favored groups, some race-neutral and one not. *See* 47 U.S.C. § 1721(8)(G). But that is not the same as "considering" a race-neutral *alternative* to administering the Competitive Grant Program. As noted in Defendants' MTD, Congress did not wait to see whether actual race-neutral alternatives—e.g., a Competitive Grant Program without the racial classification—could narrow the purported "digital divide" on their own. Sidestepping strict scrutiny is not so easy.

Plaintiff then suggests that narrow tailoring is no real barrier because the DEA appropriated funds for only five years. Opp. at 39. But an expiration date is not a license to discriminate. Otherwise, Plaintiff's interpretation of strict scrutiny would greenlight any number of racially-targeted pork-barrel programs. If the City of San Francisco decided to offer a one-time cash payment limited to Chinese-Americans, surely it could not defend the deal on the basis that it would happen only once.

16

Dissenting in *Croson*, Justice Marshall defended a government contract set-aside for minority business enterprises because it was—as here—"limited to five years[.]" 488 U.S. at 548 (Marshall, J., dissenting). The Court acknowledged this fact but invalidated the plan anyway. *See id.* 478 & n.1 (although the plan was now gone, the case was not moot). For narrow tailoring, the question is whether the length and size of the racial classification actually relate to the harm to be remedied. And the DEA provides no meaningful standards to determine when it has achieved its amorphous goal, aside from pure racial balancing, which is plainly illegal.[14] *Compare* 47 U.S.C. § 1724(a)(1) *with* MTD at 32.

Finally, Plaintiff reiterates its arguments for why strict scrutiny does not apply in the first place. Opp. at 39-40 (arguing that NTIA can simply ignore components of the "covered populations" rule as it sees fit, and that the racial classifications are "not an operative limitation"). But the DEA's use of race to allocate grants is subject to strict scrutiny—"even if it is one of several factors and is outcome-determinative in only 'some' cases." MTD at 23 (citing *SFFA*, 600 U.S. at 219 & n.6).

### D.     Regardless of Severability, It is Proper for the Court to Address the Equal Protection Question at This Time

Defendants seek a court ruling that will clarify the future of the Competitive Grant Program. Defs.' Opp. to Stay Mtn. (Stay Opp.) at 6-8, ECF 35. To that end, DOC's position is that it should not be required to allocate $1.25 billion in grant funding until the judiciary settles the validity of the DEA's racial classifications. The severability doctrine may require DOC to administer the Competitive Grant Program in some form, whether race-neutral or race-classified; as Plaintiff correctly notes, when the Solicitor General determined that the DEA's racial classifications were unconstitutional, he did not say the entire DEA was unconstitutional. Opp. at 18, 42. But this Court still needs to resolve what criteria DOC should use to administer the program. If DOC were to administer the program now on race-

---

[14] Because Plaintiff's arguments sound in disparate impact, the Opposition implies that racial classifications are permissible until minorities have the same broadband access rates as the racial majority. But *SFFA* rejected that exact racial balancing argument. "By promising to terminate their use of race only when some rough percentage of various racial groups is admitted … [the universities] assure that race will always be relevant … and that the ultimate goal of eliminating race as a criterion will never be achieved." 600 U.S. at 223-24 (simplified).

neutral terms, the Court might then order it to start from square one with the classifications intact. That chain of events would be inefficient for everyone involved.

To avert a ruling on equal protection, Plaintiff invites the Court to make a ruling on statutory construction: to read the DEA in a way that eliminates the racial preferences by effectively ignoring them. Plaintiff cannot have it both ways: it cannot demand that DOC preserve the racial preferences but also urge the agency to functionally ignore the statutory text. Yet either way, both sides call for the Court to address whether the DEA discriminates on the basis of race. And if Plaintiff has standing to challenge the Program Termination—a matter Defendants no longer contest on an MTD posture[15]—that removes the main obstacle to such a ruling.

## II.    By Disclaiming the Grant, Plaintiff Disclaimed Its Challenges to the Grant Termination and the Grant Conditions

### A.    Plaintiff Misconstrues *NIH*'s Two-Track Process

Plaintiff's jurisdictional arguments misapply *National Institutes of Health v. American Public Health Association (NIH)*. The controlling opinion in that case articulated a "[t]wo-track litigation" process for challenges to grant terminations that were, at least in part, based on agency guidance or programmatic decisional documents. 145 S. Ct. 2658, 2662 (2025) (Barrett,. J., concurring). Justice Barrett split such cases in two: (1) the grant terminations go to the CFC, and (2) the agency's broader decisions (if any) to terminate the underlying grant programs may stay in district court if jurisdiction and other threshold conditions are satisfied.

