**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL DIGITAL INCLUSION ALLIANCE,

     Plaintiff,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

     Defendants.

No. 1:25-cv-3606-JDB

---

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS

**INTRODUCTION**

This case turns on a pure question of law: whether Congress violated the Fifth Amendment's guarantee of equal protection by requiring the consideration of race in allocating federal broadband benefits under the Digital Equity Act of 2021, 47 U.S.C. §§ 1721–26. As explained at oral argument, our Constitution prohibits such a racial classification. The Supreme Court, in case after case, has made clear that racial classifications are "presumptively invalid," *Shaw v. Reno*, 509 U.S. 630, 643–44 (1993) (*Shaw I*) (internal quotation marks omitted), and "are permitted only as a last resort," *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (internal quotation marks omitted). This makes sense: the Constitution is "colorblind." *Allen v. Milligan*, 146 S. Ct. 1377 (2026) (per curiam). It made "a transformative promise stemming from our American ideal of fairness," under which only "the most extraordinary case" will allow the Government to classify by race. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 205, 208 (2023) (*SFFA*) (internal quotation marks omitted). The DEA's racial classification—defining the "covered populations" grantees must serve to include "individuals who are members of a racial or ethnic minority group," 47 U.S.C. § 1721(8)(G)—comes nowhere close to meeting that high constitutional bar and is therefore unconstitutional.

Before determining whether that conclusion is correct, this Court has asked the Government two questions. The first is whether the Court can decide the constitutionality of the DEA's racial classification on a motion to dismiss—or whether discovery and further fact development is necessary. And the second is whether adequate funding exists for the Competitive Grant Program's administration in a race-neutral manner, should the Court invalidate and sever the DEA's express racial classification. The answer to both questions is the same: yes. No amount of discovery can overcome Congress's threshold failure to justify its use of race. Nor is there any doubt that funds remain available for the Department of Commerce to administer the Competitive Grant Program without consideration of race. Put simply, this Court can and should decide this case now.

## ARGUMENT

### I.   The Court Should Decide the Constitutionality of the DEA's Racial Classification on a Motion to Dismiss

There is no obstacle to declaring the DEA's racial classification unconstitutional on a motion to dismiss.  To conclude the DEA racially discriminates, the Court must determine whether the DEA contains an express racial classification and, if so, whether that racial classification survives strict scrutiny.  Both determinations in this case are purely legal, not factual, questions.  And both can be decided by the Court on the present record without any factual development.  That is because the only relevant record here is that of Congress, "the institution that makes the racial distinction." *Louisiana v. Callais*, 146 S. Ct. 1131, 1153 (2026) (quoting *Shaw v. Hunt*, 517 U.S. 899, 910 (1996) (*Shaw II*)).  As the Supreme Court recently confirmed, and as the Government explained at oral argument, "Congress expresses itself as a body through the text it enacts[.]" *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, No. 24-345, 2026 WL 1686059, at *8 (U.S. June 11, 2026); Ex. A, Hr'g Tr. at 10:15–16 (same).  By the DEA's plain text, Congress expressed a racial classification for allocating federal broadband benefits.  *See* 47 U.S.C. § 1721(8)(G).  But nowhere in the DEA (or the surrounding legislative record) did Congress make the requisite effort—or any real effort whatsoever—to constitutionally justify the consideration of race with specific findings of past discrimination in the broadband industry.  No amount of discovery or delay can overcome that conclusion.  As a matter of law, this Court has everything it needs to hold the DEA's racial classification unconstitutional.

Start with the DEA's racial classification itself.  The plain text of the DEA requires the Government to issue grants "to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among *covered populations*." *Id.* § 1724(a)(1) (emphasis added).  In turn, the DEA's definition of "covered populations" includes "individuals who are *members of a racial or ethnic minority group*." *Id.* § 1721(8)(G) (emphasis added).  Applicants, by statute, must target their services towards the "covered populations"—including, therefore, "members of a racial or

ethnic minority group"—and the National Telecommunications and Information Administration (NTIA) must consider an applicant's service to such groups as a factor in making awards. *Id.* § 1724(d)(1)(A)(i), (d)(2)(A)(ii). That is a racial classification on its face, clear from the DEA's plain text alone. Indeed, as the Court noted at oral argument, whether the DEA classifies on the basis of race is "a legal question" and "not a factual question[.]" *See* Ex. A, Hr'g Tr. at 30:23–31:6.

