# Exhibit A

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL DIGITAL INCLUSION      .
ALLIANCE,                       .
                                .  CA No. 25-3606 (JDB)
        Plaintiff,              .
                                .
    v.                          .
                                .  Washington, D.C.
DONALD J. TRUMP, et al.,        .  Thursday, June 11, 2026
                                .  10:38 a.m.
        Defendants.             .
. . . . . . . . . . . . . . . ..


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


 APPEARANCES:

 For Plaintiff:                 KEITH J. HARRISON, ESQ.
                                ALEXANDRA BARBEE-GARRETT, ESQ.
                                Crowell & Moring LLP
                                600 Fifth Street NW
                                Washington, DC 20001

 For Defendants:                PARTRICK L. BUTLER, ESQ.
                                U.S. Department of Commerce
                                1401 Constitution Avenue NW
                                Washington, DC 20230

                                WINSTON SHI, ESQ.
                                U.S. Department of Justice
                                1100 L Street NW
                                Washington, DC 20005

 Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue NW
                                Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

DEPUTY CLERK:  We are on the record in civil case 25-3606, National Digital Inclusion Alliance versus Trump, et al.  Starting with plaintiff's counsel, please approach the podium and state your appearance for the record.

MR. HARRISON:  Good morning, Your Honor.  Keith Harrison with the law firm of Crowell & Moring.  We represent the plaintiffs, National Digital Inclusion Alliance.

THE COURT:  Good morning.

MS. BARBEE-GARRETT:  Good morning, Your Honor.  I am Alexandra Barbee-Garrett, also with the firm of Crowell & Moring.

THE COURT:  Good morning to you.

MS. CASSELL-STIGA:  Good morning, Your Honor.  Gillian Cassell-Stiga with the Lawyers' Committee for Civil Rights for National Digital Inclusion Alliance.

THE COURT:  Good morning.

MS. Frazier:  Good morning, Your Honor.  Leah Frazier with the Lawyers' Committee, also representing plaintiff National Digital Inclusion Alliance.

THE COURT:  And good morning to you as well.

All right.  Going to the other table.

MR. BUTLER:  Good morning, Your Honor.  Patrick Butler for the United States.  With me at counsel table are Max Nikitas, Winston Shi, and Stephen Elliott.

THE COURT:  Good morning to all of you.  All right. We're here this morning on the government's motion to dismiss in this case, and I'm figuring -- well, depending on what the answers to some preliminary questions are, I'm figuring about 30 minutes a side.

The case is well briefed and is, I believe, narrower than it appeared to be at one point.  But since it is the government's motion, we'll hear first from the government. I assume that will be you, Mr. Butler, presenting argument.

MR. BUTLER:  Yes.

THE COURT:  Who will be presenting argument on behalf of the plaintiffs?

MR. HARRISON:  Your Honor, I will be presenting the constitutional arguments in response to the motion, and my colleague, Alexandra Barbee-Garrett, will be handling the APA claims.

THE COURT:  All right.  And I look forward to hearing from you both, but we'll start with Mr. Butler.

Normally, I give counsel a little time to get their footing and get going in their arguments, but I think today I want to start with some questions for you to see what the scope of the case is from your perspective.

It looks like the scope has narrowed.  That's largely due to the fact that there might have been some uncertainty with respect to the nature of the claim that NDIA is bringing in

its complaint, but the briefing seems to me has made clear that what's pled by NDIA is claims related to the cancelation of the competitive grant program but not as to the termination of the individual grant through that program.

The government appears to be accepting that framing of the case and then acknowledging that because of the narrower framing, some of the threshold arguments are going to fall away. And NDIA, it seems to me, is committing to that characterization of that case in the brief and opposition.

So based on that, let me ask a few questions of the government to begin with to clarify what the grounds for dismissal that I ultimately am going to have to deal with really are, what continues to be relevant. So do you agree that, again, for purposes of the motion to dismiss, NDIA has demonstrated standing to bring their program cancelation claims under an opportunity to compete theory?

MR. BUTLER: Yes, Your Honor. At this stage we agree, and obviously the standing burden increases at each stage of litigation. But for now the motion to dismiss...

THE COURT: You're probably going to want to --

MR. BUTLER: That better?

THE COURT: You can actually raise the podium, maybe?

MR. BUTLER: It's a little further up. That better?

THE COURT: I'm more worried about the court reporter and myself, because you're on the tall side and therefore away

from the microphone.

All right. Next question. So in the motion to dismiss, you have argued that some of the claims by NDIA are not constitutionally ripe. But again, for purposes of the motion to dismiss, do you agree that the program cancelation claims are ripe?

MR. BUTLER: Yes, Your Honor.

THE COURT: And do you agree that the APA supplies a cause of action to challenge the termination of the competitive grant program?

MR. BUTLER: Yes, sir, so far as the underlying program termination was unconstitutional.

THE COURT: And do you agree that NDIA meets the various APA threshold requirements for judicial review? That would include finality and exhaustion, for example.

MR. BUTLER: Yes, Your Honor, although I think the disclaiming of the individual grant has some repercussions for their APA claims, specifically the termination under the uniform guidance, but I think otherwise yes.

THE COURT: And what about the argument that's been made that the APA excess of statutory authority and APA contrary to law claims -- that's counts 4 and 5 -- should fail because the government complied with appropriate legal and regulatory authority? Do those arguments still apply to the NDIA claim as now more narrowly framed?

MR. BUTLER:  We believe there's no violation of those procedures because plaintiffs have disclaimed the individual grant termination.  So there's no way in which we would have violated them.

Obviously, we have merits arguments, but we think now in their opposition plaintiffs have disclaimed any relief related to the individual grant.  So the fact that we might have terminated the individual grant improperly -- and again we believe we did so properly -- doesn't really apply here.

THE COURT:  And a different question.  I just want to get a general sense of the funding here.  The total money appropriated under the DEA, the Digital Equity Act, is what, 2.75 billion?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  But only some of it goes to the competitive grant program.

MR. BUTLER:  Yeah.  I believe it's at 1.25 billion.

THE COURT:  Has any of that already been obligated?

MR. BUTLER:  The only grant that was obligated was NDIA's grant.

THE COURT:  That was the only one that was obligated. Is there a -- I know it's a five-year availability, but does that mean -- and this was back in 2021, but does that mean that the funding is no longer available, or was the five years just a gradual disbursement of the funding?

MR. BUTLER:  My understanding is the latter, and you know we can get into the constitutional effects of the funding, but we think, you know, we're still by the plain text of the statute required to give out that money unless we have a constitutional objection to it, and we do here.

THE COURT:  All right.  Now you're on your own.

MR. BUTLER:  Thank you, Your Honor.

Your Honor, this case is about whether the federal government can use race in allocating federal broadband benefits --

COURT REPORTER:  Now you're going way too fast.

MR. BUTLER:  I'll start over.

Your Honor, this case is about whether the federal government can use race in allocating federal broadband benefits under the competitive grant program of the Digital Equity Act.

The answer to that question under our constitution is no.  The express racial classification fails strict scrutiny.  It lacks any compelling government interest whatsoever and the text the DEA it shows no narrow tailoring.  And for that reason, all the plaintiff's claims fail as a result.  I'll walk you through the exact constitutional reasons why this is problematic.

Under our Fifth Amendment guarantee of equal protection, race-based classifications by the federal government are

presumptively unconstitutional.  That's clear from *Bartlett,* which said racial classifications are only permitted as a last resort.  That's even clearer recently from *SFFA* , *Students for Fair Admissions,* which said racial classifications are odious and they're a perilous remedy.  But that's precisely what the DEA does here.

In allocating federal funding to grantees like NDIA, the federal government must consider whether an application would, quote, increase internet access in the adoption of broadband among covered populations to be served by the applicant in turn the DEA defines --

COURT REPORTER:  You need to really slow down.

MR. BUTLER:  And in turn, the DEA defines "covered population" to include individuals who are members of a racial or ethnic minority group.  That's a racial classification on its face.  But it's really hard to see how it can be anything but.  Race therefore put simply places selection factor in how the federal government gives out grant money.

This racial classification of the DEA has real-world consequences.  The grant funding is statutorily required to support activities aimed at covered populations including individuals who are members of a race or ethnic minority as I said.  The whole purpose of the program then is aimed at covered populations one of which are members of a racial or ethnic minority.  Given the global --

THE COURT:  What do you think that provision -- members of a racial or ethnic minority group as part of the definition of covered populations, what do you think it really allows the government to do or not to do?  Does it just put discretion in the government's hands?

