**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL DIGITAL INCLUSION ALLIANCE, | |
| Plaintiff, | |
| v. | Civil Action No. 25-3606 (JDB) |
| DONALD TRUMP et al., | |
| Defendants. | |

**MEMORANDUM OPINION**

The National Digital Inclusion Alliance (NDIA) challenges the President's dissolution of the Digital Equity Act's Competitive Grant Program, part of a multibillion dollar initiative to bring internet connection and skills to underserved parts of the country. It argues that the President and federal agencies lack authority to annul programs that are authorized and appropriated by Congress.

Over the past year, plaintiffs across the country have challenged the President's termination of various federally funded programs. These plaintiffs argue that the President lacks statutory and constitutional authority to disregard the laws that authorize those initiatives and appropriations that fund them. But obtaining relief is not as simple as showing that the President acted unlawfully. Plaintiffs bringing funding-related claims face numerous jurisdictional and threshold requirements that courts must consider before reaching the merits. For many, these cannot be overcome.

This case is different.  The government concedes that federal district court jurisdiction over this case is proper, and that NDIA has standing to bring its claims.  It also agrees, at this stage, that the President lacks the power to cancel laws passed by Congress based on his bald disagreement with Congress's policy determinations.  Instead, the government contends that the Competitive Grant Program is itself unconstitutional because the enabling statute authorizes funds to be allocated based on the race or ethnic status of the people served by grant awardees.

On that issue, the government is correct.  The Digital Equity Act straightforwardly categorizes members of certain races as "covered" by the Act and targets grant money to programs that benefit those groups.  That is an explicit racial classification, which can only be upheld if it withstands strict scrutiny.  Here, it does not: the offending provision is neither justified by a compelling governmental interest nor narrowly tailored to meet a permissible goal.  Accordingly, it is unconstitutional.

However, the offending provision is severable from the rest of the statute.  NDIA's claim to restore the Competitive Grant Program, minus the statutory text authorizing the government to consider the race of grant beneficiaries, thus survives.  And because the government's only objection to the Digital Equity Act is this singular unconstitutional provision, it has now committed to restoring the Competitive Grant Program upon receiving this judicial determination.  Defs.' Suppl. Br. [ECF No. 56] at 10.

## **BACKGROUND**

### A.  The Digital Equity Act

Millions of Americans lack reliable, high-speed broadband.  As a result, they struggle to access telemedicine, job listings, and other internet-dependent resources.  Over the last decade, these services have become critical to economic and social life.  To be excluded from the

internet, therefore, is to be denied the fruits of modern society.  And this lack of reliable digital access is felt disparately across the country.  Certain groups, such as lower income and rural Americans, disproportionately struggle to participate in the online ecosystem.

To address this digital divide, Congress passed the Digital Equity Act.  Pub. L. No. 117-58, div. F, tit. III, §§ 60301-60307, 135 Stat. 1209 (Nov. 15, 2021), codified at 47 U.S.C. §§ 1721-1726.  The Act appropriated $2.75 billion to "promote digital inclusion activities, and spur greater adoption of broadband among covered populations."  47 U.S.C. § 1724(a)(1).  Just like the national projects of previous generations brought running water, roads, and electricity to those without them, Congress hoped the Digital Equity Act would do the same for the internet.  It was signed into law on November 15, 2021, as part of the $1.2 trillion Infrastructure Investment and Jobs Act.  Pub. L. No. 117-58, 135 Stat. 429-1467 (Nov. 15, 2021).

To expand broadband access to underserved groups, the Act authorized two grant programs, the Capacity Grant Program and the Competitive Grant Program.  47 U.S.C. §§ 1723-1724.  Each initiative received roughly half of the total funds appropriated by the Act.  The former program allocates money to states, while the latter allocates money to individual applicants, mostly cities and nonprofit entities.  The Competitive Grant Program, at issue in this case, is administered by the National Telecommunications and Information Administration (NTIA) and the National Institute of Standards and Technology (NIST), both housed within the Department of Commerce.  NTIA reviews grant applications and recommends determinations to NIST, which makes the awards and oversees compliance.  See Compl. [ECF No. 1] ¶¶ 54-59.

NTIA is authorized to review grant applications based on whether the award will "increase internet access and the adoption of broadband among covered populations to be served

by the applicant . . . ."  47 U.S.C. § 1724(d)(1)(A) (emphasis added).  The Act defines "covered

populations" as:

> (A) individuals who live in covered households;
> (B) aging individuals;
> (C) incarcerated individuals, other than individuals who are incarcerated in a Federal correctional facility;
> (D) veterans;
> (E) individuals with disabilities;
> (F) individuals with a language barrier, including individuals who— (i) are English learners; and (ii) have low levels of literacy;
> (G) individuals who are members of a racial or ethnic minority group; and
> (H) individuals who primarily reside in a rural area.

Id. § 1721(8).  Once awarded, the use of grant money is restricted to six permissible purposes,

five of which relate to increasing covered populations' internet access, and one catchall

provision.  Id. § 1724(d)(2)(A).  The Act, however, does not require that any grantee serve any

particular subset of covered populations, exclusively serve covered populations, or serve covered

populations at the expense of other groups.  It also does not require that grantees themselves be

members of covered populations and prohibits "discrimination under any program or activity that

is funded" by the Digital Equity Act.  Id. § 1726(a)(1).

### B.  National Digital Inclusion Alliance

NDIA is a nonprofit dedicated to expanding internet access.  Compl. ¶ 22.  It advocates

for local, state, and federal policies that increase broadband availability and digital literacy.  Id.

¶ 53.  NDIA also partners with local communities to design and implement programs that help

their residents acquire computer skills.  Id.  Its flagship program is the Digital Navigator

initiative, which trains staff and volunteers to help community members use online services.  Id.

To expand the Digital Navigator initiative, NDIA applied for funding from the

Competitive Grant Program.  Id. ¶ 55.  It proposed using Digital Equity Act funds to equip

thirteen Digital Navigator partnerships with training and resources to better support their communities.  NDIA projected that grant funding would allow it to serve over 30,000 people in "covered populations" across America.  Id.  It also asked for money to support its annual conference, which features discussions between practitioners, academics, and industry members on policies related to expanding broadband access.  Id. ¶ 56.  On January 6, 2025, NTIA awarded NDIA Competitive Grant Program funding.  Id. ¶ 58.  Later that month, NIST informed NDIA that it would receive over $25 million, to be disbursed over a five-year period.  Id. ¶ 60.

### C.  The Government Terminates the Competitive Grant Program

NDIA never received the money it was promised.  On January 20 and 21, 2025, the President signed two executive orders that characterized "diversity, equity, and inclusion" as "discriminatory" and "illegal" and ordered federal agencies to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements."  Exec. Order 14151, 90 Fed. Reg. 8339 (2025); Exec. Order 14173, 90 Fed. Reg. 8633 (2025).  Pursuant to that guidance, on April 9, NTIA emailed NDIA that "any costs associated with diversity, equity, and inclusion conferences, trainings, and/or professional development [would not be] allowable."  Compl. ¶ 13.