---

[15] For standing, instead of relying on the loss of its individual grant, Plaintiff now argues that the closure of the Competitive Grant Program prevented it from applying for a replacement grant. Opp. at 9. This theory isn't pleaded distinctly in the Complaint, *cf.* Compl. ¶ 22, but if construed as a request for leave to amend, the theory appears plausible on a motion to dismiss. That said, Defendants express no position on whether Plaintiff's standing theory could survive a motion for summary judgment. The burden to show standing rises as the case goes on. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And the loss of an opportunity to compete is not a complete injury in fact. A contractor has standing to demand "a legally valid procurement process," but "a contractor unable to demonstrate that, but-for the alleged illegality in the contracting decision, it would have been awarded the disputed contract, may not bring a challenge in [D.D.C.]." *Eco Tour Adventures, Inc. v. Jewell*, 174 F. Supp. 3d 319, 329-30 (D.D.C. 2016). The plaintiff must be "within the zone of active consideration," and must be a "sufficiently viable runner[]-up." *Free Air Corp. v. FCC*, 130 F.3d 447, 450 (D.C. Cir. 1997).

In its Opposition, Plaintiff says Defendants misunderstand Justice Barrett's concurrence and that "*NIH* does not mean that all claims related to grants must be litigated at the CFC." Opp. at 12. But Defendants agree that the Barrett concurrence leaves the Program Termination in district court. It is Plaintiff that misunderstands *NIH*'s controlling concurrence by blending two separate doctrines. Grant terminations and program terminations are subject to different threshold defenses.

As Defendants previously recounted in their MTD and Stay Opposition, in a grant termination suit, the plaintiff tries to force the Government to pay money. Under *NIH*, the Tucker Act gives the CFC exclusive jurisdiction over these claims. MTD at 11-18. Thus, sovereign immunity bars litigation in district court. *Id.* at 10-11. And a plaintiff may not evade the CFC's exclusive jurisdiction by pleading constitutional causes of action in district court. *Id.* at 15. But even assuming a district court may hear a claim that DOC violated the Constitution by breaching a contract, Plaintiff's constitutional causes of action fail because *Dalton v. Specter* reclassifies these claims as *ultra vires* claims, and Plaintiff has not met the high bar for *ultra vires* relief. *Id.* at 34-36. The Spending Clause claim independently fails because the Spending Clause constrains Congress, not the Executive Branch. *Id.* at 37-38.

By contrast, where (as here) the Executive Branch terminates a grant program on grounds of unconstitutionality, the Tucker Act argument does not apply because *NIH* channels program terminations to district court. *Id.* at 36; Stay Opp. at 11. And the constitutional claims are superfluous because the Administrative Procedure Act (APA) allows a district court to review DOC's determination that the DEA's racial classifications violate the Fifth Amendment's equal protection component. Stay Opp. at 11 ("If the Court finds that the DEA's racial preferences are constitutional, DOC would presumably be vulnerable to an APA contrary to law claim in district court, and the question of constitutional versus *ultra vires* review would be academic.").[16]

The reason for the confusion is that this is not a typical grant termination case. The classic Tucker Act/*Dalton* grant dispute is a three-step process. *First*, the grantee argues that its claim belongs in district court because the Government terminated an entire grant program. Before *NIH*, the grantee

---

[16] For this reason, Amicus Constitutional Accountability Center's brief is largely irrelevant, as it mainly argues that separation of powers requires DOC to follow Congress' spending directives. *See* ECF 41.

would then argue that the program termination claim extracts the grant termination from the CFC's jurisdiction. *But see NIH*, 145 S. Ct. at 2661 (Barrett, J.) (rejecting the Chief Justice and Justice Jackson's arguments that "because the District Court is the right forum for the challenge to the guidance, it is necessarily also the right forum for the challenge to the grant terminations"). *Second*, the Government would usually respond that it did not terminate a grant program, but instead terminated many individual grants. *Third*, the grantee would reply that the agency effectively (though maybe not formally) issued a programmatic termination. *See, e.g.*, *Department of Educ. v. California*, 604 U.S. 650, 658-59 & n.1 (2025) (Jackson, J., dissenting) (recounting allegations of a "mass termination"). This case is different in at least two critical ways. First, DOC agrees that it terminated the Competitive Grant Program. And second, *NIH* rules out the strategy of using the Program Termination to bootstrap the Grant Termination into the CFC.