Plaintiff's counterarguments fail to persuade. The DEA automatically categorizes only certain individuals as part of the "covered populations"—and not others—based on their race and ethnicity. In that way, it explicitly classifies by race and ethnicity, and Plaintiff's insistence to the contrary is simply wrong. Plaintiff clings to irrelevant observations, including that § 1721(8)(G) expressly *includes* some on the basis of race and ethnicity rather than expressly *excluding* others, that § 1721(8) lists seven other independent groups as "covered populations," and that under § 1724 race and ethnicity might not be dispositive in every grantmaking decision. None matters. The provision still classifies based on race as a legal matter, plain and simple. And for that reason, as the Court noted at argument, the DEA "could have been challenged the day the statute went into effect"; whether NTIA considered race in 2024-2025 says nothing about what Congress enacted in 2021. *See* Ex. A, Hr'g Tr. at 39:11–15. Similarly flawed is Plaintiff's related contention that NTIA has discretion to functionally read out the DEA's racial classification. That NTIA could just ignore the DEA's requirement to consider race in issuing awards is legally incorrect under binding precedent. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("Even when an agency has significant discretion in deciding how much weight to accord each statutory factor, that does not mean it is free to ignore any individual factor entirely." (internal quotation marks and citation omitted)). Try as it might, Plaintiff cannot wish away the plain text of the DEA or its racial classification.

Whether the DEA's racial classification survives strict scrutiny and its "daunting two-step examination" is likewise a purely legal question. *See SFFA*, 600 U.S. at 206. Under that framework,

a court must ask "whether the racial classification is used to further [a] compelling governmental interest[]" and, if so, "whether the government's use of race is narrowly tailored—meaning necessary—to achieve that interest." *Id.* (internal quotation marks omitted). There is only one possible compelling interest that can satisfy that standard here: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Callais*, 146 S. Ct. at 1152 (quoting *SFFA*, 600 U.S. at 207). "To rise to the level of a compelling state interest, an effort to remediate past discrimination must satisfy two conditions." *Id.* (quoting *Shaw II*, 517 U.S. at 909). First, "the State or *Federal Government must identify* the specific instances of past discrimination that it aims to remediate and, in light of that specification, must determine the precise scope of the injury it seeks to remedy," *id.* (emphasis added; internal quotation marks omitted). And "[s]econd, after identifying the specific instance of discrimination, *the institution that makes the racial distinction must have . . . a strong basis in evidence* to conclude that [its] remedial action [is] necessary." *Id.* (emphasis added; internal quotation marks omitted; alteration in original). In other words, "*[u]nless Congress clearly articulates* the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 229 (1995) (emphasis added; quotation marks and citation omitted). Congress's racial classification in the DEA fails on both levels as a matter of law.

*First,* the DEA provides no compelling government interest on its face. To reiterate, Congress must find "specific, identified instances of past discrimination that violated the Constitution or a statute" to justify a remedial racial classification, *SFFA*, 600 U.S. at 207, because it is *Congress* who made that racial classification in the first place, *see Callais*, 146 S. Ct. at 1152. And Congress must make these findings at the time it passes the race-conscious law. *See Wis. Legis. v. Wis. Election Comm'n*, 595 U.S. 398, 404 (2022) (noting that Congress "must have had a 'strong basis in evidence' to conclude that remedial action was *necessary*, '*before* it embarks on an affirmative-action program'" (emphasis in