MR. BUTLER:  Sure, Your Honor.  We don't --

THE COURT:  And we're only dealing with the provision -- the parallel provisions that aren't exactly the same for the competitive grant program and for the state capacity grant program, but we're really focused on the competitive grant program.

MR. BUTLER:  Yes, Your Honor.  But we don't think it allows the government to consider race whatsoever.  Racial classifications, as I said, are only as a last resort and requires Congress to satisfy strict scrutiny it shows -- it needs to show a compelling government interest and narrow tailoring.  Here there's neither.  On that basis we declared that we would no longer enforce the racial classification here.

THE COURT:  Should it matter to me that the provision with respect to the competitive grant program is more discretionary, a little bit different than the provision with respect to the state capacity grant program?  Should that indicate anything?

MR. BUTLER:  I don't believe so, Your Honor. Discretion is no cure to discrimination as we said in our

briefs the fact that the government could choose to ignore the racial classification as plaintiffs propose is really not an option for a couple of reasons, one that's not what the statute says by its plain text it requires consideration of benefits to covered populations one of which is individuals who are racial and ethnic minority but also we'd be subject to an APA challenge of just completely ignoring one factor in a multifactor test, and that's clear from D.C. Circuit case law as well.

THE COURT:  So why isn't discovery a good idea here to explore some of the considerations relevant to a strict scrutiny analysis?

MR. BUTLER:  Your Honor, under the strict scrutiny framework, Congress must clearly articulate the basis for racial classification, and Congress speaks to the text of what it enacts.  Here there's simply no racial remedial findings here.  Under *FSSA* they have to identify specific instances of discrimination.  Here in the Digital Equity Act they identified a digital divide.  They tied it to social economic issues, but nowhere do they tie it to racial issues.

And worse still they never tie it to identified instances of discrimination.  So that's clear from the plain text of the DEA.  If you want to look at legislative history, and again we think it's plain from the text of the DEA that also confirms our position there's no committee reports there's no floor

statements, etc.  The most plaintiffs can point to are citations to hearing transcripts that mention race but never tie race to the digital divide or really tied to intentional discrimination.

It's also unclear what sort of discovery plaintiffs would be proposing here that would help them.  We think on the plain text of the DEA and even if you want to consider legislative history nothing could absolve the DEA from its infirmities. What Congress --

THE COURT:  Strict scrutiny in many cases is a pretty fact-intensive assessment, but here you think there's nothing to it in terms of facts.

MR. BUTLER:  I wouldn't say there's nothing to it.  I think there's nothing to the text of the DEA related to race. So if they had said perhaps that racial discrimination was animating the DEA, that might be one thing to test out how severe that was.  You know, case after case in Supreme Court talks about it needing to be specific and identified.

In *Croson*, for example, you know, had to be tied to the city in Mississippi at issue in that case.  But here at the threshold there's simply no legislative fact finding to that effect.

THE COURT:  What do you think the distinction is between racial classifications and race-conscious policies?

MR. BUTLER:  Sure, Your Honor.  So here again we

believe it's a racial classification.  You know, an example of race-conscious policies might be some of the cases plaintiffs cite related to seeking government information related to race.  There you're not allocating a benefit or burden based on race but you're simply seeking to collect information demographic data related to race.  My understanding under current case law that's not a racial classification that triggers strict scrutiny.

THE COURT:  So are some of the cases that the D.C. Circuit has decided in the past where they've upheld race-conscious policies, are those no longer good law?

MR. BUTLER:  No, Your Honor, and we're not asking you to deviate from D.C. Circuit precedent.  I think what you're referring to is *Rothe* from 2016, and there the racial classification was in the regulation, not on the face of the statute.

So plaintiffs there challenged the statute.  They made clear they disclaimed any reliance in the regulation which is where the prejudice element came in -- excuse me -- the presumption element.  So the text of that statutory scheme didn't presume a racial classification.

Here the racial classification is bare.  It says individuals who are members of a racial or ethnic minority.  In *Rothe*, I believe that there was additional clause that who had suffered prejudice based on their ethnic or racial

minority.  So there was something more there.

THE COURT:  So in *Students for Fair Admissions*, was the racial classification something that had to be considered?

MR. BUTLER:  Sorry, Your Honor.  I'm not sure --

THE COURT:  Was race something that had to be considered in an admission decision with respect to any given student?

MR. BUTLER:  Under the UNC and Harvard regimes, I believe they had to consider race based on that.  Here if the government is doing the racial classification, which is even more suspect, there there was more discretion, and even then under the Supreme Court precedent, that failed too.  So here there's a mandate to consider race, to use race as a selection factor, and that's problematic under our constitution.

THE COURT:  So do you think race is mandated to be considered in every grant determination?

MR. BUTLER:  As written in the DEA, when you're considering whether to benefit covered populations through giving out a grant, that necessarily implies race.

THE COURT:  Couldn't a lot of those grant decisions be decided on the basis of identifying one of the other -- what is it, eight? -- definitional classifications for covered population and never even reaching the question of race or ethnicity?

MR. BUTLER:  Sure, Your Honor.  I think the Supreme --

THE COURT: Wouldn't that be true in any number of instances?

MR. BUTLER: Sure, Your Honor. I think in the Supreme Court in *SFFA* dealt with this when plaintiffs had said that race was not a dispositive factor in college admission decisions, and the court rejected that argument and said as soon as you start classifying on the basis of race and considering race, that itself is the injury.

So here, whether or not race was dispositive of giving the grant -- giving out a grant, sort of irrelevant to the constitutional determination whether race played a selection factor.

THE COURT: So it's just the possibility that race will be considered and determinative that matters.

MR. BUTLER: So, Your Honor, I don't know if it's a possibility we're required to consider as part of the determination of whether to give out a grant whether it benefits covered populations. And we have to go through the list of eight covered populations to consider whether it's going to benefit those eight.

The fact that it's a multifactor test and some parts of it may be waived more than others is not really what matters. Instead, the fact that we even have to consider race and that there's a classification based on race is what really matters.

THE COURT: So what if Congress enacted the Digital

Equity Act without that particular provision -- it's 8(g) of the list of it goes through (h) -- but then competitive grant program funding was still disproportionately going to grantees who benefitted members of minority groups because of the correlation between minority groups and those other eight categories for covered population, would that still be an equal protection problem?

MR. BUTLER:  No, Your Honor.  I think your question shows why there's an equal protection problem here.  The fact that there is a racial classification without the finding of causation and a tie between that is the issue.  If there's mere correlation, that's not sufficient to satisfy compelling government interest.  So the fact that there my be disparate impact really is not the issue here.

THE COURT:  And I take it that when we're talking about racial classifications we include within that concept ethnicity.

MR. BUTLER:  Yes, Your Honor.

THE COURT:  You're not dividing between race and ethnicity.

MR. BUTLER:  No, Your Honor.  And I don't think the Supreme Court precedent divides either.

THE COURT:  All right.  Please continue.

MR. BUTLER:  So as I said, Your Honor, the use of race here in the Digital Equity Act plainly triggers and fails strict scrutiny.  First start with the complete lack of

compelling government interest here.  The DEA classifies by race as a facial matter that distinguishes it from *Rothe* in the D.C. Circuit, and as soon as it triggers by race it needs to have a compelling government interest.

Here under *SFFA*  and other precedents, *Callais* more recently, the only compelling government interest here could be remediating specific identified instances of past discrimination.  And this was a big portion of that is very important.  It can't just be general alleviation of societal discrimination *Croson*, *Adarand*, case after case rejects that justification.

It must be Congress who identifies the specific instance of past discrimination, not anyone after the fact, you know, post-enactment evidence of racial discrimination even isn't relevant.  And again to be clear, there's nothing like that here.  Again those findings must be present at the time Congress made that law.

Under *Adarand*, unless Congress clearly articulates the need and basis for racial classification and also tailors the classification to its justification the court should not uphold this kind of statute.  The same is true here.

So again nowhere in the text of DEA again Congress speaks to the text it enacts did they identify anything close to a specific identified instance of discrimination of broadband industry.  They instead refer to the sense of Congress

provision which identifies the importance of broadband connection and digital literacy but it notes that digital exclusion carries a high societal and economic cost but none of that is tied to race let alone racial discrimination.  I'll also turn now to narrow tailoring, Your Honor, unless you have --

THE COURT:  No, go ahead.