The rest of the Competitive Grant Program was soon to follow.  On May 8, 2025, the President announced that he believed the Digital Equity Act was unconstitutional because it required the allocation of federal funding on the basis of race.  Id. ¶ 66.  In the same message, the President said he was "ending" the initiatives authorized by the Act "immediately."  Id.  The next day, NIST issued a formal letter to NDIA explaining that the Competitive Grant Program was unconstitutional and that the Program and the grants made under it were terminated.  Id. ¶ 67.  The NIST letter also explained that the decision was final and that there would be no right of

administrative appeal.  Id. ¶ 68.  NDIA nevertheless attempted to administratively appeal the termination of its award, which was denied.  Id. ¶¶ 69, 70.

When the government declines to enforce a statute on the grounds that the law is unconstitutional, it must transmit a letter to Congress explaining why.  28 U.S.C. § 530D. Solicitor General D. John Sauer sent that letter on March 4, 2026, explaining that the Capacity Grant Program and Competitive Grant Program both required the government to consider the race of the beneficiaries of the grant recipients.  Letter from Solicitor General Sauer to Speaker Mike Johnson, "Classification of Individuals Based on Race in the Digital Equity Act of 2021," U.S. Dep't of Just. (Mar. 4, 2026), https://www.justice.gov/oip/media/1430066/dl?inline [https://perma.cc/THA4-QKSB].  He reasoned that under the Supreme Court's recent decision in Students for Fair Admissions, Inc. v. President & Fellows of Harvard College, 600 U.S. 181 (2023), such consideration of race in awarding government benefits was unconstitutional.

NDIA filed suit in this Court, challenging the "unilateral repeal by the Executive Branch of the Digital Equity Competitive Grant Program."  Compl. ¶ 1.  It brings claims directly under the Constitution for violations of the separation of powers and the Spending Clause, as well as under the Administrative Procedure Act (APA).  The government has filed a motion to dismiss for lack of jurisdiction and failure to state a claim.  That motion is now ripe.

## STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  The plaintiff bears the burden of establishing jurisdiction, and because courts have an affirmative obligation to ensure their jurisdictional authority, "the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge of

Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (citation modified). If a court determines it lacks jurisdiction, the complaint must be dismissed. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006); Fed. R. Civ. P. 12(h)(3).

A court must also dismiss a complaint that does not contain sufficient factual matter that, accepted as true, states a plausible claim to relief. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When considering a motion to dismiss for failure to state a claim, the court will "assume [the] veracity" of all "well-pleaded factual allegations," id. at 679, "construe the complaint in favor of the plaintiff," and give the plaintiff "the benefit of all inferences that can be derived from the facts alleged," Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012). A court does not, however, credit "formulaic recitation[s] of the elements of a cause of action" or other conclusory assertions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

## ANALYSIS

The parties have substantially narrowed their dispute. At the outset, the government contested federal district court jurisdiction, the availability of a cause of action, and whether NDIA met various requirements to enable judicial review under the APA. But NDIA has since clarified that it challenges the cancellation of the Competitive Grant Program, not the termination of its individual award. As a result, the government concedes that most of those threshold matters fall away. Although the Court has an independent obligation to consider its jurisdiction, the parties agree that this case belongs in district court and that NDIA may bring its claims under the APA's cause of action. The principal remaining issue is whether the Competitive Grant Program unconstitutionally requires the government to consider race when allocating grant money.

## I.    Jurisdiction

The Court begins, as it must, with its jurisdiction to hear the case.  NDIA's claims present two issues: channeling and standing.  Channeling is a question of whether federal district court is the appropriate forum to hear NDIA's claims, based on Congress's division of jurisdiction between the federal district courts and the Court of Federal Claims.  Standing ensures that NDIA has a bona fide stake in the litigation as necessary to satisfy the Constitution's requirement that federal courts only hear "cases" and "controversies."  Both requirements are met here.

### A.  Channeling

Suits against the United States are "available by grace and not by right."  United States v. Tohono O'odham Nation, 563 U.S. 307, 317 (2011).  Accordingly, they are subject to the consent Congress provides and the conditions that flow from it.  The two relevant forms of congressional consent here are the Administrative Procedure Act and the Tucker Act.  The APA waives sovereign immunity for suits "stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," 5 U.S.C. § 702, while the Tucker Act waives sovereign immunity over government contract disputes.  Megapulse, Inc. v. Lewis, 672 F.2d 959, 963 (D.C. Cir. 1982).

But suits brought under the Tucker Act are subject to the exclusive jurisdiction of the Court of Federal Claims.  Crowley Gov't Servs., Inc. v. GSA, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  By negative implication, the Act forbids federal district courts from hearing most federal contract disputes.  Id.  This prohibition extends to contract claims against the United States that might otherwise be brought in district court under a plain reading of the APA.  Id.  That is because allowing district court plaintiffs to plead federal contract claims through the APA would circumvent "the restrictions of the Tucker Act."  Megapulse, 672 F.2d at 967.  Accordingly, to

vindicate Congress's forum-allocation decision to channel most federal contract disputes to the Court of Federal Claims, district courts must ferret out whether a claim is, in its essence, a contract action, regardless of how it is labeled.

Sorting claims is a two-step process: courts must first consider "the source of the rights upon which the plaintiff bases its claims." Id. at 968. When the plaintiff asserts rights that flow from the contract itself, the claim is likely contractual. But when the source of rights is constitutional or statutory, the claim likely belongs in district court. Vera Inst. of Just. v. DOJ, 805 F. Supp. 3d 12, 24 (D.D.C. 2025); Crowley, 38 F.4th at 1106-07. Importantly, the mere presence of a contract in a dispute does not render a claim contractual, because "[c]ontract issues may arise in various types of cases where the action itself is not founded on a contract." Megapulse, 672 F.2d at 968. For instance, an employee may sue the government in district court for violation of their constitutional rights in connection with their employment, even though the employer-employee relationship would not exist but-for a contract. See TransOhio Sav. Bank v. Dir., Office of Thrift Supervision, 967 F.2d 598, 610-11 (D.C. Cir. 1992); see also NIH v. Am. Pub. Health Ass'n, 145 S. Ct. 2658, 2660-62 (2025) (Barrett, J., concurring).

At step two, courts consider whether "the type of relief sought" is like actions traditionally brought in contract. Megapulse, 672 F.2d at 968. The telltale form of relief for a contract action is specific performance. Ingersoll-Rand Co. v. United States, 780 F.2d 74, 80 (D.C. Cir. 1985). Put another way, if the plaintiff's claim is ultimately about compelling the government to satisfy the terms of the initial award, it sounds in contract. Id. By contrast, requests for injunctive or declaratory relief beyond the four corners of the agreement, unavailable in contract actions, support federal district court jurisdiction. See Megapulse, 672 F.2d at 969.

9

The Supreme Court recently explained how courts should channel claims related to the termination of individual federal grants versus those concerning the cancellation of grant programs. In NIH, Justice Barrett's controlling concurrence sent the plaintiffs' grant termination claims to the Court of Federal Claims and directed the program cancellation ones to district court. 145 S. Ct. at 2661 (Barrett. J., concurring). She reasoned that while the former claims were essentially contractual disputes about the government's failure to satisfy a financial obligation, the latter challenged a broader agency policy more appropriate for APA review in federal district court. Id.