Here's where Plaintiff goes off track: it says it's not seeking reinstatement of its grant, but based on *NIH*'s two-track framework, some of its arguments make sense only if it is still angling (if obliquely) for its grant. Defendants have already acknowledged that their Tucker Act and *Dalton* arguments focus on the Grant Termination and will not prevent this Court from reviewing the Program Termination. Stay Opp. at 11. Even so, Plaintiff discusses those arguments at length, refusing to take yes for an answer. Plaintiff cannot ask the District Court for its money back. It may demand the funds in the CFC, or not at all.

Some of Plaintiff's arguments are (correctly) premised on the notion that its individual grant must be litigated in the CFC. Plaintiff concedes that vacating DOC's termination of the Competitive Grant Program will "not reinstate terminated grants[.]" Opp. at 12 (quoting *NIH*, 145 S. Ct. at 2661 (Barrett, J.)). It says that it "does not challenge the termination of its individual award" but rather "seeks the opportunity to compete" for new awards. *Id.* at 10. It says its Program Termination claims do not go to the CFC because it is not seeking "reinstatement of its individual award" (although in this case, that argument serves no purpose). *Id.* at 12. It says that prevailing would mean "reinstat[ing] the Competitive Grant Program, not pay[ing]" Plaintiff. *Id.* at 14. It says that it is not "seek[ing] retroactive damages for harms [it] has suffered due to Defendants' termination of its grant." *Id.* at 16.

20

Finally, it says that Defendants may not rely on 2 C.F.R. § 200.340's "procedures for individual grant termination" because DOC may not terminate a program with individualized procedures. *Id.* at 25.

But Plaintiff also tries to have it both ways. It devotes a third of its brief to its Tucker Act and *Dalton* arguments, which—as Defendants have explained at length—concern the grant termination. *Compare id.* at 10-17 (Tucker Act), 18-24 (*Dalton*) *with* Stay Opp. at 11; MTD at 36. And while it argues that 2 C.F.R. § 200.340 is too individualized to apply to its Program Termination claim, it simultaneously says the equally individualized grant termination procedures in 47 U.S.C. § 1724(g) displace § 200.340. Opp. at 25-26. Finally, it still angles for "vacatur of the Program's termination *and any related actions*." *Id.* at 13 (emphasis added); *see also* Compl. Prayer for Relief ¶ C (asking the Court to vacate "actions relating to the Competitive Grant Program"). Each of these arguments is tethered to the individual Grant Termination, leaving it unclear what relief Plaintiff wants.

In any event, Plaintiff's arguments with respect to the Grant Termination are mostly vague and indistinct. The only Grant Termination-specific argument Plaintiff develops is the procedural argument with respect to 2 C.F.R. § 200.340(a)(4). Opp. at 25-26. Defendants respond to that argument below. *See infra* § II.C. Other than that, Plaintiff's arguments generally focus on establishing that the Court may review the Program Termination, notwithstanding the Tucker Act or *Dalton*. Opp. at 8-24. But, again, Defendants have already conceded that point. Stay Opp. at 11.

The Court should put this issue to rest and hold that Plaintiff has affirmatively waived any claim to relief in district court for the Grant Termination. Because "a litigant has an obligation to spell out its arguments squarely and distinctly," a plaintiff who ignores the motion's contentions in its opposition brief waives the point. *Doe #1 v. AFGE*, 554 F. Supp. 3d 75, 96 (D.D.C. 2021) (Bates, J.) (simplified); *see also Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 39 (D.D.C. 2010) (Bates, J.) (same).

**B.      The CFC Can Properly Address Plaintiff's Individual Grant Termination**

Plaintiff adds that "the CFC could not adjudicate NDIA's claims" at all because "[t]he CFC lacks jurisdiction over claims arising under violations of the Constitution that are not money-mandating." Opp. at 16-17. It adds that there should always be a judicial forum for a constitutional claim. *Id.* at 13. It's not entirely clear what Plaintiff is driving at, given that Defendants agree Plaintiff

21

has a cause of action to challenge the Program Termination in district court. But if this is a veiled suggestion that this Court should try to address the propriety of the Grant Termination because there would otherwise be no forum to handle the dispute, the Court should reject this invitation.