original) (quoting *Shaw II*, 517 U.S. at 910)).  But nowhere in the DEA does Congress attempt to do so.  Instead, the plain text of the DEA confirms that Congress failed wholesale to connect the need to "increase internet access and the adoption of broadband" to any specific, identified instances of racial discrimination.  47 U.S.C. § 1724(d)(1)(A)(i).  Just look at the DEA's "Sense of Congress" provision, which notes that "broadband connection and digital literacy are increasingly critical" to everyday life, that "digital exclusion" "carries a high societal and economic cost," and that "achieving digital equity is a matter of social and economic justice and is worth pursuing."  *Id.* § 1722 (1), (2), (5).  Or consider Congress's stated "purpose" for the Competitive Grant Program—"to support efforts to achieve digital equity, promote digital inclusion activities, and spur greater adoption of broadband among covered populations."  *Id.* § 1724(a)(1).  The rest of the statutory scheme is the same: nothing in the DEA identifies any specific instance of racial discrimination.  And Plaintiff's complaint seems to admit as much, observing that the DEA's "goal is to provide critical broadband internet access to Americans—all of them" and that "the 'digital divide' Congress sought to address in the Act is not an issue of race or gender[.]"  Compl. ¶ 7 (D.E. 1).  The only real reference to race in the DEA, then, is its racial classification—and that is fatal under strict scrutiny as a matter of law.

*Second*, the lack of narrow tailoring is an equally dispositive legal issue.  Narrow tailoring here requires that "[t]he government's use of race is . . . 'necessary,' to achieve" the remediation of "specific, identified instances of past discrimination that violated the Constitution or a statute.  *See SFFA*, 600 U.S. at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013)).  The DEA's use of race is anything but.  Although "[n]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative, strict scrutiny does require a court to examine with care, and not defer to, a [body's] serious, good faith consideration of workable race-neutral alternatives."  *Fisher*, 570 U.S. at 312 (internal quotation marks omitted).  Yet nothing in the legislative record shows that Congress even considered such alternatives—much less seriously and in good faith.  Instead, Congress

jumped right to an express racial classification by requiring consideration of whether "individuals who are members of a racial or ethnic minority group" would have their "internet access and the adoption of broadband" increased through grant funding. *See* 47 U.S.C. §§ 1721(8)(G), 1724(d)(1)(A)(i). Nor did Congress identify a "logical end point" for its racial classification as required. *See SFFA*, 600 U.S. at 221 (internal quotation marks and citation omitted). By the DEA's plain terms, race will always be a selection factor in allocating federal broadband benefits; and to the extent Congressional funding may potentially show an "end point," the appropriation for the Competitive Grant Program "remain[s] available until expended." *See infra* 9–10; Pub. L. No. 117-58, div. J, tit. II, 135 Stat. 1354. Finally, the DEA's definition of racial classification is plainly over-inclusive. Its text treats those minorities who *suffered* specific instances of discrimination the same as those minorities who did *not*. Such "gross overinclusiveness of [Congress's] racial preference strongly impugns [its] claim of remedial motivation," if one even existed. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989); *Strickland v. U.S. Dep't of Agric.*, 736 F. Supp. 3d 469, 483 (N.D. Tex. 2024). Just as Congress failed wholesale to articulate a compelling government interest, so too did it fail to narrowly tailor the DEA's use of race in grantmaking.

These legal conclusions are clear from the plain text of the DEA, no matter how much Plaintiff argues otherwise. But even resorting to the legislative record only confirms them. In its briefing, all Plaintiff could muster on this front were bare citations—in footnotes—to hundred-page committee hearing transcripts (without pincites); a blog post (concerning purported racial disparities, not discrimination); a 2012 corporate interview with a single legislator (who passed before the DEA's enactment), and a Federal Reserve Bank of St. Louis essay about mortgage redlining from 2023 (two years after the DEA). *See* Opp. at 37–38 & nn. 15–19 (D.E. 38). Plaintiff fared no better at argument. It could not identify a single piece of legislative history that would save the DEA's racial classification—that is because none exists. Nowhere in the record does Congress identify specific

instances of racial discrimination.  At most, legislators and witnesses occasionally mentioned race, but only to identify statistical disparities and disparate impacts.  *See* Defs.' Reply at 12 (D.E. 50).  That is plainly insufficient under the Constitution: "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw II*, 517 U.S. at 909–10 (citation omitted).  Such a straightforward conclusion is one the Court can make today.  After all, the DEA's legislative record is public and available, a reality the Court already alluded to at argument.  *See* Ex. A, Hr'g. Tr. 37:7–38:11 (noting, among other things, that "[i]f it's just looking at the record before Congress, the parties have that and have presented their arguments based on that. And I have access to it. So I don't understand how waiting would be beneficial to the resolution of the issue").  Other courts have decided constitutional challenges applying strict scrutiny on a motion to dismiss.  *See, e.g.*, *Jeffery v. City of New York*, 113 F.4th 176, 194 (2d Cir. 2024) (affirming dismissal of constitutional challenge and holding the challenged policy showed a compelling government interest and was narrowly tailored); *Walker v. Beard*, 789 F.3d 1125, 1135–39 (9th Cir. 2015) (similar).  This Court should too.