MR. BUTLER:  So assuming there wasn't even a compelling government interest here it's not narrowly tailored here to remedy the specific instances.  So under *Fisher*, under *SFFA*, narrow tailoring must be and serves a coherent goal must have the compelling justification.  There must be a logical end point and it must also not be over- or underinclusive.  The DEA's use of race in a competitive grant program fails each of those requirements.

Here Congress jumped right to a racial classification. It didn't see whether that seven other provisions in the definition of "covered population" would fix the racial -- excuse me -- the digital divide to the extent it's racial. And again just to be clear there's nothing in the text of DEA or legislative history that shows the requisite compelling government interest but assuming that isn't satisfied --

THE COURT:  So if Congress had simply said in our assessment of the relevant materials, we think in most instances the other categories would suffice to advance the

purpose of the statute, but there might be, and we believe there will be, some that would warrant specific assessment of race or ethnicity, would that be enough of a rationale for narrow tailoring?

MR. BUTLER:  So Your Honor's saying that for the most part --

THE COURT:  Well, you're suggesting that what Congress needed to do was try without that provision first and see if that would advance the goals of the statute.  You're not saying that they needed to do a test case first, are you?

MR. BUTLER:  No, Your Honor.

THE COURT:  So all they needed to do was explain why Congress thought that the other provisions would not be sufficient to advance the purposes of the statute.

MR. BUTLER:  Your Honor, I'd actually point the court to the Service Transportation Disadvantaged Business Enterprise program, which was enacted around the same time as the DEA, where Congress tried to make exactly those findings you're referring to.

So it said, quote, testimony and documentation provide a strong basis that there is a compelling need for the continuation of the disadvantaged business enterprise program to embrace race and gender discrimination in service transportation related businesses.  So that is Congress attempting to show the compelling government interest.

They also tried to show narrow tailoring by saying Congress has received and reviewed testimony and documentation of race and gender discrimination from numerous sources, and then it goes on to say, which show that race and gender-neutral efforts alone are insufficient to address the problem.

We don't have anything like that here.  The Digital Equity Act has a bare racial classification without any attempt to show Congress's work, and that's a constitutional problem. So, you know, Congress jumped right to the racial classification that began without showing its work.

THE COURT:  It's almost as if you're not requiring anything more than the factual record on the narrow tailoring issue but you're just saying that Congress needed to assess whether this provision was necessary or whether there was a narrower way to accomplish the goals.

MR. BUTLER:  Your Honor, I think that you know obviously the narrowed tailoring analysis depends on what the compelling interest is and the racial classification needs to be tailored to serving that interest, so the fact that they don't have the former dooms the latter.  But assuming they do have the former, Congress again made nothing like the required findings in the service transportation board issue.

I might address a few of plaintiff's counter-arguments to the absence of strict scrutiny if Your Honor would like.

THE COURT:  Go ahead.

MR. BUTLER: So plaintiffs effectively ask this court to read race out of the statute. They say a number of different ways to do that. They cite the general antidiscrimination principle in 1726. They say discretion, which Your Honor picked up on that you can choose not to apply the racial classification here, but that does nothing to solve the problem. The racial classification is still on the books. The new administration could pick up down the road and decide to allocate on the basis of race.

Again, *Croson* dealt with this as well. Racial classifications are suspect, and that means simple legislative -- simple legislative assurances can't suffice nor can the executive's assurance that we'll use this responsibly suffice either under our constitution.

I'll also note *SFFA* rejected the sort of "trust us" argument in the college admissions context. That applies here as well. And as I noted, D.C. Circuit precedent requires that relevant statutory factors when they're enumerated each of them to be considered even if they're not present or if there's no facts emanating them they must be considered.

I'd also note that 1726, the general discrimination principle, applies to grantees and how they use the money, not the federal government and how it allocates it that plaintiff proposes sort of saving construction on the racial classification but that racial classification means what it

says.  Plaintiffs can't avoid that simply to say the statute, you know, the reason why the executive declined to enforce the grant program was because of the constitutional issue.

We're requesting that ruling here to see if the executive -- excuse me -- the judiciary agrees with us.  That's plain from *In re Aiken* by Justice Kavanaugh, then Judge, that the executive can choose not to enforce the statute determines to be unconstitutional unless and until the judiciary rules that it is constitutional.

THE COURT:  Yeah, a lot's being made of *In re Aiken* in a concurring opinion by one then-judge of the D.C. Circuit.

MR. BUTLER:  Sure.

THE COURT:  It's not as if there's a contrary law; it's just an observation of how things work between the executive and the -- executive branch, Congress, and the judiciary.

MR. BUTLER:  Yes, Your Honor.  Your Honor picked up on this on discovery and why it's needed here.  Plaintiffs cite to several separation of powers cases about the nature and extent of intrusion on the executive branch as support for that reason for discovery, but all of those cases don't really apply here.

We're not saying the Digital Equity Act intrudes on the executive branch.  We're not saying the president's abilities to enforce the laws are hindered by this.  We're saying that giving out these grants are the result of an unconstitutional

statute.  So those cases are a bit beside the point.

I'd also like to address plaintiff's pretextual assertion that there was something else motivating this grant termination program, or termination of the grant program. Again, we have to take plaintiff's pleadings as true at this stage of the motion to dismiss, but even assuming all that is true I don't think there's a connection between an email on April 9th disclaiming any reimbursements related to DEI conferences or programs related to plaintiff's individual grant and a month later a public statement from the president and the secretary of commerce in a grant letter that the Digital Equity Act is a competitive grant program is unconstitutional.  I just don't know --

THE COURT:  Are their motives for terminations at all relevant?

MR. BUTLER:  So, Your Honor, I think here the reason why the executive terminated the grant program is because it's unconstitutional.  So that is really what this case turns on. Whether or not there was something else motivating that, and again we have to take --

THE COURT:  So if there were something else motivating, some broader consideration, would that lead to a different result?

MR. BUTLER:  I don't think so, Your Honor.

THE COURT:  Why not?

MR. BUTLER:  The Constitution, under the executive's view, compels this result.  The statute discriminates on the basis of race by having a racial classification.  It doesn't show a compelling government interest to justify that racial classification, and there's no narrow tailoring.  That's a mandate decision, assuming you agree with us, that the statute is unconstitutional.

If this was a discretionary decision about whether to give out the grants without any sort of constitutional objection, that might be one thing and sort of more in the pure APA land. But here there's a constitutional dimension that required us in our determination not to give out the grant money.

Again, Your Honor, most plaintiffs can point to here to show a compelling government interest is bare citations to hundred-page committee reports -- excuse me -- committee hearing transcripts, not even reports, blog posts and corporate interviews with legislatures.  Even if you picked though them there's simply no way that they show specific identified instances of past discrimination.

That's plainly insufficient under our case law.  Plaintiffs try to wish away the lack of compelling government interest to say COVID-19, they should -- we should apply a lesser burden to Congress because of the pandemic.  That would --

THE COURT:  That makes some sense that it would be harder for Congress in that context.

MR. BUTLER: Sure. You know, there's some intuitive appeal to that, but the Superior Court has rejected that justification in other contexts. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court said even in a pandemic the Constitution cannot be put away and forgotten.

Here, because racial classifications are supposed to be a last resort because they're a perilous remedy, because they're odious, Congress has to show its work. Strict scrutiny is supposed to be burdensome.

And whether Covid-19 affected legislative comings and goings and the ability to legislate doesn't really change that. Again, the service transportation board legislation came around the same time. They were perfectly capable of trying to show its work there. Here there's a complete absence of that.

Again, Your Honor, plaintiffs also rely on *Grutter* here, and I don't think you need to decide whether *Grutter* is good law to be clear under *SFFA*. You could look at *Croson* as well and say Congress was required to consider race-neutral alternatives, and we talked about that earlier. I'll also note that under *Croson* the court rejected a narrow tailoring analysis where the racial classification applied to all minorities without showing whether they had suffered discrimination.

So African Americans were treated the same as Hispanic

minorities regardless of whether there was discrimination shown against them in the construction industry in that town in Mississippi.  Here the same is true.  There is no narrow tailoring to serve the compelling government interest of remediating specific identified instances of discrimination, even assuming that exists.

I'm happy to turn to the APA issues, Your Honor, unless you have any further questions --

THE COURT:  Go ahead.

MR. BUTLER:  Sure, Your Honor.  You know --

THE COURT:  What are the APA issues?