NDIA's claims belong in district court. The substantive rights it asserts are rooted in the Constitution and the Digital Equity Act, not in its individual grant award. To understand why, remember that NDIA asks the Court to reinstate the Competitive Grant Program. See Compl. ¶¶ 22, 76. Its asserted entitlement to that relief is based on the theory that "[n]either the President nor the Executive Branch has any constitutional power to unilaterally repeal duly enacted statutes," Compl. ¶ 73, and that the Digital Equity Act itself requires that the Competitive Grant Program be administered, Compl. ¶¶ 88, 94. Accordingly, NDIA asserts a substantive right—an entitlement for the Competitive Grant Program to exist and to be administered according to the terms of the statute—that is entirely separate from the obligations that the government owes to NDIA under the terms of its award. See NIH, 145 S. Ct. at 2660.

NDIA satisfies step two of the Megapulse test because it does not request specific performance or any similar relief. It asks the Court to declare the Competitive Grant Program lawful and vacate the government's actions to terminate it. It does not seek reinstatement of its grant award or an order forcing the government to comply with the terms of that award. Compl. ¶ 22; Opp'n to Mot. to Dismiss [ECF No. 38] ("Opp'n") at 10 ("NDIA does not challenge the

10

termination of its individual award; it seeks the opportunity to compete.").  Indeed, the requested relief entirely concerns reversing the program cancellation—which is relief that the Court of Federal Claims has no power to grant.

NDIA's claims are the spitting image of the program cancellation claims from <u>NIH</u>. There, the plaintiffs' program cancellation claims challenged "internal guidance documents" that established the agency would "not fund research related to DEI objectives, gender identity, or COVID-19 [or award] grants to researchers based on race."  <u>NIH</u>, 145 S. Ct. at 2661.  Here, NDIA challenges the government's attempt to cancel a grant program based on a similar policy disagreement.  <u>See, e.g.</u>, Compl. ¶¶ 75, 82, 85.  That is a challenge to the government's management of the grant program, not to any individual grant termination.

In sum, this Court has jurisdiction over NDIA's claims.  NDIA's claims are not, at bottom, contract disputes, so district court jurisdiction is proper.

## B.  Article III Standing

Article III restricts the jurisdiction of federal courts to "Cases" or "Controversies."  Art. III, § 2, cl. 1.  That limitation gives rise to the requirement that every plaintiff must have standing to sue.  <u>See</u> <u>Diamond Alt. Energy, LLC v. EPA</u>, 145 S. Ct. 2121, 2133 (2025).  To demonstrate standing, a plaintiff must show an (1) injury in fact (2) caused by the defendant that is (3) redressable by the relief requested.  <u>See</u> <u>id.</u>  The issue here is whether NDIA has suffered an injury-in-fact that a favorable decision from this Court could redress.  In its reply, the government concedes that NDIA has standing (at the motion to dismiss stage) based on its inability to apply for future grant funding.  Reply [ECF No. 50] at 18.

That is correct.  In <u>Global Health Council v. Trump</u>, the D.C. Circuit held that grantees "may be harmed by [the] denial of the opportunity to compete for a pool of funds for which they

11

are able and willing to compete." 153 F.4th 1, 12 (D.C. Cir. 2025). In that case, "the grantees had asserted that the court could redress their injuries by ordering funds to be made available because the grantees would be eligible to compete for the funds even if not guaranteed to obtain them." Id.; see also Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 668 (1993). Crucially, the court explained that reinstating the grant program provided redressability irrespective of whether individual grants were restored. Glob. Health, 153 F.4th at 12.

In terms of injury, this case is on all fours with Global Health. NDIA applied for, and has received, funding from the Competitive Grant Program. It provides the types of services covered by those awards. And it has expressed a credible intent to apply for grants from the same program in the future. The inability to apply for that money is a concrete injury that will meaningfully change NDIA's operations going forward. For redressability, NDIA only seeks prospective relief to reinstate the specific grant program that it intends to apply for. So, as with Global Health, the relief that NDIA requests is appropriately calibrated to remedy the injury it has suffered. This Court thus concludes that NDIA has an injury-in-fact that is redressable by a favorable decision from this Court, as needed to confer Article III standing. The government agrees.

## II.    Cause of Action

Getting into federal court is only the first step. Before it can make its substantive arguments, NDIA must identify a cause of action that gives it a private right to sue. It brings claims under the separation of powers, the Spending Clause, and the APA. The APA provides a statutory right to sue federal agencies for unlawful action. But the government contends that

12

NDIA lacks a cause of action for its freestanding constitutional claims (Counts I and II), and so those should be dismissed.

Adversarial briefing has narrowed this issue down to whether the availability of the APA's cause of action, which both parties agree NDIA may employ, displaces NDIA's ability to bring claims directly under the Spending Clause and the separation of powers. The government argues that it does, because equitable jurisdiction is typically unavailable when a party has an adequate remedy at law. See Reisman v. Caplin, 375 U.S. 440, 443 (1964). For its part, NDIA does not contest this principle, or the notion that the APA would displace the constitutional claims if it allowed the Court to grant the same relief as the constitutional claims. NDIA only argues that the APA does not displace NDIA's constitutional claims because NDIA requests declaratory and injunctive relief against the President, which is unavailable under the APA. Franklin v. Massachusetts, 505 U.S. 788, 796 (1992) (plurality opinion) ("[T]he President is not an agency within the meaning of the [APA]."). So, the question before the Court is whether the APA offers an adequate remedy at law for NDIA's claims, despite that limit.

The answer is yes. Although the APA does not enable judicial review of actions taken by the President, the Court would similarly refrain from entering injunctive or declaratory relief against him under an equitable cause of action. That is because a "court generally may not 'enjoin the President in the performance of his official duties.'" Severino v. Biden, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (quoting Franklin, 505 U.S. at 802). And it is unclear whether courts have the authority to issue declaratory relief against the President either.[1] Instead, courts typically enjoin subordinate executive branch officials to enforce compliance with the law. See

---

[1] The D.C. Circuit has said that courts have "never submitted the President to declaratory relief." Newdow v. Roberts, 603 F.3d 1002, 1013 (D.C. Cir. 2010). Although the D.C. Circuit once issued declaratory relief against the President, see Nat'l Treasury Emps. Union v. Nixon, 492 F.2d 587, 616 (D.C. Cir. 1974), it later questioned whether that case remains good law after Franklin. See Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996).

Severino, 71 F.4th at 1042-43.  NDIA does not argue that enjoining the remaining defendants in this case, who are subject to the APA, would not constitute effective relief.  Accordingly, the APA provides an adequate remedy at law for NDIA's claims, and thereby displaces equitable constitutional claims.[2]

### III.    Claim-Specific APA Arguments

The Court now considers the government's arguments for dismissal based on the merits of NDIA's specific APA claims.  NDIA challenges the government's termination of the Digital Equity Grant program as contrary to constitutional rights (Count III), contrary to law (Count IV), in excess of statutory authority (Count V), and arbitrary and capricious (Count VI).  The government argues that NDIA's "contrary to the Constitution" claim fails for the same reasons as its separation of powers and Spending Clause claim, and that it complied with various grant termination regulations.

#### A.  Contrary to the Constitution

In two sentences, the government asserts that NDIA's APA claim that the termination of the Competitive Grant Program was contrary to the Constitution for violating the separation of powers and the Spending Clause should fail because the equitable constitutional claims, discussed above, fail.  Mot. to Dismiss (Mot.) [ECF No. 32-1] at 43.  It is mistaken.