The mere fact that Plaintiff has not pleaded a breach of contract claim in district court does not mean that the CFC is forever foreclosed from addressing the merits of the Grant Termination. The CFC is perfectly capable of handling "constitutional claims alleging that the government unconstitutionally violated a contract." MTD at 15 (citing *Consolidated Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1384-85 (Fed. Cir. 2001)). And even if the CFC could not formally entertain a Spending Clause or separation of powers cause of action, once this Court clarifies that any dispute over the Grant Termination must be litigated in the CFC, Plaintiff will have 26 million reasons to replead breach of contract in that forum.[17]

### C.    DOC Appropriately Terminated Plaintiff's Grant

DOC properly terminated Plaintiff's award on two grounds: to halt an ongoing equal protection violation triggered by the application of an unconstitutional statutory provision, and to course-correct agency priorities under 2 C.F.R. § 200.340(a)(4). As previously explained, "awarding federal monies to a grantee that was selected using unconstitutional, racially discriminatory criteria, by definition, advances no constitutionally permissible goals or agency priorities." MTD at 42. If this Court orders DOC to administer the Competitive Grant Program on severability grounds, Plaintiff may apply for a replacement grant on a race-neutral basis. But Plaintiff may not keep its old grant, which was awarded based on unconstitutional criteria.

Plaintiff repeats the Complaint's misguided allegation that Defendants violated procedural requirements when terminating the grant. Opp. at 25-26. The DEA's termination procedure for non-compliance allows agencies to terminate grants if "the grant funds are not being used in a manner

---

[17] On a similar note, amici grant applicants say they incurred legitimate reliance interests in the Competitive Grant Program by "design[ing] projects and form[ing] partnerships … in reliance on the DEA as a duly authorized statutory program." Amicus Brief of Competitive Grant Program Applicants & Supporters at 3, 20, ECF 45-1. That is factually questionable, as amici never allege that they received any executed grant awards—only that they incurred costs to apply. But more importantly, if they want to plead detrimental reliance, the CFC would be the proper forum in which to do so.

that is consistent with the application" and the grantee is "not upholding assurances made [to NTIA]." 47 U.S.C. § 1724(g)(1)(A). Such terminations require "notice to the [grantee] and opportunity for a hearing." *Id.* § 1724(g)(1). Plaintiff argues that § 1724(g) fully displaces all four bases for termination in the Uniform Guidance (UG), 2 C.F.R. § 200.340(a)(1)-(4), only one of which is termination for non-compliance, *id.* § 200.340(a)(1) (allowing terminations if the grantee "fails to comply with the terms and conditions of the Federal award"). But Defendants already addressed this argument: Plaintiff selectively misquotes § 1724(g), which, by its own terms, operates in harmony with "other authority under applicable law." MTD at 41. And here, that authority is 2 C.F.R. § 200.340(a)(4), which allows grant terminations "if an award no longer effectuates the program goals or agency priorities."

Plaintiff responds that a "valid statute always prevails over a conflicting regulation." Opp. at 25 (quoting *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013)). But there is no conflict here. At most, Section 1724(g) would collide with the UG's procedure for non-compliance terminations, 2 C.F.R. § 200.340(a)(1). That is irrelevant. DOC did not terminate Plaintiff's grant for non-compliance. *See* MTD at 40-41. It instead terminated Plaintiff's grant for "a change in agency priorities"— specifically, disclaiming racial classifications.

Next, Plaintiff argues that the UG would allow DOC to sidestep the more stringent processes for noncompliance terminations by characterizing all grant terminations as § 200.340(a)(4) changed-priorities terminations. In a true non-compliance case, DOC would still have incentives to go through the distinct procedures for terminations under § 1724(g) and/or 2 C.F.R. § 200.340(a)(1), to ensure federal award funds are used appropriately for the statutory and programmatic purposes for which they were appropriated. Also, a non-compliance termination would make it harder for that grantee to receive federal funds in the future, deterring future non-compliance. *See* 2 C.F.R. § 200.340(c) (penalty for noncompliance includes entry into an OMB database for non-compliant contractors). DOC has ample reason to accurately characterize a grant termination.