No amount of discovery can save the DEA's racial classification from its legal invalidity.  For starters, that Plaintiff seeks discovery is itself a concession that Congress has not "clearly articulate[d] the need and basis for a racial classification" here.  *See Adarand*, 515 U.S. at 229 (internal quotation marks and citation omitted).  It is not as if Congress does not know how to do so.  In fact, Congress tried to satisfy strict scrutiny when it enacted the Surface Transportation Disadvantaged Business Enterprise (DBE) program at the same time as the DEA.  *See* Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58, § 11101(e), 135 Stat. 429, 448–50 (2021).  There, Congress explicitly attempted to identify a compelling government interest for its racial classification and noted it had considered "testimony and documentation" showing "a *strong basis that there is a compelling need* for the continuation of the disadvantaged business enterprise program to address race and gender discrimination in surface transportation-related business."  IIJA § 11101(e)(1)(E) (emphasis added).  Likewise, in an effort to

show narrow tailoring, Congress further found "that *race- and gender-neutral efforts alone* are insufficient to address the problem" of continuing discrimination in the surface transportation industry, *id.* § 11101(e)(1)(C) (emphasis added). Similar findings are entirely absent from the DEA, something that no post-hoc document discovery, depositions, or expert reports can change.

In any event, it is unclear what discovery the Plaintiff even seeks here. If it is discovery into the Executive Branch, that would make no difference. What matters here are the findings that Congress—"the institution that ma[de] the racial distinction"—made when enacting the DEA's racial classification, and what this Court thinks of those findings. *See Callais*, 146 S. Ct. at 1152 (quoting *Shaw II*, 517 U.S. at 910). Those findings had to come when Congress enacted the law, *see Wis. Legis.*, 595 U.S. at 404, so any administrative record from the Department of Commerce (DOC) post-enactment would be beside the point, *see, e.g.*, Ex. A, Hr'g Tr. at 39:1–40:12 (observing that "the promulgation of the challenged provision of the statute" is "not based on an administrative record in the executive branch; that's based on the congressional record and the assessment of the constitutionality of that provision"). Moreover, any post-enactment evidence *developed by Plaintiff* during litigation (e.g., studies, datasets, or expert reports) would be just as irrelevant: "a racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature." *Shaw II*, 517 U.S. at 908 n.4; *see id.* at 910 (rejecting use of reports commissioned after lawsuit that, by definition, were not considered by legislators).

If it is discovery into the Legislative Branch, that would raise a whole host of problems too. Even assuming a waiver of legislative privilege, no amount of post-enactment legislative findings, expert work, or other discovery can alter what Congress wrote—and failed to find—when enacting the DEA's racial classification. *See, e.g.*, *Am. Petrol. Inst. v. SEC*, 953 F. Supp. 2d 5, 20 (D.D.C 2013) (Bates, J.). Backfilling through discovery directly contravenes that principle, which exists for good reason: "[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and

because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be *clearly identified and unquestionably legitimate*[.]" *Croson*, 488 U.S. at 505 (emphasis added; internal quotation marks and citation omitted).  That other equal protection cases—*SFFA*, for example—proceeded beyond the pleadings is immaterial.  *Contra* Ex. A, Hr'g Tr. at 31:7–13.  *SFFA* went to trial not because strict scrutiny categorically demands a developed factual record, but because defining race's amorphous role as a "plus" factor in college admissions demanded one.  *See* 600 U.S. at 192–98 & n.1.  Or put another way, what Congress said, or failed to say, by statute played no role in *SFFA*'s outcome.  By contrast, the constitutionality of the DEA's racial classification is not a factual question for discovery, but a "fairly straightforward legal question" answered by the statutory text and the legislative record.  *See* Ex. A, Hr'g Tr. at 37:7–38:8.