MR. BUTLER:  Sure.  I think just to clarify things, Your Honor, if you decide that -- unconstitutional, that resolves all of plaintiff's claims.  You can't have an APA claim against the government for its failure to give out money under an unconstitutional grant program.  But even assuming -- like assuming that constitutional --

THE COURT:  If I decide that I should reach basically the equal protection assessment of that provision and whether it's a racial classification and decide that it is, that's the end of the game.

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Nothing else really matters.

MR. BUTLER:  Well, I think --

THE COURT:  Except for something you'll get to in a

moment, and that's severability.

MR. BUTLER:  Sure, Your Honor.  I'm happy to talk about severability now if you'd like.

THE COURT:  You can do it in whatever order you wish.

MR. BUTLER:  Sure.  So just on the APA claims quickly, again, counts 4 and 5 of the APA allegations here are tied to the individual grant termination.  Plaintiffs have disclaimed any reliance on these individual grant terminations.  So that alone sort of knocks out those APA claims related to the grant termination.  They still have APA claims related to the larger program termination as Your Honor noted at the beginning of the hearing, but anything tied to the individual grant termination has been disclaimed.

Assuming they didn't disclaim that, the Department of Commerce properly terminated the individual grant initiative here from --

THE COURT:  I have to resolve jurisdictional issues. I'm not sure I have to resolve everything that is on the basis of assuming that they did --

MR. BUTLER:  Sure.  Agree, Your Honor.  And again if you decide the constitutional issue in our favor, you do not have to reach these APA issues.  So I can move on to severability if you'd like.

THE COURT:  All right.

MR. BUTLER:  Excuse me?

THE COURT:  Go ahead.

MR. BUTLER:  Okay.

THE COURT:  Why is it that -- or what is your argument as to why the racial provision is not severable?

MR. BUTLER:  Sure, Your Honor.  I'd like to clear this up because I think there was some ambiguity in the briefs as I prepared for the argument.  It's our position that the racial classification is severable.

So if you decide that the racial classification is unconstitutional but it doesn't satisfy strict scrutiny, et cetera, and then you sever it, we would obviously apply the grant program without considering race.  And that's not too far from what plaintiffs want to sue.  They want to read race out of the statute.  We want to do that too, but we think we need a constitutional determination from this court to do so.

THE COURT:  So in the government's view, that determination by a court that the racial provision is a racial classification and therefore unconstitutional but that it can be severed would enable the government, and you say the government would continue to have this program under the DEA, the competitive grant program and allow it to receive applications and disburse funds.

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Using the other definitional categories under the statute for covered populations but not using this

one provision.

MR. BUTLER:  Yes, Your Honor.  A policy disagreement, to the extent it is even one, is not sufficient to ignore the statute.  Here the issue is the racial classification.  And if that's excised, we would obviously apply the grant program as written in consideration of those covered populations.

THE COURT:  But in fact what the government has done so far is to suspend the entire program, right?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  But you're saying that the government is not going to continue to do that.

MR. BUTLER:  Yes, Your Honor.  Admittedly, the public statements could have been more precise, but I think going forward we would administer it without the racial classification and adhere to the text of the statute.

THE COURT:  Because I think even the letter from the solicitor general to the House of Representatives was broad enough to conclude that the whole program was being suspended.

MR. BUTLER:  Yes, Your Honor.  I'm glad to clarify that.  You know, obviously, if you sever we will adhere to that ruling.

THE COURT:  All right.  Thank you.

What else would you like to say?

MR. BUTLER:  Sure.  I think unless Your Honor has any other questions, I'd just like to --

THE COURT:  Give someone else a chance.

MR. BUTLER:  Thank you.

THE COURT:  Thank you.

So to hear the government, basically, this case boils down to, Judge, you need to decide the issue of the constitutionality of this one provision of the DEA, one of the definitional provisions for covered populations -- and from the government's perspective, it is unconstitutional -- and the government agrees that it can be severed and the program can continue to operate and accept applications, including from your client, without that one provision being considered in deciding applications.  So is the case as simple as that, or are there a lot of other things we need to deal with?

MR. HARRISON:  Your Honor, may it please the court, the case is far from that simple.  Your Honor, if it was that simple, then the executive branch could have made different decisions.  Didn't have to terminate the entirety of the program.  It could simply have, one, used the Impoundment Act of 1974 to ask Congress to remove that language that it found offensive.  It didn't do that.

THE COURT:  I have to tell you that for the last year and a half I've been dealing with situations where the government could have done it this way, and often things do modify through litigation being filed and things are clarified.  Why shouldn't I take the government at its word

now that what they really intend to do, even if they didn't say it, as well as in the past, is to continue with the program just without this racial classification?

MR. HARRISON:  Your Honor, what the government is asking this court to do is make a determination that a properly enacted statute by Congress is on its face unconstitutional.

As this court is well aware, facial unconstitutionality is a very difficult test.  The test is that there is no set of facts under which this statute could be constitutional.

For number one, there is no case that the defendants have cited and no case that we have found where a court made that type of constitutional decision on a motion to dismiss without any factual record.  Not a single case that they relied on says that.

And to declare for this court at the motion to dismiss stage, to declare this statute unconstitutional not based on the pleadings but based on a defense that is raised in opposition would be to essentially throw first principles of Rule 12(b)(6) out.  There are a multitude of factual issues that are extremely relevant and that matter.

THE COURT:  Tell me what they are.

MR. HARRISON:  Yes, Your Honor.

First of all, we believe that *Twombly* controls and that the facts alleged -- that the claims, especially the constitutional

claims, have been plausibly alleged throughout the complaint. Without regard to the factual issues, the most glaring factual issue is the assertion that the covered population framework constitutes a racial classification.

THE COURT: That's a legal question. That's not a factual question, is it?

MR. HARRISON: Your Honor, we believe it's a mixed question of law and fact. And none of the cases relied on by the defendants were ever decided on anything less than a full trial record. *SFFA*, in fact, that was two separate trial records. *Adarand Contractors*, full record. No court has made the decision that the defendants are asking this court to do based on the pleadings alone.

THE COURT: But you've got to tell me why that's a problem rather than just saying, oh, you can't do it on a motion -- or shouldn't do it on a motion to dismiss; you should somehow wait for motion for summary judgment.

What's the difference going to be? What are the facts that we're waiting for? What's the failing in the factual presentation? I have the statute and the record for the statute, i.e., what Congress said in support of this racial classification. What more factually should I be waiting for?

MR. HARRISON: Your Honor, with regard to the congressional record, we believe that the record before Congress was not just what is in the statutory background.

Congress has been looking at this issue of the digital divide for several years, and we believe that the court should look at the entirety of the congressional record. With regard to the racial classification, there are a number of facts.

THE COURT: But isn't that something that you could have presented to me already by referring me to parts of the congressional record if you thought that they supported the position that this provision is constitutional?

MR. HARRISON: In fact we did, Your Honor, in our opposition.

THE COURT: So I have that before me. So what facts am I waiting for, then?

MR. HARRISON: Your Honor, with regard to the congressional record, in response to the motion to dismiss, we submitted some additional information, but I don't think it's incumbent -- I didn't think it was incumbent upon us on a motion to dismiss review the entirety of what could have been before the court -- could have been before Congress.

THE COURT: Is all we're talking about then, basically, a request to me, don't decide this on the motion to dismiss and the briefing and materials in support of each side provided during that briefing; instead, simply schedule -- defer on the motion to dismiss. Don't decide it, or deny it without prejudice, whatever we want to say, and simply schedule summary judgment briefing to decide that

constitutional question through summary judgment briefing, which would include fuller, perhaps, references to the congressional record, or are you talking about some other development of facts?

MR. HARRISON:  Yes, Your Honor.  There's additional development of facts.

THE COURT:  What is that additional development of facts, and what procedure are you suggesting should be used in order to develop those facts?

MR. HARRISON:  With regard to additional facts, the concept of whether this is a racial classification is a fact-based inquiry.  With regard to the framework of the DEA statute, it's not a racial set-aside.  It's not a racial quota.  It is the express consideration of race by Congress that has not been outlawed by *SFFA* or any other more recent Supreme Court decisions.

THE COURT:  But listening to what you're saying, that sounds like a legal argument you're making.  It doesn't sound like, oh, Judge, you need to wait for the development of further facts and here's how those facts should be developed. We want to take -- we want to issue interrogatories and take depositions, or this is an APA case and we're talking about the administrative record and there is no administrative record really, there's just a congressional record, but we want to delve into that further and present you with more

precise information from the record that was before Congress. What is it that you want to do?