NDIA cannot bring claims under the separation of powers or the Spending Clause because Congress, through the APA, has displaced equitable jurisdiction over them.  See supra Part II.  But NDIA's "contrary to Constitution" claim is brought under the statutory cause of action provided by sections 702 and 706(2)(B) of the APA.  Section 702 allows individuals to sue

---

[2] Even if the APA did not supply an adequate remedy, it is unlikely that NDIA's equitable constitutional claims could proceed.  This is not a case where the government has expressly "disclaimed any statutory authority" for its actions, as is necessary for such a claim.  Dalton v. Specter, 511 U.S. 462, 473 (1994) (citing Youngstown, 343 U.S. at 585).

to challenge unlawful agency action, while section 706(2)(B) explains that such actions include those that are contrary to the Constitution.  The APA thus supplies the missing ingredient from NDIA's two constitutional claims—a private right to sue.  And indeed, the availability of judicial review for alleged violations of the Digital Equity Act under the APA is the very reason that equitable jurisdiction directly under the Constitution for such claims is displaced.

The government only cites a single case to support its argument that dismissal of NDIA's constitutional claims merits dismissal of its parallel APA claim.  That case reasons that an "analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." Nat'l Educ. Ass'n v. U.S. Dep't of Educ., 779 F. Supp. 3d 149, 197 (D.N.H. 2025).  The government misinterprets that decision.  The court held that the merits of a plaintiff's APA contrary to Constitution claim must reflect whether the underlying substantive constitutional right was violated.  Id.; cf. United States v. District of Columbia, 897 F.2d 1152, 1158 (D.C. Cir. 1990) (finding APA cause of action unnecessary where constitutional claims could be raised otherwise).  For example, an APA contrary to Constitution claim that the government violated a party's First Amendment rights would look the same on the merits as a claim brought under the First Amendment itself.  And indeed, in National Education Association, the court found plaintiffs were likely to succeed on their APA contrary to Constitution claim because that court had already decided that their underlying constitutional arguments were likely meritorious.  779 F. Supp. 3d at 197.

But whether an agency action violates a party's substantive constitutional right is separate from whether that party has a private right of action to sue.  In circumstances unlike National Education Association, where plaintiffs sue under a constitutional provision that does not contain

15

an organic cause of action, APA section 706(2)(B) fills the gap. If the government's interpretation were correct, APA section 706(2)(B) would do no work, because it would only allow parties to sue for constitutional rights that they could already bring to court. Accordingly, APA section 706(2)(B) is designed precisely for cases like this one, where the plaintiffs allege violations of a substantive constitutional right but otherwise lack a cause of action through which to vindicate it. This APA claim thus survives.

### B. Compliance with Grant-Termination Laws and Regulations

The government argues that NDIA's APA contrary to law and excess of statutory authority claims both fail because it complied with the laws and regulations governing grant termination when cancelling NDIA's award. The terminations were procedurally sound, the argument goes, because the government followed the grant termination provisions in the Office of Management and Budget's Uniform Administrative Requirements and in the Digital Equity Act. See Mot. at 38-41; 2 C.F.R. § 200.340.

Compliance with statutory and regulatory obligations is a defense to an APA claim that the government acted contrary to or in excess of those requirements. See E. Band of Cherokee Indians v. U.S. Dep't of the Interior, 534 F. Supp. 3d 86, 97 (D.D.C. 2021). But those statutes and regulations must delineate the procedures for the challenged agency action. See Sissel v. Wormuth, 77 F.4th 941, 947 (D.C. Cir. 2023) (agency action is contrary to law when the agency fails to "act in accordance with the law governing" the issue in question (emphasis added)). Compliance with protocols for an entirely separate agency action, by contrast, is not a defense.

Accordingly, the government's compliance with the legal authorities that govern grant termination is irrelevant to whether it acted lawfully regarding program cancellation. The government contends that it complied with two relevant legal authorities: the Office of

16

Management and Budget's Uniform Administrative Requirements and the grant termination provisions in the Digital Equity Act. The former is a general regulation, incorporated into the Competitive Grant Program, that allows for the termination of a grant when "an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340. By its own terms, it only applies to the termination of individual grant awards. Id. § 200.340(a). The latter is a provision of the Digital Equity Act that limits the circumstances in which individual grants may be terminated. Neither of those provisions deal with program cancellation, and the government does not contend otherwise. Because NDIA's claims are about program cancellation, compliance with provisions relating to grant termination is not a basis for dismissal.

## IV.    Equal Protection

The government contends that all NDIA's claims should be dismissed because the Digital Equity Act requires the unconstitutional consideration of race in grantmaking. Because the Act draws impermissible racial classifications, the argument goes, the government has an obligation not to enforce its terms. See In re Aiken Cnty., 725 F.3d 255, 261 (D.C. Cir. 2013) (Kavanaugh, J.) ("[U]ntil a final Court decision in a justiciable case says that a statutory mandate or prohibition on the Executive Branch is constitutional, the President . . . may decline to follow that statutory mandate or prohibition if the President concludes that it is unconstitutional."). After all, the government cannot be required to carry out an unconstitutional law.

That is half right. The Act authorizes grants to be awarded based on race—which is impermissible. However, the single unconstitutional condition for allocating grants can be severed from the remainder of the statute. Accordingly, NDIA's claim for the reinstatement of the Competitive Grant Program survives, with the understanding that any relief the Court may ultimately grant to reinstate the program must exclude the unconstitutional provision.

**A.  Factfinding for the Purpose of Establishing an Administrative Record is Irrelevant to the Government's Facial Challenge**

At the outset, NDIA contends that the Court should defer resolution of the constitutional issue to permit discovery into the President's motives in terminating the program and the development of an administrative record as to how the Competitive Grant Program was implemented in deciding grant awards.  NDIA asserts that the government's constitutional argument is pretext for a policy disagreement that forms the true basis for the cancellation of the Competitive Grant Program.  Further development of the factual record would, it argues, allow NDIA to prove this.  Accordingly, NDIA says, the Court should not consider whether the Digital Equity Act unconstitutionally discriminates based on race at this stage of the proceedings.  But such factfinding is not necessary for, or relevant to, the resolution of a facial challenge to the text of the statute.

The government argues that the Digital Equity Act is entirely unconstitutional. If true, that argument would provide the government an absolute defense against its obligation to enforce the law.  See In re Aiken, 725 F.3d at 261; Smith v. Indiana, 191 U.S. 138, 148 (1903) ("It is but just to say . . . that the power of a public officer to question the constitutionality of a statute as an excuse for refusing to enforce it has often been assumed, and sometimes directly decided, to exist.").  That is because NDIA (and others) cannot receive entitlements that flow from an unconstitutional statute.  A law that conflicts with the Constitution cannot be applied, so this defense would afford the government a valid basis for dismissal regardless of whether the President secretly harbored a policy disagreement with the law.  Pretext may be a valid reason for courts to look beyond a purported legitimate justification to ferret out animus, see, e.g., Dep't of Com. v. New York, 588 U.S. 752, 780-85 (2019), but it is not a reason to fail to consider independent grounds upon which a statute is unlawful.