Finally, Plaintiff argues that even though the UG provides appeal rights for noncompliance terminations under § 200.340(a)(1) but not changed-priorities terminations under § 200.340(a)(4), the Court should read an appeal right into (a)(4) anyway. That is wrong. OMB and DOC knew how

23

to include appeal rights when they created and adopted the UG, meaning the decision to not include such rights for § 200.340(a)(4) terminations was intentional. *See Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008) (discussing the *expressio unius est exclusio alterius* canon); MTD at 40-41 (OMB said appeal rights apply to "noncompliance," and "the UG treats noncompliance differently at every step"). The Court should not disturb that decision. *Cf. United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have the authority to create others.").[18]

### D.    Without Its Grant, Plaintiff May Not Challenge the April 9, 2025 Email

Plaintiff reasserts its challenge to the April 9, 2025 email (MTD Ex. E, ECF 32-9), where NTIA previewed that it would disallow cost recovery for diversity, equity, and inclusion activities. Opp. at 27-29. But Plaintiff concedes that its grant has been terminated and will stay terminated. Thus, standing doctrine precludes further litigation over the April 9 Email. Plaintiff may not use the courts to complain about how NTIA administers other entities' grants—even if it might have had a basis to complain in the past. *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); MTD at 45 n.15. In the event DOC administers the Competitive Grant Program and Plaintiff receives a new grant, Plaintiff can argue about NTIA's reimbursement policy at that time. Plaintiff responds that it has standing to challenge the April 9 Email for the same reasons it has standing to challenge the Program Termination. Opp. at 29 (cross-referencing Section I.A of the Opposition). But "[s]tanding is not dispensed in gross[,]" so that argument fails. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted).

Plaintiff introduces only one new, backwards-looking allegation: that NTIA purportedly sent the April 9 Email to stop Plaintiff from "using its annual Net Inclusion conference as a core grant activity." Opp. at 28. That is wrong for several reasons. First, a claim that the Government breached the terms of a grant by failing to reimburse costs incurred pursuant to the grant is a quintessential contract claim. Only the CFC may review it. Second, the April 9 Email does not mention Net Inclusion

---

[18] Plaintiff replies that Judge Nichols read appeal rights into § 200.340(a)(4) in *Porwancher v. National Endowment for the Humanities*, 792 F. Supp. 3d 107, 115-16 (D.D.C. 2025). He did not. He assumed the grant was terminated for noncompliance. *See id.* at 111 ("The regulations also contain a specific termination procedure. The NEH must 'determine that noncompliance cannot be remedied by imposing additional conditions' on the award.").

24

or any specific cost associated with that conference. *See* MTD Ex. C. Third, the issue is neither final nor ripe, as Plaintiff does not allege that it submitted a cost recovery request for the 2025 Net Inclusion conference or that it ever told DOC what speakers, trainings, or events it had planned that might be non-reimbursable "diversity, equity, and inclusion" activities—a term the April 9 Email does not define, in any event. MTD at 44-45. (Indeed, Plaintiff's grant application barely mentions Net Inclusion.[19]) The Grant Termination is a final agency action, but the April 9 Email is not. *See* MTD at 44; *contra* Opp. at 28-29.

Finally, Plaintiff says the doctrine of administrative exhaustion does not apply because "NTIA had already declared its decision final." *Id.* at 28 (citing Compl. ¶ 68). But that paragraph of the Complaint applies to the Grant Termination, not the April 9 Email (from the month prior). *See* Compl. ¶ 68 ("The May 9 [Grant Termination] Letter also claimed that '[t]his decision is final and there is no right of administrative appeal.'"). That is evident from the text of the April 9 Email, which did not say it was final and contained no hallmarks of finality. *See* Ex. E ("As more information becomes available, we will provide additional information."). This Court lacks jurisdiction to review the email.

## CONCLUSION

For the foregoing reasons and those stated in Defendants' Motion to Dismiss, Plaintiff's challenge to DOC's determination that 47 U.S.C. § 1721(8)(G) is unconstitutional should be dismissed. The challenge to the termination of Plaintiff's individual grant should be dismissed for lack of jurisdiction, or in the alternative, for failure to state a claim. And the challenge to the April 9 Email should be dismissed for lack of jurisdiction.

---

[19] The grant application says only that Net Inclusion provides "ongoing collaborative opportunities and support" and allows subrecipients to "develop relationships with each other and the broader digital inclusion community." MTD Ex. C, ECF 32-7 at 3, 13.

Dated: May 26, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

*/s/ Winston Shi*
WINSTON SHI (NY Bar No. 5747068)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel.: 202-880-0387
E-mail: winston.g.shi@usdoj.gov

*Counsel for Defendants*