## II.     The Department of Commerce Can Administer the Competitive Grant Program in a Race-Neutral Manner

There is likewise no obstacle to declaring the DEA's racial classification unconstitutional on funding or prudential grounds.  As the Government clarified at oral argument, the DEA's racial classification—specifically, "individuals who are members of a racial or ethnic minority group," 47 U.S.C. § 1721(8)(G)—is severable from the rest of the statute.  And after severance, appropriations necessary to constitutionally administer the Competitive Grant Program in a race-neutral manner remain fully available.  Recall that Congress appropriated $2.75 billion in combined funding for the DEA's twin grant Programs, including $1.25 billion for the Competitive Grant Program.  *Id.* § 1724(a)(1), (l); *see also* Pub. L. No. 117-58, div. J, tit. II, 135 Stat. 1354.  That legislation included advance appropriations of $550 million apportioned annually for fiscal years 2022 through 2026, to "remain available until expended" (also known as "no-year" appropriations).  *See also* Pub. L. No. 117-58, div. J, tit. II, 135 Stat. 1354.  Congress has already appropriated to DOC, through NTIA, each annual tranche through fiscal year 2025—a total of $2.2 billion.  DOC also has custody over these unspent balances through an account at Treasury.  *See The Federal Account Symbols and Titles (FAST)*

9

*Book, Part II, available at* https://tfx.treasury.gov/reference-books/fast-book (Treasury Account Symbol 013X0563). And to date, Congress has not enacted any rescission or cancellation of those balances. DOC thus possesses funding to administer the Competitive Grant Program without consideration of race, should this Court invalidate and sever the DEA's racial classification.

That DOC (and NTIA) did not include funding for the Competitive Grant Program in their budget requests does not change things. As undersigned counsel previously told the Court, while cancellation "might have been proposed," "[a] lot of things get proposed in Congress," and Congress has not made a final determination on the DEA funds. Ex. A, Hr'g Tr. at 63:5–8. After terminating the Competitive Grant Program in May 2025, DOC proposed cancelling the DEA's fifth-year and final $550 million funding tranche in its 2026 Budget. But Congress, in DOC's Fiscal Year 2026 appropriation, expressly declined to adopt the proposed cancellation. *See generally* Department of Commerce Appropriations Act, 2026, Pub. L. No. 119-74 § 5, div. A, tit. I, 140 Stat. 5, 6–16. Similarly, the President's Fiscal Year 2027 Budget proposed cancelling the remaining $2.2 billion in unobligated DEA balances. *See* OMB, *Budget of the U.S. Gov't*, Fiscal Year 2027, at 9 (Apr. 2026) (noting that "[t]he Budget proposes to cancel funding for NTIA's Digital Equity program that the statute requires, and the Biden Administration planned to, *unconstitutionally award based on race*." (emphasis added)). Yet the House Appropriations Committee's marked-up Commerce, Justice, Science Bill for Fiscal Year 2027 omits the cancellation proposed in the President's Fiscal Year 2027 Budget. *See* Commerce, Justice, Science, and Related Agencies Appropriations Act, 2027, H.R. 8845, 119th Cong. (2026). In short, the no-year funds Congress appropriated for the Competitive Grant Program remain in the program today, undiminished by any enacted legislation.

In sum, should this Court sever § 1721(8)(G) as unconstitutional, DOC would administer the Competitive Grant Program applying the statute's race-neutral criteria subject to available funding. *See* 47 U.S.C. § 1721(8)(A)–(F), (H); Ex. A, Hr'g Tr. at 27:5–28:15, 63:13–17.

10

Date:   June 22, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         STEPHEN M. ELLIOTT
                                         Assistant Branch Director
                                         WINSTON SHI
                                         Trial Attorney
                                         Federal Programs Branch

                                         */s/ Patrick L. Butler*
                                         PATRICK L. BUTLER
                                         (NY Bar No. 5813456)
                                         Special Assistant United States Attorney
                                         United States Department of Justice
                                         1401 Constitution Avenue NW
                                         Washington, DC 20230
                                         Tel.: 202-892-0997
                                         E-mail: pbutler@doc.gov

                                         *Counsel for Defendants*

11