MR. HARRISON:  Your Honor, with regard to the -- we believe there is at least some administrative record with regard to how the award to NDIA was made, and at least that is some --

THE COURT:  That's the individual reward.  That's not really what your focus in this case is.  Your focus is on the termination of the program.

MR. HARRISON:  That is correct, Your Honor.

THE COURT:  Now the program is not being terminated, according to the government.

MR. HARRISON:  Well, I don't know -- the --

THE COURT:  I think we can get through that oddity, but go ahead.

MR. HARRISON:  But, Your Honor, that is evidence of how the program was being administered and how and to what extent race was being considered.  But in addition to just the --

THE COURT:  What time period are you talking about for how the program was administered?  From 2021 to the present?

MR. HARRISON:  I believe it would be the time from the enactment through the time that the president issued his social media tweet --

THE COURT:  Till May of last year.

MR. HARRISON:  Yes.  Yes.  But also, part of the --

THE COURT: But most of that was by the prior administration, not by the current administration.

MR. HARRISON: Yes.

THE COURT: Do I correctly understand the government is saying that there was only one disbursement of any funds, only one grant made and that was to your client, NDIA, the $25 million grant that we're talking about, that there had been no other grants?

MR. HARRISON: That is our understanding, Your Honor. There were other obligees; that is, there were five other nonprofits that applied and were in the process of receiving an award. So there's that administrative record. But there's also the record with regard to the termination of the program.

THE COURT: Okay. But what is that going to show me that is relevant to the determination of the constitutionality of this provision at 8(g) of the definitions of covered populations? What is all that going to show me? I don't understand what the facts are that you say are going to be determinative or helpful for me in determining the constitutionality.

MR. HARRISON: The actual way that the program design of covered populations was implemented; that is, there's a lot of discretion, as Your Honor pointed out, that's built in.

THE COURT: Let's assume that in every instance there's only one grant, but in the other considerations that didn't

reach culmination.  In every instance, the government decisionmakers with respect to disbursing these funds on the grant awards did not specifically reference 8(g) in their determinations.  Let's assume that.  I think that's the best that the record could show for you.  What would that mean in terms of my deciding the constitutionality of this provision?

MR. HARRISON:  Well, that would demonstrate as a matter of fact and law that there was no racial classification.  The issue of racial classification means that benefits were being awarded based on race.

First of all, we believe that the way the framework is set up that would not happen in any event because, for example, the training programs that NDIA was intending to provide, they're not limited by race in any measure.  In fact, that's prohibited by the statute itself.

And so the fact that the way the program was designed to consider and include but not exclude members of any race is what separates the design of this program from any of the programs that have been examined by courts previously.  There was an opportunity for Congress, and the goal of this language was to make sure that populations were not excluded, that they were included.

But in that regard, there's nothing in the statute that excludes any member of any race from attending an NDIA training.  So the benefits to the individual are not allocated

based on race.  That's what a racial classification is. In every instance where race was considered to be a racial classification, it had to do with some benefit or some money that was being provided to a company, an individual, or some right or effort to an individual based on race.  That is not happening here.

THE COURT:  It seems to me that that's a viable or colorable argument for you to make, but I don't understand how it is dependent upon the development of a further factual record.  You're making that argument, and it doesn't depend on a further factual record being developed.

What I'm not understanding is why I need to wait to decide this issue.  As a generality, you're arguing you need to wait because this is only the motion to dismiss, not a motion for summary judgment, and you need to wait because there are factual issues.

Well, you haven't really identified a specific factual question that's relevant to the determination that's in dispute, and you haven't really identified for me what further facts need to be developed and how they would be developed. If it's just looking at the record before Congress, the parties have that and have presented their arguments based on that.  And I have access to it.  So I don't understand how waiting would be beneficial to the resolution of the issue. That's what I'm grappling with.

I'm not going to beat this dead horse any longer, but I'll give you a chance to respond one more time to my question as to what is it that would be gained by waiting to resolve what appears to be a fairly straightforward legal question and instead waiting for the development of some facts. What are those facts, and how would they be developed?

MR. HARRISON: May I have a moment, Your Honor?

THE COURT: Sure.

(Plaintiffs conferring.)

MR. HARRISON: Thank you, Your Honor.

THE COURT: Certainly.

MR. HARRISON: There is an administrative record because there was consideration of these grants.

THE COURT: Consideration of what?

MR. HARRISON: Of the grant applications. And we believe that understanding and seeing as Your Honor said what the agency actually did with these grants is an important factual aspect with regard to *SFFA* and all the other cases on which the defendants rely. The courts looked carefully at how those programs actually worked.

Here we don't have the record before the court, the administrative record before the court, about how these programs -- how the award process, which is at issue, actually worked. And so we believe that at a minimum that would be an important aspect for the court to consider as opposed to --

THE COURT:  The problem with this is this APA-related analysis.  Normally in an APA case, there's a challenge to a government action.  And you have that government action, and there's an administrative record supporting — the government hopes — that government action.

Here there are three different events that can be focused on.  One is the promulgation of the challenged provision of the statute.  That's not based on an administrative record in the executive branch; that's based on the congressional record and the assessment of the constitutionality of that provision.

It could have been challenged the day the statute went into effect and there wouldn't be any record of the administration of that statutory provision by the executive branch in deciding grant awards.  It would be assessed, based on its face, is that an impermissible racial classification.

Another event that is presented is the grants, or the consideration of applications for grants, and that's what you want me to focus on as an administrative record that is relevant to the determination of the constitutionality of that provision of the law.

And the third event is the government's decision -- the president's decision in this instance implemented by others -- that this provision is unconstitutional.

But those are three different events.  Talking about it in APA administrative record terms is a little bit odd because

what we're really talking about at this juncture is the constitutionality of a provision of a statute that was passed by Congress, not an executive branch action in determining whether it is or is not constitutional.  What the executive branch says as to whether it is or is not constitutional, quite frankly, it's just the argument they're making.  I mean it's up to the court to assess the law that Congress passed.

I'm just grappling with the problem of identifying what administrative record is essential to resolving that legal question of the constitutionality of this provision that the government contends is a racial classification.

MR. HARRISON:  Your Honor, the manner --

THE COURT:  And I can see that this is sort of an odd posture to be talking about the administrative record, so it's giving me and you some difficulty in identifying what it is that we'd really be looking for in terms of an administrative record with respect to this provision of law.

What the government has done or not done with respect to considering grant applications, I can see how it might have some relevance, but I can also see an argument that's not really determinative of the constitutionality of the provision.

MR. HARRISON:  Well, Your Honor --

THE COURT:  But I'm going to let you go on now to what else you want to talk about so that I don't continue on this theme.

MR. HARRISON:  Thank you, Your Honor.

THE COURT:  So talk to me about -- I mean, this is continuing the theme, but just give me one last crack at sort of your best case of what you think could be developed factually or a record could show that would support your position that this single definitional provision of the statute is constitutional.

Hypothetically, what's the best case that you think a record should demonstrate that should lead me to conclude that the provision is constitutional?

MR. HARRISON:  Your Honor, I'm assuming you're asking basically the same question, that is, what facts we would be looking for?

THE COURT:  It's another way of asking the same question.  I think it's the 17th way that I've asked the same question.

MR. HARRISON:  Well, Your Honor, there was a lot of demographic data that was considered by the court.

THE COURT:  By Congress?

MR. HARRISON:  I'm sorry, by Congress.  I do not believe we have provided the full and robust record of everything that Congress considered in making its determination in developing the covered population framework on a motion to dismiss.  We identified a number of reports, a number of hearings and information, but we're confident that

42

there's more in terms of --

THE COURT:  The government's position is that you're still faced with the same shortcoming as existed in *Students for Fair Admissions*.  And the Supreme Court spoke to that and said that you can't have a race-based preference that is justified only by the government interest in remedying the effects of societal discrimination.

Their position is -- and they're pointing to the record before Congress -- that that's all that Congress really was relying on.  That's all that Congress was really looking at were those generalized effects of societal discrimination, not specific events of discrimination.

You're telling me that the record will actually reveal something more than what the Supreme Court has found inadequate in *Students for Fair Admissions*, which is these effects of societal discrimination?

MR. HARRISON:  Yes, Your Honor.  But I would also say that --

THE COURT:  Now, you could have pointed those out to me in this briefing because you made that argument.  You made an argument along those lines, right?