18

NDIA also argues that the Court should allow discovery into the administrative record of how the Department of Commerce awarded grants.  Pls.'s Supp. Mem. [ECF No. 55] at 1.  It believes that such discovery would demonstrate that, in practice, the Department did not racially discriminate when awarding funds.  The government counters that the Department of Commerce's post-enactment agency practice is irrelevant to the question of whether the Digital Equity Act is facially unconstitutional.  Here too, the government is correct.

The facial validity of an explicit "racial classification" is a "legal question," not a factual one.  Lynch v. Donnelly, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring) (citation modified); see also Beach Commc'ns, Inc. v. FCC, 959 F.2d 975, 977 (D.C. Cir. 1992) (noting that an equal protection challenge raises a "purely legal" issue).  A party lodging a facial challenge need not delve into any "specific fact situation" created by implementation.  Rust v. Sullivan, 500 U.S. 173, 195 (1991).  Instead, that party must show that the "institution that ma[de] the racial distinction"—here, Congress—created a statutory scheme that irreconcilably conflicts with a constitutional guarantee.  Louisiana v. Callais, 146 S. Ct. 1131, 1153 (2026).

NDIA's confusion arises from its misunderstanding of the differences between various types of equal protection claims.  Some of the cases NDIA cites address the need for an administrative record in an as-applied challenge.  See, e.g., Pl.'s Supp. Mem. at 5 (citing Nat'l Urb. League v. Trump, 783 F. Supp. 3d 61, 90 (D.D.C. 2025) (remarking that factfinding was necessary for an as-applied First Amendment challenge).  But in such a challenge, the plaintiff's claim is that a law cannot be leveraged against them, based on their circumstances.  Factfinding is inherently necessary to review such a claim, because the court must determine whether the circumstances in question are protected by the Constitution.  NDIA also confuses facial challenges with a discriminatory-purpose challenge to a facially-neutral law.  See Arlington

19

Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 256 (1977). To bring such a challenge, the plaintiff must build a record that demonstrates that the legislature was motivated by a hidden animus. But no such record is necessary in a case like this, where the racial classification appears on the face of the statute and the government argues that the law is unconstitutional in all applications. See Shaw v. Reno, 509 U.S. 630, 642 (1993) ("[N]o inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute.").[3]

And finally, there is no basis to conclude that the record will be meaningfully developed through discovery. Although this case is at the motion to dismiss stage, the government does not contest NDIA's factual arguments about how grants are awarded in practice, which must be taken as true. Cf. Brown v. District of Columbia, 390 F. Supp. 3d 114, 126-27 (D.D.C. 2019) (declining to evaluate a constitutional claim at the motion to dismiss stage where doing so would require the court to "ignore, or contradict, [the] complaint's factual allegations"); see also Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 17-19 (2020) (finding restrictions on public gathering likely fail strict scrutiny at the temporary restraining order posture).[4] The Court asked the parties to file supplemental memoranda on whether further factual development was necessary. Notably, in that brief, NDIA did not suggest that any further development of the congressional record is necessary to enable this Court to apply strict scrutiny, or that any of the

---

[3] NDIA points out, correctly, that the government cannot succeed on its facial challenge unless it shows that "no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). To be sure, that is a high burden. But here, Salerno stands for the opposite of what NDIA wants. The Supreme Court's high standard for a facial challenge requires courts to consider whether any judicially cognizable circumstances exist where the law would be valid—not whether the Executive Branch's implementation of a law thus far has produced any particular results. In Salerno itself, the Supreme Court considered the constitutionality of the Bail Reform Act based on the sweep of the law, not the government's record in applying it. Id. at 745-55.

[4] Louisiana v. Callais, 146 S. Ct. 1131 (2026), which NDIA cites to suggest that discovery is necessary prior to applying strict scrutiny, revolved around proving whether Louisiana had engaged in unjustified race-based redistricting. Here, the race-based preference is apparent from the statutory terms themselves and there is no dispute about how grants are awarded in practice.

relevant statutory terms are unclear.[5]   In such circumstances, courts are fully competent to address constitutional arguments, including in cases that NDIA cites for the opposite proposition. See Jeffery v. City of New York, 113 F.4th 176, 188 (2d Cir. 2024).  For example, in Jeffrey, the Second Circuit subjected New York City's COVID-19 curfew law to strict scrutiny based on the text of the law, "the pleadings and judicially noticeable facts."  Id. at 194.  It is thus appropriate for this Court to address the constitutionality of the Digital Equity Act now, before any discovery.

## B.  The Digital Equity Act Unlawfully Authorizes the Disbursement of Grants Based on Race

The Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property, without the due process of law.  U.S. Const. amend. V.  That guarantee encompasses the protections of the Fourteenth Amendment's Equal Protection Clause and applies them to the federal government.  See Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954).  In so doing, the Fifth Amendment prohibits the federal government from engaging in "all invidious racial discriminations."  Loving v. Virginia, 388 U.S. 1, 8 (1967).  That is because legal distinctions based on race are "odious to a free people whose institutions are founded upon the doctrine of equality."  Id. at 11 (quotation omitted).

Federal laws that classify based on race are thus subject to strict scrutiny.  Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995).  Strict scrutiny is "the most exacting" form

---

[5] In the Second Amendment context, for example, courts may be required to consider facts about whether a firearm named in a statute presents similar dangers to firearms the Supreme Court has held may be prohibited, such as machine guns and sawed-off shotguns.  See, e.g., Bianchi v. Brown, 111 F.4th 438, 453 (4th Cir. 2024), cert. denied sub nom. Snope v. Brown, 145 S. Ct. 1534 (2025); Barnett v. Raoul, No. 24-3060, 2026 WL 1982951, at *6 (7th Cir. July 9, 2026); cf. Wolford v. Lopez, No. 24-1046, 2026 WL 1825723, at *17 (U.S. June 25, 2026) (Barrett, J., concurring) (explaining that the constitutionality of a firearm regulation may turn on an examination of whether the regulation targets a "specific, heightened risk" of firearm misuse).  In such circumstances, factfinding to clarify the meaning of ambiguous terms in the law itself may be necessary for judicial review, which would otherwise be based on speculation.  But here, the government argues that the Digital Equity Act is an explicit, facial race classification, and neither party argues that the Act contains any undefined terms.  Such a challenge is appropriately resolved based on the statute itself.

of judicial review.  Id. at 218 (quotation omitted).  To satisfy it, the law must be necessary to "serve a compelling governmental interest."  Id. at 235 (quotation omitted).  And Congress must also "clearly articulate[] the need and basis" for the racial classification.  Id. at 229 (quotation omitted).  That requirement is rarely met—the Supreme Court has only identified two objectives sufficiently persuasive to permit racial sorting: remediating specific instances of past unlawful discrimination and avoiding imminent violence in prisons.[6]  Students for Fair Admissions, 600 U.S. at 207.

Second, the law must be "narrowly tailored to further that interest."  Adarand, 515 U.S at 235.  In practice, "narrowly tailored" means "necessary," Fisher v. Univ. of Tex. at Austin, 570 U.S. 297, 311-12 (2013), because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (quotation omitted).  Any asserted racial categories must bear a tight connection to the means they employ and the goals they pursue without being overinclusive or underinclusive.  See Students for Fair Admissions, 600 U.S. at 215-17 (finding racial classifications used in college admissions both overinclusive—for grouping together students of many backgrounds—and underinclusive—for not providing categories that apply to certain students).  The government must also have considered whether race-neutral means could have achieved the same objectives and must have designed the program to be limited such that it "will not last longer than the discriminatory effects it is designed to eliminate."  Adarand, 515 U.S. at 237-38. (quotation omitted).