MR. HARRISON:  Yes, Your Honor.  And some of that information we did provide.  But we did not believe that at the motion to dismiss stage it was incumbent to explore the entirety of the congressional record and present it,

especially given --

THE COURT: You just want an opportunity to do so through summary judgment briefing. So what you want me to do is schedule summary judgment briefing. There's no discovery that would be relevant; there's just summary judgment briefing that gives both sides, but you in particular, an opportunity to present a fuller presentation of the record before Congress that would support this provision.

MR. HARRISON: Your Honor, we believe that the discovery of the administrative record would certainly benefit the court's consideration, and we also believe that with regard to issues like constitutional avoidance that a facial discrimination claim should not be addressed in a motion to dismiss. But with regard to summary judgment, we believe that summary judgment is where this case should be headed, but we also believe that the administrative record and a fulsome review of all the facts that are before Congress would be important.

THE COURT: I know I can't get off of this, because you won't let me get off of it. It's not an administrative record. You're not asking that the government provide a fuller record of its decisionmaking. Are you? You're instead asking -- and I know at an earlier point you focused on the implementation of the program and how grant awards were decided, but right now you're focused on the congressional

record.

It's not an administrative record that the government would be providing.  It's a record that already exists before Congress.  I wouldn't say, Government, I don't have an adequate administrative record; you need to provide a fuller administrative record.  It's not their record.  It's the congressional record that you're talking about.

MR. HARRISON:  Yes, Your Honor, with regard to the statute itself.  We also believe that the process of the termination is also relevant.  While the court could base its decision on the assertion that it's unconstitutional with regard to it being a policy, we certainly believe that there's evidence that the decision was made not based on the constitutionality but based on a policy which would put this in a different constitutional setting.

THE COURT:  I understand that as a concern you have.  I don't necessarily understand it as to how it affects the outcome of the legal questions of the constitutionality of this provision.  And I don't know that the government's position today that they are going to continue to implement the program even if the court agrees that program is unconstitutional, they're going to continue to implement, accept applications, and disburse funds under the program, I don't know that that helps your argument there.

MR. HARRISON:  The fact that they're willing to

continue with the program?

THE COURT:  Right.  Because you're basically saying there's another reason that they wanted to stop the program, but now they're telling me they don't want to stop the program.

MR. HARRISON:  Well, Your Honor, this is the first time we're hearing that.

THE COURT:  You and me both.

MR. HARRISON:  Because they in fact did act to stop the program, which is what initiated this lawsuit in the first place.

THE COURT:  I know that, and I pointed that out to your colleague on the other side, Mr. Butler.

MR. HARRISON:  Your Honor, if I may, I'd like to address some of the other issues with regard to the constitutional aspects.

THE COURT:  Please do so.

MR. HARRISON:  Your Honor, I mentioned briefly constitutional avoidance.  I'm sure Your Honor's familiar with that doctrine, but this court in *Judicial Watch* stated that the doctrine of constitutional avoidance counsels against answering such important constitutional questions at the motion to dismiss stage.

THE COURT:  I don't know that constitutional avoidance as a doctrine is limited to the motion to dismiss stage.

MR. HARRISON:  Well, I would agree, Your Honor.

THE COURT:  It's basically you're saying, if courts can find another way to resolve the case rather than dealing with the constitutional issue, they should do so.  How do I resolve this case without ultimately dealing with the question of whether this provision is or is not constitutional?

MR. HARRISON:  We want this court to deal with this issue.

THE COURT:  That's not constitutional avoidance.  That's just constitutional delay.  That's just saying, don't do it today at the motion to dismiss; do it tomorrow at a motion for summary judgment.

MR. HARRISON:  Your Honor, we would submit that --

THE COURT:  I don't think that temporal concept is constitutional avoidance.  It's not a question of when you deal with it.

MR. HARRISON:  I agree, Your Honor.  I would suggest that it's both, in part because having a fulsome record not just in terms of this decision but it's likely to be appealed, making sure and ensuring that there is a robust record on which other courts can review what this court has done does certainly help when it comes to these kinds of important constitutional issues.

Your Honor, we do not believe that this is a racial classification.  It's not a racial preference.  When it comes to the actual benefits themselves, there's no discrimination.

Members of any race can participate in any program that comes out of the DEA statute, and so from that perspective, it is a very different framework and a very different consideration of race.  And as Your Honor indicated, Congress's consideration of race has not been prohibited.  It is not prohibited.  In fact, it's important for Congress to consider race on certain opportunities and certain circumstances to promote the greater good, and that's what happened with regard to this statute.

THE COURT:  So does Congress get more leeway in having a racial classification than Harvard University does?

MR. HARRISON:  Your Honor --

THE COURT:  Congress is more focused on the public good and gives more deference in racial classifications or similar provisions to Congress than we would to Harvard University?

MR. HARRISON:  Your Honor, I wouldn't say from a purely legal perspective that that would be the case.  What I would suggest is that when it comes to the separation of powers and when it comes to the actions of the executive that perhaps some deference should be given to both the judicial and the legislative branches.

But I also believe that the cases that talk about race consciousness focus on Congress and government's ability to take those things into account.  I don't know that I would say it's more than a university or less than a university.  What I would say, Your Honor, though, is that in the facts of this

case it is very different than what was happening in those universities with regard to individual selections and individual racial assessments.  There's none of that on the facts of this case.

Your Honor, what Congress did here was make an attempt to bridge the digital divide by collecting information and attempting to ensure that segments of the population that had been historically left behind and underserved were no longer going to be underserved.

THE COURT:  And I may believe that that's a laudable policy objective, and I may believe as a policy matter that's something that Congress should be engaged in doing and it will potentially benefit the public.  But that's not what I'm deciding.

What I'm deciding is whether the law, as developed most recently in the Supreme Court through equal protection cases dealing with these racial classifications, permits Congress to do so, whether it's constitutional under equal protection principles.  That's what I have to decide.

I don't have to decide, and shouldn't decide, whether it's good policy, whether there are laudable objectives.  It's not that that's beside the point.  I don't want to denigrate it in that way, but it's not what I can base my decision on.  I have to base my decision on what the law is principally, as the Supreme Court and the D.C. Circuit have directed.

MR. HARRISON:  Absolutely, Your Honor.  Couldn't agree more.  But neither the Supreme Court nor the D.C. Circuit has said that consciousness of race in governmental decisionmaking is improper or unconstitutional.  And given the current state of the law --

THE COURT:  But you've said, I think in your briefing, that a racial classification is a policy that treats people differently because of their race.  I think that's a direct quote from your briefing.  And I think you also say that this provision allows but does not require the government to allocate federal funding to projects that benefit certain races.

How doesn't that fit within your definition of a racial classification?  Isn't that what the provision does?  Now, it doesn't mandate it in every instance.  It may be that in most instances it isn't what directs the decision on the grant award.  But that was true in *Students for Fair Admissions* as well, that race wasn't going to determine every decision, and it seems to me that what you've identified as a definition of a racial classification this sort of fits within.

MR. HARRISON:  Well, Your Honor --

THE COURT:  What is it that makes it not a racial classification?  The fact that it's discretionary on the part of the government?

MR. HARRISON:  Yes.  The fact that it's discretionary,

the fact that it's not based on any -- it does not restrict members of any race from receiving the benefits. There's no racial classification with regard to who should receive benefits, or who should be considered for the receipt of benefits. The only consideration of race is with regard to whether the applicants are including certain populations in the disbursement of the benefits.

And that is not a racial classification that has been prohibited by any court. That is merely including, trying to ensure as best any design could that farmers, veterans, all the other covered classes are considered and included. I think that every racial classification case that I'm aware of results in the exclusion of a member of certain races. This program does not do that. It excludes members of no race.

Your Honor, with regard to the separation of powers argument, we believe that this is a classic case of the executive branch usurping the power of the judiciary to declare what's constitutional and acting upon that by usurping the legislative branch's ability under the Spending Clause to appropriate funds.

THE COURT: But on the first of those points, the fact that we're here in litigation, the government isn't disputing that it's up to the court to decide the issue of the constitutionality of that provision.

MR. HARRISON: Well, that's true, but that's only after

they've taken action, Your Honor.  They've already taken the action of termination.  They've already impacted my client's constitutional rights, and now we're talking about how that's going to be rectified.