---

[6] Prior to Students for Fair Admissions, the Supreme Court had identified academic diversity in higher education as a compelling governmental interest.  See Regents of Univ. of Calif. v. Bakke, 438 U.S. 265, 311-12, 314 (1978).  But Students for Fair Admissions overturned that assessment and held that diversity does not qualify as a compelling governmental interest.  600 U.S. at 214-15.

Strict scrutiny applies equally to laws that ostensibly benefit the target racial group. Adarand, 515 U.S. at 223.  It also "does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273 (1986); see also Yick Wo v. Hopkins, 118 U.S. 356, 368-69 (1886) (holding that the Equal Protection Clause applies "without regard to any differences of race" and is "universal in [its] application").  This principle, known as equal protection "consistency," Adarand, 515 U.S. at 224, flows from the notion that racial "distinctions impinge upon personal rights," and so entitle individuals to "a judicial determination that the burden he is asked to bear on that basis" satisfies strict scrutiny.  Bakke, 438 U.S. at 299.

Recall that the Digital Equity Act established the Competitive Grant Program to "increase internet access and the adoption of broadband among covered populations . . . ."  47 U.S.C. § 1724(d)(1)(A).  The Act defines "covered populations" by a list of eight groups, including "individuals who are members of a racial or ethnic minority group."  Id. § 1721(8).  In determining whether to issue an award, the Assistant Secretary of NTIA must consider whether the grantee's proposal will increase broadband adoption among covered populations.  Id. § 1724(d)(1).  Funding is further contingent on the grantees' performing one of five specified activities for the benefit of covered populations—such as "providing hardware and software . . . to covered populations"—or satisfying a residual clause.  Id. § 1724(d)(2); cf. Fischer v. United States, 603 U.S. 480, 487 (2024) (explaining that residual clauses should be read to be consistent with the preceding terms).

The government argues that the Digital Equity Act impermissibly classifies based on race.  In its view, the statute sorts individuals into "covered populations" based on their racial

23

status and requires that the government prefer benefitting those groups when awarding funds. The government further argues that such race-based preferences fail strict scrutiny because NDIA does not identify a compelling interest to justify racial classifications and the statutory scheme is not narrowly tailored.

The government is correct. The provisions in the Digital Equity Act that authorize the consideration of racial status constitute an explicit racial classification. Those provisions straightforwardly authorize NTIA to consider the grant beneficiary's racial group status when awarding grants. See Rothe Dev., Inc. v. DOD, 836 F.3d 57, 62, 63-64 (D.C. Cir. 2016) (explaining that a regulation that designated certain racial groups for funding preferences was a racial classification). After all, the Act categorizes members of certain races—"racial . . . minority group[s]"—as "covered populations" and instructs the government to award grants based on whether the application, if approved, would improve broadband access among those groups. The Act also conditions grantees' eligibility on performing a limited set of activities, including activities for the specific (albeit not exclusive) benefit of covered populations. And the fact that the law focuses on the race of the grant beneficiary as opposed to the grantee, or exists for the benefit of those groups, changes nothing. See Adarand, 515 U.S. at 205, 213 (federal incentive for contractors to hire subcontractors based on race was a racial classification). At this stage, what matters is that the Digital Equity Act empowers the government to consider race when allocating federal money.

NDIA resists this conclusion by claiming that the Digital Equity Act is a "race-conscious policy," not a "racial classification." Opp'n at 33. In support, it cites this Circuit's decision in Rothe, which held that "[p]olicymakers may act with an awareness of race . . . without thereby subjecting the resultant policies to the rigors of strict constitutional scrutiny." 836 F.3d at 72. Of

24

course, Rothe predates the Supreme Court's decision in Students for Fair Admissions.  But Rothe cuts against NDIA's position anyway.  In that case, the circuit held that a law that provided grants to "socially and economically disadvantaged" individuals was not a racial classification because that requirement used "race-neutral terms."  Id. at 61-62.  But that court also concluded that the agency's implementing regulation that designated individuals of minority racial groups as presumptively included within the scope of the statute did constitute a racial classification.  Id. at 62.  The lesson from Rothe is that legislators may write laws that address broad-based social inequities with the understanding that those benefits may largely flow to disadvantaged racial groups without triggering strict scrutiny, but if the law explicitly targets certain racial groups, strict scrutiny applies.  See Callais, 146 S. Ct. at 1146 (explaining that in equal protection challenges, "if race play[s] a role in a decision made by a government actor, strict scrutiny applie[s]").  And the Digital Equity Act is more like the implementing regulation than the statute in Rothe because it explicitly directs the government to consider racial status in awarding grants.

The Act does not escape scrutiny by authorizing the consideration of criteria aside from race.  Because grants must benefit "covered populations" generally, it is entirely possible for individual awards to be made without race being dispositive—for example, to organizations that primarily benefit rural populations.[7]  But in Students for Fair Admissions, the Supreme Court rejected the notion that "race is not a negative factor" in college admissions simply "because it does not impact many [individual] decisions."  600 U.S. at 219.  The Court held that heightened review is appropriate when laws allow government actors to "intentionally allocate preference"

---

[7] NDIA also argues that the Digital Equity Act does not classify on the basis of race because it merely authorizes, as opposed to requires, the government to consider the race of grant beneficiaries.  Opp'n at 35.  That is incorrect.  Although the statute gives the government discretion in weighing grant benefits to various covered populations, it requires that covered population status be considered.  See 47 U.S.C. § 1724(d)(1) (providing that NTIA "shall" consider the impact of grants on covered populations "to the extent practicable").  And "even when an agency has significant discretion in deciding how much weight to accord each statutory factor, that does not mean it is free to ignore any individual factor entirely."  Carlson v. Postal Regul. Comm'n, 938 F.3d 337, 344 (D.C. Cir. 2019) (citation modified).

between racial groups. Id. at 220. Even when the ultimate impact on decisionmaking may be minor, the Court concluded that racial classifications reflect impermissible racial stereotypes and erroneously suggest that it is appropriate for the government to treat people differently because of their skin color. Id. The Digital Equity Act unquestionably allows NTIA to privilege grant applications that purport to benefit certain racial groups.

NDIA also argues that the Act does not contain a racial classification because it requires the government to consider the population-level demographics of grant beneficiaries when allocating money, as opposed to making racial classifications on a person-by-person basis. To NDIA, "benefits to the individual are not allocated based on race" because even grants that primarily support racial minorities may benefit non-minorities who access the same programs. Tr. [ECF No. 56-1] 36:23-37:6. But NDIA concedes that the "covered population" framework enables the government to "consider and include" certain racial groups as target beneficiaries (albeit not specifically excluding others). Tr. 36:16-22. If so, the provision must be a racial classification. NDIA offers no principled reason as to why the Equal Protection Clause would allow the government to explicitly use race to steer federal funding at the population-level. Quite the opposite—"laws that explicitly distinguish between individuals on racial grounds" receive strict scrutiny, even when those distinctions are aggregated and the statutory benefit flows to those individuals indirectly, such as in the redistricting context. See Shaw, 509 U.S. at 642 (redistricting context). For example, states could not escape equal protection scrutiny by allowing officials in charge of agricultural grants to prefer applications from majority-white municipalities, a population-level distinction, merely because the municipalities do not formally exclude minorities. There, as here, equal protection forbids the explicit use of race data to

structure political benefits, even though no individual is awarded personal favor based on their race. Accordingly, this Court will apply strict scrutiny.