THE COURT:  Okay.  Well, to the extent you're talking about whether you have a cause of action, whether you can get into court to challenge that, I understand your position, and it seems to me the government has pretty much conceded that you have an APA cause of action that gets you into court.

MR. HARRISON:  Yes, Your Honor.  As well as a --

THE COURT:  And an APA cause of action may be for a constitutional violation.

MR. HARRISON:  Well, Your Honor, I think we have a constitutional violation completely and wholly independent of the APA claim.  In fact, I would suggest that the constitutional claim is even more important.  We could have been here without any APA claim at all based on the actions of the executive here.  The executive made a decision that the program was unconstitutional and then executed that same decision.  And that is the exact type of activity, the exact type of action, Your Honor, that the founders of our nation, said framers of the Constitution, warned us about.

THE COURT:  But normally speaking, an equitable claim and constitutional claims are generally viewed as equitable claims.

MR. HARRISON:  Agreed.

THE COURT:  Equitable relief is not available when a plaintiff has an adequate remedy at law.  And here, let's take it as given that the government is agreeing this is an APA cause of action.  Why should the equitable constitutional claim be allowed to proceed if you have a statutory cause of action under the APA?

MR. HARRISON:  I do not believe that the Court of Federal Claims could direct the reestablishment --

THE COURT:  I'm not saying it should go to the Court of Federal Claims.

MR. HARRISON:  Oh, I'm sorry.

THE COURT:  I think as long as we're talking about the program termination rather than the award termination, we're not arguing about where the proper venue is, whether it's here or in the Court of Federal Claims.  I don't think that's the issue.  The issue is whether there's a cause of action, an equitable constitutional cause of action, if there's an adequate remedy at law, and if I find and/or the government has conceded that there is an APA cause of action.

MR. HARRISON:  Well, Your Honor, we are also seeking the reestablishment of the program.  I'm not aware that the court could do that under the APA.  And also we are seeking declaratory relief that in fact the program is constitutional.  And so I don't believe those remedies are available -- would

be available solely under the APA.

THE COURT: Okay. We'll see. I don't know that -- I'll hear your colleague on the APA claims as well.

MR. HARRISON: Your Honor, then if Your Honor has any questions for me, I'll be glad to answer them. But I want to say in closing that this is what happened here notwithstanding today the government's essentially changing its tune from prior to litigation.

I think the words of James Madison are important here. Justice Kavanaugh actually mentioned the same language in *In re Aiken* that's been referenced previously. But in Federalist Papers No. 47, Mr. Madison said the accumulation of all powers — legislative, executive and judiciary — in the same hands may justly be pronounced the very definition of tyranny.

Your Honor, the reason that NDIA brought this claim is because of the challenge to its constitutional rights from the actions of the executive taking action to terminate, eliminate, veto after an action, an act of Congress.

We are looking for this court to rectify that, to solve the constitutional dilemma that was created by that, and to reestablish the DEA program. The constitutional claims are well pled. We believe *Twombly* controls and this case should proceed and the complaint should not be dismissed. Your Honor, I'd like to have my colleague address the APA claims.

THE COURT: Thank you. So it will be Ms. Barbee-Garrett

who has some further argument?

MS. BARBEE-GARRETT:  Yes, Your Honor, and may it please the court.  I will be very brief here.

THE COURT:  Yes.  This case has evolved and morphed somewhat in the latter stages of briefing, but also today.

MS. BARBEE-GARRETT:  Yes.  I think that substantial portions of what I had prepared to state are kind of off the table now, but happy to answer any questions.

THE COURT:  It's not to say that I don't have to independently determine that there is jurisdiction, standing, etc.

MS. BARBEE-GARRETT:  Of course.

THE COURT:  Those are things that I do have to grapple with because I have an independent obligation to do so.

MS. BARBEE-GARRETT:  Of course.

THE COURT:  Go ahead.

MS. BARBEE-GARRETT:  And if Your Honor would like any discussion about why there is jurisdiction and why NDIA has standing, I'm happy to provide that.

THE COURT:  I don't think you need to address that. I think the record and the positions of the parties are clear enough.

MS. BARBEE-GARRETT:  Thank you.  So we've been talking a lot about the constitutional reasons for defendants' termination of the competitive grant program, but what is also

at issue and as pled in paragraphs 64, 65, 104, and 109 of our complaint is that the termination letter that defendant -- that agency defendants sent carrying out the president's order to terminate the program, that was based on two grounds.

It was based on both the assertion that the program was constitutional and this assertion that the program was -- or that each individual branch under the program, and by information and belief, these were form letters that were sent to all grant recipients, or all obligees as the case may be, but those should be terminated because of the uniform guidance at 2 CFR 200.340(a)4).

And that provision permits termination when an individual grant award is contrary to the agency's priorities or program goals.  But here there's no way to terminate an entire program based on being contrary to agency priorities or program goals, especially when --

THE COURT:  They're no longer saying they're terminating an entire program.

MS. BARBEE-GARRETT:  Sure.  And that is well taken, and we appreciate defendants' candor in admitting that here now. But the fact remains that defendants' public statements have been inconsistent.  The president's fiscal year 2027 budget includes in the budget briefing that Digital Equity Act funds are to be rescinded.

And so if that is true -- and that is something that we

included in our response brief.  But if that's true, then that means that maybe the program will not be implemented and maybe judicial intervention is required in order to make sure that the program moves forward as Congress required it to do so.

And I also want to note that this program is -- the relief that NDIA seeks would not be complete under just the APA because, as to the constitutional relief that we are seeking, there is an action by the president to terminate the program via -- or to announce the termination of the program via Truth Social.

But then there was also the next day an action by the agency defendants to terminate the program via letter, and that's carrying out the president's direction.  Both of those independent actions create harm here, and they're actions that injured NDIA.

THE COURT:  And you're asking me to do something about the social media?

MS. BARBEE-GARRETT:  No, Your Honor.  I am just pointing out that the social media post in and of itself is a decree of the unconstitutionality of the program, and then that that was followed by the agency defendants, or perhaps there was another --

THE COURT:  And therefore?

MS. BARBEE-GARRETT:  And therefore there is perhaps a need for equitable relief, although, you know, relief under --

THE COURT:  Relief going to the president?  I mean, let's get down to what you're really dealing with.  Are you asking me to enjoin the president?

MS. BARBEE-GARRETT:  We are asking for the recognition that the separation of powers does not permit the president nor the executive branch from decreeing certain statutes to be unconstitutional and terminating grant programs that are required to be carried out under those statutes.

THE COURT:  So let's assume for a moment that the only reason given in letters and otherwise was the unconstitutionality of what they view as a racial classification.  Are you saying that the executive cannot reach that conclusion and cannot act on that conclusion by saying we're not going to follow this provision in the statute unless and until a court tells us otherwise?  What is it that you're saying?

MS. BARBEE-GARRETT:  So we are saying that because there are other avenues for the executive to take other than termination of the grant program.

THE COURT:  Which they're not taking now.

MS. BARBEE-GARRETT:  Yes.  Yes.  Well, and they're not doing that now, but that is -- then it is unclear of the status of both the program funding and the program itself. And so I think that raises a number of questions that we will need to address through this matter or otherwise.  But part of the issue here is --

THE COURT:  So assume for a moment that I get over the problem that has been raised with respect to whether I should reach the issue of the constitutionality of this provision at this time on motion to dismiss.  Assume I get over that and I decide that issue and I decide that it is unconstitutional.  Are you saying that should not be the end of the case?

MS. BARBEE-GARRETT:  Yes, Your Honor.

THE COURT:  And I say, as the government now agrees, that it is severable and sever that provision from the rest of the statute, and therefore the program continues.  Are you saying there's more left to this case?

MS. BARBEE-GARRETT:  Your Honor, I think because of the manner in which this grant program was terminated, there is more to the case because --

THE COURT:  What is the injury that's been suffered?

MS. BARBEE-GARRETT:  Well, I think there's the lack of clarity in the current -- it's hard to make this argument at this moment with what we have and, you know, the fact that there is a brand-new, or I guess hour and a half old now determination that the government has determined that this is severable and that the competitive grant program could continue.  But if that were the case, then defendants have still terminated the competitive grant program as a whole, and so it is not clear how it would be able to be reinstated.

And in addition, there was a second policy that NDIA

challenged which was referred to in our papers as the April 9th letter, and that is the type of policy that I believe -- at an earlier point in this argument, there was a discussion of pretext. I think we raised it because it is a second independent policy that we are challenging.