The challenged provision fails strict scrutiny at the outset. Congress identified no governmental interest that specifically justifies racial classifications either in the statute itself or in the legislative record. See Wisc. Legislature v. Wisc. Elec. Comm'n, 595 U.S. 398, 404 (2022) (racial classifications must be justified "at the time of imposition"). NDIA gestures towards unrelated legislative hearings and interviews to suggest that Congress considered the digital divide to be a civil rights issue, Opp'n at 37, but none concern the Digital Equity Act or endorse the idea that a racial classification is necessary as part of a remedial scheme. Certainly, there is nothing in the Digital Equity Act like laws where Congress has affirmatively justified the need for classifications. For instance, in the Surface Transportation Reauthorization Act, passed in the same legislative package as the Digital Equity Act, Congress "reviewed testimony and documentation of race and gender discrimination" in surface transportation markets and determined that "race- and gender-neutral efforts alone are insufficient to address the problem," thereby warranting preferential treatment for certain groups. Pub. L. No. 117-58, div. A, tit. I, § 11101(e), 135 Stat. 443, 448-49 (2021). The lack of such a finding here is fatal, because Congress must "clearly articulate" the need and basis for a racial classification at its inception. Adarand, 515 U.S. at 229.[8]

At most, the Act includes a statement of purpose that lack of broadband "exacerbates existing wealth and income gaps, especially those experienced by covered populations." 47 U.S.C. § 1722. NDIA nominally contends that the Act "remedies specific instances of past

---

[8] NDIA briefly argues that the COVID-19 pandemic made assembling a legislative record difficult. Opp'n at 38. That may be true. But the Supreme Court has specifically rejected the notion that the pandemic reduced the government's burden under strict scrutiny to articulate and demonstrate a compelling government interest and employ the least restrictive method of achieving that goal. See Roman Cath. Diocese, 592 U.S. at 19-20 (2020) ("But even in a pandemic, the Constitution cannot be put away and forgotten.").

discrimination," but its argument is that the law is justified by facially neutral events like the COVID-19 pandemic, which disparately impacted certain communities which lack internet access. Opp'n at 37. Its stance boils down to the idea that the "digital divide disproportionately affects communities of color." Id. (citation modified).[9] Addressing that gap is a laudable goal, but the Supreme Court has admonished that ameliorating general societal inequalities—as opposed to specific instances of past discrimination—"does not constitute a compelling interest that justifies race-based state action." Students for Fair Admissions, 600 U.S. at 226. Otherwise, Congress could deploy racial classifications when confronted with any situation of an uneven resource distribution. Shaw v. Hunt, 517 U.S. 899, 909-10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."). Accordingly, Congress has not supplied a compelling governmental interest for the racial classification provision of the Digital Equity Act.

Nor is the provision narrowly tailored. It "is almost impossible to assess whether the [racial criterion] is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way." City of Richmond v. J.A. Croson Co., 488 U.S. 469, 507 (1989). As discussed above, nothing in the statute, its legislative history, or the record points to specific instances of past discrimination that the Digital Equity Act purports to remedy.

To the extent that a legislative intent to address specific instances of past discrimination in broadband access is ascertainable, the classification in question is ill fit for that purpose. The Act allows the government to provide a blanket advantage for certain racial groups, regardless of whether the applicant actually suffers from lack of broadband access. That is substantially

---

[9] Amicus Benton Institute, in support of NDIA, similarly argues that the purpose of the Act is to address systemic, population-level disparities in internet access, as opposed to specific instances of past discrimination. Benton Br. [ECF No. 42-1] at 8-10.

28

overinclusive, because it affords certain beneficiaries "an absolute preference over other citizens based solely on their race," many of whom may not have "suffered the effects of prior discrimination." Id. at 508.  Nor is there any indication that Congress considered whether the Competitive Grant Program could have achieved similar outcomes using only race-neutral selection criteria.  Race-neutral policies may achieve some of the same outcomes as race conscious policies because universal barriers can be felt more acutely by members of disadvantaged groups. Id. at 509-10.  This Court will not speculate as to the impact of such an approach here, but there is no evidence that Congress engaged in the "good faith consideration of workable race-neutral alternatives" required to satisfy strict scrutiny. Grutter, 539 U.S. at 339.

The Digital Equity Act contains a provision that authorizes the use of race to award federal funds.  That provision is neither justified by a compelling governmental interest nor narrowly tailored to advance any such interest.  Accordingly, under current Supreme Court case law, particularly Students for Fair Admissions, it fails strict scrutiny and is unconstitutional.

## C.  The Provision is Severable

The Court has found that the Digital Equity Act is unconstitutional insofar as it authorizes the allocation of federal money based on a racial classification.  But that does not mean NDIA's complaint must be dismissed.  Dismissal is only warranted if the identified infirmity renders the complaint incapable of "stat[ing] a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  NDIA's claim—that the government is obligated not to terminate the Competitive Grant Program—survives because the unconstitutional aspect of the Digital Equity Act is severable from the remainder of the statute.  If the unconstitutional component can be severed, then declaratory or injunctive relief, should NDIA prevail, could restore the Competitive Grant

29

Program minus any unconstitutional racial classification within the Digital Equity Act. Accordingly, dismissal would be inappropriate.

A law that conflicts with the Constitution is invalid. U.S. Const. art. VI, cl. 2. But the Constitution only displaces laws to the extent that the two actually collide—and by necessary implication, statutory provisions that are harmonious with the Constitution survive. See Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 625 (2020); William Baude, Severability First Principles, 109 Va. L. Rev. 1, 8 (2023). Accordingly, courts that find a statutory provision unconstitutional must strike down only the invalid aspects of the law and leave the remainder intact where possible. Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 81 (D.C. Cir. 2020).[10]

Statutes are presumed to be severable because, even without an explicit severability clause, "[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions." Champlin Refining Co. v. Corp. Comm'n of Okla., 286 U.S. 210, 234 (1932). And severability manifests respect for Congress by preserving the fruits of the political process where possible. Am. Ass'n of Pol. Consultants, 591 U.S. at 626-27. It also prevents litigants from using a discrete constitutional infirmity to take down an entire law. Id.

Courts determine whether a statutory provision is severable by considering whether the remainder is capable of functioning independently and whether the absence of the offending

---

[10] Nothing about the atypical posture of this case changes the Court's obligation to conduct a severability analysis. Ordinarily, challenges to the constitutionality of laws are raised by the plaintiff, seeking to enjoin an allegedly unlawful statutory provision. But here, the government raises its constitutional argument as, essentially, a defense against its obligation to enforce the Digital Equity Act. Neither party asserts that this posture should alter the Court's obligation to consider severing the unconstitutional aspects of the Act rather than setting it aside altogether. Despite the unusual posture of this case, then, the Court is bound by the same obligation to set aside legislation only to the extent it conflicts with the Constitution. See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 29-32 (2015) (invalidating a single provision of the Foreign Relations Authorization Act that the President declined to enforce based on constitutional concerns). Moreover, it is not clear why the unconstitutional race criterion allows the government to suspend the entire Digital Equity Act in the first instance, prior to securing judicial review. If the Constitution requires courts to consider the degree to which an unconstitutional provision infects the remainder of the law, and to fashion relief accordingly, the same obligation likely applies to the executive branch.

provisions substantially undermines Congress's design. Id. (citing Seila Law v. CFPB, 591 U.S. 197, 235 (2020)). Here, both considerations strongly support severability.