THE COURT: But they're just challenging that and not asking for a declaration on my part with respect to that, or is there some injury that your client has suffered?

MS. BARBEE-GARRETT: Your Honor, if the --

THE COURT: I'm sorry for interrupting. But particularly in a context where we're assuming that I decided that the racial provision is a racial classification and therefore unconstitutional and needs to be severed out and stricken.

MS. BARBEE-GARRETT: Your Honor, the April 9th letter is still unclear. It states that there will be -- that all DEI-related activities, including conferences, must be -- or are no longer eligible to be reimbursed under the program. This is -- there's no explanation of why DEI activities are conferences or what a DEI conference is but for an organization like NDIA who's net inclusion conference is about the digital divide but not necessarily --

THE COURT: Isn't that something that should be left for -- again, on the assumptions that we've made and discussed just a moment ago, so it's hypothetical. Isn't that something

that should be left for a later application and the decision made with respect to that grant award regarding NDIA, and if there is something there that involves DEI or anything else it can be challenged on an APA basis with respect to that application and grant decision?

MS. BARBEE-GARRETT:  Your Honor, the D.C. Circuit in *Crowley v. General Services Administration* in 2022 held that there is an ongoing right to challenge an agency policy regardless of whether it is -- you know, that it is related to the reimbursability or payment otherwise under a contract, or in this case, a grant.

But based on the *Crowley* holding, this court has jurisdiction to consider the April 9th letter, and it would be -- that issue remains ripe regardless of whether NDIA has a grant under the new revived competitive grant program, which we're thrilled to hear is going to come back.

THE COURT:  Okay.

MS. BARBEE-GARRETT:  So I am happy to answer any other questions that this court may have about the Administrative Procedure Act claims that we've raised in counts 3 through 6 of our complaint, but overall we would -- our argument is that NDIA's claims are well pled, and the fact that defendants' motion to dismiss them was essentially a motion for a summary judgment belies that fact.  And there is -- we meet the *Twombly* standard, and the court should deny defendants' motion

as to those APA claims.

THE COURT:  Thank you.

MS. BARBEE-GARRETT:  Thank you, Your Honor.

THE COURT:  Mr. Butler.

MR. BUTLER:  Thank you, Your Honor.  We've been going for a while, so I'll keep this quick.  Three specific points.  One, you can decide this case now.  It's a pure legal question based on what Congress said in the text of the DEA and the face of the DEA's racial classification.

My colleague identifies no set of discovery that could save or alter that reality.  That's because nothing could.  Congress speaks through its text, and if you don't consider the text, consider the legislative history.

THE COURT:  Why isn't the history of how the government has dealt with grant applications relevant to the question of the constitutionality of this, quote-unquote, racial classification?

MR. BUTLER:  Sure.  If you mean the government, you mean the Department of Commerce?

THE COURT:  Yes.

MR. BUTLER:  Sure.  So the relevant sort of metric is what Congress thought when they were making a racial classification.  It's not the executive here who wrote the law; it's Congress and what they had before it.  So *Adarand* makes that clear.  Unless Congress clearly articulates the

basis for the racial classification, the racial classification cannot stand.

Second, allocation of federal benefits is inherently zero sum. *Students for Fair Admissions* dealt with this issue when Harvard and UNC wanted to say race was not a factor. But inherently, if you're considering something on the basis of race and benefitting one race or ethnicity, you're inherently not benefitting the other race or ethnicity.

And then third on the APA issues quickly, Your Honor, we agree we didn't terminate the entire grant program based on changes in agency priorities; we terminated NDIA's individual grant. I understood from plaintiff's opposition that they're disclaiming any relief related to that individual grant program.

So that dooms several of their APA claims, and it also disclaims -- excuse me -- it also dooms any claim related to the April 9th email. It doesn't really make sense if you're seeking reimbursement related to an individual grant for that to be challengeable if you disclaimed that underlying grant program. So unless Your Honor has any other questions --

THE COURT: Well, I do have one question, and that is with respect to the funding of this program. A reference has been made to the fact that the funding has been terminated, suspended, or whatever.

How does that mesh with your representation that the

government intends to continue the program without the racial classification provision?  If there's no funding, then what are you going to be doing?  Are they right that the funding has been eliminated or suspended?

MR. BUTLER:  Your Honor, I don't think so.  I don't think there's been any final determination about the funding from Congress.  It might have been proposed.  A lot of things get proposed in Congress.

THE COURT:  Funding by Congress?  Congress has already allocated the funds.  Isn't it in the hands of the executive?

MR. BUTLER:  Sure.  Are you --

THE COURT:  -- in the hands of the executive?

MR. BUTLER:  Sorry, I was misunderstanding.  To the extent this court rules that the racial classification is unconstitutional, we will spend the money without considering race.  So, you know, I think that might have been an open issue, but now if you sever, we will spend the money.

THE COURT:  All right.  Anything else?

MR. BUTLER:  No, Your Honor.

THE COURT:  All right.  Here's what we're going to do. We're going to get a little more briefing.  I want each side to file no more than 10 pages.  The plaintiffs should be addressing the issue, and I'll just use a shorthand for the issue, and that is this issue of why this should not be decided on the motion to dismiss level, but we should go to

whatever you say we should go to, summary judgment, development of the record, however you want to put it, I want further briefing on your position on that.

And the second issue I want you to address is the issue of how, if assuming I were to find -- reach and find this provision unconstitutional but I were to agree with both sides now that it is severable, what do the plaintiffs say remains of this case?

It seems to me that Ms. Barbee-Garrett was arguing that there's something remaining of the case, and I'm not really sure what it is. And if it's just relating to the specific grant termination, I find that problematic given where this case has evolved, that it's a case dealing with the program termination, not the grant termination. So that's your ten-page brief.

The government is to address also that question, in 10 pages, of the motion to dismiss versus developing a record and going to summary judgment; and then also is, in writing, to clarify its position, No. 1, on severability -- well, it's all the same issue -- severability that the government would, again, assuming that the court struck the racial provision as being a racial classification and therefore unconstitutional, that the government would continue the program and that there's adequate funding that exists for disbursement of grant awards under the program.

Okay?  Ten pages from each side.  I look forward to that in seven days?  Ten days?  Tell me from the plaintiff's perspective.

MR. HARRISON:  Your Honor, we would prefer 10 days.

THE COURT:  Ten days is fine.  Is the government comfortable with that?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  All right.  Ten days from today would be -- I've lost track of time because this week is selection of law clerks week, and I have no idea what day of the week it is.

So it's Thursday, June 10?  Is that correct?  Or 11th. 11th.  So 10 days from now would be the 21st.  That's a Sunday, so make it the Monday the 22nd.

Some problem from the government's perspective, Mr. Shi?

MR. SHI:  Your Honor, I have a cross-motion for summary judgment due on the 25th, so I understand that the court's --

THE COURT:  What's dues on the 25th?

MR. SHI:  Say that again?

THE COURT:  I'm sorry.  I didn't understand the first part of what you were saying.

MR. SHI:  I have a cross-motion for summary judgment due on June 25 before Judge Lee in this court, so I would appreciate if we could potentially file the briefs a little after I'm done with that motion, if that's all right with you. I understand that the court's waited quite a while for this

and that 10 days is generous, but --

THE COURT:  Mr. Butler can do it.

MR. SHI:  Say again?

THE COURT:  Mr. Butler can do it.

MR. SHI:  All right.  Fair enough.

THE COURT:  Well, I don't want to be unreasonable, but it sounds like you're asking me not to have it due on the 22nd but to wait until sometime after the 25th, which would mean a whole nother week, at least.

MR. SHI:  If that would be possible, yes.  But if the court wants something sooner, I'm sure that between us and the Department of Commerce, we can work that out.

MR. BUTLER:  Your Honor, we'll adhere to whatever the --

THE COURT:  I think we're going on the shorter schedule.  I understand and can appreciate your situation, Mr. Shi.  I don't want to unduly and overly burden you, but I think getting it in the on the 22nd -- I'd be comfortable moving to the 23rd, 24th, 25th, but that's not what you're asking for.  You're asking for a much longer extension than that, or at least a number of days longer.  So I think we'll stick with the 22nd.

All right.  Any other questions?  I'll look for that, and I'll be prepared to work this through to resolution pretty promptly thereafter.  Thank you.

(Proceedings adjourned at 12:27 p.m.)

*    *    *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Bryan A. Wayne
Bryan A. Wayne