As an initial matter, the Digital Equity Act is perfectly capable of functioning independently without the racial classification. The Act defines a set of eight "covered populations," 47 U.S.C. § 1721(8), for whom it directs funds to be allocated, see id. §§ 1724(a)(1), (d)(1)(A)(i), (d)(2)(A). Only one of those eight is racial or ethnic status. The others are low income Americans, "aging individuals," "incarcerated individuals," "veterans," "individuals with disabilities," "individuals with a language barrier," and individuals who live in rural areas. 47 U.S.C. § 1721(8). Even without the racial criterion, grant money can be allocated among the remaining groups. The Act requires consideration of covered population status generally and does not mandate that money go to any particular subgroup. That means that the Competitive Grant Program can be administered—consistent with the language of the Digital Equity Act—exactly as it was before, minus consideration of racial or ethnic status.

Nor does severability undermine the Digital Equity Act's purpose. The Act was passed to ensure that "all people of the United States" have "the information technology capacity that is needed for full participation in the society and economy." 47 U.S.C. §§ 1721(10), 1722(3). And congressional proponents of the Act foresaw that funding would support "communities that have not yet secured the skills, technologies, and support needed to take advantage of broadband connection," not just particular racial groups. 167 Cong. Rec. S5684 (daily ed. Aug. 3, 2021) (statement of Sen. Collins). The Act also includes a separate provision that prohibits discrimination on the basis of race within any funded program. See 47 U.S.C. § 1726. This suggests that the Act, at its core, does not require unconstitutional race discrimination in order to

31

carry out its design.  Common sense dictates that Congress would prefer to have a version of the Digital Equity Act without the racial criterion than to have no law at all.

Precedent also supports severability here.  In equal protection challenges, "the Court typically severs the discriminatory exception or classification, and thereby extends the relevant statutory benefits or burdens to those previously exempted, rather than nullifying the benefits or burdens for all."  Am. Ass'n of Pol. Consultants, 591 U.S. at 632.  Nullification is particularly inappropriate for federal programs that allocate funding, because it "would impose hardship on beneficiaries whom Congress plainly meant to protect."  Califano v. Westcott, 443 U.S. 76, 90 (1979).  That is certainly the case here, where nullification would deprive all Americans who lack reliable broadband of access to funds.  And, based on the briefing, the government has no apparent objection to distributing these grants aside from the provision that authorizes allocations based on race or ethnicity.  Defs.' Suppl. Br. at 10; see also U.S. Dep't of Just., Letter from Solicitor Geneal Sauer to Speaker Johnson, "Classification of Individuals Based on Race in the Digital Equity Act of 2021" (Mar. 4, 2026), www.justice.gov/oip/media/1430066/dl?inline. (setting out race criterion as sole objection to carrying out the Act).

To summarize, the provision of the Digital Equity Act that authorizes the consideration of race or ethnicity in grantmaking is severable from the remainder of the statute.  That means NDIA may still claim that it is entitled to apply for benefits that flow from the Act, minus consideration of the provision of the Act authorizing funding based on race or ethnicity.

V.    **APA Reimbursement Claim**

NDIA also brings a claim challenging the government's policy—articulated in an April 9, 2021, email—prohibiting grantees from requesting reimbursements for costs incurred from conferences, training, and professional development programs associated with diversity, equity,

and inclusion efforts. NDIA challenges that policy on a prospective basis, because it will "continue to apply to any Competitive Grant Program recipient." Pl.'s Suppl. Br. at 10. It brings this claim separate from its challenge to the termination of the Competitive Grant Program. For its part, the government argues that NDIA lacks standing to bring the claim. Reply at 24.

In any event, courts have an "independent obligation" to ensure "that jurisdiction is proper." Inst. Shareholder Servs., Inc. v. SEC, 142 F.4th 757, 763 (D.C. Cir. 2025) (quotation omitted). And in this Court's view, the issue is more easily conceptualized as one of ripeness, although standing and ripeness overlap. See Trump v. New York, 592 U.S. 125, 131 (2020) (explaining that standing and ripeness are "[t]wo related doctrines of justiciability—each originating in the case-or-controversy requirement of Article III"); cf. Indus. Energy Consumers of Am. v. FERC, 125 F.4th 1156, 1163-65 (D.C. Cir. 2025) (Henderson, J., concurring) (arguing that constitutional ripeness has been subsumed under imminent injury in fact component of standing). The ripeness doctrine requires that courts consider whether an issue is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Trump, 592 U.S. at 131 (quotation omitted). A claim may be unripe, for example, if it relies on a party's speculation about how the Executive Branch will implement a general statement of policy. Id.

This issue is not presently ripe. Even setting aside this decision, it is not clear how the government intended to apply its new policy—for example, what kinds of programming it would deem impermissibly associated with diversity, equity, and inclusion issues. Now, the government plans to imminently reinstate the Competitive Grant Program and must fashion new guidelines for grant applicants on a prospective basis. It is thus even less clear whether this (or any) policies that governed the previous iteration of the Competitive Grant Program will remain,

33

and in what form.  By necessary implication, it is premature to say how the policy articulated in the April 9 email will apply to future applicants or even if it will apply at all.  The Court cannot review the reimbursement policy articulated in the April 9 email, which applied to the now-terminated Competitive Grant Program, on speculation about how the policy will be applied or even that the same policy will apply to the renewed program.  And of course, the policy has not yet been applied to any future application by NDIA.

Ripeness has practical benefits as well.  With its premature claims dismissed, NDIA may wait to litigate on the basis of the actual terms of the renewed Competitive Grant Program that they will be subject to.  And it will benefit the government by allowing it a chance to clarify whether the April 9 email is an accurate description of a continuing agency policy and how it would be implemented.

Because this claim is unripe, the Court lacks jurisdiction and it will be dismissed.

## CONCLUSION

NDIA survives dismissal.  Its claims challenging the termination of the Competitive Grant Program belong in federal court because they are rooted in the Digital Equity Act and the Constitution, not its individual grant award.  NDIA has standing to sue based on its interest in competing for Competitive Grant Program funding, and the APA provides a private right of action to vindicate those rights.  Finally, although a provision of the Digital Equity Act is unconstitutional, that infirmity does not require the Court to disregard the still-valid remainder.

What next?  NDIA will have the opportunity to press its APA claims challenging the cancellation of the Competitive Grant Program.  But the government has committed to reinstating the Competitive Grant Program upon a judicial determination that the race criterion is unconstitutional and severable.  When it does so, the Court must consider whether some or all of

NDIA's claims are moot.  Until then, this case will continue along the ordinary track of civil litigation.

A separate order will issue on this day.

/s/
JOHN D. BATES
United States District Judge

Dated: July 15, 2026